# EXHIBIT G

                                        DARCY BLACK


      UNITED STATES DISTRICT COURT
      WESTERN DISTRICT OF NEW YORK
      --------------------------------------------------
      DARCY M. BLACK,

                              Plaintiff,


          -vs-


      BUFFALO MEAT SERVICE, INC., doing business
      as BOULEVARD BLACK ANGUS, also known as
      BLACK ANGUS MEATS, also known as
      BLACK ANGUS MEATS & SEAFOOD,
      ROBERT SEIBERT,
      DIANE SEIBERT,
      KEEGAN ROBERTS,

                              Defendants.

      --------------------------------------------------

                              Examination Before Trial of

      DARCY BLACK, Plaintiff, taken pursuant to the Federal Rules

      of Civil Procedure, in the law offices of BARCLAY DAMON

      LLP, The Avant Building, Suite 1200, 200 Delaware Avenue,

      Buffalo, New York, taken on January 23, 2018, commencing at

      9:35 A.M., before ERIN L. COPPING, Notary Public.

2

1                    INDEX TO EXHIBITS

2

3

4   Exhibits                              For Identification

5   D-1 through D-7  seven Medical Records        147

6   D-8             Document entitled EEOC        193
                    Intake Questionnaire
7
    D-9             Document entitled Charge      193
8                   of Discrimination

9   D-10            Plaintiff's Answers to        247
                    Defendants' First Set of
10                  Interrogatories

11  D-11            Plaintiff's Supplemental      254
                    Response to Defendants'
12                  First Set of Requests
                    For Production of
13                  Documents

14  D-12            Plaintiff's Third             259
                    Supplemental Response to
15                  Defendants' First Set of
                    Requests For Production
16                  of Documents

17  D-13            Bankruptcy Court              299
                    Document
18

19

20

21

22

23

3

1     APPEARANCES:

2     GRECO TRAPP, PLLC,
      By JOSEPHINE A. GRECO, ESQ.,
3     and DANIEL PALERMO, ESQ.,
      1700 Rand Building,
4     14 Lafayette Square,
      Buffalo, New York 14203,
5     Appearing for the Plaintiff.

6     BARCLAY DAMON LLP,
      By RANDOLPH C. OPPENHEIMER, ESQ.,
7     and MEGAN E. BAHAS, ESQ.,
      The Avant Building, Suite 1200,
8     200 Delaware Avenue,
      Buffalo, New York 14202,
9     Appearing for the Defendants.

10    PRESENT:  Diane Seibert
                Keegan Roberts
11

12

13          (The following stipulations were entered

14    into by both parties.)

15          It is hereby stipulated by and between counsel

16    for the respective parties that the oath of the

17    Referee is waived, that filing and certification

18    of the transcript are waived, and that all

19    objections, except as to the form of the

20    questions, are reserved until the time of trial.

21

22

23

32

 1   A.   No.
 2   Q.   Did you ever receive an employee handbook at
 3        Laidlaw Bus Company?
 4   A.   Yes.
 5   Q.   Did you ever receive an employee handbook at TNT
 6        Bus Service?
 7   A.   Yes.
 8   Q.   Did you ever receive an employee handbook at
 9        Marriott Sodexo?
10   A.   Yes.
11   Q.   Did you ever receive an employee handbook when
12        you worked for Able Transportation?
13   A.   Yes.
14   Q.   Did you ever receive an employee handbook when
15        you worked for Dependable Cab?
16   A.   I do not recall.
17   Q.   Did you receive an employee handbook during your
18        training for NCO Financial?
19   A.   Yes.
20   Q.   And did you receive an employee handbook when you
21        worked for Mobil?
22   A.   I do not recall.
23   Q.   With respect to the subject of harassment, sexual

1        or otherwise in the workplace, did you receive

2        any training at any of the employers that we've

3        been discussing?  When I'm talking about training

4        in this sense I'm referring to a session in a

5        room where people are discussing what sexual

6        harassment is, what is prohibited in the

7        workplace, how people should behave.

8    A.  Yes.

9    Q.  Which company or companies did that occur?

10   A.  Kmart, Laidlaw, TNT and NCO.

11   Q.  What was the thrust of the training that you

12       received with respect to sexual harassment at

13       that session at -- was it one session at Kmart?

14   MS. GRECO:  Objection, form.

15   BY MR. OPPENHEIMER:

16   Q.  What was the form of the training concerning

17       sexual harassment at Kmart?

18   A.  I do not recall.

19   Q.  Was there more than -- did you have more than one

20       experience at Kmart where there was training on

21       sexual harassment?

22   A.  No.

23   Q.  Okay.  Are you able to recall what the training

34

1          was like for sexual harassment at Laidlaw?
2    A.    Ever year they touch base on it in a classroom
3          with the other drivers.
4    Q.    Can you recall anything about the substance of
5          the training that you received at Kmart on
6          subject of sexual harassment?
7    MS. GRECO:  Can you just read that back.
8               (Whereupon, the above-requested question was
9          then read back by the reporter.)
10   THE WITNESS:  I do not recall.
11   BY MR. OPPENHEIMER:
12   Q.    What about Laidlaw, are you able to recall the
13         substance of any of the training concerning
14         sexual harassment at Laidlaw?
15   MS. GRECO:  Objection, form.
16   THE WITNESS:  I do not recall.
17   BY MR. OPPENHEIMER:
18   Q.    What was the form of the training on sexual
19         harassment at TNT Bus Service?
20   A.    I do not recall.
21   Q.    What was the form of the training concerning
22         sexual harassment at NCO Financial?
23   A.    I just remember we were hired with a group of ten

1       and we all trained together and that was part of

2       our packet of training.

3  Q.  Do you recall -- so in terms of training, you're

4       thinking about receiving a packet of information

5       at NCO?

6  A.  Yes, that they went over with us individual --

7       like each individual page.

8  Q.  Is that what they did at Kmart, they went over

9       some written materials with you at some point on

10      the subject of sexual harassment?

11  A.  Yes.

12  Q.  Is that what they did at Laidlaw, going over some

13      written material with you on the subject of

14      sexual harassment?

15  A.  Yes.

16  Q.  And is that what they did with you at TNT Bus

17      Service, they went over some written material

18      concerning the subject of sexual harassment?

19  A.  Yes.

20  Q.  Those four companies, Kmart, Laidlaw, TNT and

21      NCO, those are the ones that you received some

22      sort of training on sexual harassment, as you

23      just testified.  Was the subject of race

36

1      discrimination covered?

2  A.  Yes.

3  Q.  Was it covered in the same way that you've just

4      testified about sexual harassment, meaning that

5      they went over some written materials on the

6      subject of race discrimination?

7  A.  Yes.

8  Q.  And that occurred in each of those four

9      employers?

10 A.  Yes.

11 Q.  Okay.  Did you ever receive any training on the

12     subject of equal pay for equal work, meaning that

13     men and women who are performing similar work

14     under similar circumstances with similar skills,

15     experience, et cetera, should be paid the same?

16 A.  Yes.

17 MS. GRECO:  Objection, form.

18 BY MR. OPPENHEIMER:

19 Q.  Where did you receive any training on the subject

20     of equal pay for equal work?

21 A.  Kmart, Laidlaw, and NCO.

22 Q.  What did the training on the subject of equal pay

23     for equal work consist of at Kmart?

138

```
 1   Q.   Is cleaning the exterior of the building a job
 2        that you wanted to be trained how to do?
 3   A.   Yes.
 4   Q.   When do you think you should have been offered
 5        the opportunity to learn what they wanted done
 6        with respect to cleaning the exterior of the
 7        building?
 8   A.   I could have done that in 2006.
 9   Q.   Would that -- cleaning the exterior of the
10        building, would that have included snow
11        shoveling, as far as you're concerned, you wanted
12        to learn how to do that?
13   A.   I did do that.
14   Q.   Did you do any of the landscaping outside?
15   A.   No.
16   Q.   Did you take any garbage out?
17   A.   Yes.
18   Q.   Okay.  Were you ever given a key to the butcher
19        shop?
20   A.   No.
21   Q.   Did you ever ask for a key?
22   A.   No.
23   Q.   Do you think you should have been given a key?
```

142

1   A.   Yes.

2   Q.   Who did you ask?

3   A.   Diane.

4   Q.   When?

5   A.   I don't recall.

6   Q.   Did you ask Robert?

7   A.   No.

8   Q.   Did you ask Keegan?

9   A.   No.

10  Q.   Did you ask anyone else?

11  A.   No.

12  Q.   Okay.  Did you ask Diane, Robert, or Keegan

13       whether you could have the opportunity to learn

14       meat cutting at Black Angus?

15  A.   No.

16  Q.   Did you ask anyone else?

17  A.   No.

18  Q.   Did you ever ask Diane, Robert --

19  MS. GRECO:   Object to form.

20  BY MR. OPPENHEIMER:

21  Q.   Did you ever ask Diane, Robert or Keegan to give

22       you the opportunity to learn how to process deer?

23  A.   What part of it?

144

1      asked him for an opportunity to learn how to use

2      the meat grinder?

3   A. I don't recall at this time.

4   Q. Okay. Did you ever ask Diane, Robert or Keegan

5      for an opportunity to learn how to use the cuber?

6   A. No.

7   Q. Anyone else that you asked for an opportunity to

8      learn how to use the cuber?

9   A. Thomas.

10  Q. Is that what you told us about earlier?

11  A. Yes.

12  Q. Okay. The same thing, when you mentioned Thomas

13     about the meat grinder, you talked about that a

14     little earlier, right?

15  A. Um-hum.

16  Q. Okay. Did you ever ask Diane, Robert or Keegan

17     for an opportunity to learn how to use the

18     smoker?

19  A. No.

20  Q. And that would include learning how to clean it

21     as well, never asked them?

22  A. No.

23  Q. Did you ever ask Diane, Robert or Keegan for an

1    opportunity to learn how to make sausage, the
2    entire process?
3  A. No.
4  Q. Did you ever ask Diane, Robert or Keegan for an
5    opportunity to learn how to make jerky, the
6    entire process?
7  A. No.
8  Q. Did you ever ask Diane, Robert or Keegan for an
9    opportunity to learn how to assemble and
10   disassemble the grinder?
11 A. No.
12 Q. Did you ever ask anyone else about that?
13 A. Tommy.
14 Q. Did you ever ask Diane, Robert or Keegan for an
15   opportunity to learn how to assemble and
16   disassemble the stuffer?
17 A. No.
18 Q. Did you ever ask Diane, Robert or Keegan for an
19   opportunity to learn how to assemble or
20   disassemble the cuber?
21 A. No.
22 Q. Did you ever ask Diane, Robert or Keegan for
23   opportunities to learn how to clean the exterior

1  Q.  Why do you believe that gender has something to

2      do with the reason you were not given an

3      opportunity to deliver meat to customers?

4  A.  Because no females were ever trained or asked,

5      even when I had brought it to Diane's attention.

6  Q.  Any other reasons that you believe what you

7      believe concerning that opportunity?

8  A.  I believe the guys got trained and treated better

9      than the women there.

10 Q.  Your testimony is that you regularly observed

11     that male employees received more favorable

12     treatment than you with respect to training

13     opportunities?

14 MS. GRECO:  Objection to form.

15 THE WITNESS:  Yes.

16 BY MR. OPPENHEIMER:

17 Q.  Is that your testimony?

18 A.  Yes.

19 Q.  Do you believe that one of the reasons that you

20     were not given an opportunity with respect to the

21     delivery of fliers on company time had something

22     to do with gender?

23 A.  Yes, I do.

168

1   Q.   Why is that?

2   A.   Because I was capable of delivering them on my

3        own time and I was not given the opportunity to

4        do so with a crew of females.

5   Q.   Okay.  Any other reasons that you think that

6        gender was a reason that you were not given the

7        opportunity to deliver fliers on company time?

8   A.   No.

9   Q.   Do you believe that one of the reasons that you

10       were not given the opportunity to deliver fliers

11       on company time had something to do with race?

12  A.   No.

13  Q.   With respect to the opportunity to learn and

14       engage in meat cutting at Black Angus, do you

15       believe you were denied that opportunity because

16       of your gender?

17  A.   Yes.

18  Q.   Why do you believe that?

19  A.   Because I was not given the opportunity when I

20       stressed to Tommy I was interested and he said he

21       can't go above his authority.

22  Q.   When did Tommy say that?

23  A.   It was around possibly 2007 when I had interest

180

1       2008, and another year would have been to 2007,

2       and then the last of the four would have been

3       sometime back in 2006, right?

4    A.  Yes.

5    Q.  That's what I'm trying to figure out.  When

6       you're saying --

7    A.  It was the last three years.

8    Q.  Okay.  So when you say three years, are you

9       talking about any time in 2006 or are you picking

10      up 2007?

11   MS. GRECO:  Objection to form.  If you understand it

12      you can answer.

13   THE WITNESS:  The end of 2006.

14   BY MR. OPPENHEIMER:

15   Q.  Okay.  So the end of 2006 through the end of your

16      employment was when you were experiencing some

17      kind of treatment at Black Angus Meats for which

18      you received counseling?

19   A.  Yes.

20   Q.  Okay.  What is the treatment at Black Angus Meats

21      that you're referring to in this sentence, the

22      discrimination?

23   A.  Yes.

181

1   Q.  Okay.

2   A.  And the hostile work environment.

3   Q.  Hostile work environment, the discrimination are

4       claims in this case?

5   A.  Yes.

6   Q.  That's what you're saying.  Okay.  That has to do

7       with the way the men were treated as opposed to

8       the way you as a woman were treated?

9   MS. GRECO:  Objection to form.

10  THE WITNESS:  Towards me.

11  BY MR. OPPENHEIMER:

12  Q.  Towards you.  The way you were treated as

13      compared to the way the men were treated, that is

14      one of your claims, right?

15  MS. GRECO:  Objection to form.

16  THE WITNESS:  Yes.

17  BY MR. OPPENHEIMER:

18  Q.  You're saying you received counseling because of

19      that during that --

20  A.  Not that specifically.

21  Q.  The -- that plus the other things that you were

22      dealing with?

23  A.  Yes.

```
 1   Q.   Okay.  On the top of the page it indicates it was
 2        received by the EEOC on January 3rd of 2011.
 3        Does that help you refresh your recollection?
 4   A.   It must have been.
 5   Q.   Okay.  So you think you signed it on December 16
 6        of 2010 and that the EEOC time stamped it in on
 7        January 3rd of 2011, that's what that appears to
 8        show us, right?
 9   A.   Yes.
10   Q.   Okay.  Under earliest there's a block, it says
11        date discrimination took place.  It's down here.
12        Do you see it?
13   A.   Yes.
14   Q.   It says the earliest, and then it's got a date of
15        5/16/2004.  Do you see that?
16   A.   Yes.
17   Q.   Now, is that a typo?  Would that be --
18   A.   Yes.
19   Q.   2005?
20   A.   Yes.
21   Q.   Okay.  Because you didn't start your employment
22        in 2004, you started it in May of 2005, right?
23   A.   Yes.
```

194

```
1   A.   Yes.
2   Q.   Okay.  On the first page of the exhibit the name
3        of the people to whom this is addressed, the
4        companies to whom it's addressed include Black
5        Angus Meats a/k/a Boulevard Meats and Robert and
6        Diane Seibert.  Do you see that?
7   A.   Yes.
8   Q.   You did not include Keegan in your charge of
9        discrimination, correct?
10  A.   Not at this time.  It wasn't on there.
11  Q.   Okay.  And then in the text that was written the
12       four pages of text that are typewritten and
13       attached to that first sheet of this exhibit?
14  A.   Yes.
15  Q.   Okay.  So we'll start there.  Just before you
16       read the entire exhibit, the question was do you
17       believe the discrimination occurred prior to the
18       end of 2006, and then you were given an
19       opportunity to read your entire charge.  So the
20       question is, do you believe that discrimination
21       occurred prior to the end of 2006?  And by
22       discrimination I mean hostile work environment,
23       or your pay act claims, all of the stuff that
```

1      you're claiming in this case that you claim had

2      something to do with gender or race.

3   A.   Yes.

4   Q.   When?

5   A.   When I started performing more duties at work.

6   Q.   Okay.  Was that sometime in 2005?

7   A.   When I started in 2006, the beginning.

8   Q.   Okay.  The beginning of 2006?

9   A.   Yes.

10  Q.   Okay.  So you think sometime in the beginning of

11       2006 the discrimination started?

12  A.   Yeah.

13  MS. GRECO:  Objection to form.

14  BY MR. OPPENHEIMER:

15  Q.   I'm just trying to figure out what you're saying.

16       Prior to reading this --

17  A.   As my duties I learned more there, I wanted to

18       learn more so that I could get better pay raises

19       like the guys did.  That's what their -- they

20       were doing so I thought I could do that too to

21       better myself because I was helping the company

22       better.

23  MS. GRECO:  He's asking about all your

197

1    thirteen dollars per hour.

2          Now, what I'm focusing on is the words you

3    used, during the time of my employment.  So your

4    employment began in May of 2005.  Are you

5    claiming that the discrimination began when your

6    employment began in May of 2005?  Because you

7    used the words during the time of my employment

8    in this -- and in other parts of your appendix

9    that I'll point out.

10   MS. GRECO:  I object to the form of the question.

11   THE WITNESS:  Yes.

12   BY MR. OPPENHEIMER:

13   Q.  Okay.  So when you refer to Sean Round, you

14       referred to in the next paragraph it says that he

15       was hired in 2005, and then you refer to the

16       amount that he was being paid.  So you believe

17       that the pay discrimination claims that you have

18       in this case arose back in or relates to the pay

19       that he was receiving back in 2005?

20   A.  Yes.

21   MS. GRECO:  Object to the form.  You can answer.

22   BY MR. OPPENHEIMER:

23   Q.  You compare yourself to Sean Round in this case

198

1       for purposes of whether he was being paid more

2       for doing similar work?

3   A.  We were doing the same work.

4   Q.  I'm asking you if you compare yourself to Sean

5       Round.

6   A.  Yes.

7   Q.  Okay.  Do you compare yourself to Jamie Lapress?

8   A.  Yes.

9   Q.  For your pay claims?

10  A.  I could be.

11  Q.  Okay.  You could be or you are comparing yourself

12      to Jamie Lapress for your pay claims?

13  A.  Yes.

14  Q.  Are you comparing yourself to Mark Leible for

15      your pay claims?

16  A.  Yes.

17  Q.  Okay.  The paragraph after Sean Round refers to

18      Patrick Howells in October to March each year

19      during the time I was employed.  So again, that

20      is what I was focused on, trying to figure out if

21      your pay claims began when your employment began.

22      Right?

23  A.  Yes.

209

1       similarly situated males such as Mark Leible,

2       Jamie Lapress, Sean Round and Patrick Howells

3       have been paid at a higher salary rate for doing

4       similar work, close quote.

5           What does that have to do with training or

6       opportunities to do work?

7   MS. GRECO:  Objection to the form of the question.

8       Asked and answered.  She can tell you again.

9   THE WITNESS:  We were paid differently for doing the

10      same stuff.

11  MR. OPPENHEIMER:  I'm not asking --

12  THE WITNESS:  I can't find it in here.

13  MS. GRECO:  Objection to form.  Don't guess.  Just

14      answer the question he's asking you.

15  MR. OPPENHEIMER:  Counsel --

16  MS. GRECO:  You keep asking the same question.  She

17      answered it.  You don't like it.  You want your

18      answer, let her answer the way she wants.  It is

19      what it is.

20  BY MR. OPPENHEIMER:

21  Q.  I'm going to put in front of you what's been

22      marked as Exhibit D-8.  I have a copy for you.

23      That is D-8.

217

| | | |
|---|---|---|
| 1 | | you were working in the pack room, is it |
| 2 | | something that you regularly observed? |
| 3 | A. | Yes. |
| 4 | Q. | Paragraph -- read paragraph twenty-five to |
| 5 | | yourself, just like we did with paragraph |
| 6 | | twenty-four. |
| 7 | A. | Okay. |
| 8 | Q. | All right.  When did you first observe the facts |
| 9 | | on which the -- which are addressed in paragraph |
| 10 | | twenty-five? |
| 11 | A. | Towards the end of 2007. |
| 12 | Q. | And after you observed those facts, was that |
| 13 | | something that you regularly observed for the |
| 14 | | rest of your employment? |
| 15 | A. | I don't understand the question. |
| 16 | Q. | Okay.  You became aware that your time was being |
| 17 | | closely scrutinized whereas another male's was |
| 18 | | not, and you say that happened toward the end of |
| 19 | | 2007, right? |
| 20 | A. | Yes. |
| 21 | Q. | What I'm asking you is, how long did that |
| 22 | | continue, that your time was scrutinized and the |
| 23 | | males' were not? |

218

```
 1   A.   Until the end of my employment.
 2   Q.   Okay.  Look at paragraph twenty-six.
 3   A.   Okay.
 4   Q.   When did you first observe the situation which is
 5        described in paragraph twenty-six?
 6   A.   Which situation?
 7   Q.   Oh, the fact that he was twenty minutes -- Jamie
 8        was twenty minutes or an hour and a half late and
 9        wasn't reprimanded?
10   A.   The end of 2007.
11   Q.   When did you first observe the situation
12        involving him going behind the dumpster and
13        smoking marijuana?
14   A.   I can't recall.
15   Q.   Are you able to say what year it was?
16   A.   No.
17   Q.   The next sentence, you say management was aware
18        of this.  Are you referring to the -- that Jamie
19        was behind the dumpster smoking marijuana?
20   A.   Yes.
21   Q.   Who in management was aware of it?
22   A.   Keegan Roberts.
23   Q.   Okay.  And you say someone was joking with Mr.
```

223

1      happened to you?

2  MS. GRECO:  Objection to form.

3  THE WITNESS:  It could be.

4  BY MR. OPPENHEIMER:

5  Q.  Tell me what happened that you think means that

6      your time was closely scrutinized what happened

7      that you're referring to as being a close

8      scrutiny of your time?

9  A.  They kept tabs on all my breaks so I felt

10     compelled to mark my timecards with every time I

11     walked out the door to every time I walked in.

12 Q.  Okay.  And that began in I think you said

13     sometime in 2007.

14 A.  Yes, the end.

15 Q.  Okay.  And this portion of paragraph twenty-nine

16     where you're indicating that Keegan --

17 MS. GRECO:  Wait.  Wait.  We're not --

18 BY MR. OPPENHEIMER:

19 Q.  Twenty-five where Keegan would come out and he

20     would look at his arm as if he were looking at

21     his watch, did that also happen in 2007?

22 A.  I don't recall.  It happened, but I'm not sure of

23     the time frame.

224

1    Q.   Okay.  Is this something that you regularly

2         observed after you first became aware of it in

3         2007, that your time was closely scrutinized?

4    A.   Yes, when I began to work in the pack room.

5    Q.   Okay.  Is the -- is it also true for paragraph

6         twenty-six that once you became aware of Jamie

7         being treated more favorably, that is something

8         you regularly observed through the end of your

9         employment?

10   A.   Yes.

11   Q.   When did you first become aware of the situation

12        involving Sean Round that is described in

13        paragraph twenty-seven?

14   A.   When I started working in the pack room.

15   Q.   2007?

16   A.   Yes.

17   MS. GRECO:  Did you read the whole thing?  He's going

18        to ask you questions about it.

19   THE WITNESS:  I did.

20   BY MR. OPPENHEIMER:

21   Q.   Okay.  So it was -- Sean Round was treated

22        differently in terms of getting Saturdays off,

23        that's part of what you're alleging -- your

225

1     counsel alleged in paragraph twenty-seven?

2  A.  Yes.

3  Q.  And that is something you became aware of in

4     2007?

5  A.  Yes.

6  Q.  And that continued for the balance of the period

7     of time that Sean was employed there while you

8     were employed?

9  A.  Yes.

10 Q.  Okay.  Then you mentioned that he would come in

11    anywhere from a half hour to an hour and a half

12    late and would mark his timecard as if he arrived

13    at the scheduled time.  When did you become aware

14    of that?  I'm asking when you became aware of the

15    timecard business that you have in paragraph

16    twenty-seven.

17 MS. GRECO:  I was just directing her to where it is

18    so she knows where to read.

19 THE WITNESS:  I don't recall when Tommy brought it to

20    my attention.

21 BY MR. OPPENHEIMER:

22 Q.  Is the basis for your knowledge about the

23    timecard business involving Sean Round, that is

228

1    Q.   You address that subject matter in paragraph
2         twenty-nine where Matt Marshall was taking
3         smoking breaks throughout the day?
4    A.   Yes.
5    Q.   All right.  Is it your claim that you were not
6         allowed to take smoking breaks throughout the day
7         on the same basis that employees like Mark Leible
8         and Matt Marshall were permitted to do so?
9    A.   Yes.
10   Q.   And is it your contention that is because of your
11        gender?
12   A.   Yes.
13   Q.   And why do you believe it's because of your
14        gender?
15   A.   Because the guys got to do whatever they wanted.
16   Q.   All right.  Go to paragraph thirty-one, please.
17   MS. GRECO:   Thirty-one?
18   MR. OPPENHEIMER:   Yes.
19   MS. GRECO:   Okay.
20   THE WITNESS:   Okay.
21   BY MR. OPPENHEIMER:
22   Q.   When did you first become aware of the situation
23        which is described in paragraph thirty-one?

236

1  A.  I don't recall.

2  Q.  What is the -- strike that.  During your -- the

3      period of your employment at Black Angus, did you

4      hear other male employees make comments of a

5      sexual nature other than those that are listed or

6      quoted in paragraph thirty-three?

7  A.  Can you repeat the question?

8  Q.  Yes.  During the period of your employment at

9      Black Angus, did you hear male employees make

10     comments of a sexual nature other than the ones

11     that are quoted in paragraph thirty-three?

12 A.  Not that I can recall.

13 Q.  Did you ever make comments of a sexual nature

14     while you were employed?

15 MS. GRECO:  Objection to the form.

16 THE WITNESS:  What?

17 BY MR. OPPENHEIMER:

18 Q.  Did you ever make comments of a sexual nature

19     while you were employed at Black Angus?

20 A.  No, I did not.

21 Q.  Did you ever say in describing your husband that

22     he's a two pump chump?

23 A.  No, I did not.

248

1   MS. GRECO:  Are you done with this one?

2   MR. OPPENHEIMER:  Yes.

3   THE WITNESS:  May of 2010.

4   BY MR. OPPENHEIMER:

5   Q.   When is the last time you spoke to Regina Rush?

6   A.   May of 2010.

7   Q.   The last time you spoke to Taylor Kunzelman?

8   A.   I don't recall.

9   Q.   Patrick Howells, when is the last time you spoke

10       to him?

11  A.   I don't recall.

12  Q.   When is the last time you spoke to Roseanne

13       Barnes?

14  A.   I think it was 2013.

15  Q.   Did you talk about this case?

16  A.   No.

17  Q.   Did you talk about your claims against Black

18       Angus?

19  A.   No.

20  Q.   Do you have anything in writing concerning your

21       employment with Black Angus written by Roseanne

22       Barnes?

23  A.   No.

256

1  A.  No.

2  Q.  All of your pay was through the paychecks -- the

3     payroll system?

4  A.  Yes.

5  Q.  Okay.  Turn to page P321 in Exhibit D-11.  What

6     is this page of Exhibit D-11?

7  A.  A resume I had help with.

8  Q.  Okay.  Is it something that you prepared?

9  MS. GRECO:  Objection to form.

10 THE WITNESS:  I had help with it from One Stop.

11 BY MR. OPPENHEIMER:

12 Q.  Okay.  And is the substance of the information

13    contained in this document something you provided

14    so that it could be completed?

15 MS. GRECO:  Objection.

16 THE WITNESS:  I actually provided more, but he picked

17    out stuff for me to put that was pertaining to

18    the job I was applying for.

19 BY MR. OPPENHEIMER:

20 Q.  With respect to the entry for a period of 4/04 to

21    5/10, it says that there was -- you were customer

22    service, cashier at Black Angus Meat Market.  Do

23    you see that?

257

1    A.   Yes.

2    Q.   Did you write that or did the One Stop person

3         write that?

4    A.   The One Stop clicked on the stuff that he wanted

5         entered.

6    Q.   Okay.

7    A.   Pertaining to this job.

8    Q.   Did you agree with this?

9    MS. GRECO:   Objection to form.

10   BY MR. OPPENHEIMER:

11   Q.   Did you agree with what he put in here?

12   A.   Yes.

13   Q.   Did you use this resume for any purpose?

14   A.   For this job at the top.

15   Q.   Okay.  What job was that?

16   A.   Adult care aid slash service provider.

17   Q.   What company was that for?

18   A.   The one that they had posted in the Unemployment

19        office.

20   Q.   Do you have a name for what company it was?

21   A.   No, I don't.  I don't recall at this time.

22   Q.   The next page, P322, line eight, the pay you

23        received at your last job, is that eleven dollars

291

1  Q.  Okay.  So it was 2005 to 2008?

2  A.  Yes.

3  Q.  As far as you were concerned, that's what you --

4  MS. GRECO:  Objection to form.

5  BY MR. OPPENHEIMER:

6  Q.  Well, you started working in 2005?

7  A.  Yes.

8  Q.  So you would know from 2005 forward rather than

9     2004 forward, is that what you're saying?

10  A.  Yes.

11  Q.  Okay.  So they worked during the period that you

12     worked, they worked between 2005 and 2008?

13  MS. GRECO:  Objection to form.

14  BY MR. OPPENHEIMER:

15  Q.  Is that right?  You saw them working in the store

16     between 2005 and 2008?

17  A.  Yes.

18  MS. GRECO:  Objection to form.

19  BY MR. OPPENHEIMER:

20  Q.  Okay.  During that time period what did you hear

21     about them having black boyfriends from other

22     employees at Black Angus Meats?

23  A.  That they should be with one of their own kind,

292

1      what's wrong with white guys.

2   Q.   Who said they should be with one of their own

3        kind?

4   A.   Sean Round.

5   Q.   When?

6   MS. GRECO:   Is she done -- or, I mean, you went on,

7        but is there more?

8   MR. OPPENHEIMER:   Well, there may be more.  I'll get

9        to it.

10  MS. GRECO:   Okay.

11  BY MR. OPPENHEIMER:

12  Q.   Who said that they should be with one of their

13       own kind?  You said Sean Round.  I asked when did

14       that happen?

15  A.   When I was employed at Black Angus.

16  Q.   Before you were in the pack room or after?

17  A.   After.

18  Q.   Are you able to say what year?  Let me remind

19       you, you said that Raelean and Regina worked --

20  A.   I know.  I can't remember if it was 2007 or 2008.

21  MS. GRECO:   The records speak for themselves when you

22       worked there, but the best recollection you have

23       now.

293

1  BY MR. OPPENHEIMER:

2  Q.  The comment was made by Sean Round in 2007, 2008?

3  MS. GRECO:  Objection to form.

4  BY MR. OPPENHEIMER:

5  Q.  Is that what you're saying is best recollection?

6  A.  Best recollection.

7  Q.  What about what is wrong with white guys, who

8      said that?

9  A.  Sean Round.

10 Q.  When did he say that?

11 MS. GRECO:  Objection to form.

12 THE WITNESS:  I can't recall at this time.

13 BY MR. OPPENHEIMER:

14 Q.  To whom did he say it?

15 A.  To Raelean.

16 Q.  Were you present when that was said?

17 A.  Yes.  We were at the deer wrapping station that's

18     offset from the pack room.

19 Q.  Are you able to say what year that was?

20 A.  I believe that one was in 2007.

21 Q.  Okay.  What other comments did you hear Sean

22     Round make about Raelean or Regina's dating black

23     guys?

1        break into it.  And I says no, why would you ask

2        me that and he says well, you have two black kids

3        and that's what black people do.  And I says my

4        kids don't break into stuff, so why would he call

5        -- why would he say that about my kids.  He goes

6        well, they're niggers.  And I says that I can't

7        believe you said that, and I got very upset and

8        Tommy was right at the butcher block right by the

9        other wrapping table and that's where Debbie was

10       too.  And Tommy and Debbie both told Jamie that

11       his actions were inappropriate.

12   Q.  You heard both of them say that?

13   A.  Yes.

14   Q.  Okay.  Did Jamie say anything in response?

15   A.  I don't know what he mumbled on the way to the

16       washroom.

17   Q.  Okay.  Did anything happen after that involving

18       Keegan and that incident?

19   A.  I was called into the office by Bob and Keegan

20       and I believe the 25th of May and they wanted to

21       know what happened.  I told them.  They called

22       Jamie in, asked him what happened and he told

23       them that he wasn't talking to me and it was

297

1      nice.

2   Q. What happened next with respect to this incident?

3   A. Jamie -- he says okay, Jamie, you're done.

4      Keegan walked out the office door closest to the

5      employee entrance and I talked with Bob then, and

6      Bob told me that I would have to get used to

7      things like that, people are mean and cruel, and

8      I said so it's okay for one of my co-workers to

9      call my kids niggers and he says it happens in

10     politics and it happens in sports so I'm going

11     have to get used to the idea.

12  Q. What was the date of this conversation?

13  A. I believe it was May 25th, and I told Bob then I

14     was uncomfortable with the situation and he said

15     -- no.  I was uncomfortable with working with

16     Jamie and he said he was uncomfortable with the

17     situation also and I could leave now.  I was

18     punched in for work at about -- for about two and

19     a half hours.

20  Q. At some point, you had written a letter about the

21     incident to Robert and Diane?

22  A. Yes.

23  Q. I'm putting in front of you 195.  On the very

331

1        lot of significant events in your life, but you

2        never posted anything at all about your treatment

3        at work?

4   MS. GRECO:  Objection to form.

5   THE WITNESS:  Not that I can recall.

6   BY MS. BAHAS:

7   Q.  Now, Miss Black, it's your claim that you were

8        treated so badly at Black Angus you sought mental

9        health counseling about the way you were treated,

10       is that correct?

11  A.  Yes.

12  Q.  You claim you began receiving this mental health

13       counseling regarding your treatment at work in

14       2006?

15  MS. GRECO:  Object to the form.

16  THE WITNESS:  Among other things.

17  BY MS. BAHAS:

18  Q.  So is that a yes?

19  A.  Yes.

20  Q.  So then it clearly bothered you that you were

21       subjected, in your view, to a hostile work

22       environment at Black Angus, correct?

23  MS. GRECO:  Objection to form.

340

1    Q.   Do you see the next line down, name of patient,
2         Darcy Black?
3    A.   Yes.
4    Q.   Do you see that it's dated August 12th of 2009?
5    A.   Yes.
6    Q.   Now, I would like to direct your attention
7         specifically to the third paragraph from the top.
8         It starts with the words, she talked quite a bit
9         about her work situation.  Do you see where I'm
10        referring to?
11   A.   Yes.
12   Q.   It states, she talked quite a bit about her work
13        situation, how the men, they are not treating her
14        very well and complaining that she takes breaks,
15        which she's allowed to do.  Although she has been
16        there several years, she is looking around to
17        find a new job and there might be a good prospect
18        through a friend.  Did I read that correctly?
19   A.   Yes.
20   Q.   Does that refresh your recollection as to whether
21        or not you ever told a health care provider that
22        you were considering quitting your job in 2009?
23   A.   No.

343

1  A.  Yes.

2  Q.  What do you mean?

3  A.  At the end.  I met with an attorney.

4  Q.  Regarding your bankruptcy?

5  A.  Yes.

6  Q.  When was that meeting?

7  A.  I can't recall the exact date.

8  Q.  Who was the attorney?

9  A.  David Butterini.

10  Q.  So your first meeting with Mr. Butterini was at

11     the end of 2008?

12  MS. GRECO:  Objection to form.

13  THE WITNESS:  I'm not sure if that's when I met him.

14     I know I did talk to his secretary on the phone.

15  BY MS. BAHAS:

16  Q.  When was the first time you spoke with Mr.

17     Butterini?

18  A.  I can't recall.

19  Q.  Approximately how many times did you speak with

20     Mr. Butterini?

21  A.  Three.

22  Q.  You spoke with Mr. Butterini three times total,

23     is that correct?

344

```
 1   A.   I believe so.
 2   Q.   So tell me about the first time you spoke with
 3        him.   Was that on the telephone or in person?
 4   A.   In person.
 5   Q.   Where did you have that meeting?
 6   A.   At his office.
 7   Q.   Who was present in his office when you had that
 8        meeting?
 9   A.   Myself and Mr. Butterini.
10   Q.   No one else was present?
11   A.   No.
12   Q.   After you concluded that first meeting, did you
13        speak with anyone about that meeting?
14   A.   No.
15   Q.   You never told your boyfriend at the time that
16        you met with Mr. Butterini?
17   A.   I can't recall.   He, maybe, knew I went there.
18   Q.   Did he know you were filing for bankruptcy?
19   A.   Yes, he did.
20   Q.   How did he know that?
21   A.   Because he witnessed the paperwork I had to fill
22        out.
23   Q.   What paperwork?
```

345

1   A.   A pamphlet of papers.

2   Q.   Were these papers that you were giving to Mr.

3        Butterini or papers that you were submitting to

4        the court?  What type of papers, specifically,

5        did he witness you filling out?

6   MS. GRECO:  Objection to form.

7   THE WITNESS:  David Butterini gave me a pamphlet of

8        papers to fill out and to bring back when I was

9        done.

10  BY MS. BAHAS:

11  Q.   Your boyfriend saw you filling those out, or what

12       is your testimony related to that?

13  MS. GRECO:  Objection to form.

14  THE WITNESS:  I did them in the house.  He must have

15       seen them.  I didn't talk to him about it.

16  BY MS. BAHAS:

17  Q.   So that's how you believe your boyfriend knew

18       that you were filing for bankruptcy?

19  A.   Yes.

20  Q.   He watched you filling out papers?

21  MS. GRECO:  Objection to form.

22  THE WITNESS:  I believe so.

23  BY MS. BAHAS:

349

1              (Whereupon, a short recess was then taken.)

2    THE COURT REPORTER:  Eleven o'clock.

3    BY MS. BAHAS:

4    Q.  Miss Black you mentioned that you filled out a

5         pamphlet of papers for Mr. Butterini, is that

6         correct?

7    A.  Yes.

8    Q.  How many pages was that pamphlet?

9    A.  I don't know.  I can't recall.

10   Q.  You filled it out at home?

11   A.  Yes.

12   Q.  When did you fill that out?

13   A.  I'm not sure.

14   Q.  You had three meetings with him, correct?

15   A.  Yes.

16   Q.  Was it after the first meeting?

17   A.  Yes.

18   Q.  Before the second meeting?

19   A.  Yes.

20   Q.  Did you bring it to him for the second meeting?

21   A.  I brought it to his secretary.

22   Q.  Did you speak with his secretary about it?

23   A.  Just when I handed it in and she said that he'll

361

```
 1   THE WITNESS:  He knows why I'm here today.

 2   BY MS. BAHAS:

 3   Q.  But you never had a conversation with him about

 4       the fact that you resigned?

 5   A.  I might have said that I wrote a letter saying

 6       that I gave my two weeks' notice.  I'm not sure

 7       when or where I was.

 8   Q.  You testified earlier that you would come home in

 9       tears after work occasionally, is that correct?

10   A.  Yes.

11   Q.  How often would that happen?

12   MS. GRECO:  Object to the form.

13   THE WITNESS:  Probably four days out of five.

14   BY MS. BAHAS:

15   Q.  Four days out of five that you were working?

16   A.  Yeah.

17   Q.  For the entire period of your employment?

18   MS. GRECO:  Object to form.

19   THE WITNESS:  I don't know that.  I can't remember

20       when it started.

21   BY MS. BAHAS:

22   Q.  Well, you began receiving mental health

23       counseling regarding their treatment at Black
```

369

```
 1   Q.  Now, you said that you left work crying four out
 2       of five days because of the treatment you
 3       received at Black Angus.
 4   A.  Yes.
 5   Q.  Did you ever talk to Regina Rush about that?
 6   A.  She would sometimes see me leave crying.
 7   Q.  You said that she babysat your children, correct?
 8   A.  Her and her sister.
 9   Q.  Both of them babysat your children?
10   A.  At the same time.
11   MS. GRECO:  Object to the form.
12   BY MS. BAHAS:
13   Q.  So is it fair to say you trusted them enough to
14       watch your children?
15   A.  Yeah.
16   Q.  Did you ever have any conversation with them
17       about any of the things that were bothering you
18       in the workplace?
19   A.  Like what bothered me?
20   Q.  You tell me what bothered you.
21   MS. GRECO:  Object to form.
22   THE WITNESS:  I didn't discuss it with them.  They
23       knew when I was upset because they would see me
```