UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DARCY M. BLACK

                        Plaintiff,

v.

BUFFALO MEAT SERVICE, INC., doing business
as BOULEVARD BLACK ANGUS, also known as
BLACK ANGUS MEATS, also known as
BLACK ANGUS MEATS & SEAFOOD,
ROBERT SEIBERT,
DIANE SEIBERT,
KEEGAN ROBERTS,

                        Defendants.
_____

**PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**15-CV-00049 WMS-HBS**

Plaintiff, Darcy M. Black, by and through her attorneys, Greco Trapp, PLLC, as and for her Counter-Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment pursuant to Local Rule 56(a), states as follows:

1.      Darcy M. Black (hereinafter "Black") admits that, on January 15, 2015, she commenced this action by filing a Summons & Complaint in the United States District Court for the Western District of New York. *See* Ex. 14, Dkt. 1 ("Complaint"). Black further states that her Complaint named as Defendants: Buffalo Meat Service, Inc. (hereinafter "BAM"); Robert Seibert; Diane Seibert; and Keegan Roberts (collectively "Defendants"). *See* Ex. 14.

Black further states that her Complaint alleged that she is a Caucasian female and the mother of two children whose fathers are African-American. *See* Ex. 14, Compl. ¶¶ 3, 9. Black began working for BAM on or about May 16, 2005. Ex. 2, Black Dep. 198. She continued to work for BAM until, on or about May 25, 2010, when she was constructively discharged. *Id*. ¶ 49. Black alleged that Defendants, Robert Seibert, Diane Seibert, and Keegan Roberts, were the

sole shareholders of BAM with primary authority to hire and fire and to make salary and benefit determinations.  *Id*.  ¶ 6.  Black alleged "that Defendants created and permitted a hostile work environment on the basis of race and sex, discriminated against her on the basis of race and sex, discriminated against her with respect to wages on the basis of sex, and constructively discharged her."  Ex. 70, Dkt. 69-1 ¶ 3; *see generally* Ex. 14, Compl.

Concerning hostile work environment, Black alleged that Defendants were aware of numerous instances of racially offensive conduct.  *See* Ex. 14, Compl. ¶¶ 39, 41-44.  Specifically, Defendants were aware that Sean Round, Black's male co-employee, made racially offensive comments to Black's female co-employees, Raelean Rush and Regina Rush, who were both Caucasian and dating African-American men.  *See Id*. ¶ 39.  Sean Round said to Raelean Rush and Regina Rush: "She would be better off with a white guy"; "She needs to be with one of her own kind": "What is wrong with white guys?"; and "Her boyfriend was using her to get her name because Black men always cheat and he probably has a lot of girlfriends."  *Id*. ¶ 39.  Defendants were also aware that male employees referred to BAM's African-American customers as "Bob's Niggs."  *Id*. ¶¶ 41, 44.  Defendants were also aware that employees made other racially offensive comments relative to African-Americans, such as "How can they have nice cars and get food stamps?"; "How can they have nice clothes and get food stamps"; and that an African-American customer was too fat and asking why can't they get out and work.  *Id*. ¶¶ 42-43.  Black further alleged that Defendants discriminated against African-Americans in hiring.  *Id*. ¶¶ 35-38.  Specifically, when Defendants were actively hiring, they did not interview or offer employment to African-American applicants, despite over 50 African-Americans having submitted applications.  *Id*. ¶¶ 36-37.  Black also alleged that Defendants were aware of numerous instances of sexually

offensive conduct, including but not limited to comments like: "She's got a nice ass"; "Your headlights are on": "Oh, look at that cleavage"; and "Does the carpet match the drapes?"  *Id*. ¶ 33.

Black alleged that Defendants constructively discharged her as the result of events that began on or about May 15, 2010.  Ex. 14, Compl. ¶¶ 45-49.  Specifically, on or about May 15, 2010, Jamie LaPress, one of Black's Caucasian male co-employees, did not have the key for a paper towel dispenser and asked Black if she could break into it.  *Id*. ¶ 45.  When Black said no, he said "You have two Black kids so you must know how."  *Id*.  Black responded that her children do not steal or break into things and asked him why he would say that.  *Id*.  Jamie LaPress responded: "Cause they're niggers."  *Id*.  After this occurred, still on or about May 15, 2010, Black made a complaint to Debbie Negrych and Thomas Howells, BAM employees who were both frequently in charge of the staff.  *Id*. ¶ 46.  They told Jamie LaPress that his actions were inappropriate, but Jamie LaPress said that Black would have to "get over it."  *Id*.

Over the following seven days, Defendants failed to take any further action relative to Black's complaints.  *See* Ex. 14, Compl. ¶ 47.  On or about May 22, 2010, Black tendered a letter of resignation, which stated that she could no longer face the hostile work environment and harassment and that Jamie LaPress had referred to her children as niggers.  *Id*.  On May 25, 2010, Defendant, Robert Seibert, had a meeting with Black relative to her May 22, 2010 resignation letter, which also complained of racial harassment and hostile work environment.  *Id*. ¶ 48.  Robert Seibert took no action relative to Black's complaint and, instead, told her "stuff like this happens all the time"; "it happens in sports and politics"; and she would have to deal with it.  *Id*.  Black then told Robert Seibert that, because of Jamie LaPress's racially offensive comment about her children, she was uncomfortable working around him.  *Id*.  Robert Seibert replied that "he was

uncomfortable with the situation so [Black] could leave right now.  *Id*.  Black collected her belongings and left work crying.  *Id*.

Black also alleged that Defendants subjected her to less favorable terms and conditions of employment than male employees.  Ex. 14, Compl. ¶ 23.  She alleged that Defendants permitted males but not females to arrive late without calling in and take several smoke breaks (*id*. ¶ 24); Defendants closely scrutinized Black's time and breaks but did not do so as to male employees (*id*. ¶ 25); male employees were consistently late to work without reprimand (*id*. ¶¶ 26, 28-30); Defendants were aware that male employees smoked marijuana on site during the work day and took no action (*id*. ¶ 26); Defendants gave males preference for Saturdays off while denying females' requests for Saturdays off (*id*. ¶¶ 27, 31); and that BAM's male owner, Robert Seibert, and male Store Manager, Keegan Roberts, greeted male employees by name but did not acknowledge Black (*id*. ¶ 32).

Black also alleged that she was paid less than similarly situated male employees for the same work.  Ex. 14, Compl. ¶¶ 12-19.   The last position that Black held with Defendants was Wrapper-Packer-Cleaner, earning $10/hour.  *Id*. ¶ 12.  Black's Complaint identified similarly situated male co-employees who received a higher hourly rate from Defendants for the same work. *Id*. ¶¶ 15-19.  Additionally, Defendants paid Debbie Negrych, who had been an employee for over 20 years, a lower hourly rate than they paid to comparable male employees with far shorter tenures. *Id*. ¶ 20.  In or about March 2010, Black requested an increase in her hourly rate, which Defendants denied.  *Id*. ¶ 22.

Black further states that, as discussed in detail herein, admissible evidence supports Black's allegations and provides additional evidence demonstrating Defendants' unlawful conduct.  *See infra* ¶¶ 11-14.

2.      Black admits that she is Caucasian and has two children whose fathers are African-American.  Ex. 2, Black Dep. 3, 263-64.  Black further states that she graduated high school in 1989.  Ex. 1, Black Decl. ¶ 2.  After that, she subsequently received a Commercial Driver's License, which she had during the time she worked at BAM.  *Id*.  Prior to working BAM, Black worked for Pizza Junction, Pizza Pickup, Payne Avenue Pizzeria, High Spot Pizza, and Marriott Sodexo, doing tasks including but not limited to making sandwiches, salads, pizza, chicken wings and working in other aspects of food preparation.  *Id*.  In addition, Black had deli experience while working at Budwey's.  She also worked for Laidlaw and TNT Bus driving school Busses.  *Id*. She drove a dump truck for Power City Paving.

3.      Black admits that BAM does business at a location at 2519 Niagara Falls Boulevard, Amherst, New York.  Ex. 5, R. Seibert Dep. 16-17.  Black further states that, during her employment, BAM's only two owners were Defendants, Robert Seibert and Diane Seibert, who had owned the business since about 1984.  *See* Ex. 15 at DEF0131; Ex. 4, D. Seibert Dep. 71. Black also states that, in or about October 2000, Keegan Roberts began working at BAM as an employee.  Ex. 16.  Prior to Black's employment, Keegan Roberts became BAM's store manager, which was a salaried position.  Ex. 6, Roberts Dep. 51-53; Ex. 17.  During Black's employment, Defendants, Robert Seibert, Diane Seibert, and Keegan Roberts, each had independent authority to hire and fire and otherwise affect Black's terms and conditions of employment.  Ex. 5, R. Seibert Dep. 89-91; Ex. 4, D. Seibert Dep. 105, 127; Ex. 6, Roberts Dep. 116.  After Black's May 2010 constructive discharge, Keegan Roberts became an owner of BAM, with Robert Seibert, Diane Seibert, and Keegan Roberts each holding a one-third interest in the company.  Ex. 5, R. Seibert Dep. 42-43; Ex. 4, D. Seibert Dep. 104-05.  Black admits that BAM sells meat and seafood and

further states that it also sells salads, and hundreds of grocery items, and processes deer and other wild game. Ex. 2, Black Dep. 107-08, 101; Ex. 5, R. Seibert Dep. 52; Ex. 18.

4.      Black denies that she made "several" submissions to the Equal Employment Opportunity Commission (hereinafter "EEOC").  Black admits that she submitted to the EEOC an Intake Questionnaire, dated June 14, 2010, and stamped received by the EEOC on June 18, 2010. Defendants' Exhibit A (Dkt. 106-3).  Black further states that, with her Intake Questionnaire, she attached a three-page handwritten narrative.  Defendants' Exhibit A at DEF0161-DEF0162.  Black also states that, on the fourth page of her Intake Questionnaire, she checked  "BOX 2" indicating that she wanted "to file a charge of discrimination" and authorizing "the EEOC to look into the discrimination . . . described above."  Defendants' Exhibit A at DEF0159.

Black further states the Intake Questionnaire stated that she was discriminated against during her employment at BAM on the basis of race and sex and included specific allegations against Robert Seibert and Keegan Roberts.  *See generally* Defendants' Exhibit A.  The Intake Questionnaire included references to specific conduct occurring on May 15, 2010 and in February 2010.  Defendants' Exhibit A at DEF0157.

Black further states that, with respect to the May 15, 2010 incident, Black's co-employee, Jamie LaPress, had called her children niggers.  *Id.*  Black's attached narrative stated:

> The thing that finally set me to put in my 2 weeks notice was one of my co-workers called my boys "Niggers", and when I was approached By the owner Bob Seibert, to discuss my 2 week notice, He (Bob Seibert) told me that stuff happens like that all the time, so I asked Bob, "So it is okay for Jamie to call my kids "Niggers", and Bob said that it happens in sports and politics, so basically just deal with it.  I was punched in for work for about 2 hrs. 40 mins. and Bob told me to leave now, so I got my things together and left crying.

*Id*. at DEF0160.  Black further specifically indicated that Robert Seibert had discriminated against her by, in response to an incident in which a co-employee called her children niggers, telling her that it "happens in politics and sports."  *Id*.

Black further states that the Intake Questionnaire specifically indicated that, in February 2010, Keegan Roberts, Store Manager, yelled at her about her breaks and was "very mean" to female employees, while male employees "can say and do whatever they want to anyone. Defendants' Exhibit A at DEF0157.  The Intake Questionnaire also identified two similarly situated male employees—Mark Leible and Jamie LaPress—who were treated more favorably than Black and other female employee, Debbie Negrych.  *Id*. at DEF0157-0158.

Black further states that her narrative attached to the Intake Questionnaire stated that male employees were paid more than female employees for the same work and otherwise enjoyed more favorable terms and conditions of employment.  Defendants' Exhibit A at DEF0157-0162.  Black wrote:

> The guys are all $12.00 and way over, but the girls that work their (sic.) are worked the hardest, But we are all supposed to have the same responsibilities, But we are all treated very differently, most of the guys are late every day . . . But the 2 other women workers (Darcy; Debbie) we are never late nor do we call in sick.  . . .  But the guys never call, and they don't get in trouble for being late, up to 1 hour late.

*Id*. at DEF0162.

Black denies that Defendants' Exhibit B (Dkt. 106-4) is a document that she submitted to the EEOC, as it is unsigned and undated.  Ex. 1, Black Decl.  ¶ 25.  Black further states that the EEOC prepared this Charge of Discrimination on Black's behalf and assigned Charge No. 846-2010-55217 (*see* Defendants' Exhibit B); however, Black did not sign and return the document to

the EEOC, as she was working with counsel to submit a Charge of Discrimination.  Ex. 1, Black Decl. ¶ 25.

Black admits that, assisted by counsel, she made a second submission to the EEOC: a Charge of Discrimination under Charge No. 846-2010-55217, dated December 16, 2010, and stamped received by the EEOC on January 3, 2011.  Defendants' Exhibit C.  Black further states that this Charge of Discrimination named as Respondents: BAM, Robert Seibert, and Diane Seibert.  *Id*. at DEF0141.  Black further states that this document, which named as Respondents BAM, Robert Seibert, and Diane Seibert, was the operative document before the EEOC and was signed by Black and verified as true to the best of her knowledge.  *Id*.  Black further states that the Charge of Discrimination consisted of four typewritten pages.  *Id*. at DEF0142-0145.  This Charge of Discrimination contained similar allegations as those contained in her Complaint in this action, discussed in detail above.  *Compare* Defendants' Exhibit C, *with* Ex. 14, Compl.; *see supra* ¶ 1.

5.      Black denies that her first submission to the EEOC asserted a claim against BAM only.  *See* Defendants' Exhibit A.  As noted above (*see supra* ¶ 4), Black's Intake Questionnaire to the EEOC indicated that she was discriminated against on the basis of race and sex and made specific allegations against Robert Seibert and Keegan Roberts.  *See generally id*.  The Intake Questionnaire also identified Robert Seibert as BAM's owner.  *Id*. at DEF0156-0157, 0160.  Black further states, as noted above (*see supra* ¶ 4), that the operative document before the EEOC was Black's Charge of discrimination, December 16, 2010, and stamped received by the EEOC on January 3, 2011, which named as Respondents BAM, Robert Seibert, and Diane Seibert.  *See* Defendants' Exhibit C.  Black further states that, at the time of this Charge of Discrimination, Robert Seibert and Diane Seibert were BAM's only two owners.  *See supra* ¶ 3.

6.     Black admits that in correspondence to the EEOC, dated October 24, 2011 (Defendants' Exhibit D), and November 3, 2014 (Defendants' Exhibit E), Black's counsel referred to the Respondents/Defendants in this matter in the singular.  Black further states, as noted above (*see supra* ¶ 4), that the operative document before the EEOC was Black's Charge of Discrimination, dated December 16, 2010, and stamped received by the EEOC on January 3, 2011, which named as Respondents BAM, Robert Seibert, and Diane Seibert.  *See* Defendants' Exhibit C.  Black further states that, despite her Charge of Discrimination clearly naming as Respondents BAM, Robert Seibert, and Diane Seibert, opposing counsel entered appearances before the EEOC on behalf of BAM only.  *See* Ex. 19.

7.     Black admits that the EEOC conducted an investigation but denied that it was against BAM only and states that it was against all Respondents/Defendants.  Black also denies that it was a "full" investigation.  Black states that the EEOC's investigation was not a full investigation because Defendants made multiple misstatements of fact before the EEOC.  *See* Exs. 20, 15.  Black further states that, despite Defendant's self-serving factual misstatements, the EEOC issued probable cause determinations on some of Black's claims.  *See* Defendants' Exhibit F.  The EEOC found that "the investigation revealed that Charging Party was subjected to a racially offensive and hostile work environment.   Further, Charging Party complained about race discrimination, but Respondent failed to take effective or corrective actions, and she was constructively discharged on May 25, 2012." *Id*. at DEF0019.  The

The EEOC's investigation:

> also revealed that Black applicants applied for employment during the years Charging Party worked for Respondent; none of them were interviewed or offered employment.  EEOC requested Respondent provide copies of most recent employment applications that they received, but they were unable to comply.  Because its response was "only completed applications are kept . . . and they are maintained

> for a few months or until a position is filled," this represents a recordkeeping violation. Employment Laws require that employment records, including employment applications shall be kept for at least a period of one year of the date of an employment action.

*Id*. at DEF0019. Black also states that Defendants destroyed these employment applications despite Robert Seibert knowing that the law required that the applications be retained. Ex. 5, R. Seibert Dep. 224-26.

Black further states that the EEOC ultimately concluded that there was:

> reasonable cause to believe that Charging Party was subjected to a hostile work environment and constructive discharge based on race discrimination in violation of Title VII. It has been also confirmed that Respondent failed to interview and hire Black applicants. In addition, Respondent incurred in a recordkeeping violation by not retaining its employment applications for at least one year as required by law.

Defendants' Exhibit F at DEF0019.

Black further states, as mentioned above, that the EEOC made this probable cause determination despite Defendants' numerous self-serving misstatements of fact. The relevant document was signed by both Robert Seibert and Diane Seibert (Ex. 15) with the assistance of Keegan Roberts (Ex. 6, Roberts Dep. 175-77). These factual misstatements include but are not limited to these statements:

- "In the past 35 years we have employed native Americans, Caucasians, African Americans, Asians and Middle Eastern." Ex. 15. However, evidence demonstrates that Defendants have not employed an Asian or Middle Eastern employee. Ex. 7, Negrych Dep. 99; *see* Ex. 20.

- "Debbie [Negrych] has a rate of pay of $10.50/hr. but has been grandfathered in with family health coverage which amounts to approximately $12,000/yr." Ex. 15 at DEF0132. However, evidence demonstrates that the total cost for Debbie Negrych's health insurance was $7,170.36 in 2005; $7,750.80 in 2006; $9,675.12 in 2007; and $9,369.48 in 2008. *See* Ex. 21 DEF3830-3833. Defendants have produced no documents relative to the cost of Debbie Negrych's health insurance for the last two years of Black's employment, i.e., 2009 and 2010. Greco Decl. ¶ 4. Additionally, starting on or about December 22, 2006, Debbie

Negrych began making $50 weekly contributions toward her health insurance, totaling $2,600/year.  Ex. 22; Ex. 7, Negrych Dep. 66-68.

- "In our 35 years of doing business we have employed several great African American employees.  We currently have Franklin Bennett on our payroll.  Some previous employees would be Bobby Rivers, Eddie David, and the Goodwin brothers as meat cutters."  Ex. 15 at DEF0133.  With respect to Franklin Bennett, Defendants did not hire him until on or about December 17, 2010, over six months after Black's constructive discharge.  Ex. 23. Additionally, in saying that Franklin Bennett is on BAM's payroll, Defendants overstated BAM's employment of Franklin Bennett, given that, at and around the time that Defendants submitted Ex. 15 to the EEOC, Franklin Bennett earned $240.00 from BAM in 2010 and $902.50 from BAM in 2011.  Witnesses testified that Franklin Bennett is at BAM, at most, once or twice per month.  Ex. 8, LaPress Dep. 45-46; Ex. 10, Leible Dep. 120.  With respect to Bobby Rivers, Eddie David, and the Goodwin brothers, Defendants failed to indicate that these employees did not work form BAM since the 1980s or 1990s, long before Black worked for BAM.  Ex. 5, R. Seibert Dep. 36-39.

- Robert Seibert told employees " 'you can talk about weather and sports, this is no soap opera – leave your personal dramas at home' " largely because Black "every day . . . had another personal tragedy that occurred the night before."  Ex. 15 at DEF0134.  However, evidence shows that Robert Seibert had been often repeating this phrase at BAM since at least as early as about 1991.  Ex. 5, R. Seibert Dep. 255; Ex. 6, Roberts Dep. 291; Ex. 8, LaPress Dep. 267, 278-79; Ex. 10, Leible Dep. 171-72; Ex. 11, T. Howells Dep. 32-33; Ex. 7, Negrych Dep. 229.  Black began her employment at BAM on or about May 16, 2005. Ex. 2, Black Dep. 189.

- "After [] talking to employees in the pac room [], it was Darcy who had a grotesque and foul mount."  Jamie LaPress testified that Black's use of foul language was no different than that of other employees.  Ex. 8, LaPress Dep. 50-52.

- Sean Round had starting pay of $11.00/hour and a current rate of pay at $13.00/hour.  Ex. 20 at DEF 0053.  However, evidence demonstrates that, in fact, Sean Round was hired on or about February 23, 2007, at a rate of $9.50/hour.  Ex. 24; Ex. 9, Round Dep. 53-54. Notably, Black was earning only $8.50/hour when Sean Round was hired at $9.50/hour, despite Black having worked for BAM for over one year at that time.  *Compare* Ex. 24, with Exs. 25, 26; Ex. 4, D. Seibert Dep. 399-400.  Then only one month later, on or March 23, 2007, Sean Round received a raise to $10.00/hour.  Ex. 27; Ex. 9, Round Dep. 64-65. Then less than three months later, on or about June 15, 2007, Sean Round received a $1/hour raise to $11.00/hour.  Ex. 28; Ex. 9, Round Dep. 67-68.  About three months after that, on or about September 21, 2007, Sean Round received another $1/hour raise to $12.00/hour.  Ex. 29; Ex. 9, Round Dep. 74-75.  Thus, in about six months after starting at BAM, Sean Round's hourly rate increased by $2.50/hour, which is more than Black's hourly rate increased at BAM over the course of her entire five-year employment. *Compare* Exs. 24, 27, 28, *with* Exs. 30, 25, 26, 31-33.  On or about February 5, 2010, Sean Round received a raise to $13.00/hour.  Ex. 34; Ex. 9, Round Dep. 79-80.  In comparison,

when Black asked for a raise in March 2010, Defendants denied her request.  Ex. 1, Black Decl. ¶ 24.

- Thomas Howells had both a starting and current rate of pay of $15.00/hour.  Ex. 20 at DEF0050.  However, evidence demonstrates that Thomas Howells was earning $12/hour in February 2005 (Ex. 35); $13/hour in January 2007 (Ex. 36); $14/hour in February 2008 (Ex. 3**7**); and not $15/hour until on or about October 31, 2008 (Ex. 3**8**).

Black further states that Defendants made numerous admissions before the EEOC that

confirm Black's claims and allegations as well as demonstrate Defendants' discriminatory motive

and intent, including but not limited to:

- "Darcy's time here [at BAM] has been scrutinized," which confirms one of Black's allegations in this matter.  Ex. 15 at DEF0132.

- If Defendants were "looking for someone to organize freezers and put loads away, which require heavy lifting, *we would discard females as a rule*, or older males, or anyone with a back problem.  Ex. 15 at DEF0134 (emphasis added).

- With respect to Black's friendship with Raelean Rush and Regina Rush, Defendants stated "[b]oth dated African Americans and Darcy felt a connection to them because her children were biracial."  Ex. 15 at DEF0134.  Debbie Negrych agreed that such a statement indicates that people are not treated equally.  Ex. 7, Negrych Dep. 209.  When Black learned of this comment, she was offended.  Ex. 1, Black Decl. ¶ 18.

- Defendants admitted that "Sean [Round] did make a comment to Raelean about her [African-American] boyfriend using her for her good credit score and other things."  Ex. 15 at DEF1034.  BAM's employees agreed that such a statement is inappropriate and racially offensive.  Ex. 4, D. Seibert Dep. 132-33; Ex. 6, Roberts Dep. 232, 287; Ex. 11, T. Howells Dep. 271-73; Ex. 13, Rush Dep. 89, 107-08.  Raelean Rush, Raelean Rush described this incident to Keegan Roberts, Store Manager, as "Sean being Sean," leading to the reasonable evidentiary conclusion that Sean Round had said other racially offensive things to Raelean Rush.  Ex. 6, Roberts Dep. 234.

- Defendants admitted that Defendant, Robert Seibert, said to Black "she would have to get used to the idea that her children were black – there was no changing that.  School kids are cruel and racial remarks from kids is not unusual.  That was his opinion."  Ex. 15 at DEF0134.  Notably, Robert Seibert testified that he had no actual basis for this opinion. Ex. 5, R. Seibert Dep. 222-24.  Debbie Negrych testified that this statement was racially offensive and should never be said by an employer to an employee.  Ex. 7, Negrych Dep. 229-30.

- Defendants admitted that, prior to the May 15, 2010 incident in which Jamie LaPress called Black's children niggers, "[h]e would joke about [Black's] kids not because they were

black, but because they were always in trouble." Ex. 15 at DEF0134. Prior to that incident, Debbie Negrych had spoken to Jamie LaPress about this inappropriate conduct. *Id*. Keegan Roberts testified that Jamie LaPress's jokes about Black's children were inappropriate for the workplace. Ex. 6, Roberts Dep. 185. Given that, on May 15, 2010, Jamie LaPress called Black's children niggers, there is a reasonable evidentiary basis for the conclusion that his prior comments about Black's children were also racially motivated.

- Defendants stated "Darcy was easy to feel sorry for early on in her employment. A single mother with two biracial children trying to work to provide for her family." Ex. 15 at DEF0135. Debbie Negrych agreed that such a statement is racially offensive, as the race of Black's children has nothing to do with feeling sorry for her. Ex. 7, Negrych Dep. 233. When Black learned about this comment, she was offended. Ex. 1, Black Decl. ¶ 19.

8.      Black admits that her Complaint asserted 10 causes of action, alleging Defendants' unlawful conduct in violation of Title VII, the New York State Human Rights Law (hereinafter "NYSHRL"), the Equal Pay Act, and 42 U.S.C. § 1981. *See* Ex. 14, Compl. ¶¶ 60-152. Black further states that her Complaint's allegations are described above. *See supra* ¶ 1. Black denies that she seeks $20,000,000 in damages. Black further states that this Court's CM/ECF docket in this matter states that Black seeks $2,000,000 in damages, subject to future revision. Ex. 39.

9.      Black admits that Defendants filed their Answer on April 17, 2015. *See* Ex. 40, Dkt. 8 (Answer). Black denies that Defendants' Answer denied her allegations. *See generally* Ex. 40, Dkt 8. Black further states that Defendants' Answer made the following relevant admissions:

- "Defendants admit knowing that Plaintiff's two children are Black." Ex. 40, Dkt. 8 ¶ 34.

- "Defendants admit that Black Angus employed Raeleen Rush and Regina Rush; that they each had boyfriends who were Black; that on one occasion, Plaintiff informed Mr. Roberts that a co-worker made a comment to Raeleen Rush to the effect that she could "do better" than her boyfriend; that Mr. Roberts immediately spoke to Raeleen Rush about that remark being inappropriate and immediately counseled the employee that he was forbidden to make such a statement." Ex. 40, Dkt. 8 ¶ 39.

- "Defendants admit that Plaintiff complained that Jamie LaPress made a comment about her children; that Defendants promptly and thoroughly investigated the matter, concluding that there was insufficient evidence to establish that the comment was made; and that, nonetheless, Mr. LaPress was counseled to ensure that his workplace behavior would meet expectations." Ex. 40, Dkt. 8 ¶ 46.

- "Defendants admit that Sean Round's work schedule was modified to alter his working hours to allow him to participate in a football league."  Ex. 40, Dkt. 8 ¶ 27.

Black further states that Defendants' Answer did not plead a defense that Black lacked the capacity to pursue any claims in this action because she had filed bankruptcy in 2009.  *See generally* Ex. 40, Dkt. 8.  Defendants that Black had filed for bankruptcy in 2009 at least as early as February 17, 2017, as demonstrated by Oppenheimer Aff. Exhibit B, wherein it states that Defendants retrieved the relevant information on that date.  Defendants, however, did not seek to amend their Answer.  Thus, Black's counsel completed seven of the nine noticed depositions, including the depositions of the named defendants, without knowledge that Defendants intended to rely on this allegedly dispositive issue.  *See* Appendix Ex. 2-13.   In was not until the final minutes of Black's January 23, 2018 deposition that Defendants' counsel even asked about Black's bankruptcy, amounting to an intentional ambush on this issue.  Ex. 2, Black Dep. 299-308.  Only after Black's January 23, 2018 deposition did Defendants, with service of their Response to Plaintiff's Second Set of Interrogatories, dated February 12, 2018, first indicate that they would contend that Black's 2009 bankruptcy called for the dismissal of her claims.  Ex. 72.

10.    Plaintiff denies that, as Defendants represent,  "[t]he gravamen of Black's claims is that Defendants created a hostile work environment on the basis of race and sex, discriminated against her with respect to wages on the basis of sex, and constructively discharged her."  Dkt. 106-1 ¶ 10.  Black also claims: that Defendants "discriminated against her on the basis of race and sex." *Compare* Dkt. 106-1 ¶ 10, *with* Ex. 70, Dkt. 69-1 ¶ 3.

11.    Black states that her Complaint speaks for itself and is discussed above.  *See supra* ¶ 1.  Black admits that her Complaint alleges that she "was subjected to different terms and conditions of employment than similarly situated Caucasian employees and a hostile work environment" (Ex. 14, Compl. ¶ 61); she "was subjected to a continuing course of racial

discrimination" (*id.* ¶ 62); she "was required to work in a racially hostile environment" (*id.* ¶ 63); she "was subjected to different terms and conditions of employment than similarly situated male employees and a hostile work environment" (*id.* ¶ 98); she "was subjected to a continuing course of sex discrimination" (*id.* ¶ 99); she "was required to work in a sexually hostile environment" (*id.* ¶ 100); she was "treated . . . adversely because of her sex" (*id.* ¶ 111); she "brought the above-described unlawful conduct to the attention of her supervisors" (*id.* ¶ 119); "[s]imilarly situated male employees were paid at a higher rate of pay than" Black (*id.* ¶ 15); "[m]ale employees were not required to call in when they are going to be absent or come in late, or take several breaks to smoke, and they were not reprimanded, but females are not allowed to do that without being reprimanded" (*id.* ¶ 24); male co-employees made racially and sexually offensive comments (*id.* ¶¶ 33-34); and Defendants failed to interview or offer employment to any African-American applicant, despite over 50 such individuals applying for employment (*id.* ¶ 36-37).  Black further states that her Complaint alleged that she was constructively discharged from her employment.  *Id.* ¶ 49.

Black further states that the admissible evidence detailed below supports each claim and cause of action stated in her Complaint:

Black is Caucasian, and she has two children whose fathers are African-American fathers. Ex. 2, Black Dep. 263-66.  Defendants admit knowing this. Ex. 40, Dkt. 8 ¶ 34.  Defendants also admits to multiple instances of racially offensive conduct occurring at BAM.  For example, Defendants admit that Sean Round made at least two racially offensive comments to Raelean Rush about the fact that her boyfriend was African-American.  *See* Ex. 40, Dkt. 8 ¶ 39; Ex. 15 at DEF1034).  First, Defendants admit that Sean Round told Raelean Rush that she could "do better" than her boyfriend. Ex. 40, Dkt. 8 ¶ 39.  Black was offended by this comment (Ex. 1, Black Decl. ¶ 8), and Defendants admit that Black made a complaint to Keegan Roberts about this racially offensive comment (Ex.

40, Dkt. 8 ¶ 39).  Second, Defendants admit that Sean Round made a racially offensive comment to Raelean Rush about her African-American boyfriend that he was using her for her good credit score and other things.  Ex. 15 at DEF1034.   Black states that Sean Round had no basis to make these comments, as Raelean Rush's African-American boyfriend was a hard-working business owner who fully contributed to the relationship.  Ex. 13, Rush Dep. 37, 89-91.  Black was present for and was offended by this comment.  Ex. 2, Black Dep. 291-95.  Defendants also admit that they were aware of these two racially offensive comments.  *See* Ex. 40, Dkt. 8 ¶ 39; Ex. 15 at DEF1034.

Defendants also admit that, about six months to one year prior to Black's May 25, 2010 constructive discharge, Robert Seibert said to Black "she would have to get used to the idea that her children were black – there was no changing that.  School kids are cruel and racial remarks from kids is not unusual."  Ex. 15 at DEF0134; Ex. 5, R. Seibert Dep. 222-23.  Black states that she did not tell Robert Seibert that her children were being bullied because they were black."  Ex. 1, Black Decl. ¶¶ 9-10.  Robert Seibert testified that he had no actual basis for this opinion.  Ex. 5, R. Seibert Dep. 222-24.  Black was offended by this statement.  *Id.*  Debbie Negrych and Mark Leible also testified that this statement is racially offensive.  Ex. 7, Negrych Dep. 229-30; Ex. 10, Leible Dep. 183.

Further, credible evidence demonstrates other racially offensive conduct occurring during Black's employment at BAM.  Black was present on multiple occasions when BAM employees, including Keegan Roberts, Store Manager, and Jamie LaPress referred to Defendants' African-American customers as "Bob's niggs."  Ex. 2, Black Dep. 271-73, 276-77.  When Keegan Roberts and Sean Round made deliveries to predominantly African-American neighborhoods, they said that they had to deliver to "Bob's niggs."  Defendants' Exhibit C at 5.  When Robert Seibert asked

Jamie LaPress to clean BAM's parking lot, Jamie LaPress said that he had to clean the parking lot because "Bob's niggs are dirtying [it] up." *Id.*  Defendants were also aware of other racially offensive comments, such as Jamie LaPress saying with respect to African-American customers: "how they could have nice cars and get food stamps" or how can they have "gold around their neck . . . [a]nd get food stamps." Ex. 2, Black Dep. 276-77.  Additionally, the Seiberts' daughter, Nicole Seibert, and Keegan Roberts laughed at these comments. Defendants' Exhibit C at 5. Additionally, Nicole Seibert said regarding an African-American customer who made a purchase with food stamps, he was "too fat" or "why can't they get out and work." *Id.*  Black was offended by these comments.  Ex. 1, Black Decl. ¶ 11.  Black was also present when Jamie LaPress said regarding Defendants' African-American customers "how they could have nice cars and get food stamps" or how can they have "gold around their neck . . . [a]nd get food stampsBlack was offended by these comments.  Ex. 1, Black Decl. ¶ 11.  Additionally, Keegan Roberts, Store Manager, was present in the pack room when Jamie LaPress made these racially offensive comments.  Ex. 2, Black Dep. 239-42, 279-81.  Robert Seibert also made racially offensive comments about African-Americans.  Ex. 2, Black Dep. 275-76.  Black heard these and similar racially offensive comments starting in about 2007 and continuing through her May 25, 2010 constructive discharge.  Ex. 2, Black Dep. 279-81.  BAM's employees testified that these comments are racially offensive and discriminatory, and Robert Seibert testified that many of the comments would be grounds for termination. Ex. 5, R. Seibert Dep. 245-50, 254; Ex. 4, D. Seibert Dep. 132-33, 151; Ex. 6, Roberts Dep. 284-90; Ex. 8, LaPress Dep. 209-10, 281-85; Ex. 10, Leible Dep. 168-71, 173-75; Ex. 13, Rush Dep. 95; Ex. 11, T. Howells Dep. 273-75, 283; Ex. 7, Negrych Dep. 210-15.

Credible evidence also demonstrates incidents of sexually offensive conduct that occurred during Black's employment at BAM. For example, Thomas Howells said to Black and Debbie Negrych (on different occasions) "does the carpet match the drapes?" Ex. 2, Black Dep. 234-35, 243-45. On several occasions, the latest being in 2010 shortly before Black's May 25, 2010 constructive discharge, Sean Round commented that Raelean Rush has a nice ass. Ex. 2, Black Dep. 231-33. Defendants were aware of these comments, as Sean Round made some of them to Keegan Roberts, Store Manager. Ex. 2, Black Dep. at 232-33. Sean Round made other sexually offensive comments as well, saying relative to female customers: "her headlights are on" and "oh look at that cleavage." Ex. 2, Black Dep. 234-35. Black was present when Sean Round made these comments, and she was offended by them. Ex. 1, Black Decl. ¶ 14. BAM's employees testified that these comments are sexually offensive. Ex. 4, D. Seibert Dep. 157-59; Ex. 6, Roberts Dep. 295-97; Ex. 8, LaPress Dep. 286-88; Ex. 10, Leible Dep. 162-64; Ex. 13, Rush Dep. 97-98; Ex. 11, T. Howells Dep. 254-57; Ex. 7, Negrych Dep. 201-02.

As the result of events that began on May 15, 2010 and concluded on May 25, 2010, Defendants constructively discharged Black from her employment at BAM. Specifically, on May 15, 2010, Jamie LaPress had lost the key to a paper towel dispenser and came up alongside Black and asked her if she could break into the paper towel dispenser. Ex. 2, Black Dep. 295-96. Black told him that she could not and asked Jamie why he would ask. *Id*. Jamie LaPress said to Black "you have two black kids and that's what black people do." *Id*. at 296. Black replied that her children do not break into things, and she asked why he would say that. *Id*. "He goes well, they're niggers." *Id*. Following this incident, Black, also on May 15, 2010, complained to both Debbie Negrych and Thomas Howells, who were nearby when Jamie LaPress made this racially offensive comment about Black's children. Ex. 2, Black Dep. 296-97. Additionally, Defendants have

identified Debbie Negrych and Thomas Howells as managers who regularly oversaw other employees.  Ex. 20.

On May 18, 2019, Black complained to Keegan Roberts, store manager, and told him that Jamie LaPress had called her children niggers.  Ex. 6, Roberts Dep. 310.  Keegan Roberts understood Black's complaint to be one of discrimination and harassment.  *Id*. 310.  Keegan Roberts testified that he then spoke with Jamie LaPress, Debbie Negrych, and Thomas Howells, and Jamie LaPress denied calling Black's children niggers.  *Id*.  Diane Seibert testified that Defendants never even considered the possibility that Jamie LaPress was lying and Black was telling the truth.  Ex. 4, D. Seibert Dep. 144-45.  In comparison, Raelean Rush testified that Black was always straightforward and honest, and there was no reason to believe Jamie LaPress and disbelieve Black.  Ex. 13, Rush Dep. 117-18.

On May 21, 2010, Keegan Roberts, Store Manager, had already determined that he did not believe Black's complaint, and he indicated that he wanted Black to have a further conversation with Jamie LaPress about the incident.  Ex. 6, Roberts Dep. 311-12.  As a result, Black, on May 21, 2010, left a resignation letter for Robert Seibert and Diane Seibert (who were on vacation at the time), putting in her two weeks' notice.  Ex. 2, Black Dep. 297-99.  Black's letter stated:

> I am writing you this because I have a hard time talking about what happened at work.  I can deal with issues that have to do with me.  I get emotional, then I get over it, but when someone can look and me and call my kids "niggers", I can not deal with that.  My kids might be a handful but they are mine, and don't deserve to be called that by one of my co-workers.  So, I am giving you my 2 week notice.  Thank you for all you have done for me.

Ex. 41 at DEF0048.

On May 25, 2010, Robert Seibert had returned from vacation, and Robert Seibert and Keegan Roberts called Black into the office for a meeting.  Ex. 2, Black Dep. 298.  In that meeting,

Black again explained the May 15, 2010 incident in which Jamie LaPress had called her children niggers. *Id*. Robert Seibert and Keegan Roberts then called Jamie LaPress into the meeting, and Jamie LaPress then said that he was not talking to Black, and it was nice. *Id*. at 296-97. After that Keegan Roberts and Jamie LaPress left the office. *Id*. at 297. Robert Seibert then said to Black that she would have to get used to things like that (i.e., people calling her children niggers) because people are mean and cruel. *Id*. Black then asked Robert Seibert "so it's okay for one of my co-workers to call my kids niggers?" *Id*. Robert Seibert replied "it happens in politics and it happens in sports so [Black is] going have to get used to the idea." *Id*. Black was offended by this comment. Ex. 1, Black Decl. ¶ 16. Multiple witnesses testified that this statement by Robert Seibert is racially offensive and discriminatory. Ex. 4, D. Seibert Dep. 168; Ex. 10, Leible Dep. 187. Black then told Robert Seibert that she was uncomfortable working with Jamie LaPress, and Robert Seibert said that he "was uncomfortable with the whole situation" and directed Black to leave immediately. Ex. 2, Black Dep. 297. May 25, 2010 was Black's last day of work at BAM. *Id*. Notably, Robert Seibert, himself, testified that he agreed that this response to Black's complaint of discrimination and harassment would be retaliatory. Ex. 5, R. Seibert Dep. 324.

Prior to the May 15, 2010 incident in which Jamie LaPress called Black's children niggers—and Defendants' failure to take any action to address Black's complaint—Black had no intention of resigning her employment at BAM. Ex. 3, Black Dep. 336. Black could not afford to leave her job at BAM because she needed it to support her family. *Id*. Notably, Raelean Rush, who is Caucasian and whose husband is African-American and the father of her two children, testified that she could think of nothing more offensive than a white employee calling Black's children niggers. Ex. 13, Rush Dep. 108, 128-29. She also testified that, if an employee referred

to her children as niggers and the employer did not discharge or discipline the employee, she would leave employment.  Ex. 13, Rush Dep. 108, 128-29.

In addition to the evidence noted above, other admissible evidence demonstrates that Defendants' racially discriminatory motive and intent affected the terms and conditions of Black's employment.  For example, Defendants made representations before the EEOC indicating racial bias, including but not limited to:

- With respect to Black's friendship with Raelean Rush and Regina Rush, Defendants stated "[b]oth dated African Americans and Darcy felt a connection to them because her children were biracial."  Ex. 15 at DEF0134.  Debbie Negrych agreed that such a statement indicates that people are not treated equally.  Ex. 7, Negrych Dep. 209.  Raelean Rush said that this statement was false and that she would find it offensive if someone said this.  Ex. 13, Rush Dep. 102.

- Defendants admitted that "Sean [Round] did make a comment to Raelean about her [African-American] boyfriend using her for her good credit score and other things."  Ex. 15 at DEF1034.  BAM's employees agreed that such a statement is inappropriate and racially offensive.  Ex. 4, D. Seibert Dep. 132-33; Ex. 6, Roberts Dep. 232, 287; Ex. 11, T. Howells Dep. 271-73; Ex. 13, Rush Dep. 89, 107-08.  Raelean Rush, Raelean Rush described this incident to Keegan Roberts, Store Manager, as "Sean being Sean," providing an evidentiary basis for the reasonable conclusion that Sean Round had said other racially offensive things to Raelean Rush.  Ex. 6, Roberts Dep. 234.

- "Defendants admit that Black Angus employed Raeleen Rush and Regina Rush; that they each had boyfriends who were Black; that on one occasion, Plaintiff informed Mr. Roberts that a co-worker made a comment to Raeleen Rush to the effect that she could "do better" than her boyfriend; that Mr. Roberts immediately spoke to Raeleen Rush about that remark being inappropriate and immediately counseled the employee that he was forbidden to make such a statement." Ex. 40, Dkt. 8 ¶ 39.

- Defendants admitted that Defendant, Robert Seibert, said to Black "she would have to get used to the idea that her children were black – there was no changing that.  School kids are cruel and racial remarks from kids is not unusual.  That was his opinion".  Ex. 15 at DEF0134.  Notably, Robert Seibert testified that he had no actual basis for this opinion.  Ex. 5, R. Seibert Dep. 222-24.  Debbie Negrych testified that this statement was racially offensive and should never be said by an employer to an employee.  Ex. 7, Negrych Dep. 229-30.

- Defendants stated "Darcy was easy to feel sorry for early on in her employment.  A single mother with two biracial children trying to work to provide for her family."  Ex. 15 at

DEF0135.  Debbie Negrych agreed that such a statement is racially offensive, as the race of Black's children has nothing to do with feeling sorry for her.  Ex. 7, Negrych Dep. 233.

Additionally, admissible evidence shows that Defendants refused to interview or offer employment to African-American applicants.  It is undisputed that, during the five years that Black worked at BAM, Defendants employed no African-Americans or other ethnic minorities.  Ex. 2, Black Dep. 282-83.   In fact, at the time of Black's May 25, 2010 constructive discharge, Defendants had not employed an African-American in about 20 years.  *See* Ex. 5, R. Seibert Dep. 36-39. In general, Diane Seibert's policy with respect to interviews was that, if she was available, she interviewed applicants immediately when they delivered their completed applications.  Ex. 6, Roberts Dep. 72-73; Ex. 9, Round Dep. 172-73.  If Defendants had a "help wanted" sign posted, there was no legitimate reason that an applicant would not be immediately interviewed.  Ex. 11, T. Howells Dep. 259; Ex. 7, Negrych Dep. 102-03.

However, Defendants did not, during Black's employment with BAM, interview or offer employment to a single African-American applicant.  Ex. 2, Black Dep. 282-83.  First, when Defendants were seeking applications, they did so by placing a "help wanted" sign on the front door.  Ex. 6, Roberts Dep. 70-71.  Given that 60% of BAM's customers were African-American (Ex. 15), many African-Americans saw this sign.  Despite this, Defendants did not have a single African-American employee from between the 1990s until after Black's May 25, 2010 constructive discharge.  Ex. 5, R. Seibert Dep. 36-39; Ex. 20.  Before determining whether to conduct an interview, Diane Seibert looked out of her office window at the applicant.  Ex. 2, Black Dep. 287-88; Ex. 4, D. Seibert Dep. 179.  If the applicant was African-American, Diane Seibert instructed employees to tell the applicant that Defendants were only collecting applications, and the applicant would receive a phone call.  Black 288-89.  Diane Seibert gave this instruction to Black regarding at least 20 African-American applicants.  *Id.*  Additionally, Defendants failed to

retain employment applications for the relevant period and have, therefore, destroyed evidence relevant to Black's claims.  *See supra* ¶ 7.

Black was also, during her employment with BAM, aware of at least 50 African-American applicants who Defendants did not interview or offer employment to.  Ex. 2, Black Dep. 282-83. When Spartacus Towne, an African-American male, applied at BAM, Black personally brought his application to Diane Seibert.  Ex. 1, Black Decl. ¶ 13.  Diane Seibert looked out of the office window, saw that Spartacus Towne was African-American, and instructed Black to tell him that BAM was only gathering applications and would call him.  *Id.*  As Black was walking away, she observed Diane Seibert throw Spartacus Towne's application into her garbage can.  *Id.*  Later that day, when Black was assigned to empty garbage cans, she confirmed that Diane Seibert had, in fact, thrown away Spartacus Towne's application.  *Id.;* Ex. 2, Black Dep. 289-90.  Defendants did not interview or offer employment to Spartacus Towne.  Ex. 1, Black Decl. ¶ 13.  When Black brought the application of Leo Cumberlander, Jr., an African-American male, to Diane Seibert, Diane Seibert looked out of the office window, saw that Leo Cumberlander, Jr., was African-American, and instructed Black to tell him that Defendants were only gathering applications and would call him.  *Id.*  Defendants did not interview or offer employment to Leo Cumberlander, Jr. *Id.*  During the last year of Black's employment with BAM, the son of a customer called Mr. John, who is African-American, put in multiple applications while Defendants were hiring.  *Id.*  On another occasion, Black personally took his application to Diane Seibert, who looked out of the office window, saw that the applicant was African-American, and instructed Black to tell him that Defendants were only gathering applications and would call him.  *Id.*  Defendants did not interview or offer employment to this African-American applicant.  *Id.*  Black was offended by Defendants' refusal to interview or offer employment to African-American applicants.  *Id.*

As noted above (*see supra* ¶ 7), it was only after Black's complaints of discrimination, harassment, and hostile work environment and her May 25, 2010 constructive discharge that Defendants hired Franklin Bennett, their first African-American employee in about 20 years.  *See* Ex. 23; Ex. 5, R. Seibert Dep. 36-39.  And Franklin Bennett works for Defendants no more than once or twice per month.  Ex. 8, LaPress Dep. 45-46; Ex. 10, Leible Dep. 120.

Evidence also demonstrates that Black was subjected to less favorable terms and conditions of employment than similarly situated male employees, including with respect to wages.  As an initial matter, Diane Seibert testified that, but for the owners and management employees, all of Defendants' other employees have equal duties and responsibilities.  Ex. 4, D. Seibert Dep. 199-200.  Specifically, Diane Seibert testified that all such employees are equally expected to do any work as needed: "We hire employees to do work, to do labor. We are not specific when they are hired."  Ex. 4, D. Seibert Dep. 199-200.  Diane Seibert testified that all employees are expected to fill packs for deliveries, wrap, wait on customers, and do whatever else needs to be done.  Ex. 4, D. Seibert Dep. 203.  Thus, Defendants employees were basically interchangeable.  Ex. 4, D. Seibert Dep. 202; *see also* Ex. 9, Round Dep. 138 (describing one employee's responsibilities as the "[s]ame as everyone.").

Black, Mark Leible, Sean Round, Jamie LaPress, and Patrick Howells were all, first and foremost, packers, i.e., they worked in the pack room preparing orders for deliveries.  Ex. 6, Roberts Dep. 262.  Black's primary duty was working in the pack room.  Ex. 4, D. Seibert Dep. 202; Ex. 7, Negrych Dep. 168.  This was also Mark Leible's primary duty, and he had been Black's partner in the pack room.  Ex. 6, Roberts Dep. 119; Ex. 10, Leible Dep. 51.  Sean Round also worked in the pack room, and he had also been partnered with Black.  Ex. 9, Round Dep. 55, 114.  Jamie LaPress has also worked in the pack room at times (Ex. 8, LaPress Dep. 87-88; Ex. 9, Round

Dep. 15-16), but not with the same frequency as Black, Mark Leible, and Sean Round, as Jamie

LaPress had difficulty wrapping (Ex. 4, D. Seibert Dep. 298) and being on time for the 7:00 a.m.

packing shift (Ex. 8, LaPress Dep. 91-98).   Patrick Howells also worked in the pack room

seasonally beginning in about 2006 and continuing through Black's May 25, 2010 constructive

discharge.   Ex. 1, Black Decl. ¶ 21.   It was only after these pack room employees completed

packing duties that they moved on to other tasks.   Ex. 5, R. Seibert Dep. 172-73, 177; Ex. 10,

Leible Dep. 51.   These employees' additional tasks were also equivalent.   Ex. 1, Black Decl. ¶ 21.

First, Mark Leible and Jamie LaPress did not have primary duties related to meat cutting.

Ex. 10, Leible Dep. 117; Ex. 8, LaPress Dep. 152.   Thomas Howells was Defendants' main

butcher.   Ex. 4, D. Seibert Dep. 116; Ex. 2, Black Dep. 96-97; Ex. 8, LaPress Dep 151-52; Ex. 10,

Leible Dep. 62-63; Ex. 9, Round Dep. 125.   Thomas Howells came in every morning and did meat

cutting until the work was done.   Ex. 11, T. Howells Dep. 180.   In general, he arrived before Black

arrived for her 7:00 a.m. shift and worked until about 4:00 or 5:00 p.m.   Ex. 1, Black Decl. ¶ 21.

During deer season, it was not uncommon for Thomas Howells to work over 60 hours in a week.

*Id.*   Jamie LaPress cut meat only upon specific request and only when Thomas Howells was not

present.   Ex. 8, LaPress Dep. 151-53.   Mark Leible cut meat even less frequently, as he would cut

meat only when both Thomas Howells and Jamie LaPress were not available.   Ex. 10, Leible Dep.

117; Ex. 8, LaPress Dep. 152. Additionally, Black also did meat cutting.   Ex. 2, Black Dep. 93-97.

Specifically, she had butterflied chicken breasts, cut pork chops, and cut steaks.   *Id*.   Thomas

Howells, Defendants' primary butcher, testified that these tasks are consistent with the duties of a

meat cutter.   Ex. 11, T. Howells Dep. 170-71.

Additionally, after completing the day's packs, Black had significant duties and

responsibilities while working for BAM, including the following: order products with Bell-View,

including but not limited to canned goods, glass peppers, pickles, olives, and dressing (Ex. 2, Black

Dep. 91); answer phones, take orders, take payment information, and secure food stamps for

deliveries (*id*. 104-06); check delivery orders against invoices and sign off on deliveries (*id*. 106-

07); mark up product (*id*. 107-08); clean out the sausage machine after use (*id*. 110-12); use the

steak cubing machine (*id*. 112-13); work with deer, including taking the deer from the hunter,

dragging it into the cooler, cutting off its limbs, and wrapping deer meat (*id*. 116-17, 119-20);

slice, screen, scrape, and bag jerky (*id*. 123-24); take out the trash (*id*. 137-38); pick up trash and

cigarette butts from the exterior of the building (*id*.); cleaning the exterior of the building (*id*. 137-

38); butterflying chickens (*id*. 93-95); and cutting pork chops and steaks (*id*. 93-95).  In the deli,

Black created three new types of salads that were then sold at BAM: homemade macaroni and

cheese, old-fashioned macaroni, and spiral antipasto.  *Id*. 107-09; Ex. 7, Negrych Dep. 194.  Black

began to ask Thomas Howells for additional training in meat cutting in about 2007.  Ex. 2, Black

Dep. 126-27.  Thomas Howells, however, did not provide Black any further meat cutting training

but continued to provide training to male employees Jamie LaPress and Mark Leible.  *Id*.  Thomas

Howells also repeatedly described female employees performing wrapping and customer service

duties as the "girls."  Ex. 11, T. Howells Dep. 147, 219-22.  He also referred to Debbie Negrych,

a female management employee with over 20 years at BAM as "lead girl."  Ex. 11, T. Howells

Dep. 238-40.

Further, Black requested but was denied the opportunity to perform additional duties with

respect to deliveries, flyering, meat grinding, operating the smoker, making sausage, and making

jerky.  Ex. 2, Black Dep. 98-99, 115-16, 119-24.  When Black told Diane Seibert that she (Black)

wanted to take on driving responsibilities, Black reminded Diane that she was especially qualified

to do so, as she had a commercial drivers' license.  *Id*. 124-26, 140-41.  Meat grinding was not a

significant task, and it took only a couple hours to teach.  Ex. 11, T. Howells Dep. 198.  Thomas Howells could and would have taught Black meat grinding if he was told to do so.  *Id*. 201.  Making jerky is also easy to learn.  Ex. 10, Leible Dep. 179-80.  And operating the smoker is easy; it is just pressing buttons and takes only one day to learn.  *Id*. 178-79.

Despite being similarly situated to Defendants' male employees, Defendants treated male employees more favorably than females, including Black.  Black was always on time and treated people with respect.  Ex. 15; Ex. 13, Rush Dep. 126; Ex. 10, Leible Dep. 59.  She was a good worker who always did her best to give a fair day's work.  Ex. 7, Negrych Dep. 182.  "When you asked Darcy to work, she would work."  Ex. 6, Roberts Dep. 330.   In comparison, Jamie LaPress, Mark Leible, and Sean Round were consistently late for work.  Ex. 5, R. Seibert Dep. 169; Ex. 4, D. Seibert Dep. 286-87; Ex. 6, Roberts Dep. 111-12, 118; Ex. 2, Black Dep. 225-26.   Jamie LaPress admitted that he has been spoken to about being late by Keegan Roberts, Diane Seibert, and/or Robert Seibert at least 65 times. Ex. 8, LaPress Dep. 91-98.  Defendants were also aware that Sean Round had, on occasion, arrived to work between 60 and 90 minutes late and then wrote on his time card the time he was schedule to arrive, rather than the time he actually arrived.  Ex. 2, Black Dep. 225-26. Defendants did not discipline these employees or consider terminating them.  Ex. 6, Roberts Dep. 112, 116; Ex. 2, Black Dep. 226-27; Ex. 8, LaPress Dep. 99-103.  Defendants also did not require male employees to call in when they were going to be late.  Ex. 2, Black Dep. 221-22.

Defendants also admit that they scrutinized Black's time (Ex. 15); in comparison, male employees were able to take breaks throughout the day without scrutiny.  Ex. 2, Black Dep. 184-185, Ex. 3, Black Dep. 322; Ex. 10, Leible Dep. 108.  Throughout Black's employment, continuing to her May 25, 2010 constructive discharge, Defendants permitted male employees to take

unauthorized breaks without any consequence.  Ex. 2, Black Dep. 221-22; Ex. 8, LaPress Dep. 79-83.  In fact, if both Black and a male employee were on break at the same time, Defendants would require Black to return to work but allow the male employee to continue on break.  Ex. 2, Black Dep. 184-85.  Defendants' scrutiny of Black's time and breaks became so severe that she began tracking her 15-minute breaks on her time card.  *Id*. 223-24.  Although Defendants represented before the EEOC that they scrutinized Black's time "because she abused [their] good graces" by receiving personal phone calls, Black received no more phone calls than male employees.  Ex. 1, Black Decl. ¶ 11.  Black, in compliance with Defendants' policy, left her mobile phone in her car during working hours.  Ex. 1, Black Decl. ¶ 22; Ex. 10, Leible Dep. 139; Ex. 13, Rush Dep. 127.  As a result, she received calls on BAM's landline concerning her children and other important matters.  Ex. 1, Black Decl. ¶ 22.  In comparison, male employees carried mobile phones during business hours (Ex. 10, Leible Dep. 139-40), and they would regularly make and receive calls on them.  Ex. 1, Black Decl. ¶ 22.

Additionally, although Defendants represented before the EEOC that "[e]veryone who is hired is informed that they do not request time off for the first 12 days of the month, or Saturdays, as a rule" (Ex. 15 at DEF0131), Defendants did not apply this rule to male employees but denied female employees' requests for Saturdays off.  Ex. 2, Black Dep. 229-30.  First, Defendants admitted that this rule did not apply to Sean Round, who was permitted Saturdays off to participate in a football league.  Ex. 15 at DEF0133; Ex. 2, Black Dep. 225-26; Ex. 9, Round Dep. 57-58; Ex. 4, D. Seibert Dep. 248-49.  Additionally, Mark Leible received Saturdays off without request, and he was never told that he had to work every Saturday.  Ex. 10, Leible Dep. 110, 160.  Jamie LaPress received Saturdays off upon request.  Ex. 8, LaPress Dep. 102.  In comparison, Defendants denied Black's and Debbie Negrych's requests for Saturdays off.  Ex. 2, Black Dep. 229-30.  Defendants

were also aware that Jamie LaPress smoked marijuana on premises behind a dumpster and took no action.  *Id*. 218-21.  And Robert Seibert and Keegan Roberts said hello to male pack room employees but ignored Black.  *Id*. 230-32.

Defendants also denied Black the opportunity to enroll in health insurance through BAM, a benefit offered to similarly situated male employees.  Specifically, when Black lost Medicaid coverage, she asked Diane Seibert if BAM offered health insurance, and Diane Seibert told Black that BAM did not, as it was too expensive.  Ex. 1, Black Decl. ¶ 23.  However, Robert Seibert and Diane Seibert both testified that health insurance is available to employees, with BAM paying 40% of the premium.  D. Seibert. 264, 274-75; Ex. 5, R. Seibert Dep. 66.  In comparison, when Mark Leible asked Diane Seibert to enroll in health insurance, Diane Seibert arranged for Mark Leible to meet with BlueCross Blue Shield to enroll in a plan.  Ex. 10, Leible Dep. 43.

Defendants also discriminated against Black and other female employees with respect to wages.  Black learned about this pay discrimination in or about April 2010, when Debbie Negrych was handing out paychecks because the Seiberts Keegan Roberts were on vacation in Florida.  Ex. 1, Black Decl. ¶ 21.  Debbie Negrych told Black that Defendants were paying her less that the male employees who she worked with in the pack room.  Ex. 1, Black Decl. ¶ 21.  Debbie Negrych was also upset because she had gotten no raise in about three or four years but male employees who started after Debbie Negrych were earning a higher hourly rate.  *Id*.

Defendants had a simple overarching policy, which was "[s]how up to work, do your job, stay safe, go home at the end of the day."  Ex. 6, Roberts Dep. 106.  Being on time was a component of showing up to work.  Ex. 6, Roberts Dep. 106; *see* Ex. 5, R. Seibert Dep. 136; Ex. 7, Negrych Dep. 131.  In fact, the only written rule or policy at BAM was this written above the employees' work schedules: "you get your checks on time, I expect you to be on time for work."  D. Seibert.

Dep. 87.  Raises were merit-based, and one factor in determining raises was following work rules. Ex. 6, Roberts Dep. 125.  Despite male employees' numerous work rules violations (discussed above), Black had to ask for a raise each year on her work anniversary (Ex. 4, D. Seibert Dep. 387), while male employees, including but not limited to Mark Leible and Jamie LaPress, received raises without asking.  Ex. 10, Leible Dep. 48, 86-87; Ex. 8, LaPress Dep. 136-37.  The following wage comparisons demonstrate that Defendants paid male employees more than female employees, including Black, for the same work.

       (a)      <u>Black as compared to Mark Leible</u>

Black's Salary history with BAM is as follows:

Black's starting rate of pay in May 2010 was $7.50/hour.  Ex. 30; Ex. 4, D. Seibert Dep. 399-400.  After initially working for BAM for about 8 months, on or about January 8, 2006, she received a fifty-cent raise to $8.00/hour.  Ex. 25; Ex. 4, D. Seibert Dep. 399-400.  About a year later, on or about December 31, 2006, she received a fifty-cent raise to $8.50/hour.  Ex. 26; Ex. 4, D. Seibert Dep. 399-400.  About four months later, on or about May 6, 2007, she received a fifty-cent raise to $9.00/hour.  Ex. 31; Ex. 4, D. Seibert Dep. 400.  About a year and two months later, on or about August 3, 2008, she received a fifty-cent raise to $9.50/hour.  Ex. 32; Ex. 4, D. Seibert Dep. 400.  About ten months later, on or about June 7, 2009, she received her final fifty-cent raise to $10.00/hour.  Ex. 33; Ex. 4, D. Seibert Dep. 400.  In or about March 2010, Black approached Keegan Roberts about a raise, as her five-year anniversary employment anniversary was approaching.  Ex. 1, Black Decl. ¶ 24.  Keegan Roberts instructed Black to speak to Diane Seibert about this request, and Diane Seibert denied Black's request, stating that it was not a "good time" and Defendants could not afford it.  Ex. 1, Black Decl. ¶ 24.  Black was earning $10.00/hour at the time of her May 25, 2010 2010 constructive discharge.  Ex. 33.

Defendants have not provided wage information for Mark Leible predating January 2005. Greco Decl. ¶ 4.  On or about January 7, 2005, Mark Leible was earning $10.25/hour.  Ex. 42; Ex. 10, Leible Dep. 40-41.  Notably, when Defendants hired Black on or about May 16, 2005, she and Mark Leible performed the same job duties working together in the pack room.  *See supra* ¶ 11. However, Defendants hired Black at $7.50/hour, $2.75 less per hour than Mark Leible was earning. Ex. 30.  On or about December 8, 2006, Mark Leible received a raise to $11.25/hour.  Ex. 43; Ex. 10, Leible Dep. 48-49.  In comparison, Black at this point was earning only $8/hour.  *Compare* Ex. 25, *with* Ex. 43.  Then, in or about June 2007, Mark Leible left employment with BAM.  Ex. 44.  On or about March 3, 2009, Mark Leible returned to BAM at a rate of $12/hour, performing the same duties as he had in June 2007.  Ex. 44.  At this time, Black was earning $9.50/hour in comparison.  Ex. 32.

Additionally, Mark Leible was enrolled in health insurance through BAM, of which Defendants paid 40%.  Ex. 10, Leible Dep. 43.  This employee benefit constituted additional compensation paid to Mark Leible, as Diane Seibert had denied Black's request to enroll in health insurance through BAM.  Ex. 1, Black Decl. ¶ 24.  Moreover, when Mark Leible returned to BAM in March 2009, BAM's records indicate that Mark Leible was making no contribution toward his health insurance premium from between March 2009 and September 2011, after Black's constructive discharge.  Ex. 45; Ex. 10, Leible Dep. 90.  However, Mark Leible testified that, when he returned to BAM in March 2009, he was enrolled in the same health insurance plan he had been enrolled in in June 2007.  Ex. 10, Leible Dep. 90.  Notably, Defendants have failed to produce their costs relative to employee health insurance for years 2009 and 2010.  Greco Decl. ¶ 4. However, using Defendants' single plan health insurance premium from 2011 as guidance, Defendants contributed about $3,422.52 toward Mark Leible's health insurance in 2010.  Ex. 46

at DEF3837.  As a result, Mark Leible's effective salary at the time of Black's May 25, 2010 constructive discharge was about $13.65/hour.  Additionally, shortly after Black's May 25, 2010 constructive discharge, on or about September 5, 2010, Mark Leible received a $1 raise to $13/hour, making his effective salary $14.65/hour.  Ex. 47; Ex. 10, Leible Dep. 87.  In comparison, when Black requested a raise in or about March 2010, Defendants denied her request.  Ex. 1, Black Decl. ¶ 24.

Thus, throughout her employment with BAM, Mark Leible earned more than Black for the same work.  At the time of Black's May 25, 2010 constructive discharge, her rate was $10.00/hour, as compared to Mark Leible's $13.65/hour, which was raised three months later to $14.65/hour.

(b)   <u>Black as compared to Sean Round</u>

BAM hired Sean Round on or about February 23, 2007, at a rate of $9.50/hour.  Ex. 24; Ex. 9, Round Dep. 53-54.  At that time, Black was earning $8.50/hour.  Ex. 25; Ex. 4, D. Seibert Dep. 399-400.  As noted above, when BAM hired Sean Round, he had no specialized skills or experience wrapping and/or packing meat.  Ex. 9, Round Dep. 55.  However, about six months later, Sean Round's hourly rate had increased by $2.50/hour to $11.50/hour, which is more than Black's hourly rate of $10/hour at the time of her May 25, 2010 constructive discharge.  *Compare* Exs. 24, 27, 28, *with* Exs. 30, 25, 26, 31-33.  On or about February 5, 2010, Sean Round received a $1.50/hour raise to $13.00/hour.  Ex. 34; Ex. 9, Round Dep. 79-80.  This was approximately one month before Defendants denied Black's request for a raise in or about March 2010.  Ex. 1, Black Decl. ¶ 24.  Evidence also indicates that Sean Round worked off the books for BAM, given that he admitted working for BAM since January 11, 2015 (Ex. 9, Round Dep. 102-06), but he is not reflected on any of BAM's payroll records after January 11, 2015.  Ex. 48.

(c)   <u>Black as compared to Patrick Howells</u>

Admissible evidence demonstrates that, during Black's employment, BAM seasonally employed Patrick Howells and paid him off the books for doing work similar to Black, i.e., packing orders for deliveries. *See* Ex. 1, Black Decl. ¶¶ 21, 24. Specifically, beginning in about 2006 and continuing through Black's May 25, 2010 constructive discharge, each year from approximately October to March, when Patrick Howells was laid off from his regular concrete job, he worked daily in BAM's pack room. Ex. 1, Black Decl. ¶¶ 21, 24. This was in Black's presence. *Id.* When working in the pack room, Patrick Howells brought product from the freezers to the pack room, which other employees used to fill orders for deliveries. *Id.* Patrick Howells was working at BAM so frequently, that Black invited him to her March 2009 wedding. Ex. 12, P. Howells Dep. 84-86; Ex. 49. Defendants' payroll records do not reflect any wages paid to Patrick Howells; but at the time of her May 25, 2010 constructive discharge, Black was earning $10.00/hour, subject to all applicable taxes and withholdings. Exs. 25, 26, 31-33.

(d)     Black as compared to William Frase

William Frase, also known as Turtle, worked in the pack room and performed the same duties as Black did. Ex. 1, Black Decl. ¶ 24; Ex. 6, Roberts Dep. 213. William Frase began working at BAM at or about the same time that Black did, May 16, 2005. Ex. 1, Black Decl. ¶ 24. However, Defendants' records show that William Frase does not appear on BAM's payroll until on or about July 31, 2009. Ex. 50. On or about February 9, 2009, William Frase's mother, Grace Frase, died. Ex. 51. Subsequently, William Frase decided to purchase his mother's house. Ex. 1, Black Decl. ¶ 24. He then spoke with Defendants and said that he needed to put on the books at BAM so that he could show income to purchase his mother's home out of the estate. Ex. 1, Black Decl. ¶ 24. He first appeared on BAM's payroll on or about July 31, 2009, earning $15/hour; this is $5 more per hour than Black was earning at that time. Ex. 33. This, in conjunction with his

about four years working off the books, demonstrates that Defendants paid this male employee more for the same work.

      (e)    <u>Debbie Negrych as compared to Sean Round</u>

By the time that Black began working at BAM, Debbie Negrych, who Defendants identified as "Deli Manager" and the "Face of the Angus" had been with BAM "for more than 20 years." Ex. 15 at DEF0132. Despite her tenure and management position, on or about January 7, 2005, Debbie Negrych was earning only $10.50/hour. Ex. 52; Ex. 7, Negrych Dep. 44-46. Not until on or about June 12, 2009 did Debbie Negrych receive a raise to $11/hour. Ex. 53; Ex. 7, Negrych Dep. 69-71. She worked for over four years without a raise. Ex. 4, D. Seibert Dep. 350.

In comparison, Defendants, on or about February 23, 2007, hired Sean Round, who had no specialized meat or deli experience (Ex. 9, Round Dep. 55) at a rate of $9.50/hour. Ex. 24; Ex. 9, Round Dep. 53-54. Within six months, Sean Round was earning $12/hour, $1.50 more per hour than Debbie Negrych. Ex. 29; Ex. 9, Round Dep. 74-75. Additionally and as noted above, evidence also indicates that Sean Round worked off the books for BAM, given that he admitted working for BAM since January 11, 2015 (Ex. 9, Round Dep. 102-06), but he is not reflected on any of BAM's payroll records after January 11, 2015. Ex. 48.

BAM's contributions toward Debbie Negrych's health insurance do not resolve this pay disparity, as evidence demonstrates that the total cost for Debbie Negrych's health insurance was $7,170.36 in 2005; $7,750.80 in 2006; $9,675.12 in 2007; and $9,369.48 in 2008. See Ex. 21 DEF3830-3833. Defendants have produced no documents relative to the cost of Debbie Negrych's health insurance for the last two years of Black's employment, i.e., 2009 and 2010. Greco Decl. ¶ 4. Additionally, starting on or about December 22, 2006, Debbie Negrych began making $50

weekly contributions toward her health insurance, totaling $2,600/year.  Ex. 22; Ex. 7, Negrych Dep. 66-68.

      (f)     <u>Christopher Howells as compared to Raelean Rush and Regina Rush</u>

      BAM hired Christopher Howells, Raelean Rush, and Regina Rush each to work part time at the front counter.  Ex. 11, T. Howells Dep. 191-195; Ex. 9, Round Dep. 130; Ex. 13, Rush Dep. 59, 67-69.  At his time of hire, Christopher Howells had no specialized meat grinding or meat cutting experience.  Ex. 11, T. Howells Dep. 191-95.  Despite this, Defendants hired Christopher Howells on or about February 15, 2008, at a rate of $12/hour.  Ex. 54.  In comparison, at the time that Defendants hired Christopher Howells at $12/hour, they were paying Raelean Rush only $8.50/hour, despite her having almost three years' experience at that time.  Ex. 55; Ex. 13, Rush Dep. 52-53.  At that time, Regina Rush was also earning only $8.50/hour, despite also having worked for BAM for about three years.  Ex. 56.

      (g)     <u>Evidence that male employees are paid off the books</u>

      In addition to Defendants' payroll records indicating that Defendants paid women less than men for the same work, evidence also demonstrates that Defendants also allowed male employees to work off the books.  As noted above, evidence demonstrates that Sean Round, William Frase, and Patrick Howells each worked off the books.  *See supra*.

      Evidence also indicates that Defendants allowed David Monolopolus to work off the books.  Defendants produced only one payroll record for David Monolopolus: the week of December 5, 2005 through December 11, 2005.  Ex. 57.  However, Thomas Howells testified that he recalled working with David Monolopolus seasonally in 2015, 2016, and 2017.  Ex. 11, T. Howells Dep. 101-05.  The absence of payroll records relative to this work indicates that David Monolopolus worked for Defendants and that they were paying him off the books.

Evidence also indicates that Defendants allowed Thomas Howells to work off the books. While Black worked at BAM, Thomas Howells was the main butcher. Ex. 4, D. Seibert Dep. 116; Ex. 2, Black Dep. 96-97; Ex. 8, LaPress Dep 151-52; Ex. 10, Leible Dep. 62-63; Ex. 9, Round Dep. 125. Thomas Howells typically arrived at BAM before Black arrived for her 7:00 a.m. shift and, during most of the year, stayed until about 4:00 or 5:00 p.m. Ex. 1, Black Decl. ¶ 24. During deer season, which is November through January, Thomas Howells was at BAM working over 60 hours per week. *Id.* Defendants' payroll records, do not reflect Thomas Howells's actual hours. Exs. 36, 58-63. Thus, evidence indicates that Defendants paid Thomas Howells partially on the books and partially off the books. For example, in years prior to Thomas Howells's full retirement age, his wages reflected from BAM were under $15,000/year. Exs. 58, 59, 36, 60, 61. Then, once Thomas Howells reached full retirement age, his wages recorded from BAM increased and were $21,282.75 in 2009 (Ex. 62) and $20,947.50 in 2010 (Ex. 63). However, Thomas Howells's increased reported wages in 2009 and 2010 do not reflect his hours worked. Specifically, during both 2009 and 2010, Thomas Howells's hourly rate was $15.00/hour. Ex. 38; Ex. 11, T. Howells Dep. 130-32. At full time (40 hours), this rate should have reflected $31,200 in earning, over $10,000 more than Thomas Howells's reported wages from BAM in 2009 and 2010. Exs. 62, 63.

A significant portion of Defendants' business is deer processing during hunting season. Ex. 10, Leible Dep. 68-69. Defendants do this on a "cash only basis." Ex. 71. And Defendants use a separate register for deer processing customers. Ex. 13, Rush Dep. 73-74; Ex. 10, Leible Dep. 100-02. This allowed Defendants to pay these employees' wages off-the-books.

12.     Black admits that, with respect to her equal pay claim, she alleged that Mark Leible and Sean Round were similarly situated to her and receiving a higher rate of pay for the same job. *See supra* ¶ 11. Black denies that, with respect to her equal pay claim, she alleges that

Jamie LaPress is a comparable employee with respect to wages.  However, Black further states that Jamie LaPress had difficulty wrapping (Ex. 4, D. Seibert Dep. 298) and being on time for packing (Ex. 8, LaPress Dep. 91-98).  Black further states that, for the reasons discussed above (*see supra* ¶ 11), however, Jamie LaPress enjoyed more favorable terms and conditions of employment than Black other than wages.  Black further states with respect to her equal pay claim that evidence of pay discrimination is discussed above, with references to specific employee comparisons and to male employees' work off the books.  *See supra* ¶ 11.

13.     Black admits that her Complaint alleged that she, Mark Leible, and Jamie LaPress were "Wrapper-Packer-Cleaner[s]." Ex. 14, Compl. ¶¶ 12, 16-17.  Black further states with respect to Mark Leible and Jamie LaPress that these employees performed work similar to Black for the reasons discussed above.  *See supra* ¶ 11.  Black admits that her Complaint alleged that Sean Round was a "Wrapper-Packer-Cleaner/Driver."  Ex. 14, Compl. ¶ 18.  Black further states with respect to Sean Round that, when Defendants hired him on or about February 23, 2007, he had no specialized skills or experience wrapping and/or packing meat and, at that time, did not make deliveries.  *See supra* ¶ 11.  Black further states that, although Sean Round later began making deliveries, his primary duties still involved, like Black, filling packs for deliveries.  Ex. 5, R. Seibert Dep. 172-73, 177; Ex. 9, Round Dep. 55, 114; Ex. 10, Leible Dep. 51; *see supra* ¶ 11.

14.     Black admits that, with respect to wages, she compares herself to Patrick Howells.  *See supra* ¶ 11.  Black also admits that Patrick Howells is the son of Thomas Howells, Defendants' main butcher.  Ex. 11, T. Howells Dep. 43-44.  Black admits that Patrick Howells worked off the books at BAM from about 2006 through Black's May 25, 2010 constructive discharge.  Ex. 1, Black Decl. ¶¶ 21, 24.  Black admits that, like she was, Patrick Howells worked at BAM

performing wrapping, packing, and cleaning duties as a "Wrapper-Packer-Cleaner." *See supra* ¶ 11.

15.     Black admits that her Complaint alleged that "Throughout her time as an employee of Defendant, BLACK ANGUS MEATS, Plaintiff, DARCY M. BLACK, was subjected to different terms and conditions of employment than similarly situated Caucasian employees and a hostile work environment." Ex. 14, Compl. ¶ 61.  Black further states that she began to experience unlawful discrimination and harassment in the beginning of 2006.  Ex. 2, Black Dep. 195.  Black further states, as noted above (*see supra* ¶ 4), that her EEOC Intake Questionnaire, dated June 14, 2010, and stamped received by the EEOC on June 18, 2010, identified specific unlawful discrimination occurring on May 15, 2010 and in February 2010.  Defendants' Exhibit A at DEF0157.  Black denies that she made any representations in Defendants' Exhibit B, given that the document is unsigned and undated. *See supra* ¶ 4.

Black further states that Defendants unlawful conduct continued throughout her employment until her May 25, 2010 constructive discharge.  Ex. 1, Black Decl. ¶¶ 20, 22; Ex. 2, Black Dep. 121-22, 229.  At no point prior to the May 15, 2010 incident in which Jamie LaPress called Black's children niggers did Black ever consider leaving her employment at BAM.  Ex. 3, Black Dep. 336.  Black could not afford to leave her job at BAM; she needed it to support her family.  Ex. 3, Black Dep. 336. After Jamie LaPress called her children niggers, and Black made complaints to Robert Seibert, Diane Seibert, and Keegan Roberts, all who failed to take any action, Black felt compelled to resign her employment at BAM.   Ex. 41.   Black's resignation letter/complaint to Robert Seibert and Diane Seibert specifically stated that the reason for her resignation was that Jamie LaPress had called her children niggers and that no action was taken. Ex. 41 at DEF0048.

16.     Black admits that her EEOC Intake Questionnaire, dated June 14, 2010, and stamped received by the EEOC on June 18, 2010, indicated that Defendants had denied her a raise about 1.5 years prior.  Defendants' Exhibit A at DEF0162.  Black also admits that her Complaint alleged that she was denied a raise in March 2010.  Ex. 14, Compl. ¶ 22.  Black further states that Defendants denied her a raise in or about March 2010.  Ex. 1, Black Decl. ¶ 24.  Keegan Roberts instructed Black to speak to Diane Seibert about this request, and Diane Seibert denied Black's request stating that it was not a "good time" and BAM could not afford it.  Ex. 1, Black Decl. ¶ 24.  Black further states that, in comparison, Defendants gave $1 raises to male employees Mark Leible and Sean Round and about the same time that Defendants denied Black's request for a raise. Exs. 34, 47.

17.     Black admits that she began employment with BAM on May 16, 2005.  Ex. 2, Black Dep. 189.   Black further states that she began to experience unlawful discrimination and harassment in the beginning of 2006.  Ex. 2, Black Dep. 195.  Black further states that Defendants unlawful conduct continued throughout her employment until her May 25, 2010 constructive discharge.  Ex. 1, Black Decl. ¶¶ 20, 22; Ex. 2, Black Dep. 121-22, 229.  At no point prior to the May 15, 2010 incident in which Jamie LaPress called Black's children niggers did Black ever consider leaving her employment at BAM.  Ex. 3, Black Dep. 336.  Black could not afford to leave her job at BAM; she needed it to support her family.  Ex. 3, Black Dep. 336. After Jamie LaPress called her children niggers, and Black made complaints to Robert Seibert, Diane Seibert, and Keegan Roberts, all who failed to take any action, Black felt compelled to resign her employment at BAM.  Ex. 41.  Black's resignation letter/complaint to Robert Seibert and Diane Seibert specifically stated that the reason for her resignation was that Jamie LaPress had called her children niggers and that no action was taken.  Ex. 41 at DEF0048.

18.    Black admits that Defendants' discrimination against Black and other female employees occurred each time that Black and/or a female employee received a discriminatory paycheck.  Black further states that, with respect to her employment with BAM, she received her first discriminatory paycheck on or about May 20, 2005.  Ex. 30.  Black further states that Defendants issued her discriminatory wages until her final paycheck with BAM, issued on or about May 28, 2010.  Ex. 64.  Black denies that "all of the conduct that is the subject of Black's claims began 'in the beginning of 2006.' "  Dkt. 106-1 ¶ 18.  Black further states that, as discussed above (*see supra* ¶ 11), Defendants unlawful conduct spanned Black's entire employment, culminating with her May 25, 2010 constructive discharge.  Black further states that Defendants unlawful conduct continued throughout her employment until her May 25, 2010 constructive discharge.  Ex. 1, Black Decl. ¶¶ 20, 22; Ex. 2, Black Dep. 121-22, 229.  At no point prior to the May 15, 2010 incident in which Jamie LaPress called Black's children niggers did Black ever consider leaving her employment at BAM.  Ex. 3, Black Dep. 336.  Black could not afford to leave her job at BAM; she needed it to support her family.  Ex. 3, Black Dep. 336. After Jamie LaPress called her children niggers, and Black made complaints to Robert Seibert, Diane Seibert, and Keegan Roberts, all who failed to take any action, Black felt compelled to resign her employment at BAM.  Ex. 41.  Black's resignation letter/complaint to Robert Seibert and Diane Seibert specifically stated that the reason for her resignation was that Jamie LaPress had called her children niggers and that no action was taken.  Ex. 41 at DEF0048.

Black admits that, starting toward the end of her employment, she observed her time being closely scrutinized, while Defendants did not scrutinize males' time.  Ex. 2, Black Dep. 217-18. Black also admits that this continued until her May 25, 2010 constructive discharge.  *Id*.  Black admits that, toward the end of 2007, she observed Jamie LaPress being late without consequence.

Ex. 2, Black Dep. 218.  Black further states that this continued throughout the balance of her employment.  Ex. 1, Black Decl. ¶¶ 20, 22.  Black further states that, even after her constructive discharge, Jamie LaPress continued to regularly be late without consequence.  Ex. 6, Roberts Dep. 121-122.  Black admits that, starting in 2007, she observed that Defendants denied her Saturdays off while allowing similarly situated male employees Saturdays off.  Ex. 2, Black Dep. 229.  Black also admits that this occurred throughout her employment until her May 25, 2010 constructive discharge.  *Id.*  Black admits that she observed Defendants permitting Sean Round to have off Saturdays or to come in late/leave early on Saturdays to participate in a football league.  Ex. 15 at DEF0133; Ex. 2, Black Dep. 225-26; Ex. 9, Round Dep. 57-58; Ex. 4, D. Seibert Dep. 248-49.  Black further states that this continued until her May 25, 2010 constructive discharge.  Ex. 1, Black Decl. ¶ 22.

Black admits that, while they were employed at BAM, Raelean Rush and Regina Rush, who were both Caucasian and dating African-American men, were subjected to racially offensive comments about their boyfriends.  *See supra* ¶ 11.  Black further states that Defendants admit that Sean Round made at least two such racially offensive comments specifically to Raelean Rush.  Ex. 40, Dkt. 8 ¶ 39; Ex. 15 at DEF1034.  Specifically, Defendants admit that Sean Round told her that she could "do better" than her boyfriend (Ex. 40, Dkt. 8 ¶ 39) and that her boyfriend was using her for her good credit score and other things (Ex. 15 at DEF1034).  Black further states that she was present when Sean Round made these comments (Ex. 2, Black Dep. 293-95), and she was offended by them.  Ex. 1, Black Decl. ¶ 8; *see also* Ex. 2, Black Dep. 291-95.  Black further states that Defendants were aware of these racially offensive comments.  *See* Ex. 40, Dkt. 8 ¶ 39; Ex. 15 at DEF1034.  Black denies that racially offensive comments directed to Raelean Rush and Regina Rush occurred between 2005 and 2008, as the statements occurred throughout Raelean Rush's and

Regina Rush's employment.  Ex. 1, Black Decl. ¶ 8.  Raelean Rush was employed at BAM from July 2006 (Ex. 65) until on or about April 15, 2009 (Ex. 66).  Regina Rush was employed at BAM from July 2006 (Ex. 67) until on or about February 26, 2010 (Ex. 68).  Black further states that Defendants were aware of other racially offensive conduct occurring at BAM, as discussed in detail above.  *See supra* ¶ 11.

19.     Black admits that, during the time she was employed at BAM, Jamie LaPress and Sean Round made offensive and discriminatory racial comments about Defendants' African-American customers.  *See supra* ¶ 11.  Black further states that Defendants were aware of these comments and failed to take action.  *See id*.  Black admits that Jamie LaPress and Sean Round made these comments regularly during her employment.  Black further states that this continued until her May 25, 2010 constructive discharge.  Ex. 1, Black Decl. ¶ 11.  Black was offended by these comments.  *Id*.

20.     Black admits that she began receiving mental health counseling in 2006.  Ex. 3, Black Dep. 361-62.  Black also admits that the counseling, in part, addressed how Defendants treated her while working at BAM.  *Id*.  Black further states that she also received mental health counseling to help her cope with her stressful home life, which involved raising two disabled children.  Ex. 1, Black Decl. ¶ 23; Ex. 2, Black Dep. 50-52.  Black admits that, at some point during her employment with BAM, she came home crying four days of five working days in a week.  Ex. 3, Black Dep. 361.  However, Black denies that this occurred early in her employment, as her testimony was that she could not remember when it started.  *Id*. 361-62.  Black further states that, at no point prior to the May 15, 2010 incident in which Jamie LaPress called Black's children niggers did Black ever consider leaving her employment at BAM.  Ex. 3, Black Dep. 336.  Black could not afford to leave her job at BAM; she needed it to support her family.  Ex. 3, Black Dep.

336. After Jamie LaPress called her children niggers, and Black made complaints to Robert Seibert, Diane Seibert, and Keegan Roberts, all who failed to take any action, Black felt compelled to resign her employment at BAM.  Ex. 41.  Black's resignation letter/complaint to Robert Seibert and Diane Seibert specifically stated that the reason for her resignation was that Jamie LaPress had called her children niggers and that no action was taken.  Ex. 41 at DEF0048.

21.     Black admits that, during an August 12, 2009 counseling session with Dale Association, she complained that the men at BAM were not treating her well and complaining that she takes breaks.  Defendants' Exhibit G.  Black states that, at the time of this counseling session, she did have a part time job prospect with Gersh Experience.  Ex. 3, Black Dep. 339-42.  Black further states that she testified that the job referenced in this counseling session was a part time job, and she had no intention to resign her employment at BAM.  *Id*. 336.  She could not afford to leave her job at BAM because she needed it to support her family.  Ex. 3, Black Dep.  *Id*.  In fact, Black began working for Gersh Experience in or about November 2009 and continued to work there through her May 25, 2010 constructive discharge from BAM.  *Id*. 58-60.  Black further states that at no time did her part-time position with Gersh Experience affect the hours she was available to work at BAM.  Ex. 1, Black Decl. ¶ 23.  Black further states that, at no point prior to the May 15, 2010 incident in which Jamie LaPress called Black's children niggers did Black ever consider leaving her employment at BAM.  Ex. 3, Black Dep. 336.  After Jamie LaPress called her children niggers, and Black made complaints to Robert Seibert, Diane Seibert, and Keegan Roberts, all who failed to take any action, Black felt compelled to resign her employment at BAM.  Ex. 41.  Black's resignation letter/complaint to Robert Seibert and Diane Seibert specifically stated that the reason for her resignation was that Jamie LaPress had called her children niggers and that no action was taken.  Ex. 41 at DEF0048.

22.     Black admits that she claims she was subjected to a sexually hostile work environment.  *See supra* ¶ 11.  Black denies that employees who made these comments and those to whom the comments were made are "unnamed."  *See id*.  Black states that Thomas Howells said to Black and Debbie Negrych (on different occasions) "does the carpet match the drapes?"  Ex. 2, Black Dep. 234-35, 243-45.  On several occasions, the latest being in 2010 shortly before Black's May 25, 2010 constructive discharge, Sean Round commented that Raelean Rush has a nice ass.  Ex. 2, Black Dep. 231-33.  Defendants were aware of these comments, as Sean Round made some of them to Keegan Roberts, Store Manager.  Ex. 2, Black Dep. at 232-33.  Sean Round made other sexually offensive comments as well, saying relative to female customers: "her headlights are on" and "oh look at that cleavage."  Ex. 2, Black Dep. 234-35.  Black was present when Sean Round made these comments, and she was offended by them.  Ex. 1, Black Decl. ¶ 14.  BAM's employees testified that these comments are sexually offensive.  Ex. 4, D. Seibert Dep. 157-59; Ex. 6, Roberts Dep. 295-97; Ex. 8, LaPress Dep. 286-88; Ex. 10, Leible Dep. 162-64; Ex. 13, Rush Dep. 97-98; Ex. 11, T. Howells Dep. 254-57; Ex. 7, Negrych Dep. 201-02.  Black admits that, at the time of her deposition, she could not recall any additional sexually offensive comments made during her employment at BAM.  Ex. 2, Black Dep. 236.

23.     Black admits counsel deposed nine witnesses during this litigation: three Defendants, Diane Seibert; Robert Seibert; Keegan Roberts; and employees Sean Round; Mark Leible; Debbie Negrych; Jamie LaPress; Patrick Howells; and Raelean Rush.  Black denies that these witnesses' testimony does not corroborate or substantiate Black's allegations.  Black further states that that evidence contains the following admissions:

- Robert Seibert and Diane Seibert admitted "Darcy's time here [at BAM] has been scrutinized," which confirms one of Black's allegations in this matter.  Ex. 15 at DEF0132.

- Robert Seibert and Diane Seibert admitted that if BAM was "looking for someone to organize freezers and put loads away, which require heavy lifting, *we would discard females as a rule*, or older males, or anyone with a back problem. Ex. 15 at DEF0134 (emphasis added).

- Robert Seibert and Diane Seibert admitted that "Sean [Round] did make a comment to Raelean about her [African-American] boyfriend using her for her good credit score and other things." Ex. 15 at DEF1034. BAM's employees agreed that such a statement is inappropriate and racially offensive. Ex. 4, D. Seibert Dep. 132-33; Ex. 6, Roberts Dep. 232, 287; Ex. 11, T. Howells Dep. 271-73; Ex. 13, Rush Dep. 89, 107-08. Raelean Rush described this incident to Keegan Roberts, Store Manager, as "Sean being Sean, " providing a reasonable evidentiary basis for the conclusion that Sean Round had said other racially offensive things to Raelean Rush. Ex. 6, Roberts Dep. 234.

- Robert Seibert and Diane Seibert admitted that Defendant, Robert Seibert, said to Black "she would have to get used to the idea that her children were black – there was no changing that. School kids are cruel and racial remarks from kids is not unusual. That was his opinion." Ex. 15 at DEF0134. Notably, Robert Seibert testified that he had no actual basis for this opinion. Ex. 5, R. Seibert Dep. 222-24. Debbie Negrych testified that this statement was racially offensive and should never be said by an employer to an employee. Ex. 7, Negrych Dep. 229-30.

- Robert Seibert and Diane Seibert admitted that, prior to the Mary 15, 2010 in which Jamie LaPress called Black's children niggers, "[h]e would joke about [Black's] kids not because they were black, but because they were always in trouble." Ex. 15 at DEF0134. Given that, on May 15, 2010, Jamie LaPress called Black's children niggers, there is an evidentiary basis for the conclusion that his prior comments about Black's children were also racially motivated. Keegan Roberts stated that any jokes by Jamie LaPress concerning Black's children would have been inappropriate in the workplace. Ex. 6, Roberts Dep. 185.

- These witnesses' testimony confirmed that Black was always on time, treated people with respect, was a good worker, and did her best to give a fair day's work. Ex. 13, Rush Dep. 126; Ex. 10, Leible Dep. 59; Ex. 7, Negrych Dep. 182; Ex. 6, Roberts Dep. 330.

- These witnesses' testimony confirmed that male employees are routinely late but experience no consequence for this conduct. Ex. 6, Roberts Dep. 111-12, 118; Ex. 5, R. Seibert Dep. 169; Ex. 4, D. Seibert Dep. 286-87.

- Thomas Howells's testimony confirmed that David Monolopolus worked for Defendants during deer season in 2015, 2016, and 2017, despite BAM's payroll records not reflecting this work. Ex. 11, T. Howells Dep. 101-05; Ex. 57.

    24.    Black admits that Jamie LaPress denies that portion of her allegations that he referred to her children as niggers. Ex. 8, LaPress Dep. 68. Black denies that Jamie LaPress denies

that many parts of the underlying incident occurred.  *Id*. 222-23.  Black states that Jamie LaPress admitted that, on May 15, 2010, he was having trouble getting into one of the paper towel dispensers at BAM.  *Id*.  Jamie LaPress also admitted that he asked employees, including those in Black's vicinity, if anyone could pick the lock to open the paper towel dispenser.  *Id*. 231. Although Jamie LaPress denied asking this question directly to Black (Ex. 8, LaPress Dep. 241-42), Keegan Roberts testified that Jamie LaPress told him (Roberts) that he (LaPress) did ask this question directly to Black because she was larger and might be able to push on it or assist him in getting it open.  Ex. 6, Roberts Dep. 200-01.

Black further states that, as the result of events that began on May 15, 2010 and concluded on May 25, 2010, Defendants constructively discharged Black from her employment at BAM. Specifically, on May 15, 2010, Jamie LaPress had lost the key to a paper towel dispenser and came up alongside Black and asked her if she could break into the paper towel dispenser.  Ex. 2, Black Dep. 295-96.  Black told him that she could not and asked Jamie why he would ask.  *Id*.  Jamie LaPress said to Black "you have two black kids and that's what black people do."  *Id*. at 296.  Black replied that her children do not break into things, and she asked why he would say that.  *Id*.  "He goes well, they're niggers."  *Id*.  Following this incident, Black, also on May 15, 2010, complained to both Debbie Negrych and Thomas Howells, who were nearby when Jamie LaPress made this racially offensive comment about Black's children.  Ex. 2, Black Dep. 296-97.  Additionally, Defendants have identified Debbie Negrych and Thomas Howells as managers who regularly oversaw other employees.  Ex. 20.

On May 18, 2019, Black complained to Keegan Roberts, store manager, and told him that Jamie LaPress had called her children niggers.  Ex. 6, Roberts Dep. 310.  Keegan Roberts understood Black's complaint to be one of discrimination and harassment.  *Id*. 310.  Keegan

Roberts testified that he then spoke with Jamie LaPress, Debbie Negrych, and Thomas Howells, and Jamie LaPress denied calling Black's children niggers. *Id.* However, Diane Seibert testified that Defendants never even considered the possibility that Jamie LaPress was lying and Black was telling the truth. Ex. 4, D. Seibert Dep. 144-45. In comparison, Raelean Rush testified that Black was always straightforward and honest, and there was no reason to believe Jamie LaPress and disbelieve Black. Ex. 13, Rush Dep. 117-18.

On May 21, 2010, Keegan Roberts, Store Manager, had already determined that he did not believe Black's complaint, and he indicated that he wanted Black to have a further conversation with Jamie LaPress about the incident. Ex. 6, Roberts Dep. 311-12. As a result, Black, on May 21, 2010, left a resignation letter for Robert Seibert and Diane Seibert (who were on vacation at the time), putting in her two weeks' notice. Ex. 2, Black Dep. 297-99. Black's letter stated:

> I am writing you this because I have a hard time talking about what happened at work. I can deal with issues that have to do with me. I get emotional, then I get over it, but when someone can look and me and call my kids "niggers", I can not deal with that. My kids might be a handful but they are mine, and don't deserve to be called that by one of my co-workers. So, I am giving you my 2 week notice. Thank you for all you have done for me.

Ex. 41 at DEF0048.

On May 25, 2010, Robert Seibert had returned from vacation, and Robert Seibert and Keegan Roberts called Black into the office for a meeting. Ex. 2, Black Dep. 298. In that meeting, Black again explained the May 15, 2010 incident in which Jamie LaPress had called her children niggers. *Id.* Robert Seibert and Keegan Roberts then called Jamie LaPress into the meeting, and Jamie LaPress then said that he was not talking to Black, and it was nice. *Id.* at 296-97. After that Keegan Roberts and Jamie LaPress left the office. *Id.* at 297. Robert Seibert then said to Black that she would have to get used to things like that (i.e., people calling her children niggers) because

people are mean and cruel.  *Id*.  Black then asked Robert Seibert "so it's okay for one of my co-workers to call my kids niggers?"  *Id*.  Robert Seibert replied "it happens in politics and it happens in sports so [Black is] going have to get used to the idea."  *Id*.  Black was offended by this comment. Ex. 1, Black Decl. ¶¶ 9-10.  Multiple witnesses testified that this statement by Robert Seibert is racially offensive and discriminatory.  Ex. 4, D. Seibert Dep. 168; Ex. 10, Leible Dep. 187.  Black then told Robert Seibert that she was uncomfortable working with Jamie LaPress, and Robert Seibert said that he "was uncomfortable with the whole situation" and directed Black to leave immediately.  Ex. 2, Black Dep. 297.  May 25, 2010 was Black's last day of work at BAM.  *Id*. Notably, Robert Seibert, himself, testified that he agreed that this response to Black's complaint of discrimination and harassment would be retaliatory.  Ex. 5, R. Seibert Dep. 324.

Prior to the May 15, 2010 incident in which Jamie LaPress called Black's children niggers—and Defendants' failure to take any action to address Black's complaint—Black had no intention of resigning her employment at BAM.  Ex. 3, Black Dep. 336.  Black could not afford to leave her job at BAM because she needed it to support her family.  *Id*.  Notably, Raelean Rush, who is Caucasian and whose husband is African-American and the father of her two children, testified that she could think of nothing more offensive than a white employee calling Black's children niggers.  Ex. 13, Rush Dep. 108, 128-29.  She also testified that, if an employee referred to her children as niggers and the employer did not discharge or discipline the employee, she would leave employment.  Ex. 13, Rush Dep. 108, 128-29.

25.     Black admits that Debbie Negrych testified that she did not hear Jamie LaPress call Black's children niggers or hear Black's complaint about such conduct.  Ex. 7, Negrych Dep. 161-62, 250.  Black further states that Defendants admit that, prior to the May 15, 2010 incident in which Jamie LaPress called Black's children niggers, Jamie LaPress had made prior offensive and

demeaning comments about Black's children.  Ex. 15 at DEF0134.  Black further states that Defendants admit that Debbie Negrych had spoken to Jamie LaPress about these offensive and demeaning comments.  *Id*.  Specifically, Defendants admit that Jamie LaPress "would joke about [Black's] kids not because they were black, but because they were always in trouble.  Ex. 15 at DEF0134.  Defendants also admitted that Jamie LaPress made these offensive and demeaning comments "several months before Darcy's resignation letter," i.e., in calendar year 2010.  *Id*.  When Debbie Negrych spoke with Jamie LaPress, she told him that he "needed to stop."  *Id*.; Ex. 7, Negrych Dep. 169-72.  Given that, on May 15, 2010, Jamie LaPress called Black's children niggers, there is an evidentiary basis for the conclusion that his prior comments about Black's children were also racially motivated.  Keegan Roberts stated that any jokes by Jamie LaPress concerning Black's children would have been inappropriate in the workplace.  Ex. 6, Roberts Dep. 185.

26.     Defendants offer no reference to admissible evidence with respect to their statements of fact in Paragraph 26 and, as such, their statement is a nullity.  Black further states that admissible evidence demonstrates that racist comments were, in fact, said at BAM.

Black further states that Defendants admit to multiple instances of racially offensive conduct occurring at BAM.  For example, Defendants admit that Sean Round made at least two racially offensive comments to Raelean Rush about the fact that her boyfriend was African-American.  *See* Ex. 40, Dkt. 8 ¶ 39; Ex. 15 at DEF1034).  First, Defendants admit that Sean Round told Raelean Rush that she could "do better" than her boyfriend.  Ex. 40, Dkt. 8 ¶ 39.  Black was offended by this comment (Ex. 1, Black Decl. ¶ 8), and Defendants admit that Black made a complaint to Keegan Roberts about this racially offensive comment (Ex. 40, Dkt. 8 ¶ 39).  Second, Defendants admit that Sean Round made a racially offensive comment to Raelean Rush about her African-American boyfriend that he was using her for her good credit score and other things.  Ex. 15 at DEF1034.

Black was present for and was offended by this comment.  Ex. 2, Black Dep. 291-95.  Defendants also admit that they were aware of these two racially offensive comments.  *See* Ex. 40, Dkt. 8 ¶ 39; Ex. 15 at DEF1034.

Black further states that Defendants also admit that, about six months to one year prior to Black's May 25, 2010 constructive discharge, Robert Seibert said to Black "she would have to get used to the idea that her children were black – there was no changing that.  School kids are cruel and racial remarks from kids is not unusual."  Black states that she did not tell Robert Seibert that her children were being bullied because they were black."  Ex. 1, Black Decl. ¶¶ 9-10.  Robert Seibert testified that he had no actual basis for this opinion.  Ex. 5, R. Seibert Dep. 222-24.  Black was offended by this statement.  Ex. 1, Black Decl. ¶¶ 9-10.  Debbie Negrych and Mark Leible also testified that this statement is racially offensive.  Ex. 7, Negrych Dep. 229-30; Ex. 10, Leible Dep. 183.

Black further states that credible evidence demonstrates other racially offensive conduct occurring during Black's employment at BAM.  Black was present on multiple occasions when BAM employees, including Keegan Roberts, Store Manager, and Jamie LaPress referred to Defendants' African-American customers as "Bob's niggs."  Ex. 2, Black Dep. 271-73, 276-77.  Black was offended by these comments.  Ex. 1, Black Decl. ¶ 11.  Black was also present when Jamie LaPress said regarding Defendants' African-American customers "how they could have nice cars and get food stamps" or how can they have "gold around their neck . . . [a]nd get food stamps."  Ex. 2, Black Dep. 276-77.  Black was offended by these comments.  Ex. 1, Black Decl. ¶¶ 11-12.  Additionally, Keegan Roberts, Store Manager, was present in the pack room when Jamie LaPress made these racially offensive comments.  Ex. 2, Black Dep. 239-42, 279-81.  Robert Seibert also made racially offensive comments about African-Americans.  Ex. 2, Black Dep. 275-76.  Black

heard these and similar racially offensive comments starting in about 2007 and continuing through her May 25, 2010 constructive discharge.  Ex. 2, Black Dep. 279-81.  BAM's employees testified that these comments are racially offensive and discriminatory, and Robert Seibert testified that many of the comments would be grounds for termination.  Ex. 5, R. Seibert Dep. 245-50, 254; Ex. 4, D. Seibert Dep. 132-33, 151; Ex. 6, Roberts Dep. 284-90; Ex. 8, LaPress Dep. 209-10, 281-85; Ex. 10, Leible Dep. 168-71, 173-75; Ex. 13, Rush Dep. 95; Ex. 11, T. Howells Dep. 273-75, 283; Ex. 7, Negrych Dep. 210-15.

Black further states that credible evidence establishes the event in which Jamie LaPress called Black's children niggers, which ultimately resulted in her May 25, 2010 constructive discharge.  *See supra* ¶¶ 11, 24.

27.     Black admits that she was employed by BAM from between May 16, 2006 through her May 25, 2010 constructive discharge.  Black admits that her Complaint described her position as a "Wrapper-Packer-Cleaner."  Ex. 14, Compl. ¶ 12. Black states that Diane Seibert testified that, but for the owners and management employees, all of Defendants' other employees have equal duties and responsibilities.  Ex. 4, D. Seibert Dep. 199-200.  Specifically, Diane Seibert testified that all such employees are equally expected to do any work as needed: "We hire employees to do work, to do labor. We are not specific when they are hired."  Ex. 4, D. Seibert Dep. 199-200. Diane Seibert testified that all employees are expected to fill packs for deliveries, wrap, wait on customers, and do whatever else needs to be done.  Ex. 4, D. Seibert Dep. 203.  Thus, Defendants employees were basically interchangeable.  Ex. 4, D. Seibert Dep. 202; *see also* Ex. 9, Round Dep. 138 (describing one employee's responsibilities as the "[s]ame as everyone.").

Black admits that, on her 2009 Bankruptcy Petition, her position was stated as "Laborer." Oppenheimer Aff. Exhibit A at 24.  Black further states that "Laborer" is consistent with the duties

51

that she performed while working at BAM.  Ex. 1, Black Decl. ¶ 15.  Black further admits that, on an undated resume prepared at least after July 2014, Black listed her position with BAM as Customer Service/Cashier.  Defendants' Exhibit R.  Black states that she testified that a career assistance professional at One Stop prepared this resume.  Ex. 2, Black Dep. 256-57.  Black further states that this resume described Black's duties as "[r]eceived customers' orders for various meat products to be sliced/cut to order and wrapped/packaged the orders for them."  Defendants' Exhibit R at 21.

28.    Black admits that Diane Seibert testified that BAM does not have formal job titles. Ex. 4, D. Seibert Dep. 199.  Black further states that Diane Seibert testified that, but for the owners and management employees, all of Defendants' other employees have equal duties and responsibilities.  Ex. 4, D. Seibert Dep. 199-200.  Specifically, Diane Seibert testified that all such employees are equally expected to do any work as needed: "We hire employees to do work, to do labor. We are not specific when they are hired."  Ex. 4, D. Seibert Dep. 199-200.  Diane Seibert testified that all employees are expected to fill packs for deliveries, wrap, wait on customers, and do whatever else needs to be done.  Ex. 4, D. Seibert Dep. 203.  Thus, Defendants employees were basically interchangeable.  Ex. 4, D. Seibert Dep. 202; *see also* Ex. 9, Round Dep. 138 (describing one employee's responsibilities as the "[s]ame as everyone.").

Black denies that she was hired to work counter where customers placed orders for meat and other products, as Black, Mark Leible, Sean Round, Jamie LaPress, and Thomas Howells were all, first and foremost, packers, i.e., they worked in the pack room preparing orders for deliveries. Ex. 6, Roberts Dep. 262.  Black's primary duty was working in the pack room.  Ex. 4, D. Seibert Dep. 202; Ex. 7, Negrych Dep. 168.  This was also Mark Leible's primary duty, and he had been Black's partner in the pack room.  Ex. 6, Roberts Dep. 119; Ex. 10, Leible Dep. 51.  Sean Round

also worked in the pack room, and he had also been partnered with Black.  Ex. 9, Round Dep. 55, 114.  Jamie LaPress has also worked in the pack room at times (Ex. 8, LaPress Dep. 87-88; Ex. 9, Round Dep. 15-16), but not with the same frequency as Black, Mark Leible, and Sean Round, as Jamie LaPress had difficulty wrapping (Ex. 4, D. Seibert Dep. 298) and being on time for the 7:00 a.m. packing shift (Ex. 8, LaPress Dep. 91-98).  Patrick Howells also worked in the pack room seasonally beginning in about 2006 and continuing through Black's May 25, 2010 constructive discharge.  Ex. 1, Black Decl. ¶ 21.  It was only after these pack room employees completed packing duties that they moved on to other tasks.  Ex. 5, R. Seibert Dep. 172-73, 177; Ex. 10, Leible Dep. 51.  These employees' additional tasks were also equivalent.  Ex. 1, Black Decl. ¶ 21.

Black denies that her duties entailed "what would normally be associated with working a counter at a small butcher shop; that is cashing out customers, taking orders, and occasionally making various prepared foods."  Dkt. 106-1 ¶ 28.  Black states that her primary duties involved working in the pack room filling packs for deliveries (*see supra* ¶ 11).  She also performed these tasks: order products with Bell-View, including but not limited to canned goods, glass peppers, pickles, olives, and dressing (Ex. 2, Black Dep. 91); distribute advertising flyers (*id*. 98-99); answer phones, take orders, take payment information, and secure food stamps for deliveries (*id*. 104-06); check delivery orders against invoices and sign off on deliveries (*id*. 106-07); mark up product (*id*. 107-08); clean out the sausage machine after use (*id*. 110-12); use the steak cubing machine (*id*. 112-13); work with deer, including taking the deer from the hunter, dragging it into the cooler, cutting off its limbs, and wrapping deer meat (*id*. 116-17, 119-20); slice, screen, scrape, and bag jerky (*id*. 123-24); take out the trash (*id*. 137-38); pick up trash and cigarette butts from the exterior of the building (*id*.); cleaning the exterior of the building (*id*. 137-38); butterflying chickens (*id*. 93-95); and cutting pork chops and steaks (*id*. 93-95).  In the deli, Black created three

new types of salads that were then sold at BAM: homemade macaroni and cheese, old-fashioned macaroni, and spiral antipasto. *Id*. 107-09; Ex. 7, Negrych Dep. 194.

29.    Black admits that she did not perform some duties performed by some of Defendants' male employees. Black states that she performed duties not performed by some of Defendants' male employees such that all employees performed equivalent tasks. Ex. 1, Black Decl. ¶ 21.    Black further states that Diane Seibert testified that, but for the owners and management employees, all of Defendants' other employees have equal duties and responsibilities. Ex. 4, D. Seibert Dep. 199-200. Specifically, Diane Seibert testified that all such employees are equally expected to do any work as needed: "We hire employees to do work, to do labor. We are not specific when they are hired." Ex. 4, D. Seibert Dep. 199-200. Diane Seibert testified that all employees are expected to fill packs for deliveries, wrap, wait on customers, and do whatever else needs to be done. Ex. 4, D. Seibert Dep. 203. Thus, Defendants employees were basically interchangeable. Ex. 4, D. Seibert Dep. 202; *see also* Ex. 9, Round Dep. 138 (describing one employee's responsibilities as the "[s]ame as everyone.").

Black denies that she did not perform meat cutting. Ex. 2, Black Dep. 93-95. Black states that she butterflied chicken, cut pork chops, and cut steak.  *Id*.  Thomas Howells, Defendants' primary butcher, testified that these tasks are consistent with the duties of a meat cutter. Ex. 11, T. Howells Dep. 170-71. Black further states that Mark Leible and Jamie LaPress did not have primary duties related to meat cutting. Ex. 10, Leible Dep. 117; Ex. 8, LaPress Dep. 152. Thomas Howells was Defendants' main butcher. Ex. 4, D. Seibert Dep. 116; Ex. 2, Black Dep. 96-97; Ex. 8, LaPress Dep 151-52; Ex. 10, Leible Dep. 62-63; Ex. 9, Round Dep. 125. Thomas Howells came in every morning and did meat cutting until the work was done. Ex. 11, T. Howells Dep. 180. In general, he arrived before Black arrived for her 7:00 a.m. shift and worked until about 4:00 or 5:00

p.m.  Ex. 1, Black Decl. ¶ 21.  During deer season, it was not uncommon for Thomas Howells to work over 60 hours in a week.  Ex. 1, Black Decl. ¶ 21.  Jamie LaPress cut meat only upon specific request and only when Thomas Howells was not present.  Ex. 8, LaPress Dep. 151-53.  Mark Leible cut meat even less frequently, as he would cut meat only when both Thomas Howells and Jamie LaPress were not available.  Ex. 10, Leible Dep. 117; Ex. 8, LaPress Dep. 152.

Black admits that she did not participate in the entire process of sausage making.  Ex. 2, Black Dep. 144-45.  Black states that she did participate in portions of sausage making and knew how to make sausage.  *Id*. 110, 120-22.  Black admits that she did not make deliveries to customers. *Id*. 167.  Black states that when she told Diane Seibert that she (Black) wanted to take on driving responsibilities, Black reminded Diane that she was especially qualified to do so, as she had a commercial drivers' license.  *Id*. 124-26, 140-41.  Black denies that she did not post advertising flyers outside of the shop.  *Id*. 98-99.  Black denies that she did not perform maintenance outside of the storefront.  *Id*. 137-38.  Black states that she requested but was denied the opportunity to more often perform additional duties with respect to deliveries, flyering, meat grinding, operating the smoker, making sausage, and making jerky.  Ex. 2, Black Dep. 98-99, 115-16, 119-24.

30.     Black admits that she compares herself to Sean Round with respect to her equal pay claim.  *See supra* ¶ 11.  Black denies that Sean Round began working for Defendants in 2006.  Ex. 24.  Black states that Sean Round began working for Defendants on or about February 23, 2007. Ex. 24.  Black denies that Sean Round stopped working for Defendants on a full-time basis in 2012.  *See supra* ¶ 11.  Black states that evidence indicates that Sean Round worked off the books for BAM, given that he admitted working for BAM since January 11, 2015 (Ex. 9, Round Dep. 102-06), but he is not reflected on any of BAM's payroll records after January 11, 2015.  Ex. 48. Black denies that Sean Round's primary duty was making deliveries.  Black states that Black,

Mark Leible, Sean Round, Jamie LaPress, and Thomas Howells were all, first and foremost, packers, i.e., they worked in the pack room preparing orders for deliveries.  Ex. 6, Roberts Dep. 262.  Black's primary duty was working in the pack room.  Ex. 4, D. Seibert Dep. 202; Ex. 7, Negrych Dep. 168.  Sean Round also worked in the pack room, and he had also been partnered with Black.  Ex. 9, Round Dep. 55, 114.  Black denies that a significant portion of Sean Round's time  was spent outside of BAM, given that it was only after these pack room employees completed packing duties that they moved on to other tasks.  Ex. 5, R. Seibert Dep. 172-73, 177; Ex. 10, Leible Dep. 51.

31.     Black denies that she compares herself to Jamie LaPress for purposes of her equal pay claim.  *See supra* ¶ 11.  Black states that Jamie LaPress's wages were affected because Jamie LaPress had had difficulty wrapping (Ex. 4, D. Seibert Dep. 298) and being on time for packing (Ex. 8, LaPress Dep. 91-98).  Black further states that, for the reasons discussed above (*see supra* ¶ 11), however, Jamie LaPress enjoyed more favorable terms and conditions of employment than Black other than wages.  For the reasons stated above, Black denies that Jamie LaPress regularly performed duties that Black did not perform and/or did not know how to perform.  *See supra* ¶ 11. Black denies that Jamie LaPress began working for Defendants in 2001, about four years before Black was hired.  Black states that the first of Defendants' payroll records produced in this matter reflecting Jamie LaPress's employment with BAM is dated January 7, 2005.  Ex. 69.  Black further states that, given evidence that Defendants paid employees off the books (*see supra* ¶ 11), she cannot determine when Jamie LaPress began working for Defendants.

32.     Black admits that, for the purposes of her equal pay claim, she compares herself to Mark Leible.  *See supra* ¶ 11.  Black denies that Mark Leible was hired in 2001 and continues to work through the present day.  Black states that the first of Defendants' payroll records produced

in this matter reflecting Mark Leible's employment with BAM is dated January 7, 2006.  Ex. 42.

Black also states that Mark Leible worked for Defendants until in or about June 2007, returning to

employment with Defendants on or about March 3, 2009.  Ex. 44.  Black admits that Mark Leible

regularly made sausage.  Ex. 10, Leible Dep. 37-38.  Black further states that she did participate

in portions of sausage making and knew how to make sausage.  Ex. 2, Black Dep. 110, 120-22.

Black admits that Mark Leible cut some meat but states that Mark Leible did not have primary

duties related to meat cutting.  Ex. 10, Leible Dep. 117; Ex. 8, LaPress Dep. 152.  Mark Leible cut

meat infrequently, as he would cut meat only when both Thomas Howells and Jamie LaPress were

not available.  Ex. 10, Leible Dep. 117; Ex. 8, LaPress Dep. 152; *see supra* ¶ 11.  Black states that

meat grinding was not a significant task, and it took only a couple hours to teach.  Ex. 11, T.

Howells Dep. 198.  Thomas Howells could and would have taught Black meat grinding if he was

told to do so.  *Id*. 201.

  With respect to Mark Leible, Black further states that, prior to working for Defendants, she

had comparable culinary experience to Mark Leible.  Ex. 2, Black Dep. 14-23, 41-42, 74-75.

Specifically, Black worked for businesses including Pizza Junction, Pizza Pickup, Payne Avenue

Pizzeria, High Spot Pizza, and Marriott Sodexo doing tasks including but not limited to making

sandwiches, salads, pizza, chicken wings and working in other aspects of food preparation.  Ex. 2,

Black Dep. 14-23, 41-42, 74-75.  In fact, someone from BAM wrote in the "Remarks" section of

her job application that she also had deli experience while working at Budwey's.  Ex. 41 at

DEF0042.

  33. Black admits that she compares herself to Patrick Howells.  *See supra* ¶ 11.  Black

denies that Patrick Howell was not employed by Defendants.  *See id*.  Black states that Defendants

seasonally employed Patrick Howells and paid him off the books for doing work similar to Black,

i.e., packing orders for deliveries.  *See* Ex. 1, Black Decl. ¶¶ 21, 24.  Specifically, beginning in about 2006 and continuing through Black's May 25, 2010 constructive discharge, each year from approximately October to March, when Patrick Howells was laid off from his regular concrete job, he worked daily in BAM's pack room.  *Id*.  This was in Black's presence.  *Id*.  When working in the pack room, Patrick Howells brought product from the freezers to the pack room, which other employees used to fill orders for deliveries.  *Id*.  Patrick Howells was working at BAM so frequently, that Black invited him to her March 2009 wedding.  Ex. 12, P. Howells Dep. 84-86; Ex. 49.  Defendants' payroll records do not reflect any wages paid to Patrick Howells; but at the time of her May 25, 2010 constructive discharge, Black was earning $10.00/hour, subject to all applicable taxes and withholdings.  Exs. 25, 26, 31-33.  Black denies that Patrick Howell's presence at BAM was to bring his father, Thomas Howells, lunch or to learn meat/deer cutting during one deer season.  *See supra* ¶ 11.  Black states that Patrick Howells performed work at BAM seasonally.  *See id*.

34.     Black admits that her starting rate of pay was $7.50/hour.  Ex. 30; Ex. 4, D. Seibert Dep. 399-400.  Black denies that she received annual raises.  Black states that, in or about March 2010, Black approached Keegan Roberts about a raise, as her five-year anniversary employment anniversary was approaching.  Ex. 1, Black Decl. ¶ 24.  Keegan Roberts instructed Black to speak to Diane Seibert about this request, and Diane Seibert denied Black's request, stating that it was not a "good time" and Defendants could not afford it.  Ex. 1, Black Decl. ¶ 24.  Black further states that, in comparison, Defendants gave $1 raises to male employees Mark Leible and Sean Round and about the same time that Defendants denied Black's request for a raise.  Exs. 34, 47.  Black further states that her full salary history with Defendants is detailed above.  *See supra* ¶ 11.

35.     Black denies that Defendants' employees received any training, including but not limited to training with respect to discrimination, harassment, hostile work environment, and retaliation.  Black states that multiple witnesses testified that Defendants provided no training on these topics and had no relevant written policies.  Ex. 8, LaPress Dep. 130; Ex. 10, Leible Dep. 176, 190; Ex. 9, Round Dep. 53-54.  Black further states that the only standard of conduct during Black's employment was stated by Robert Seibert since at least about 1991: "you can talk about the weather and sports, this is no soap opera – leave your personal dramas at home."  Ex. 15; Ex. 5, R. Seibert Dep. 255; Ex. 6, Roberts Dep. 291; Ex. 7, Negrych Dep. 229; Ex. 8, LaPress Dep. 267, 278-79; Ex. 10, Leible Dep. 171-72; Ex. 11, T. Howells Dep. 32-33.

Black states that Defendants did not apply this policy to male employees.  For example, Defendants admit that they were aware that Sean Round made multiple racially offensive comments to Raelean Rush, who is Caucasian, about the fact that she was dating an African-American male.  *See* Ex. 40, Dkt. 8 ¶ 39; Ex. 15 at DEF1034; *see supra* ¶ 11.  Defendants admit that "Sean [Round] did make a comment to Raelean about her [African-American] boyfriend using her for her good credit score and other things" (Ex. 15 at DEF1034) and that he told her that she could "do better" that her African-American boyfriend (Ex. 40, Dkt. 8 ¶ 39).  Defendants' employees agreed that these statements are racially offensive.  Ex. 4, D. Seibert Dep. 132-33; Ex. 6, Roberts Dep. 232, 287; Ex. 11, T. Howells Dep. 271-73.  Although Raelean Rush did not recall specifically any comment that Sean Round made to her about her boyfriend, she did recall that Sean Round did make a comment and agreed that the comments that Defendants admitted that Sean Round made were offensive and racially discriminatory.  Ex. 13, Rush Dep. 89, 107-08.  Raelean Rush described this incident to Keegan Roberts, Store Manager, as "Sean being Sean," providing an evidentiary basis for the conclusion that Sean Round had said other racially offensive things to

Raelean Rush.  Ex. 6, Roberts Dep. 234.  Defendants also admit that, prior to the Mary 15, 2010 in which Jamie LaPress called Black's children niggers, "[h]e would joke about [Black's] kids not because they were black, but because they were always in trouble."  Ex. 15 at DEF0134.  Given that, on May 15, 2010, Jamie LaPress called Black's children niggers, there is an evidentiary basis for the conclusion that his prior comments about Black's children were also racially motivated. Keegan Roberts stated that any jokes by Jamie LaPress concerning Black's children would have been inappropriate in the workplace.  Ex. 6, Roberts Dep. 185.  Defendants also admit that "several months before Darcy's resignation letter," Debbie Negrych spoke with Jamie LaPress and told him that he "needed to stop."  Ex. 15 at DEF0134; Ex. 7, Negrych Dep. 169-72.

Black further states that, Defendants had a simple overarching policy, which was "[s]how up to work, do your job, stay safe, go home at the end of the day."  Ex. 6, Roberts Dep. 106.  Being on time was a component of showing up to work.  Ex. 6, Roberts Dep. 106; *see* Ex. 5, R. Seibert Dep. 136; Ex. 7, Negrych Dep. 131.  In fact, the only written rule or policy at BAM was this written above the employees' work schedules: "you get your checks on time, I expect you to be on time for work."  D. Seibert. Dep. 87.  Black further states that, as detailed above (*see supra* ¶ 11), Defendants did not require male employees to comply with this policy.

36.    Black admits that she received training on workplace harassment at Kmart, Laidlaw, TNT, and NCO Financial.  Ex. 2, Black Dep. 33.  Black further states that she did not recall the substance of these trainings.  *Id*. 33-35.  Black further states that any training at these employers was limited to one time or, in the case of Laidlaw, once annually.  *Id*.  Black admits that she received employee handbooks at Kmart, Laidlaw, TNT, Marriott, NCO Financial, and Chartwells, which covered the subject of discrimination in general.  *Id*. 39.  Black states that she did not recall the substance of these handbooks.  *Id*.  Black further states that these training and

60

handbooks did not provide her with any information on if or when conduct in the workplace would allow her to bring a lawsuit or make a claim against the employer. Ex. 1, Black Decl. ¶ 2. Black further states that, not until her May 25, 2010 constructive discharge, discussed in detail above (*see supra* ¶ 11), did she consider that Defendants may have subjected her to unlawful conduct. Ex. 1, Black Decl. ¶ 15.

37.     Black admits that, as the result of the May 15, 2010 incident in which Jamie LaPress called her children niggers and Defendants subsequent failure to take action relative to her complaint, Black felt compelled to resign her employment at BAM. Ex. 41; *see supra* ¶ 11. Black admits that she left a letter for Robert Seibert and Diane Seibert making a complaint of discrimination, harassment, and hostile work environment relative to this conduct. Ex. 41. Black admits that, in that letter, she also indicated:

> I am writing you this because I have a hard time talking about what happened at work. I can deal with issues that have to do with me. I get emotional, then I get over it, but when someone can look and me and call my kids "niggers", I can not deal with that. My kids might be a handful but they are mine, and don't deserve to be called that by one of my co-workers. So, I am giving you my 2 week notice. Thank you for all you have done for me.

Ex. 41 at DEF0048. Black denies that she left this letter on May 19, 2010. Black states that she left this letter on May 21, 2010. Ex. 2, Black Dep. 297-99; Ex. 6, Roberts Dep. 311-12. Black further states that Raelean Rush, who is Caucasian and whose husband is African-American and the father of her two children, testified that she could think of nothing more offensive than a white employee calling Black's children niggers. Ex. 13, Rush Dep. 108, 128-29. She also testified that, if an employee referred to her children as niggers and the employer did not discharge or discipline the employee, she would leave employment. Ex. 13, Rush Dep. 108, 128-29. Black further states that that EEOC ultimately concluded that there was "reasonable cause to believe that Charging

Party was subjected to a hostile work environment and constructive discharge based on race discrimination in violation of Title VII." Defendants' Exhibit F at DEF0019; *see supra* ¶ 7.

38.     Black admits that, on March 3, 2009, she filed a Voluntary Petition for Chapter 7 Bankruptcy with the United States Bankruptcy Court for the Western District of New York. Oppenheimer Aff. Exhibit A.  Black states that her Bankruptcy Petition states that her total liabilities consisted of $10,220.23 in unsecured debt. *Id*. at 7.

39.     Black admits that she was represented in her bankruptcy by David Butterini, Esq. Oppenheimer Aff. Exhibit A.  Black lacks knowledge with respect to what extent David Butterini, Esq., is an experienced bankruptcy attorney. Ex. 1, Black Decl. ¶ 15.  Black admits that, during her bankruptcy proceeding, she completed paperwork for David Butterini, Esq.  Ex. 3, Black Dep. 349.  Black also admits that, if she had any questions about completing the paperwork, she would have asked David Butterini, Esq.   *Id*. 351.  However, Black denies that she did not have any questions about the paperwork, as her testimony was that she did not recall if she had any questions. *Id*.

40.     Black admits that she did not disclose any claims against Defendants during her bankruptcy proceedings.  Oppenheimer Aff. Exhibit A.  Black denies that doing so was a failure. Black states that, at the time that she filed her March 3, 2009 Bankruptcy Petition, she was currently employed at BAM.  *See supra* ¶ 11.  Prior to the May 15, 2010 incident in which Jamie LaPress called Black's children niggers—and Defendants' failure to take any action to address Black's complaint—Black had no intention of resigning her employment at BAM.  Ex. 3, Black Dep. 336.  Black could not afford to leave her job at BAM because she needed it to support her family.  *Id*.  Black further states that, at the time of her Bankruptcy Petition, she did not believe that she had any claims against Defendants, and she had not considered bringing a legal claim, as

she needed to continue to work at BAM to support herself and her family.  Ex. 1, Black Decl. ¶ 15; Ex. 3, Black Dep. 336.  Black did not even know that it was possible to bring a claim against or sue BAM while she still worked there.  Ex. 1, Black Decl. ¶ 15.  Black further states that, after she filed bankruptcy on March 3, 2009, she continued to work for Defendants for another year and two months, until her May 25, 2010 constructive discharge.  *See supra* ¶ 11.

Black further states that it was not until these events that she had no choice but to stop working for Defendants:

As the result of events that began on May 15, 2010 and concluded on May 25, 2010, Defendants constructively discharged Black from her employment at BAM.  Specifically, on May 15, 2010, Jamie LaPress had lost the key to a paper towel dispenser and came up alongside Black and asked her if she could break into the paper towel dispenser.  Ex. 2, Black Dep. 295-96.  Black told him that she could not and asked Jamie why he would ask.  *Id.*  Jamie LaPress said to Black "you have two black kids and that's what black people do."  *Id.* at 296.  Black replied that her children do not break into things, and she asked why he would say that.  *Id.*  "He goes well, they're niggers."  *Id.*  Following this incident, Black, also on May 15, 2010, complained to both Debbie Negrych and Thomas Howells, who were nearby when Jamie LaPress made this racially offensive comment about Black's children.  Ex. 2, Black Dep. 296-97.  Additionally, Defendants have identified Debbie Negrych and Thomas Howells as managers who regularly oversaw other employees.  Ex. 20.

On May 18, 2019, Black complained to Keegan Roberts, store manager, and told him that Jamie LaPress had called her children niggers.  Ex. 6, Roberts Dep. 310.  Keegan Roberts understood Black's complaint to be one of discrimination and harassment.  *Id.* 310.  Keegan Roberts testified that he then spoke with Jamie LaPress, Debbie Negrych, and Thomas Howells,

and Jamie LaPress denied calling Black's children niggers.  *Id*.  However, Diane Seibert testified

that Defendants never even considered the possibility that Jamie LaPress was lying and Black was

telling the truth.  Ex. 4, D. Seibert Dep. 144-45.  In comparison, Raelean Rush testified that Black

was always straightforward and honest, and there was no reason to believe Jamie LaPress and

disbelieve Black.  Ex. 13, Rush Dep. 117-18.

On May 21, 2010, Keegan Roberts, Store Manager, had already determined that he did not

believe Black's complaint, and he indicated that he wanted Black to have a further conversation

with Jamie LaPress about the incident.  Ex. 6, Roberts Dep. 311-12.  As a result, Black, on May

21, 2010, left a resignation letter for Robert Seibert and Diane Seibert (who were on vacation at

the time), putting in her two weeks' notice.  Ex. 2, Black Dep. 297-99.  Black's letter stated:

> I am writing you this because I have a hard time talking about what
> happened at work.  I can deal with issues that have to do with me.  I
> get emotional, then I get over it, but when someone can look and me
> and call my kids "niggers", I can not deal with that.  My kids might
> be a handful but they are mine, and don't deserve to be called that
> by one of my co-workers.  So, I am giving you my 2 week notice.
> Thank you for all you have done for me.

Ex. 41 at DEF0048.

On May 25, 2010, Robert Seibert had returned from vacation, and Robert Seibert and

Keegan Roberts called Black into the office for a meeting.  Ex. 2, Black Dep. 298.  In that meeting,

Black again explained the May 15, 2010 incident in which Jamie LaPress had called her children

niggers.  *Id*.  Robert Seibert and Keegan Roberts then called Jamie LaPress into the meeting, and

Jamie LaPress then said that he was not talking to Black, and it was nice.  *Id*. at 296-97.  After that

Keegan Roberts and Jamie LaPress left the office.  *Id*. at 297.  Robert Seibert then said to Black

that she would have to get used to things like that (i.e., people calling her children niggers) because

people are mean and cruel.  *Id*.  Black then asked Robert Seibert "so it's okay for one of my co-

workers to call my kids niggers?" *Id.* Robert Seibert replied "it happens in politics and it happens in sports so [Black is] going have to get used to the idea." *Id.* Black was offended by this comment. Ex. 1, Black Decl. ¶ 16. Multiple witnesses testified that this statement by Robert Seibert is racially offensive and discriminatory. Ex. 4, D. Seibert Dep. 168; Ex. 10, Leible Dep. 187. Black then told Robert Seibert that she was uncomfortable working with Jamie LaPress, and Robert Seibert said that he "was uncomfortable with the whole situation" and directed Black to leave immediately. Ex. 2, Black Dep. 297. May 25, 2010 was Black's last day of work at BAM. *Id.* Notably, Robert Seibert, himself, testified that he agreed that this response to Black's complaint of discrimination and harassment would be retaliatory. Ex. 5, R. Seibert Dep. 324.

Prior to the May 15, 2010 incident in which Jamie LaPress called Black's children niggers—and Defendants' failure to take any action to address Black's complaint—Black had no intention of resigning her employment at BAM. Ex. 3, Black Dep. 336. Black could not afford to leave her job at BAM because she needed it to support her family. *Id.* Notably, Raelean Rush, who is Caucasian and whose husband is African-American and the father of her two children, testified that she could think of nothing more offensive than a white employee calling Black's children niggers. Ex. 13, Rush Dep. 108, 128-29. She also testified that, if an employee referred to her children as niggers and the employer did not discharge or discipline the employee, she would leave employment. *Id.*

41. Black admits that, on June 11, 2009, the Bankruptcy Court entered an Order discharging Black's bankruptcy. Oppenheimer Aff. Exhibit C. Black states that, with respect to her involvement in the bankruptcy proceedings, this Discharge Order ended her Chapter 7 bankruptcy. *See id.* Black further states that this Order discharged only $10,220.23 in unsecured debt. Oppenheimer Aff. Exhibit A. Black admits that, while her bankruptcy filings were pending,

she did not amend her schedules to include a claim against Defendants.  Black states that on her "Statement of Financial Affairs" submitted to the Bankruptcy Court, when asked to "List all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of his bankruptcy case," Black listed the two collection actions in which she was a defendant.  *See* Oppenheimer Affidavit Exhibit A at 28.   Black had no "suits and administrative proceedings to which the debtor is or was a party within one year" to disclose.  Ex. 1, Black Decl. ¶ 15.  Black did not even know that it was possible to bring a claim against or sue BAM while she still worked there.  *Id.*

Black states, for the reasons discussed above (*see supra* ¶ 40), that, prior to the May 15, 2010 incident in which Jamie LaPress called Black's children niggers—and Defendants' failure to take any action to address Black's complaint—Black had no intention of resigning her employment at BAM.  Ex. 3, Black Dep. 336.  Black could not afford to leave her job at BAM because she needed it to support her family.  *Id.*  Black further states that, at the time of her Bankruptcy Petition, she did not believe that she had any claims against Defendants, and she had not considered bringing a legal claim, as she needed to continue to work at BAM to support herself and her family.  Ex. 1, Black Decl. ¶ 15; Ex. 3, Black Dep. 336.  It was only after these events that Black had no choice but to stop working for Defendants.  *See supra* ¶¶ 11, 40.  Black denies that, with respect to her, her bankruptcy closed on August 25, 2009, as the Bankruptcy Court entered an Order discharging Black's bankruptcy on June 11, 2009, and all that occurred after that event was discharge of the Trustee.  Oppenheimer Aff. Exhibit B.

42.     Black admits that, based on her Voluntary Petition, the Bankruptcy Court entered a June 11, 2009 Order discharging Black's bankruptcy.  Oppenheimer Aff. Exhibit C.  Black states that, for the reasons discussed above (*see supra* ¶¶ 40-41), her schedules before the Bankruptcy

Court did not list claims against Defendants.  Black states that on her "Statement of Financial Affairs" submitted to the Bankruptcy Court, when asked to "List all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of his bankruptcy case," Black listed the two collection actions in which she was a defendant.  *See* Oppenheimer Affidavit Exhibit A at 28.  Black had no "suits and administrative proceedings to which the debtor is or was a party within one year" to disclose.  Ex. 1, Black Decl. ¶ 15.  Black further states that this Order discharged only $10,220.23 in unsecured debt.  Oppenheimer Aff. Exhibit A. Black denies that, with respect to her, her bankruptcy closed on August 25, 2009, as the Bankruptcy Court entered an Order discharging Black's bankruptcy on June 11, 2009, and all that occurred after that event was discharge of the Trustee.  Oppenheimer Aff. Exhibit B.

43.    Defendants' Paragraph 43 is not a statement of fact but is a prayer for relief, which requires no response.  Black further states that, for the reasons discussed herein and set forth in the accompanying: Declaration of Darcy Black; Declaration of Josephine A. Greco; and Memorandum of Law, Black respectfully requests that the Court deny Defendants' Motion for Summary Judgment in its entirety.

Dated:  Buffalo, New York
        September 19, 2019

                                 s/Josephine A. Greco, Esq.
                                 Josephine A. Greco, Esq.
                                 Earl K. Cantwell, III, Esq.
                                 GRECO TRAPP, PLLC
                                 Attorneys for Plaintiff, Darcy M. Black
                                 1700 Rand Building
                                 14 Lafayette Square
                                 Buffalo, New York 14203
                                 E-mail: jgreco@grecolawyers.com