**EX. 1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DARCY M. BLACK

         Plaintiff,

v.

BUFFALO MEAT SERVICE, INC., doing business
as BOULEVARD BLACK ANGUS, also known as
BLACK ANGUS MEATS, also known as
BLACK ANGUS MEATS & SEAFOOD,
ROBERT SEIBERT,
DIANE SEIBERT,
KEEGAN ROBERTS

         Defendants.

**DECLARATION**

**15-CV-00049 WMS-HBS**

---

Plaintiff, Darcy M. Black, declares under the penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am the Plaintiff in this action. I am a Caucasian female and the mother of two children whose fathers are African-American.

2. I graduated high school in 1989. I subsequently received a Commercial Driver's License, which I had during the time I worked at Buffalo Meat Service, Inc. (hereinafter "BAM"). Prior to working BAM, I worked for Pizza Junction, Pizza Pickup, Payne Avenue Pizzeria, High Spot Pizza, and Marriott Sodexo, doing tasks including but not limited to making sandwiches, salads, pizza, chicken wings and working in other aspects of food preparation. In addition I had deli experience while working at Budwey's. I also worked for Laidlaw and TNT Bus driving school Busses. I drove a dump truck for Power City Paving. I received training on workplace harassment harassment at Kmart, Laidlaw, TNT, and NCO Financial, but the trainings were limited to one time

1

or, in the case of Laidlaw, once annually. I also received employee handbooks at Kmart, Laidlaw, TNT, Marriott, NCO Financial, and Chartwells, which covered the subject of discrimination in general. When I was employed at BAM, I did not recall the substance of these handbooks, and, to the best of my knowledge, I have never received any training or handbook that provided me with any information on if or when conduct in the workplace would allow me to bring a lawsuit or make a claim against the employer.

3. I started working for BAM on or about May 16, 2005. BAM sells meat, seafood, salads, and hundreds of grocery items, and processes deer and other wild game.

4. I continued to work for BAM until, on or about May 25, 2010, when I was constructively discharged.

5. At the time I began employment with BAM, Defendants, Robert Seibert and Diane Seibert, owned the business and Keegan Roberts was BAM's store manager. During my employment, Defendants, Robert Seibert, Diane Seibert, and Keegan Roberts, each had independent authority to hire and fire and otherwise affect my terms and conditions of employment. After my constructive discharge, which was on or about May 25, 2010, Keegan Roberts became an owner of BAM, with Robert Seibert, Diane Seibert.

6. Defendants created and permitted a hostile work environment on the basis of race and sex, discriminated against me on the basis of race and sex, discriminated against me with respect to wages on the basis of sex, and constructively discharged me.

7. Defendants were aware of numerous instances of racially offensive conduct.

8. Defendants were aware that Sean Round, my male co-employee, made racially offensive comments to female co-employees, Raelean Rush and Regina Rush, who were both Caucasian and dating African-American men. Sean Round said to Raelean Rush: "She would be better off with a white guy"; "She needs to be with one of her own kind": "What is wrong with white

2

guys?"; and "Her boyfriend was using her to get her name because Black men always cheat and he probably has a lot of girlfriends." On at least one occasion, I complained to Keegan Roberts about these sexually offensive comments. I was present also for and offended by these racially offensive comments.

9. About six months to one year prior to my constructive discharge on or about May 25, 2010, Robert Seibert told me that "You (I) would have to get used to the idea that your (my) children were black – there was no changing that. School kids are cruel and racial remarks from kids is not unusual." I made no comment that would cause Robert Seibert to say this, and I did not tell him that my children were being bullied because they were black.

10. I did not tell Robert Seibert that my children were being bullied because they were Black. I was offended by this racially offensive statement.

11. Defendants were also aware that male employees referred to BAM's African-American customers as "Bob's Niggs." I was present on multiple occasions when BAM employees, including Keegan Roberts, Store Manager, and Jamie LaPress referred to Defendants' African-American customers as "Bob's niggs." I was offended by these comments. I was also present when Jamie LaPress said regarding Defendants' African-American customers "how they could have nice cars and get food stamps" or how can they have "gold around their neck . . . [a]nd get food stamps." I was offended by these comments. Keegan Roberts, Store Manager, was also present in the pack room when Jamie LaPress made these racially offensive comments. Robert Seibert also made racially offensive comments about African-Americans. I heard these and similar racially offensive comments starting in about 2007 and continuing through my constructive discharge.

12. Defendants were also aware that employees made other racially offensive comments relative to African-Americans, such as "How can they have nice cars and get food stamps?"; "How

3

can they have nice clothes and get food stamps"; and that an African-American customer was too fat and asking why can't they get out and work.

13.     Defendants also discriminated against African-Americans in hiring. During the five years that I worked at BAM, Defendants employed no African-Americans or other ethnic minorities. When Defendants needed to hire an employee they would post a "help wanted" sign on the store door. In general, Diane Seibert's policy with respect to interviews was that, if she was available, she interviewed applicants immediately when they delivered their completed applications. However, during my employment with BAM, Defendants did not interview or offer employment to a single African-American applicant. Before determining whether to conduct an interview, Diane Seibert looked out of her office window at the applicant. If the applicant was African-American, Diane Seibert instructed employees to tell the applicant that Defendants were only collecting applications, and the applicant would receive a phone call. Diane Seibert gave this instruction to me regarding at least 20 African-American applicants. During my employment with BAM, I was aware of at least 50 African-American applicants who Defendants did not interview or offer employment to. When Spartacus Towne, an African-American male, applied at BAM, I personally brought his application to Diane Seibert. Diane Seibert looked out of the office window, saw that Spartacus Towne was African-American, and instructed me to tell him that BAM was only gathering applications and would call him. As I was walking away, I observed Diane Seibert throw Spartacus Towne's application into her garbage can. Later that day, when I was assigned to empty garbage cans, I confirmed that Diane Seibert had, in fact, thrown away Spartacus Towne's application. Defendants did not interview or offer employment to Spartacus Towne. When I brought the application of Leo Cumberlander, Jr., an African-American male, to Diane Seibert, Diane Seibert looked out of the office window, saw that Leo Cumberlander, Jr., was African-American, and instructed me to tell him that Defendants were only gathering applications and would call him.

4

Defendants did not interview or offer employment to Leo Cumberlander, Jr. During the last year of my employment with BAM, the son of a customer called Mr. John, who is African-American, put in multiple applications while Defendants were hiring. On another occasion, I personally took his application to Diane Seibert, who looked out of the office window, saw that the applicant was African-American, and instructed me to tell him that Defendants were only gathering applications and would call him. Defendants did not interview or offer employment to this African-American applicant. I was offended by Defendants' refusal to interview or offer employment to African-American applicants.

14. Defendants were aware of numerous instances of sexually offensive conduct, including but not limited to comments like: "She's got a nice ass"; "Your headlights are on": "Oh, look at that cleavage"; and "Does the carpet match the drapes?" For example, Thomas Howells said to me and Debbie Negrych (on different occasions) "does the carpet match the drapes?" On several occasions, the latest being in 2010 shortly before my constructive discharge on or about May 25, 2010, Sean Round commented that Raelean Rush has a nice ass. Defendants were aware of these comments, as Sean Round made some of them to Keegan Roberts, Store Manager. Sean Round made other sexually offensive comments as well, saying relative to female customers: "her headlights are on" and "oh look at that cleavage." I was present when Sean Round made these comments, and I was offended by these sexually offensive comments, which continued until my May 25, 2010 constructive discharge.

15. On March 3, 2009, I filed a Voluntary Petition for Chapter 7 bankruptcy. I used attorney David Butterini, Esq., as my bankruptcy attorney because he had helped my brother in the past. I had no idea to what extent he was an experienced bankruptcy attorney. On my Petition, I described my position as "Laborer", which was consistent with the many duties and tasks I performed worked at BAM. On June 11, 2009, the Bankruptcy Court entered an Order discharging

my bankruptcy. With respect to my involvement in the bankruptcy proceedings, this Discharge Order ended my Chapter 7 bankruptcy. The Bankruptcy Court's Order discharged only $10,220.23 in unsecured debt. On my "Statement of Financial Affairs" submitted to the Bankruptcy Court, when asked to "List all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of his bankruptcy case," I listed the two collection actions in which I was a defendant. I had no "suits and administrative proceedings to which the debtor is or was a party within one year" to disclose. Prior to the May 15, 2010 incident in which Jamie LaPress called my children niggers—and Defendants' failure to take any action to address my complaint—I had no intention of resigning my employment at BAM. I could not afford to leave my job at BAM because I needed it to support my family. In fact, while I was employed at BAM, I had to obtain a second job working part-time, even though it meant I would see my children even less. When I filed my Bankruptcy Petition, I did not believe that I had any claims against Defendants, and I had not considered bringing a legal claim, as I needed to continue to work at BAM to support myself and my family. I did not know that it was even possible to sue BAM while I continued to work for BAM. Even if I had known, I would have been fearful of suing BAM while I continued to work for BAM because my conditions at work would have worsened. It was only after I had no choice but to stop working for Defendants and was constructively discharged, losing my full-time income, that I considered a possible lawsuit

16. Defendants constructively discharged me. On May 15, 2010, Jamie LaPress had lost the key to a paper towel dispenser and came up alongside me and asked me if I could break into the paper towel dispenser. I told him that I could not and I asked Jamie why he would ask. Jamie LaPress said to me "you have two black kids and that's what black people do." I replied that that my children do not break into things, and I asked why he would say that. He said "Well, they're niggers." Following this incident on the same day I complained to both Debbie Negrych

6

and Thomas Howells, managers who regularly oversaw other employees, who were nearby when Jamie LaPress made this racially offensive comment about my children. Then, on May 18, 2019, I complained to Keegan Roberts, store manager, and told him that Jamie LaPress had called my children niggers. On May 21, 2010, Keegan Roberts, Store Manager, indicated that he wanted me to have a further conversation with Jamie LaPress about the incident. As a result, on May 21, 2010, I left a resignation letter for Robert Seibert and Diane Seibert (who were on vacation at the time), putting in my two weeks' notice. My letter stated:

> I am writing you this because I have a hard time talking about what happened at work. I can deal with issues that have to do with me. I get emotional, then I get over it, but when someone can look and me and call my kids "niggers", I can not deal with that. My kids might be a handful but they are mine, and don't deserve to be called that by one of my co-workers. So, I am giving you my 2 week notice. Thank you for all you have done for me.

On May 25, 2010, after Robert Seibert had returned from vacation, Robert Seibert and Keegan Roberts called me into the office for a meeting. In that meeting, I again explained the May 15, 2010 incident in which Jamie LaPress had called my children niggers. Robert Seibert and Keegan Roberts then called Jamie LaPress into the meeting, and Jamie LaPress then said that he was not talking to me and it was nice. After that Keegan Roberts and Jamie LaPress left the office. Robert Seibert then said to me that I would have to get used to things like that (i.e., people calling my children niggers) because people are mean and cruel. I asked Robert Seibert "so it's okay for one of my co-workers to call my kids niggers?" Robert Seibert replied "it happens in politics and it happens in sports so I was going have to get used to the idea." I was offended by this racially offensive comment. I then told Robert Seibert that I was uncomfortable working with Jamie LaPress, and Robert Seibert said that he "was uncomfortable with the whole situation" and directed Black to leave immediately. May 25, 2010 was my last day of work at BAM; I left crying.

7

17.     Prior to the May 15, 2010 incident in which Jamie LaPress called my children niggers—and Defendants' failure to take any action to address my complaint—I had no intention of resigning my employment at BAM. I could not afford to leave my job at BAM because I needed it to support my family. There is nothing more offensive than referring to my children niggers. The word nigger is the most offensive, degrading, and inflammatory racial slur I can think of, and it is used to show hatred and bigotry toward African-Americans. When Jamie LaPress called my children niggers, Defendants did not discharge or discipline him. Instead, Robert Seibert told me that I would have to get used to the idea. When I replied that I was uncomfortable working Jamie LaPress, Robert Seibert said that he "was uncomfortable with the whole situation" and directed me to leave immediately.

18.     After I filed my Charge of Discrimination with the EEOC, I learned that Defendants submitted a letter stating that my friendship with Raelean Rush and Regina Rush was because they dated African-Americans, and I felt a connection to them because my children were biracial. This statement is false, and it is racially offensive to me.

19.     After I filed my Charge of Discrimination with the EEOC, I learned that Defendants submitted a letter stating that I was easy to feel sorry for early on in my employment because I was a single mother with two biracial children trying to work to provide for her family. Defendants stating that they feel sorry for me because of the race of my children is demeaning and racially offensive to me and my children.

20.     Defendants subjected me to less favorable terms and conditions of employment than male employees. Defendants permitted males but not females to arrive late without calling in and take several smoke breaks; Defendants closely scrutinized my time and breaks but did not do so as to male employees; male employees were consistently late to work without reprimand; Defendants were aware that male employees smoked marijuana on site during the work day and took no action;

8

Defendants gave males preference for Saturdays off while denying females' requests for Saturdays off; and that BAM's male owner, Robert Seibert, and male Store Manager and subsequent owner, Keegan Roberts, greeted male employees by name but did not acknowledge me. This conduct continued throughout my employment and until my May 25, 2010 constructive discharge.

21.     I was also paid less than similarly situated male employees. I learned about this in or about April 2010, when Debbie Negrych was handing out paychecks because the Seiberts and Keegan Roberts were on vacation in Florida. Debbie Negrych told me that Defendants were paying me less that the male employees who I worked with in the pack room. Debbie Negrych was also really upset because she had not gotten a raise in about three or four years and the guys started out getting paid more than her. This was not fair, as but for BAM's owners and managers, all of Defendants' other employees have equal duties and responsibilities. We were are equally expected to do any work as needed. We were expected to fill packs for deliveries, wrap, wait on customers, and do whatever else needs to be done. Thus, Defendants' employees were basically interchangeable. Mark Leible, Sean Round, Jamie LaPress, Patrick Howells and I were all, first and foremost, packers, meaning we worked in the pack room preparing orders for deliveries. Mark Leible was my partner in the pack room. Sean Round also worked in the pack room, and he had also been partnered with me. Jamie LaPress has also worked in the pack room at times but not with the same frequency as Mark Leible, Sean Round, and me, as Jamie LaPress had difficulty wrapping and being on time for the 7:00 a.m. packing shift. Patrick Howells also worked in the pack room seasonally beginning in about 2006 and continuing through my constructive discharge on May 25, 2010. It was only after we completed our packing duties that we moved on to other tasks. Our additional tasks were also equivalent. Thomas Howells was Defendants' main butcher. Thomas Howells came in every morning and did meat cutting until the work was done. In general, he arrived arrived before I arrived for my 7:00 a.m. shift and worked until about 4:00 or 5:00 p.m. During

9

deer season, it was not uncommon for Thomas Howells to work over 60 hours in a week. Mark Leible and Jamie LaPress did not have primary duties related to meat cutting. Jamie LaPress cut meat only upon specific request when Thomas Howells was not present. Mark Leible cut meat even even less frequently, as he would cut meat only when both Thomas Howells and Jamie LaPress were not available. I also butterflied chicken breasts, cut pork chops, and cut steaks, which are the duties of a meat cutter, when a customer requested it and Thomas Howells was not present. Additionally, after completing the day's packs, I had significant duties and responsibilities while working for BAM, including the following: order products with Bell-View, including but not limited to canned goods, glass peppers, pickles, olives, and dressing); answer phones, take orders, take payment information, and secure food stamps for deliveries; check delivery orders against invoices and sign off on deliveries; mark up product; clean out the sausage machine after use; use the steak cubing machine; work with deer, including taking the deer from the hunter, dragging it into the cooler, cutting off its limbs, and wrapping deer meat; slice, screen, scrape, and bag jerky; take out the trash; pick up trash and cigarette butts from the exterior of the building; cleaning the exterior of the building butterflying chickens and cutting pork chops and steaks. In the deli, I created three new types of salads that were then sold at BAM: homemade macaroni and cheese, old-fashioned macaroni, and spiral antipasto. I began to ask Thomas Howells for additional training in meat cutting in about 2007, but Thomas Howells did not provide me any further meat cutting training but continued to provide training to male employees Jamie LaPress and Mark Leible. I also requested but was denied the opportunity to perform additional duties with respect to deliveries, flyering, meat grinding, operating the smoker, making sausage, and making jerky. When I told Diane Seibert that I wanted to take on driving responsibilities, I reminded Diane that I was especially qualified to do so, as I had a commercial drivers' license and prior driving experience. I am capable of learning, and Thomas Howells could have taught me meat grinding, making jerky, operating the smoker and

10

other things he taught the males if he was told to do so by Defendants.

22. Despite being similarly situated to Defendants' male employees, Defendants treated male employees more favorably than females, including me. I was always on time and treated people with respect. I was a good worker who always did my best to give a fair day's work. In comparison, I observed that Jamie LaPress, Mark Leible, and Sean Round were consistently late for work. Jamie LaPress was late for work on **many** occasions. I also observed that Sean Round would, on occasion, arrive to work between 60 and 90 minutes late. I was told by Thomas Howells that Sean Round would write on his time card the time he was schedule to arrive, rather than the time he actually arrived. No action was taken by Defendants to discipline or terminate these male employees. Defendants also did not require male employees to call in when they were going to be late. In addition, Defendants closely scrutinized my time, while male employees were able to take breaks throughout the day without scrutiny. Throughout my employment, continuing to my May 25, 2010 constructive discharge, Defendants permitted male employees to take unauthorized breaks without any consequence. In fact, if both a male employee and I were on break at the same time, Defendants would require me to return to work but allow the male employee to continue on break. Defendants' scrutiny of my time and breaks became so severe that I began tracking my 15-minute breaks on my time card. After I filed my Charge of Discrimination with the EEOC, I learned that Defendants submitted a letter stating that they scrutinized my time because I "abused [their] good graces" by receiving personal phone calls. I received no more phone calls than male employees. In fact, I complied with Defendants' policy and left my mobile phone in my car during working hours. As a result, I received necessary calls on BAM's landline concerning my children and other important matters. In comparison, male employees carried mobile phones during business hours, and they would regularly make and receive calls on them. Additionally, after I filed my Charge of Discrimination with the EEOC, I learned that Defendants submitted a letter stating that "[e]veryone

11

who is hired is informed that they do not request time off for the first 12 days of the month, or Saturdays, as a rule." Defendants did not apply this rule to male employees but denied female employees' requests for Saturdays off. Sean Round was permitted Saturdays off to participate in a football league each year. Additionally, Mark Leible and Jamie LaPress received Saturdays off; in comparison, Defendants denied Debbie Negrych's and my requests for Saturdays off. Defendants were also aware that Jamie LaPress smoked marijuana on premises behind a dumpster and took no action. Male employees, Keegan Roberts and Thomas Howells, used to joke in the pack room while while we were working about Jamie LaPress going behind the dumpster and smoking marijuana. Also Robert Seibert and Keegan Roberts said hello to male pack room employees but ignored me.

23. Defendants also denied me the opportunity to enroll in health insurance through BAM, a benefit offered to similarly situated male employees. Specifically, when I lost Medicaid coverage for myself, I asked Diane Seibert if BAM offered health insurance, and Diane Seibert told me that BAM did not, as it was too expensive. I began receiving mental health counseling in 2006. The counseling, in part, addressed how Defendants treated me while working at BAM. I also received mental health counseling to help me cope with my stressful home life, which involved raising two disabled children. At some point during my employment with BAM, I came home crying four days of five working days in a week, but I do not remember when it started. During my my August 12, 2009 counseling session with Dale Association, I complained that the men at BAM were not treating me well and complaining that I takes breaks. I also discussed the prospect of getting an additional part-time job with Gersh Experience. I had no intention to resign my employment at BAM. I needed additional money, as I did not have health insurance among other things. I did accept part time employment with Gersh Experience. In fact, I began working for Gersh Experience in or about November 2009 and continued to work there through my May 25, 2010 constructive discharge from BAM. At no time did my part-time position with Gersh

Experience affect the hours I was available to work at BAM. After I filed my Charge of Discrimination with the EEOC, I learned that health insurance was available to Defendants' employees, with BAM paying 40% of the premium.

24.     Defendants also discriminated against me and other female employees with respect to wages. We were expected to be on time for work. Raises were merit-based, and one factor in determining raises was following work rules. I had to ask for a raise each year on my work anniversary. I learned from documents received during discovery in this that Defendants paid male employees more than female employees, including me, for the same work.

**Darcy Black wage history:** I started work at $7.50/hour. After initially working for BAM for about 8 months, on or about January 8, 2006, I received a fifty-cent raise to $8.00/hour. About a year later, on or about December 31, 2006, I received a fifty-cent raise to $8.50/hour. About four month later, on or about May 6, 2007, I received a fifty-cent raise to $9.00/hour. About a year and two months later, on or about August 3, 2008, I received a fifty-cent raise to $9.50/hour. About ten months later, on or about June 7, 2009, I received her final fifty-cent raise to $10.00/hour. In or about March 2010, I approached Keegan Roberts about a raise, as my five-year anniversary employment anniversary was approaching. Keegan Roberts instructed me to speak to Diane Seibert about this request, and Diane Seibert denied my request, stating that it was not a "good time" and Defendants could not afford it. I was earning $10.00/hour at the time of my May 25, 2010 2010 constructive discharge.

**Darcy Black as compared to Mark Leible:**   Although I worked side-by-side as a partner with Mark Leible performing the same job duties working together in the pack room, Mark Leible earned far more money than I did based on the wage records we received from Defendants. Additionally, discovery in this case showed that Mark Leible was enrolled in health insurance through BAM, of which Defendants paid at least 40%. This employee benefit constituted additional

13

additional compensation paid to Mark Leible, as Diane Seibert had denied my request to enroll in health insurance through BAM. Thus, throughout my employment with BAM, Mark Leible earned more than me for the same work. At the time of my May 25, 2010 constructive discharge, my rate was $10.00/hour, as compared to Mark Leible's $13.65/hour, which was raised three months later to $14.65/hour.

**Darcy Black as compared to Sean Round:** Sean Round was hired on or about February 23, 2007, at a rate of $9.50/hour. At that time, I was earning $8.50/hour. When BAM hired Sean Round, he had no specialized skills or experience wrapping and/or packing meat. However, based on the wage records we received from Defendants, about six months later, Sean Round's hourly rate had increased by $2.50/hour to $11.50/hour, which was more than my hourly rate of $10/hour at the time of my May 25, 2010 constructive discharge. On or about February 5, 2010, Sean Round received a $1.50/hour raise to $13.00/hour. This was approximately one month before Defendants denied my request for a raise in or about March 2010. It also appears that Sean Round worked off the books for BAM, given that, at his deposition he admitted working for BAM since January 11, 2015 but it is not reflected on any of BAM's payroll records after January 11, 2015 that were provided in the discovery in this case.

**Darcy Black as compared to Patrick Howells:** Beginning in about 2006 and continuing through my May 25, 2010 constructive discharge, each year from approximately October to March, when Patrick Howells was laid off from his regular concrete job, he worked daily in my presence in BAM's pack room. Patrick Howells brought product from the freezers to the pack room, which employees used to fill orders for deliveries. The only way I knew Patrick Howells was from working with him at BAM, so when I invited all of the BAM employees to my March 2009 wedding, he was included. Photographs taken at my wedding show Patrick Howells along with other BAM employees at my wedding. Defendants' payroll records that we produced in this case do not reflect

14

any wages paid to Patrick Howells. During my employment, BAM seasonally employed Patrick Howells and paid him off the books for doing work similar to me. Defendants have not provided any information regarding what was paid to him, which leads me to believe he was paid more than me. Also, because he was paid off the books, none of his earning were subject to applicable taxes and withholdings.

**Darcy Black as compared to William Frase:** I was also paid less than male employee William Frase. William Frase, also known as Turtle, worked in the pack room and performed the same duties as I did. William Frase began working at BAM at or about the same time that I did in May 2005. However, Defendants' records that were produced in this case show that William Frase does not appear on BAM's payroll until on or about July 31, 2009. William Frase's mother died while he was working at BAM. While working in the pack room with William Frase and others, there was a discussion that he wanted to purchase his mother's house; however, to do so, he had to be paid on the books. So he spoke with Defendants and said that he needed to put on the books at BAM so that he could show income to purchase his mother's home out of the estate. Based on the wage records provided in discovery, William Frase first appeared on BAM's payroll on or about July 31, 2009, earning $15/hour; this is $5 more per hour than I was earning at that time. This, in conjunction with his about four years working off the books, demonstrates that Defendants paid this male employee more than me for the same work.

**Debbie Negrych as compared to Sean Round:** Also, Debbie Negrych was paid less than compared to Sean Round. When I began working at BAM, Debbie Negrych, the Front End Manager had been with BAM for more than 20 years. Records produced by Defendants in this case case show that, despite her long employment history and management position, on or about January 7, 2005, Debbie Negrych was earning only $10.50/hour. Not until on or about June 12, 2009 did Debbie Negrych receive a raise to $11/hour. She worked for over four years without a raise. In

15

comparison, Defendants, on or about February 23, 2007, hired Sean Round, who had no specialized meat or deli experience at a rate of $9.50/hour. Within six months, Sean Round was earning $12/hour, $1.50 more per hour than Debbie Negrych. Additionally and as noted above, evidence also indicates that Sean Round worked off the books for BAM, given that he admitted working for BAM since January 11, 2015. After I filed my Charge of Discrimination with the EEOC, I learned that Defendants submitted a letter stating that BAM's contributions toward Debbie Negrych's health insurance was $12,000 per year, which was not true. The insurance records that were produced show that the total cost for Debbie Negrych's health insurance was $7,170.36 in 2005; $7,750.80 in 2006; $9,675.12 in 2007; and $9,369.48 in 2008. Defendants have produced no documents relative to the cost of Debbie Negrych's health insurance for the last two years of Black's employment, i.e., 2009 and 2010. Additionally, starting on or about December 22, 2006, Debbie Negrych began making $50 weekly contributions toward her health insurance, totaling $2,600/year. Thus, Debbie Negrych was paid significantly less than Sean Round.

**Christopher Howells as compared to Raelean Rush and Regina Rush:** According to the testimony, BAM hired Christopher Howells, Raelean Rush, and Regina Rush each to work part time at the front counter. Despite this, Defendants hired Christopher Howells on or about February 15, 2008, at a rate of $12/hour. In comparison, at the time that Defendants were paying Raelean Rush only $8.50/hour, despite her having almost three years' experience at that time. At that time, Regina Rush was also earning only $8.50/hour, despite also having worked for BAM for about three years.

**Evidence that male employees are paid off the books:** I personally observed William Frase and Patrick Howells each work at BAM and be paid off the books. I also work with David Monolopulus and subsequently learned in this action that there was only one payroll record for David Monolopulus: the week of December 5, 2005 through December 11, 2005. The absence of payroll

16

records relative to this work indicates that David Monolopulus worked for Defendants and that they were paying him off the books. Also, while I worked at BAM, Thomas Howells was the main butcher. He typically arrived at BAM before I arrived for my 7:00 a.m. shift and, during most of the year, stayed until about 4:00 or 5:00 p.m. Black. During deer season, which is November through January, Thomas Howells was at BAM working over 60 hours per week. Defendants' payroll records that were produced do not reflect Thomas Howells's actual hours. Thus, Defendants Defendants paid Thomas Howells partially on the books and partially off the books.

25.   I submitted to the EEOC an Intake Questionnaire, dated June 14, 2010, with attached three-page handwritten narrative which was stamped received by the EEOC on June 18, 2010. On the fourth page of my Intake Questionnaire, I checked "BOX 2" indicating that I wanted "to file a charge of discrimination" and authorizing "the EEOC to look into the discrimination . . . described above." The Intake Questionnaire stated that I was discriminated against during my employment at BAM on the basis of race and sex and included specific allegations against Robert Seibert and Keegan Roberts. The Intake Questionnaire included references to specific conduct occurring on May 15, 2010 and in February 2010. With respect to the May 15, 2010 incident, I reported that my co-employee, Jamie LaPress, had called my children niggers. My attached narrative stated:

> The thing that finally set me to put in my 2 weeks notice was one of my co-workers called my boys "Niggers", and when I was approached By the owner Bob Seibert, to discuss my 2 week notice, He (Bob Seibert) told me that stuff happens like that all the time, so I asked Bob, "So it is okay for Jamie to call my kids "Niggers", and Bob said that it happens in sports and politics, so basically just deal with it.   I was punched in for work for about 2 hrs. 40 mins. and Bob told me to leave now, so I got my things together and left crying.

I also indicated that Robert Seibert had discriminated against me by, in response to an incident in which a co-employee called my children niggers, telling me that it "happens in politics and sports." The Intake Questionnaire specifically indicated that, in February 2010, Keegan

17

Roberts, Store Manager, yelled at me about my breaks and was "very mean" to female employees, while male employees "can say and do whatever they want to anyone. The Intake Questionnaire also identified two similarly situated male employees—Mark Leible and Jamie LaPress—who were treated more favorably than me and another female employee, Debbie Negrych. My narrative attached to the Intake Questionnaire also stated that male employees were paid more than female employees for the same work and otherwise enjoyed more favorable terms and conditions of employment. I wrote:

> The guys are all $12.00 and way over, but the girls that work their (sic.) are worked the hardest, But we are all supposed to have the same responsibilities, But we are all treated very differently, most of the guys are late every day . . . But the 2 other women workers (Darcy; Debbie) we are never late nor do we call in sick. . . . But the guys never call, and they don't get in trouble for being late, up to 1 hour late.

I have reviewed **Defendants' Exhibit B** (Dkt. 106-4) and determined that it is not a document that I prepared or submitted to the EEOC. It is unsigned and undated. The EEOC prepared this Charge of Discrimination and assigned Charge No. 846-2010-55217; however, I did not sign and return the document to the EEOC, as I was working with my counsel to submit a Charge of Discrimination. Assisted by counsel, I made a second submission to the EEOC: a Charge of Discrimination consisting of four typewritten pages signed by me and verified as true to the best of my knowledge, dated December 16, 2010, and stamped received by the EEOC on January 3, 2011 which named as Respondents: BAM, Robert Seibert, and Diane Seibert. At the time of this Charge of Discrimination, Robert Seibert and Diane Seibert were BAM's only two owners.

26.     I do not think that it would be fair to deny me my day in court for the reason that I did not disclose a claim against my employer when I had no idea a claim existed while my

18

Bankruptcy case was opened. It wasn't until eleven months after my Bankruptcy was discharged that I was forced to leave my full time employment.

DATED: September 18, 2019
Buffalo, New York

*Darcy M. Black*
Darcy M. Black

19