**EX. 2**

DARCY BLACK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
---------------------------------------------------
DARCY M. BLACK,

                          Plaintiff,


     -vs-


BUFFALO MEAT SERVICE, INC., doing business
as BOULEVARD BLACK ANGUS, also known as
BLACK ANGUS MEATS, also known as
BLACK ANGUS MEATS & SEAFOOD,
ROBERT SEIBERT,
DIANE SEIBERT,
KEEGAN ROBERTS,

                          Defendants.

---------------------------------------------------

                          Examination Before Trial of

DARCY BLACK, Plaintiff, taken pursuant to the Federal Rules

of Civil Procedure, in the law offices of BARCLAY DAMON

LLP, The Avant Building, Suite 1200, 200 Delaware Avenue,

Buffalo, New York, taken on January 23, 2018, commencing at

9:35 A.M., before ERIN L. COPPING, Notary Public.

3

1        APPEARANCES:

2        GRECO TRAPP, PLLC,
         By JOSEPHINE A. GRECO, ESQ.,
3        and DANIEL PALERMO, ESQ.,
         1700 Rand Building,
4        14 Lafayette Square,
         Buffalo, New York 14203,
5        Appearing for the Plaintiff.

6        BARCLAY DAMON LLP,
         By RANDOLPH C. OPPENHEIMER, ESQ.,
7        and MEGAN E. BAHAS, ESQ.,
         The Avant Building, Suite 1200,
8        200 Delaware Avenue,
         Buffalo, New York 14202,
9        Appearing for the Defendants.

10       PRESENT:  Diane Seibert
                   Keegan Roberts
11

12

13           (The following stipulations were entered

14       into by both parties.)

15           It is hereby stipulated by and between counsel

16       for the respective parties that the oath of the

17       Referee is waived, that filing and certification

18       of the transcript are waived, and that all

19       objections, except as to the form of the

20       questions, are reserved until the time of trial.

21

22

23

6

1    A.  Yes.

2    Q.  Okay.  All right.

3    MS. GRECO:  One intersection.

4           (Discussion off the record.)

5    BY MR. OPPENHEIMER:

6    Q.  All right.  Have you ever testified before?

7    A.  No.

8    Q.  Never in court, never in a deposition?

9    A.  No.

10   Q.  Okay.  What's your date of birth?

11   A.  December 15th, 1970.

12   Q.  Are you currently married?

13   A.  Yes.

14   Q.  To whom?

15   A.  Robert Black.

16   Q.  When did you get married?

17   A.  March 21st, 2009.

18   Q.  Have you been married previously?

19   A.  No.

20   Q.  Do you have any children?

21   A.  Yes.

22   Q.  What are their names?

23   A.  Jordan Hofert and Jahon Drake.

14

1   A.   I worked at Pizza Junction, Pizza Pickup.

2   Q.   Pizza Pickup?

3   A.   Yes.   Payne Avenue Pizzeria, High Spot Pizzeria,

4        Power City Paving.   I've worked at Laidlaw Bus

5        Company, TNT Bus Service.

6   Q.   TMT?

7   A.   TNT.

8   Q.   All right.

9   A.   And I worked for Marriott -- Marriott Sodexo.

10       They were -- they supplied school lunches and

11       when Marriott Sodexo turned over to Chartwells

12       they again supplied the school lunches.   Able

13       Transportation, Dependable Cab, NCO Financial.

14  Q.   Again, I'm focused just on your prior to Black

15       Angus employment.   So is that what you're giving

16       me?

17  A.   Yes.   Yes.

18  Q.   Okay.   Good.   Keep going if you can.

19  A.   I believe that is -- that is all.

20  Q.   Okay.   On your application, look at the bottom

21       there.   Is that Mobil -- Mobil?

22  A.   Yes.

23  Q.   Did you cover that one or no?

15

1    A.   No, I did not.

2    Q.   Okay.  So we should add that one?

3    A.   Yes.

4    Q.   Okay.  All right.  You indicated that you may not

5         be able to give us the dates of employment for

6         some of these, so let me go through those and let

7         me know if you can give me dates of employment

8         for the employers that I identify.  Okay?

9    A.   Yes.

10   Q.   Pizza Junction, dates of employment or no?

11   A.   No.

12   Q.   Pine Avenue Pizzeria, dates of employment or no?

13   A.   I do not recall.

14   Q.   Pizza Pickup, dates or no?

15   A.   1986.

16   Q.   This is then prior to your high school

17        graduation?

18   A.   Yes.

19   Q.   Okay.

20   A.   Sorry.

21   Q.   Were all of the pizza places prior to your

22        graduation from high school?

23   A.   No.

16

```
 1   Q.   Okay.  And which ones were after your high school
 2        graduation?
 3   A.   The rest of them.
 4   Q.   Okay.  So High Spot Pizzeria?
 5   A.   Yes.
 6   Q.   That was after 1989?
 7   A.   Yes.
 8   Q.   Are you able to say when?
 9   A.   I do not recall.
10   Q.   Power City Paving, dates of employment?
11   A.   Summer of 1990.
12   Q.   Laidlaw Bus, dates of employment?
13   A.   I do not recall.
14   Q.   TNT Bus Service, dates of employment?
15   A.   2004 I stopped working there.
16   Q.   Do you recall when you started working at TNT
17        Bus?
18   A.   I believe it was 2003.
19   Q.   Okay.  Marriott Sodexo -- Sodexo?
20   A.   I worked there when I was working at Laidlaw
21        Transportation.
22   Q.   Was it a part-time job?
23   A.   It was -- I was a lunch lady in between my school
```

```
1         bus runs.
2    Q.   So when you worked for Laidlaw and TNT Bus
3         Service, those were school buses that you were
4         driving?
5    A.   Yes.
6    Q.   And those were for which school district or
7         districts?
8    A.   It varied, because I drove handicapped school
9         bus.
10   Q.   Okay.  We've heard testimony in some of the other
11        cases about you having a commercial driver's
12        license.
13   A.   Yes.
14   Q.   Do you still have a commercial driver's license?
15   A.   No.
16   Q.   When did you first get your commercial driver's
17        license?
18   A.   I believe -- I do not recall.
19   Q.   Did you get it in connection with your work for
20        the school bus companies?
21   A.   Yes.
22   Q.   So prior to the work for the school bus companies
23        you didn't have a CDL?
```

18

1    A.   Yes, I did.

2    Q.   You did have a CDL prior to that?

3    A.   Yes.

4    Q.   Okay.  Why did you get the CDL?

5    A.   You have to have a commercial driver's license to

6         drive a school bus.

7    Q.   Okay.  So you got the CDL in anticipation of

8         going to work for Laidlaw Bus Company, is that

9         true?

10   A.   Before that I had a CDL license working for Power

11        City Paving.

12   Q.   Okay.  What did you do for Power City Paving?

13   A.   I drove dump truck.

14   Q.   So you got the CDL so you could drive a dump

15        truck?

16   A.   Yes.

17   Q.   Okay.  What years were you doing the work for

18        Marriott Sodexo?

19   A.   2001 to 2003.

20   Q.   And when did you work for Able Transportation?

21   A.   It was after Laidlaw.

22   Q.   Are you able to say 2003, 2000 --

23   A.   Yes.

19

1    Q.   Okay.  So sometime after 2003, and for how long

2         did you work for Able?

3    A.   It was about five or six months.  I needed a CDL

4         for that also.

5    Q.   All right.  When did you work for Dependable Cab?

6    A.   Before I had children.

7    Q.   And you had your first child in 1995?

8    A.   Yes.

9    Q.   So sometime prior to your employment with Able

10        Transportation and prior to the Marriott Sodexo

11        work?

12   A.   Yes.

13   Q.   Okay.  Are you able to pin it down sometime in

14        the 1990's more specifically?

15   A.   1992 between 1995.

16   Q.   Okay.  When did you work for NCO Financial?

17   A.   Right before I applied at Black Angus.

18   Q.   So sometime in 19 -- I'm sorry.  In 2005?

19   A.   Yes.  I worked there for a week training.

20   Q.   When did you work for Mobil?

21   A.   In 2004.

22   Q.   How long did you work for Mobil?

23   A.   About seven months.

20

1   Q.  What did your job entail when you were working

2       for Kmart?

3   A.  I was overnight stock.

4   Q.  What did that job entail, meaning what did you

5       do?

6   A.  Brought product out from shipping and receiving

7       and put it on the floor.

8   Q.  How would you bring the product out from shipping

9       and receiving from the floor?

10  A.  On U-boats.

11  Q.  On what?

12  A.  U-boats.

13  Q.  Okay.  Tell us what that is.

14  A.  It's a metal rack with two shelves.

15  Q.  All right.  You pull that or push that out?

16  A.  Yes.

17  Q.  And were there other activities that you engaged

18      in other than what you've just described in terms

19      of doing the night stock for Kmart while you were

20      working for Kmart?

21  A.  No.

22  Q.  What did you do at Pizza Junction?

23  A.  Made subs.

21

1    Q.   Anything else at Pizza Junction?

2    A.   And salads.

3    Q.   Okay.  Made subs and salads?

4    A.   Yes.

5    Q.   Where is that located?

6    A.   It was located on Erie Avenue in North Tonawanda.

7    Q.   Okay.  Where was the Kmart that you worked at

8         located?

9    A.   On Niagara Falls Boulevard in Amherst.

10   Q.   What did you do at Pizza Pickup?

11   A.   Prep.

12   Q.   What does prep consist of?

13   A.   Fill cups with blue cheese, count out wings, keep

14        stations filled.

15   Q.   Anything else?

16   A.   No, I do not recall.

17   Q.   And what does keeping a station filled mean?

18   A.   If they run out of pepperoni, fill it.  If they

19        run out of cheese, fill it.

20   Q.   Okay.

21   A.   And/or sauce.

22   Q.   All right.  What did you do at the Payne Avenue

23        Pizzeria?

22

1    A.   I was night manager.

2    Q.   What were your duties as night manager, meaning

3         what did you do?

4    A.   I looked over the other staff.  I made pizzas.  I

5         stretched dough.  I made subs.  I made wings and

6         other items that went in the fryers.  I did the

7         register at night, locked up, went home.

8    Q.   Where is that located?

9    A.   It was located on the corner of Payne Avenue and

10        Ward Road.

11   Q.   All right.  What did you do at High Spot

12        Pizzeria?

13   A.   I was a pizza maker.

14   Q.   Where is that located?

15   A.   There is two different High Spot Pizzerias I

16        worked at.  One was on Bailey Avenue and the

17        other was on High Street.

18   Q.   In the City of Buffalo?

19   A.   Yes.

20   Q.   Okay.  What did you do at Power City Paving?

21   A.   I drove dump truck.  I raked blacktop.  I sealed

22        driveways and parking lots.

23   Q.   Where was their main office located?

23

1    A.   Harding Avenue in North Tonawanda.

2    Q.   Is that -- was that your father's business?

3    A.   No, it was not.

4    Q.   Okay.  Did you ever work for your father's

5         concrete business?

6    A.   He had -- it was called Hofert's Maintenance and

7         it wasn't just concrete.

8    Q.   What was it?

9    A.   Blacktop and concrete and trenching and

10        snowplowing.

11   Q.   He did a lot of things?

12   A.   Yes, he did.

13   Q.   When did you work for your dad's business?

14   A.   I helped him throughout my childhood.

15   Q.   Okay.  After high school, did you work for his

16        business?

17   A.   Yes, I did.

18   Q.   Okay.  When did you work for his business?

19   A.   I helped out the family.

20   Q.   Okay.  Were you paid by your dad to help him out?

21   A.   No, I was -- I helped out my family.

22   Q.   Okay.  How much did you help out your family?

23   MS. GRECO:   Objection.

33

1      or otherwise in the workplace, did you receive

2      any training at any of the employers that we've

3      been discussing?  When I'm talking about training

4      in this sense I'm referring to a session in a

5      room where people are discussing what sexual

6      harassment is, what is prohibited in the

7      workplace, how people should behave.

8   A.  Yes.

9   Q.  Which company or companies did that occur?

10  A.  Kmart, Laidlaw, TNT and NCO.

11  Q.  What was the thrust of the training that you

12      received with respect to sexual harassment at

13      that session at -- was it one session at Kmart?

14  MS. GRECO:  Objection, form.

15  BY MR. OPPENHEIMER:

16  Q.  What was the form of the training concerning

17      sexual harassment at Kmart?

18  A.  I do not recall.

19  Q.  Was there more than -- did you have more than one

20      experience at Kmart where there was training on

21      sexual harassment?

22  A.  No.

23  Q.  Okay.  Are you able to recall what the training

34

1      was like for sexual harassment at Laidlaw?

2  A.  Ever year they touch base on it in a classroom

3      with the other drivers.

4  Q.  Can you recall anything about the substance of

5      the training that you received at Kmart on

6      subject of sexual harassment?

7  MS. GRECO:  Can you just read that back.

8           (Whereupon, the above-requested question was

9      then read back by the reporter.)

10 THE WITNESS:  I do not recall.

11 BY MR. OPPENHEIMER:

12 Q.  What about Laidlaw, are you able to recall the

13     substance of any of the training concerning

14     sexual harassment at Laidlaw?

15 MS. GRECO:  Objection, form.

16 THE WITNESS:  I do not recall.

17 BY MR. OPPENHEIMER:

18 Q.  What was the form of the training on sexual

19     harassment at TNT Bus Service?

20 A.  I do not recall.

21 Q.  What was the form of the training concerning

22     sexual harassment at NCO Financial?

23 A.  I just remember we were hired with a group of ten

1          and we all trained together and that was part of

2          our packet of training.

3     Q.   Do you recall -- so in terms of training, you're

4          thinking about receiving a packet of information

5          at NCO?

6     A.   Yes, that they went over with us individual --

7          like each individual page.

8     Q.   Is that what they did at Kmart, they went over

9          some written materials with you at some point on

10         the subject of sexual harassment?

11    A.   Yes.

12    Q.   Is that what they did at Laidlaw, going over some

13         written material with you on the subject of

14         sexual harassment?

15    A.   Yes.

16    Q.   And is that what they did with you at TNT Bus

17         Service, they went over some written material

18         concerning the subject of sexual harassment?

19    A.   Yes.

20    Q.   Those four companies, Kmart, Laidlaw, TNT and

21         NCO, those are the ones that you received some

22         sort of training on sexual harassment, as you

23         just testified.  Was the subject of race

1   A.   Yes.

2   Q.   Did all of those handbooks cover the subject of

3        race discrimination?

4   A.   Yes.

5   Q.   Did all of those handbooks cover the subject of

6        discrimination on the basis of gender or sex,

7        meaning men and -- meaning a woman should not be

8        the subject of discrimination because of her

9        gender?

10  A.   I do not recall.

11  Q.   Did all of those handbooks cover the subject of

12       sexual harassment?

13  A.   Yes.

14  Q.   Did all of those handbooks set forth a procedure

15       that an employee was to follow if the employee

16       believed that he or she had a complaint to make

17       concerning the subject of discrimination?

18  MS. GRECO:   Objection to form.

19  THE WITNESS:   Yes.

20  BY MR. OPPENHEIMER:

21  Q.   Okay.  What did you learn at Kmart on the subject

22       of making a complaint to someone if you believed

23       that you were a victim of some kind of

41

1    Q.   Okay.  What do you recall about the Laidlaw

2         employee handbook on the subject of complaints

3         concerning discrimination?

4    A.   We could go to our union rep.

5    Q.   Okay.  You were a member of a union at Laidlaw?

6    A.   Yes.

7    Q.   Was that the first time that you were a member of

8         a union?

9    A.   No.

10   Q.   When were you first a union member?

11   A.   I also worked at Budwey's.

12   Q.   Okay.  When did you work at Budwey's?

13   A.   Before I had children.

14   Q.   What union did you become a member of while you

15        were at Budwey's, Food and Commercial Workers?

16   MS. GRECO:  Object to the form.

17   THE WITNESS:  I don't recall the name.

18   BY MR. OPPENHEIMER:

19   Q.   Okay.  Did you receive any materials from the

20        union on the subject of discrimination?

21   A.   No.

22   Q.   What union were you a member of when you worked

23        for Laidlaw?

42

1   A.   I believe it was Teamsters.

2   Q.   Did you receive any information from the

3        Teamsters on the subject of discrimination?

4   A.   Yes.

5   Q.   What information did you receive?

6   A.   A handbook.

7   Q.   Did you read that handbook?

8   A.   Yes.

9   Q.   Do you recall anything that it contained on

10       subject of discrimination?

11  A.   Yes.

12  Q.   What did it say?

13  A.   I don't recall the exact words.

14  Q.   Do you recall the substance?

15  MS. GRECO:  Objection to form.  You can answer.

16  THE WITNESS:  No.

17  BY MR. OPPENHEIMER:

18  Q.   What do you recall about -- or, strike that.  Did

19       the TNT Bus Service employee handbook address the

20       subject of discrimination?

21  A.   Yes.

22  Q.   Did it have a complaint process that an employee

23       was to follow?

50

1   BY MR. OPPENHEIMER:

2   Q.   Or Jahon the son on Social Security disability?

3   A.   Jahon.

4   Q.   Jahon.  When did Jahon start taking SSD?  That's

5        Social Security disability.  Social Security

6        disability, is that what he got?

7   A.   SSI.

8   Q.   SSI.  When did Jahon start receiving SSI?

9   A.   I do not recall.

10  Q.   Do you recall the year?

11  A.   No.

12  Q.   What reason was it that he started receiving SSI?

13  A.   He had disabilities.

14  Q.   What kind of disabilities?

15  A.   He had tibial torsion, femoral aversion.  He had

16       problems with where his eyes, nose and throat and

17       ears all come together.  It never formed

18       correctly.  His sinus cavities never hollowed

19       out, so his tear ducts were plugged all the time

20       and he had thirteen surgeries by the time he was

21       three years old.

22  Q.   Must have been terrible to go through as a mom.

23       Has he continued to require surgery?

51

1   A.  Yes.

2   Q.  So how many surgeries has Jahon had over the

3      course of his life?

4   A.  I believe it's seventeen.

5   Q.  Is he able to attend school?

6   A.  Yes.

7   Q.  What school does he attend?

8   A.  He graduated.

9   Q.  What school did he graduate?

10  A.  He was in a six-one-one class, special education.

11  Q.  Where was that?

12  A.  At what time?

13  Q.  Where did he graduate from?

14  A.  Niagara Academy in Sanborn.

15  Q.  What's he doing now?

16  A.  Applying for applications with his case manager

17     and has an application in at VESID-VR.

18  Q.  Is he living at home with you?

19  A.  Yes, he is.

20  Q.  Does Jordan still live at home with you?

21  A.  No, he does not.

22  Q.  When did he move out?

23  A.  I do not recall.

52

1   Q.   At any time did you receive food stamps?

2   A.   Yes.

3   Q.   When was that?

4   A.   I do not recall.

5   Q.   When was the last time you received food stamps?

6   A.   I do not recall.

7   Q.   Not able to tell me the year?

8   A.   I don't know.

9   Q.   Are you still on Medicaid?

10  A.   No.

11  Q.   When did you stop Medicaid?

12  A.   While I was employed at Black Angus.

13  Q.   Is there a reason your Medicaid stopped while you

14       were at Black Angus?

15  A.   Yes.

16  Q.   What's the reason?

17  A.   I made more money.

18  Q.   You weren't eligible anymore?

19  A.   Correct.

20  Q.   Okay.  Is your husband Robert employed?

21  A.   Yes, he is.

22  Q.   Where is he employed?

23  A.   Full-time or part-time?

58

1        job at the Gersch Experience in November of 2009?

2   A.   My brother works there and he knows I needed to

3        make more money because I lost my health

4        insurance.

5   Q.   Okay.  So was there some kind of application

6        process that you went through?

7   A.   Yes.

8   Q.   What did you do?

9   A.   Filled out an application.

10  Q.   When did you do that?

11  A.   In November of 2009.

12  Q.   Did you have an interview?

13  A.   Yes, I did.

14  Q.   And obviously that was successful and you started

15       work, right?

16  A.   Yes.

17  Q.   Okay.  What position did you apply for there?

18  A.   Night cleaner and taking the students home from

19       tutoring.

20  Q.   What was the compensation for that position?

21  A.   Regular wages.

22  Q.   How much?

23  A.   I started at ten dollars an hour.

59

1    Q.   At some point did you receive an increase?

2    A.   Yes.

3    Q.   When was that?

4    A.   I don't recall.

5    Q.   What was the increase to?

6    A.   Eleven dollars an hour.

7    Q.   Are you still working for Gersch?

8    A.   No, I am not.

9    Q.   When did you stop working for Gersch?

10   A.   July of 2014.

11   Q.   What was the reason for you stopping your work

12        for Gersch?

13   A.   The chief operating officer wanted me to lie to

14        the parents and say that there was a life coach

15        living at all three apartment buildings and I

16        would not lie for them so they let me go.

17   Q.   How much were you making in compensation when you

18        stopped working in July of 2014?

19   A.   Eleven dollars an hour.

20   Q.   All right.  How many hours were you working on

21        average in the summer of 2014 before you stopped

22        working?

23   A.   Forty plus.

60

1  Q.  When did the Gersch experience job become a
2      full-time job for you?
3  A.  July or August of 2010.
4  Q.  Your last employment with Black Angus was in May
5      of 2010, is that fair?
6  A.  Yes.
7  Q.  And you worked part-time then for Gersch between
8      the end of your employment at Black Angus until
9      sometime in either July or August of 2010 when
10     your employment at Gersch became full-time?
11 A.  Yes.
12 Q.  Okay.  Did the job at Gersch change or were more
13     hours available for you to do the same job of
14     cleaning and driving?
15 A.  I was given more responsibilities.
16 Q.  What additional responsibilities were you given?
17 A.  I became a job coach.
18 Q.  What is a job coach?
19 A.  Where I assist college age students with
20     disabilities to function properly in the
21     workplace.
22 Q.  And do you receive training at Gersch on how to
23     do the job, the coach job?

74

1   A.   I can't recall.

2   Q.   What did you discuss with Lisa?

3   A.   I remember she asked me if I had any previous

4        experience.

5   Q.   Previous experience?

6   A.   In a deli.

7   Q.   In a deli?

8   A.   Yes.

9   Q.   Okay.

10  A.   And I said yes, I worked at Budwey's deli and

11       that's pretty much all I can recall.

12  Q.   Did she indicate that they were looking for

13       someone to work in the deli?

14  MS. GRECO:   Objection to form.

15  THE WITNESS:   I can't recall.

16  BY MR. OPPENHEIMER:

17  Q.   What experience did she ask you about other than

18       experience in a deli, if any?

19  A.   I can't recall.

20  Q.   Did the meeting with Lisa end in an offer to you?

21  A.   Yes.

22  Q.   What was the offer?

23  A.   That I was hired.

75

1   Q.   Okay.  Did she indicate at the time the offer was

2        made what you were hired to do?

3   A.   I don't recall.

4   Q.   Did she indicate what the rate of pay would be?

5   A.   I don't recall.

6   Q.   Did she indicate whether or not there would be

7        any employment benefits?

8   A.   I don't recall.

9   Q.   Did she indicate how many hours a week you would

10       be expected to work?

11  A.   I don't recall.

12  Q.   Did she indicate what the store hours were?

13  A.   I don't recall.

14  Q.   Did she indicate when you would start working?

15  A.   I don't recall.

16  Q.   Did she indicate what your hours would be when

17       you did start working?

18  A.   I believe ten to six.

19  Q.   Ten a.m. to six p.m.?

20  A.   Yes.

21  Q.   When was your first day of work at Black Angus?

22  A.   I don't recall.

23  Q.   Looking at your employment application, Exhibit

91

1    Q.   What was the guy?

2    A.   Bell-View guy.

3    Q.   Bell-View?

4    A.   Products.

5    Q.   He would come in and see you?

6    A.   Yes.

7    Q.   For what purpose?

8    A.   For the items that we carried that his company

9         sold us.

10   Q.   Okay.  In general, what kind of products did

11        Bell-View sell to Black Angus?

12   A.   Canned goods, glass peppers, pickles, peppers,

13        olives, stuff of that nature, dressing.

14   Q.   And what did you learn about how to put an order

15        in with Bell-View?

16   A.   What we were low on or out of we reordered.

17   Q.   Okay.  When did you learn how to do that?

18   A.   I don't recall.

19   Q.   All right.  Other than what you've told us so far

20        about the different things that you learned how

21        to do in 2005, and then when you learned how to

22        fill packs for deliveries and now you've told us

23        how to fill an order, put an order in for

92

```
1       Bell-View.  What additional jobs did you learn at
2       Black Angus, other than what you've told us
3       about?
4   A.  That I was taught?
5   Q.  That you learned how to do while you were there,
6       whether you were taught by another person, you
7       observed and as a result of observations you
8       began doing, but what I'm interested in is what
9       additional jobs did you learn how to do at Black
10      Angus other than what you've told us about?
11  A.  Cut boneless meat.
12  Q.  Cut boneless meat, what does boneless meat
13      consist of?
14  A.  Any raw meat that does not have a bone.
15  Q.  How did you learn how to cut boneless meat?
16  A.  By watching Thomas Howells.
17  Q.  When did you learn how to cut boneless meat?
18  A.  While employed at Black Angus.
19  Q.  How many times did you cut boneless meat while
20      you were at Black Angus?
21  A.  A few times.
22  Q.  What's a few, two, three?
23  MS. GRECO:  Objection to form.
```

93

1   BY MR. OPPENHEIMER:

2   Q.  Five?  What does it mean to you?

3   A.  My course of employment there from five times.

4   Q.  Do you remember the circumstances that resulted

5       in you cutting boneless meat five times over the

6       years of your employment?

7   A.  Yes.

8   Q.  What were they?

9   A.  I remember butterflying boneless breast.

10  Q.  Chicken breast?

11  A.  Yes.

12  Q.  Anything else?  Anything else?

13  A.  Boneless pork chops.

14  Q.  Anything else?

15  A.  A bigger pork, boneless pork roast other than the

16      three-pound roast we kept in the counter.

17  Q.  Anything else?

18  A.  Thomas Howells would always leave a chunk of the

19      boneless meat on a rack in the cooler and if we

20      ever had to we could cut off a steak if need be

21      and I have done that.

22  Q.  Okay.  With respect to the butterflying the

23      boneless chicken breast, someone ask you to do

94

1      that?

2    MS. GRECO:   Was she done with her answer?

3    BY MR. OPPENHEIMER:

4    Q.   You tell me.   Was there other boneless meat that

5         you cut other than the boneless pork chops, the

6         butterflied chicken, the bigger boneless pork and

7         the steak that you just mentioned?

8    A.   And I also butterflied a top round steak to make

9         lemon brine.

10   Q.   Anything else?

11   A.   Not that I can recall.

12   Q.   All right.   So did someone ask you to butterfly

13        the boneless chicken breast?

14   A.   Yes.

15   Q.   Who?

16   A.   A customer.

17   Q.   Okay.   Was there a reason that you butterflied

18        the chicken breast as opposed to someone else in

19        the store who did the butterflying more often

20        than you?

21   A.   Thomas Howells wasn't present.

22   Q.   With respect to the boneless pork chops, did

23        someone ask you to cut the boneless pork chops?

1   A.   Yes.

2   Q.   Who was that?

3   A.   A customer.

4   Q.   Why did you do that rather than someone who more

5        customarily cut the boneless meat?

6   A.   I was available and it was my customer.

7   Q.   How about the bigger boneless pork roast you

8        talked about, why did you cut that as opposed to

9        someone else who cut meat more frequently?

10  A.   There was nobody else present.

11  MS. GRECO:  Objection to form.

12  BY MR. OPPENHEIMER:

13  Q.   You said you butterflied a top round.  Did

14       someone ask you to do that?

15  A.   Yes.

16  Q.   Who?

17  A.   A customer.

18  Q.   Why did you do that as opposed to someone who cut

19       meat more regularly than you?

20  MS. GRECO:  Objection to form.

21  THE WITNESS:  There was no meat cutter there.

22  BY MR. OPPENHEIMER:

23  Q.   Okay.  Were the meat cutters the ones who

96

1     generally cut meat?

2   MS. GRECO:  Objection to form.

3   THE WITNESS:  Tommy Howells.

4   BY MR. OPPENHEIMER:

5   Q.  Tommy Howells was a meat cutter who generally cut

6       meat?

7   A.  Yes.

8   Q.  Okay.  Anyone else during your employment you

9       considered a meat cutter who generally cut meat?

10  A.  In the beginning of my employment it was Nelson

11      Schultz Senior.

12  Q.  Okay.  Anyone else other than Nelson and Howells

13      that you considered a meat cutter who regularly

14      cut meat?

15  A.  I've seen --

16  MS. GRECO:  Objection to form.

17  THE WITNESS:  I've seen Mark Leible and Jamie Lapress

18      cut meat.

19  BY MR. OPPENHEIMER:

20  Q.  Okay.  Anyone else that you've seen cut meat?

21  A.  No.

22  MS. GRECO:  Other than herself?

23  BY MR. OPPENHEIMER:

1   Q.   Thomas Howells would leave some meat available if

2        someone needed a steak cut, you said?

3   A.   Yes.

4   Q.   Did you ever cut a steak?

5   A.   Yes, I did.

6   Q.   And do you recall the instances when you did cut

7        a steak?

8   A.   It was a strip steak.

9   Q.   A strip steak on one occasion?

10  MS. GRECO:  Objection to form.

11  THE WITNESS:  I don't recall.

12  BY MR. OPPENHEIMER:

13  Q.   Do you recall cutting a strip steak, is that your

14       testimony?

15  MS. GRECO:  Objection to form.

16  THE WITNESS:  Yes.

17  BY MR. OPPENHEIMER:

18  Q.   All right.  And when did you -- why did you cut

19       the strip steak?

20  A.   Because Tommy Howells was not there.

21  Q.   Did you have a customer who needed a strip steak?

22  A.   Yes.

23  Q.   And that's why you cut it, because Tommy Howells

98

```
 1      was not there?
 2 A.   Yes.
 3 Q.   Is there anything else that you learned how to do
 4      at Black Angus during the period of your
 5      employment that you have not told us about?
 6 A.   No, I wasn't given a chance or the opportunity.
 7 Q.   Okay.  We'll get into that.
 8 MS. GRECO:  Well, wait.  Can you read her the stuff?
 9      Because it's all broken up so if there is any
10      others.  If not I'll have her go back on it.  You
11      mean during any time or just in 2007?
12 BY MR. OPPENHEIMER:
13 Q.   Is there anything else that you learned while you
14      were at Black Angus that you have not talked to
15      us about in terms of the jobs that you did there?
16 A.   I did fliers.
17 Q.   Okay.  What does doing fliers mean?
18 A.   You take fliers and take them to people's doors,
19      hang them on the door.
20 Q.   Okay.
21 A.   Or put them inside the door.
22 Q.   How many times did you do fliers?
23 A.   Twice.
```

99

1   Q.  What were those -- tell us what was involved in

2       each of those occasions.

3   MS. GRECO:  Objection to form.

4   THE WITNESS:  I took fliers from the office, asked

5       Diane and I did them with my niece and nephew and

6       my youngest son on my own time.

7   BY MR. OPPENHEIMER:

8   Q.  This is something you wanted to do and you asked

9       Diane?

10  A.  Yes.

11  Q.  Okay.  This is not something Diane asked you to

12      do?

13  A.  No.

14  Q.  Okay.  And you said you did it on your own time?

15  A.  Yes.

16  Q.  Okay.  Why did you decide you wanted to do

17      something with fliers on your own time?

18  A.  To help generate more customers.

19  Q.  For the store?

20  A.  Yes.

21  Q.  Okay.  Were you able to generate more customers

22      for the store as a result of handing out the

23      fliers that you handed out?

100

1    A.   I believe so.

2    Q.   Which customers did you generate?

3    A.   I don't recall.

4    Q.   How many customers did you generate?

5    A.   I don't recall.

6    Q.   How much business was done with the customers

7         that you generated?

8    A.   I don't recall.

9    Q.   What year was it that you generated a customer by

10        handing out a flier?

11   MS. GRECO:  Objection to form.  You can answer.

12   THE WITNESS:  I don't recall.

13   BY MR. OPPENHEIMER:

14   Q.   When one of the customers that you generated

15        ordered product from the store did that customer

16        come in the store?

17   A.   No.

18   Q.   How did that customer do business with the store?

19   A.   Called in.

20   Q.   Okay.  And was this then a delivery that was made

21        to the customer?

22   A.   Yes.

23   Q.   Did you at that time or any time identify the

101

```
 1      customer to someone else as someone you produced?
 2  A.  No, I -- it was brought to my attention.
 3  Q.  Who brought it to your attention?
 4  A.  Diane.
 5  Q.  What did Diane bring to your attention about the
 6      customer?
 7  A.  They commented on how cute my niece was.
 8  Q.  On how cute whose niece was?
 9  A.  Mine.
10  Q.  Okay.  How did the customer, to your knowledge,
11      know anything about your niece?
12  A.  Because they walked with me.
13  Q.  Okay.  So when you handed out the fliers your
14      niece walked with you, is that what happened?
15  A.  My niece, my nephew, and my youngest son.
16  Q.  Okay.  Other than Diane bringing that particular
17      customer to your attention, did anyone ever bring
18      to your attention that someone else identified
19      you as the reason for the business as a result of
20      fliers you handed out?
21  MS. GRECO:  Objection to form.  You can answer.
22  THE WITNESS:  Yes.
23  BY MR. OPPENHEIMER:
```

104

1   A.   Yes.

2   Q.   What was that?

3   A.   Learned how to answer phones.

4   Q.   How did you learn how to answer phones?

5   A.   I was told how.

6   Q.   Okay.  Who told you?

7   A.   Debbie Negrych.

8   Q.   When did Debbie tell you how to answer phones?

9   A.   I don't recall.

10  Q.   When you were -- when you learned how to answer

11       phones, what did you learn?

12  A.   What to say and how to say it.

13  Q.   Okay.  Anything else?

14  A.   Learn how to take the order, if it was an order

15       for a pickup or for a delivery.

16  Q.   Anything else with answering phones?

17  A.   How they were paying for it.

18  Q.   Okay.  Anything else that you learned about with

19       respect to answering phones?

20  A.   I can't recall at this time.

21  Q.   Are there other jobs that you learned how to do

22       at Black Angus in addition to the ones that

23       you've talked to us about?

105

1    A.   Yes.

2    Q.   Okay.  Tell me about them, please.

3    A.   I learned how to secure the food stamps that

4         orders were going out for deliveries.

5    Q.   Who taught you that?

6    A.   Diane and Debbie.

7    Q.   When did they teach you that?

8    A.   I don't recall.

9    Q.   What's involved in the process of securing food

10        stamps?

11   A.   You have to call the main number and put in their

12        card number and make sure that they have the food

13        stamps on the card for the delivery.

14   Q.   Anything else?

15   A.   You had purchase and you write down a code.

16   Q.   Does that complete your answer on securing food

17        stamps?

18   A.   At this time, yes.

19   Q.   Okay.  What other jobs did you learn how to do at

20        Black Angus that you have not talked about?

21   A.   Checked in orders.

22   Q.   What is checking in an order involve?

23   A.   An order that comes in, either be the chip guy,

106

1     potato chip guy, Hostess guy.  At that time they

2     had Luigi Rose or Sherwood order or even

3     sometimes Will Poultry's order.

4  Q.  Who taught you how to check in orders of that

5     kind?

6  A.  No one.

7  Q.  How did you learn how to do it?

8  A.  The delivery guy actually helped me what to look

9     for.

10 Q.  And would the delivery guy stock or did you stock

11    with what those delivery guys delivered?

12 A.  It depended on the product.

13 Q.  Okay.  So what was involved in checking in orders

14    that you learned from the delivery guys?

15 A.  How many we counted when there was so many boxes

16    of a product, we counted the boxes to make sure

17    that there was that many that was on the invoice.

18    For every item that they -- that they put the

19    order in and if there wasn't an item I had to put

20    a star next to it that we did not receive that

21    item.  And the driver usually initialed it.

22 Q.  Was there a payment made to the driver at the

23    time of the delivery or not?

107

1   A.   I didn't take care of that.

2   Q.   Okay.  Do you know if there was a payment made to

3        the driver at the time of delivery that someone

4        else was responsible for?

5   A.   I do not recall.

6   Q.   Are there other jobs that you learned how to do

7        at Black Angus that you have not told us about?

8   A.   Yes.

9   Q.   Tell me about them.

10  A.   Diane would bring an order in from BJ's Wholesale

11       place and I would have to take all the product

12       out of its containers, take the receipt and add

13       thirty-five percent on top of that, price the

14       product and put the product out.

15  Q.   Okay.  Are there any other jobs that you learned

16       at Black Angus that you have not told us about?

17  A.   I learned how to make salads.

18  Q.   Tell us, who told you how to make salads?

19  A.   The ones that they already carried in store they

20       -- Debbie Negrych and Linda Descalise, and I'm

21       not sure if I'm pronouncing her name right.  They

22       taught me.

23  Q.   Okay.

108

```
1   A.   And I had put three items that were my own
2        creations, my own personal recipes in the
3        counter.
4   Q.   What were those creations and recipes?
5   A.   Of mine?
6   Q.   Yes.
7   A.   Homemade macaroni and cheese, old-fashioned
8        macaroni and cheese and a spiral antipasto.
9   Q.   Okay.  When were you taught how to make salads,
10       if you recall?
11  A.   I don't recall.
12  Q.   When did Diane teach you how to deal with the
13       orders she brought in from BJ's?
14  A.   I don't recall.
15  Q.   When did you learn how to deal with the orders
16       from the guys, like the chip guy and the Hostess
17       delivery guys?
18  A.   I don't recall.
19  Q.   When did you learn how to secure the food stamps
20       if you got an order over the phone for delivery?
21  A.   I don't recall at this time.
22  Q.   When did you learn how to answer the phones?
23  A.   I don't recall at this time.
```

109

1   Q.  You described dealing with canned goods and the

2       glass jars, the peppers, pickles, et cetera.

3       When did you learn how to describe that?

4   A.  I don't recall.

5   Q.  Did you ever -- I'm sorry.  Have you ever -- did

6       you learn how to do additional jobs at Black

7       Angus that you have not described for us?

8  MS. GRECO:  So we're clear, that's at any time during

9       her employment?

10  MR. OPPENHEIMER:  Right.

11  MS. GRECO:  Okay.

12  THE WITNESS:  Yes.

13  BY MR. OPPENHEIMER:

14  Q.  What was that?

15  A.  I learned how to take apart the slicers and clean

16      them.

17  Q.  These are the slicers in the deli?

18  A.  Yes.

19  Q.  That you described before, the three -- there

20      were three slicers in the deli?

21  A.  Yes.

22  Q.  Okay.

23  A.  And also the butcher slicer.

1  Q.  When did you learn how to take apart the slicers

2      in the deli?

3  A.  I've had some knowledge of that before I went

4      there, so it was easy for me to learn their

5      technique.

6  Q.  Okay.  When did you learn how to take apart the

7      slicers in the butcher area?

8  A.  I don't recall at this time.

9  Q.  Okay.  Any additional jobs that you learned at

10     the Black Angus that you have not told us about?

11  A.  I learned how to clean out the sausage machine

12     after they made sausage.

13  Q.  Is that something that you actually did in terms

14     of cleaning out the sausage machine after they

15     made sausage?

16  A.  Not all the time.

17  Q.  How many times did you clean out the sausage

18     machine?

19  A.  I can recall right now of two times.

20  Q.  Over the course of your five years of employment?

21  A.  Yes.

22  Q.  Okay.  Who taught you how to clean out the

23     sausage machine?

111

1   A.   Mark Leible.

2   Q.   Okay.  When did he teach you how to do that?

3   A.   While I was employed at Black Angus.

4   Q.   Any particular year that you can zero in on?

5   A.   I can't recall at this time.

6   Q.   Okay.  Any other jobs that you learned while you

7        were working at Black Angus?

8   A.   I learned how to put up the meat wrapping paper

9        and cellophane.

10  Q.   What is involved in putting up meat wrapping

11       paper and the cellophane?

12  A.   Going to the pack room, carrying up the big rolls

13       and putting them on the machine, the table.

14  Q.   Sorry.  Who taught you how to do that?

15  A.   Debbie Negrych.

16  Q.   When were you taught how to do that?

17  A.   Shortly after I started.

18  Q.   Any other jobs that you learned how to do at

19       Black Angus?

20  MS. GRECO:  If it's helpful, think of your last year

21       of employment, like the last things you remember

22       doing if you learned anything new or not.

23  THE WITNESS:  I can't recall at this time.

112

BY MR. OPPENHEIMER:

Q.  Okay.  If you remember later today feel free to,
    you know, say you just remembered something,
    something popped in your head.

A.  Okay.

Q.  And the idea is to get all of the information
    that you have.  It's not -- you remembered
    something?

A.  Yes.

Q.  Okay.  Tell us.

A.  I learned -- Thomas Howells taught me how to make
    cube steaks in the cuber machine.

Q.  When did he do that?

A.  I can't recall at this time.

Q.  How many times did you make steaks for sale to
    customers at Black Angus using the cuber machine?

A.  I can't recall.

Q.  Can you recall even one?

A.  Yes.

Q.  Okay.  Can you recall more than one?

A.  Yes.

Q.  How many do you recall?

A.  I can recall at least five times.

113

1  Q.  Okay.  What is involved in making a steak using

2      the cuber machine?

3  A.  You have to drop the meat that Tommy has already

4      prepared and cut into the cuber machine one way,

5      and then you turn it sideways and drop it in

6      sideways, opposite the way you just dropped it in

7      before.

8  Q.  Okay.  Anything else that you learned to do at

9      Black Angus that you have not already told us

10     about?  That one just popped in, are there --

11 A.  Yeah.  Yeah, I can't recall at this time.

12 Q.  All right.  Well, as I said, if you remember

13     later just, you know, throw your hand up and say

14     you remember another one.  Now, you indicated

15     that there were things that you wanted to --

16 MS. GRECO:  Just a second.  It's twelve o'clock, so

17     is it a new area?  Can we take a ten-minute break

18     now, or we can keep going?

19 MR. OPPENHEIMER:  I would say take a lunch break at

20     twelve-thirty.

21 MS. GRECO:  I just want her to last the day, so part

22     of me is thinking she's been here already two

23     hours.

114

1 MR. OPPENHEIMER:  It's up to you.

2 MS. GRECO:  We'll take a ten-minute break, and then a

3  lunch break.

4 MR. OPPENHEIMER:  It's up to you.

5 MS. GRECO:  Let's let her get up and move around.

6 MR. OPPENHEIMER:  Fine with me.

7  (Whereupon, a short recess was then taken.)

8 BY MR. OPPENHEIMER:

9 Q.  All right.  This morning a couple of times you

10  mentioned, Darcy, that -- is it all right if I

11  refer to you as Darcy?

12 A.  Yes.

13 Q.  That you weren't given the opportunity to do some

14  jobs but I want to do at this point is ask you

15  about jobs that were done at Black Angus whether

16  you ever did that job and whether that was

17  something that you wanted the opportunity to do.

18  Okay?  So that's -- I just want to focus you on

19  where I'm going with this.  All right.  So making

20  deliveries of meat to customers, did you ever do

21  that?

22 A.  No.

23 Q.  Was that something that you thought you should be

115

```
 1      given the opportunity to learn how to do?
 2  A.  Yes.
 3  Q.  Now, you mentioned that you delivered fliers on a
 4      couple of occasions on your own time.  Was
 5      delivering fliers on the company's time something
 6      that you did at Black Angus?
 7  A.  No.
 8  Q.  Was that something that you thought you should be
 9      given the opportunity to do?
10  A.  Yes.
11  Q.  There's been testimony about butchering meat as
12      involving, you know, taking down a whole animal.
13      Was that something that was done at Black Angus
14      other than with respect to the deer?
15  MS. GRECO:  Objection.
16  BY MR. OPPENHEIMER:
17  Q.  Was butchering a whole animal something that was
18      done at Black Angus?
19  MS. GRECO:  Objection to form.  Go ahead.
20  BY MR. OPPENHEIMER:
21  Q.  You know what I mean, you've got a quarter of an
22      animal or half of an animal and it comes in like
23      that and they have to take it down to its
```

116

```
 1       constituent meat parts?
 2  A.   No.
 3  Q.   That wasn't done there.  They got meat in boxes,
 4       right?
 5  A.   Yes.
 6  Q.   Other than the deer that came in, right?
 7  A.   Yes.  Oh, I just remembered.  I worked with the
 8       deer.
 9  Q.   Oh, okay.  That was a job that you learned how to
10       do at Black Angus?
11  A.   Yes.  I took the hunters' information when they
12       brought the deer in and I dragged them into the
13       cooler and they wrapped the different deer
14       products that the butcher or meat cutter cut off
15       the deer.
16  Q.   The different venison products?
17  A.   Yes.
18  Q.   Who taught you how to do all that?
19  A.   Debbie Negrych.
20  Q.   When did she teach you how to do that?
21  A.   I do not recall.
22  Q.   Okay.  So going back to butchering of whole
23       animals, that wasn't something that was done at
```

1      Black Angus?

2   A.  No.

3   Q.  Okay.  I mean apart from the deer.  I'm not

4       talking about the deer.  Okay.  Meat cutting was

5       something that was done at Black Angus with

6       respect to the boxed meat that came in, right?

7   A.  Yes.

8   Q.  You mentioned the kind of cutting that you did,

9       you mentioned the butterflying of the chickens

10      and all that other stuff.  Other than that did

11      you want an opportunity to do additional meat

12      cutting at Black Angus?

13  A.  Yes.

14  Q.  Okay.  Do you have knowledge of some different

15      terms that are used by butchers such as primal

16      cuts?

17  A.  Yes, there's different grades.

18  Q.  Do you know what a primal cut is?

19  A.  It's the prime, the top of the line.

20  Q.  Okay.  Do you know what section of the animal a

21      tri tip roast is cut from?

22  A.  I don't recall.

23  Q.  Do you know what a chuck roll is?

1    A.   I don't recall.

2    Q.   Do you know the difference between a point and a

3         flat?

4    A.   Yes.

5    Q.   What is the difference?

6    A.   A point and flat of what?

7    Q.   I'm asking you.

8    MS. GRECO:   Objection to form.

9    BY MR. OPPENHEIMER:

10   Q.   Have you ever heard the terms point or flat used

11        with respect to a particular cut of meat?

12   A.   No.

13   Q.   With respect to a brisket, do you know if there's

14        a point and a flat with respect to a brisket?

15   A.   Yes.

16   Q.   Okay.  What is the point and what's the flat on a

17        brisket?

18   A.   The flat is where the grain goes all in one

19        direction and the point is at the opposite end.

20   Q.   Okay.  What's the difference between a pork

21        shoulder and a pork butt?

22   A.   Different ends of the pig.

23   Q.   Okay.  That's what I would have said.

1   MS. GRECO:   Objection to form.

2   BY MR. OPPENHEIMER:

3   Q.   In terms of processing the deer at Black Angus,

4        did you ever skin a deer there?

5   A.   No.

6   Q.   Did you ever cut the limbs off a deer?

7   A.   Yes.

8   Q.   When did you do that?

9   A.   When people wanted the hooves when they brought

10       them in.

11  Q.   Okay.  How many times did you do that?

12  A.   I can recall four times, because they wanted to

13       make coat racks.

14  Q.   Okay.  Did you ever hang a deer?

15  A.   No.

16  Q.   Did you ever load the bone barrels?

17  A.   No.

18  Q.   With respect to the meat grinder at Black Angus,

19       did you ever operate that as part of your job?

20  A.   No.

21  Q.   You mentioned a cuber that was next to Tommy

22       Howells' butchering area.  Was there any other

23       cuber at Black Angus?

120

1   A.   No.

2   Q.   Was there a smoker at Black Angus?

3   A.   Yup.

4   Q.   Did you ever operate that as part of your job?

5   A.   No.

6   Q.   With respect to the -- the deer that we were

7        talking about, skinning and cutting the limbs

8        off, hanging and loading the bone barrels, is

9        that a job that you wanted an opportunity to do?

10  A.   Yes.

11  MS. GRECO:   Object to the form.

12  BY MR. OPPENHEIMER:

13  Q.   So you wanted an opportunity to do the deer

14       processing?

15  A.   Yes.

16  Q.   And did you want an opportunity to learn how to

17       use the meat grinder?

18  A.   Yes.

19  Q.   What was the meat grinder used for?

20  A.   To make ground beef for the counter or to grind

21       venison.

22  Q.   Okay.  Was it used to make sausage?

23  A.   To grind pork or beef to make sausage.

121

1    Q.   Okay.  Now, you mentioned using the cuber with

2         Tommy a few times.  Was using the cuber a job

3         that you wanted the opportunity to do more of

4         there?

5    A.   Yes.

6    Q.   How about the smoker, was operating the smoker

7         something that you weren't given the opportunity

8         to do that you wanted to do?

9    A.   Yes.

10   Q.   Did you ever make sausage at Black Angus?

11   A.   What part of it?

12   Q.   Well, tell me what the sausage process entails.

13   A.   Grinding the product for the sausage, waking out

14        the spaces, putting it in the mixer, adding

15        water, getting the skins, loading the stuffer,

16        feeding it through the tubes.

17   Q.   Anything else?

18   A.   You have to -- so far down you have to like twist

19        them.

20   Q.   Twist the links?

21   A.   Yeah, then you have to cut the links apart, and

22        then wrap them for either the counter -- or wrap

23        them, either put some in the counter or wrap them

122

```
 1        for the freezer for packs.
 2   Q.   Okay.  So did you do part of the sausage making
 3        job?
 4   A.   I just dealt with the links.
 5   Q.   What did you do with respect to the links?
 6   A.   I cut the links apart and either placed them in
 7        the counter or wrapped them.
 8   Q.   Was that for a particular kind of sausage or for
 9        all of the sausage that they make?
10   A.   For various sausage that they make.
11   Q.   Like the summer sausage, smoked sausage?
12   A.   Yes.
13   Q.   All the different pork sausage?
14   A.   Yes, and venison.
15   Q.   And venison.  Was making sausage something that
16        you weren't given the opportunity to do that you
17        wanted to do?
18   A.   Yes.
19   Q.   Did you ever make jerky as part of your job?
20   A.   What stage of it?
21   Q.   Tell me what the stages of jerky making are.
22   A.   You have to slice the muscle meat, then you let
23        it sit in a brine, then you screen it for the
```

123

```
 1      smoker, then you smoke it, then you take it off
 2      of the scraper, put it in a bin and you weigh it
 3      in one-pound packages.
 4   Q. Which part of that job did you do?
 5   A. I sliced it.
 6   Q. Sliced the muscle meat?
 7   A. Yes.
 8   Q. Okay.
 9   A. I screened it.  I scraped it off and I bagged it
10      up.
11   Q. Okay.  Did you want to learn how to do the other
12      aspects of making jerky that you didn't describe
13      but were part of that process?
14   A. Yes.
15   Q. And that's an opportunity that you were denied?
16   A. Yes.
17   Q. So were you ever taught how to salt hides?
18   A. No.
19   Q. Were you ever taught what's involved in the cure
20      for the jerky?
21   A. No.
22   Q. Or the temperature that the water needs to be for
23      mixing the brine containing the sodium nitrate?
```

124

1  A.  No.

2  Q.  When -- I mean, you started your employment in

3     May of 2005 and it continued through May of 2010,

4     correct?

5  A.  Yes.

6  Q.  When during that period of time did you believe

7     you were denied the opportunity to learn how to

8     deliver meat to customers?

9  A.  I don't recall at this time.

10 Q.  Is that something that you -- when did you become

11    aware that delivering meat to customers was one

12    of the jobs that someone at Black Angus would do?

13 A.  Shortly after I started there.

14 Q.  Okay.  Are you able to -- without getting down to

15    pinning down a date, are you able to say a year

16    that you think that that opportunity to learn how

17    to deliver meat to customers should have been

18    offered to you?

19 A.  In 2007.

20 Q.  Okay.  Is there something about 2007 that you're

21    thinking about with respect to why you should

22    have been offered the opportunity to learn how to

23    deliver meat to customers in that year?

125

1   A.   Yes.

2   Q.   What's that?

3   A.   I had brought it up to Diane that I had a CDL

4        license, it was clean, and that I would like to

5        deliver.

6   Q.   I'm going to ask you the same kind of questions

7        with respect to all this stuff.  So in terms of

8        delivering fliers on company time to try and grow

9        the business, when do you think that you should

10       have been given the opportunity to learn how to

11       do that or to actually do that?

12  A.   2006.

13  Q.   Why do you think 2006 was the right time frame

14       for giving you that opportunity?

15  A.   Because I got the basic knowledge of what goes on

16       during a day and I really started, you know,

17       loving all my customers and I just wanted it to

18       grow.

19  Q.   How about meat cutting at Black Angus, when did

20       you think that you should have been given an

21       opportunity to learn more meat cutting at Black

22       Angus?

23  A.   2007.

126

1   Q.  Why do you refer to that year as the year that

2       you should have been given that opportunity?

3   A.  Because I displayed to Tommy Howells that I had

4       been watching him and I learned how to like take

5       the fat off of boneless pork chop, the loin and

6       the silver skin off filet mignon, and I wanted to

7       learn more.

8   Q.  When did you think that you should have been

9       given the opportunity to learn how to process

10      deer?

11   A.  2007.

12   Q.  Why 2007?  Why is 2007 the year that you think

13      you should have been given that opportunity?

14   A.  Because I was doing a lot already and I wanted to

15      further my educational part of Black Angus.  I

16      wanted to be a part of everything.

17   Q.  Okay.  When do you think you should have been

18      given an opportunity to learn how to use the meat

19      grinder?

20   A.  2007.

21   Q.  Why is 2007 the year that you think you should

22      have been given that opportunity?

23   A.  That's when I talked to Tommy about the meat

127

```
 1        cutting.
 2   Q.   When do you think you should have been given the
 3        opportunity to learn the job of using the cuber?
 4   A.   I did use a cuber.
 5   Q.   When -- but you said you -- you said you used it
 6        only, you know, maybe five times or a few times,
 7        and obviously Tommy was using it on a regular
 8        basis.  Right?
 9   A.   And Debbie Negrych.
10   Q.   And Debbie Negrych.  So when did you think you
11        should be given that opportunity to use the cuber
12        on a regular basis as part of your job at Black
13        Angus?
14   A.   I don't recall at this time.
15   Q.   Do you recall the year that you were using the
16        cuber or with Tommy?
17   A.   I think it was right around 2007 when we were
18        talking about the different meat products and the
19        different cuts.
20   Q.   So you learned how to use the cuber in 2007?
21   A.   Yes.
22   Q.   Do you think, then, at some time in 2007 or after
23        2007 would have been the right time for the
```

137

1    Q.   Did you ever prepare any of the sanitation

2         solutions?

3    A.   Yes.

4    Q.   Okay.  Is there a specific pH range for the

5         sanitation solutions?

6    A.   I was told how much to dump into a bucket.

7    Q.   Okay.  How much in terms of quantity, volume?

8    A.   How much liquid.

9    Q.   And what else would be added to the bucket?

10   A.   Water.

11   Q.   And were you told the ratio of cleanser to water?

12   A.   Yes.

13   Q.   Okay.  Was cleaning any of the vans part of

14        anyone's job at Black Angus while you were

15        working there?

16   A.   Not that I recall.

17   Q.   Okay.  Was cleaning the exterior of the building

18        a part of anyone's job while you were at Black

19        Angus?

20   A.   I believe Jamie Lapress was.

21   Q.   Okay.  Did you ever do any of the exterior

22        cleaning of the building?

23   A.   I would pick up cigarette butts.

138

```
 1   Q.   Is cleaning the exterior of the building a job

 2        that you wanted to be trained how to do?

 3   A.   Yes.

 4   Q.   When do you think you should have been offered

 5        the opportunity to learn what they wanted done

 6        with respect to cleaning the exterior of the

 7        building?

 8   A.   I could have done that in 2006.

 9   Q.   Would that -- cleaning the exterior of the

10        building, would that have included snow

11        shoveling, as far as you're concerned, you wanted

12        to learn how to do that?

13   A.   I did do that.

14   Q.   Did you do any of the landscaping outside?

15   A.   No.

16   Q.   Did you take any garbage out?

17   A.   Yes.

18   Q.   Okay.  Were you ever given a key to the butcher

19        shop?

20   A.   No.

21   Q.   Did you ever ask for a key?

22   A.   No.

23   Q.   Do you think you should have been given a key?
```

139

1    A.   If I worked nights, yes.

2    Q.   Do you think you should have been working nights?

3    A.   In the beginning I could have.

4    Q.   Okay.  Was there a point at which you couldn't be

5         working nights?

6    MS. GRECO:  Object to the form.

7    THE WITNESS:  In 2009, November.

8    BY MR. OPPENHEIMER:

9    Q.   What happened in November of 2009 that would have

10        prevented you from working nights?

11   A.   I had to get a part-time job because Black Angus

12        didn't offer health insurance.

13   Q.   Did you ever close out the cash register?

14   A.   No.

15   Q.   And is that because you didn't work nights?

16   A.   Yes.

17   Q.   Is that something that you think they should have

18        taught you how to do, to close out the cash

19        register?

20   A.   If I worked nights, yes.

21   Q.   When do you think they should have started

22        scheduling you to work nights?

23   MS. GRECO:  Objection to form.

140

1   THE WITNESS:  I don't know.

2   BY MR. OPPENHEIMER:

3   Q.   When do you think they should have taught you how

4        to close out the cash register?

5   A.   In 2005.

6   Q.   Would that mean that you were available to work

7        nights from 2005 until sometime in November of

8        2009?

9   A.   Yes.

10  Q.   With respect to this list of things that you were

11       not given the opportunity to learn, I want to ask

12       you if you ever asked the owners, the owners

13       being let's -- I'll refer to it all individually.

14       Did you ever ask Diane whether you could learn

15       how to deliver meat to customers?

16  A.   Yes.

17  Q.   When did you do that?

18  A.   Oh, 2007.

19  Q.   Did you ever ask Robert?

20  A.   No.

21  Q.   Did you ever ask Keegan if you could deliver meat

22       to customers?

23  A.   No.

1   MS. GRECO:  Just so we're clear, you're just going to

2       ask people as opposed to owners, right?  Because

3       he wasn't an owner.

4   MR. OPPENHEIMER:  Right, that's why --

5   MS. GRECO:  Just so I'm clear.  I won't interrupt

6       you.

7   MR. OPPENHEIMER:  That's why I went through Diane,

8       Robert and Keegan.

9   MS. GRECO:  So just people.

10  BY MR. OPPENHEIMER:

11  Q.  Right.  Did you ever ask anyone else other than

12      Diane, Robert and Keegan whether you could learn

13      how to deliver meat to customers?

14  A.  Yes.

15  Q.  Who?

16  A.  Diane.

17  Q.  I thought I mentioned Diane.  Diane, Robert and

18      Keegan, anyone other than those three?

19  A.  No.

20  Q.  Okay.  Did you ever ask Diane, Robert or Keegan

21      whether you could learn how to deliver fliers on

22      company time or whether you could actually do

23      that on company time?

142

1   A.   Yes.

2   Q.   Who did you ask?

3   A.   Diane.

4   Q.   When?

5   A.   I don't recall.

6   Q.   Did you ask Robert?

7   A.   No.

8   Q.   Did you ask Keegan?

9   A.   No.

10  Q.   Did you ask anyone else?

11  A.   No.

12  Q.   Okay.  Did you ask Diane, Robert, or Keegan

13       whether you could have the opportunity to learn

14       meat cutting at Black Angus?

15  A.   No.

16  Q.   Did you ask anyone else?

17  A.   No.

18  Q.   Did you ever ask Diane, Robert --

19  MS. GRECO:  Object to form.

20  BY MR. OPPENHEIMER:

21  Q.   Did you ever ask Diane, Robert or Keegan to give

22       you the opportunity to learn how to process deer?

23  A.   What part of it?

143

1   Q.   Well, you indicated that you thought they should

2        have given you the opportunity to learn how to

3        process deer sometime in 2007.  Do you recall

4        saying that to me?

5   A.   Yes.

6   Q.   Okay.  So what I'm wondering is, did you ever ask

7        Diane, Robert or Keegan for the opportunity to

8        learn how to process the deer?

9   A.   Yes.

10  Q.   Who did you ask?

11  A.   Diane.

12  Q.   What year?

13  A.   I don't recall.

14  Q.   Did you ever ask Diane, Robert or Keegan for an

15       opportunity to learn how to use the meat grinder?

16  A.   No.

17  Q.   Did you ever ask Diane, Robert or Keegan -- did

18       you ever ask anyone else for an opportunity how

19       to use the meat grinder?

20  A.   Thomas.

21  Q.   Okay.  Anyone else other than Thomas?

22  A.   No.

23  Q.   Do you recall what Thomas said to you when you

144

```
 1      asked him for an opportunity to learn how to use
 2      the meat grinder?
 3   A.  I don't recall at this time.
 4   Q.  Okay.  Did you ever ask Diane, Robert or Keegan
 5      for an opportunity to learn how to use the cuber?
 6   A.  No.
 7   Q.  Anyone else that you asked for an opportunity to
 8      learn how to use the cuber?
 9   A.  Thomas.
10   Q.  Is that what you told us about earlier?
11   A.  Yes.
12   Q.  Okay.  The same thing, when you mentioned Thomas
13      about the meat grinder, you talked about that a
14      little earlier, right?
15   A.  Um-hum.
16   Q.  Okay.  Did you ever ask Diane, Robert or Keegan
17      for an opportunity to learn how to use the
18      smoker?
19   A.  No.
20   Q.  And that would include learning how to clean it
21      as well, never asked them?
22   A.  No.
23   Q.  Did you ever ask Diane, Robert or Keegan for an
```

145

```
 1      opportunity to learn how to make sausage, the
 2      entire process?
 3  A.  No.
 4  Q.  Did you ever ask Diane, Robert or Keegan for an
 5      opportunity to learn how to make jerky, the
 6      entire process?
 7  A.  No.
 8  Q.  Did you ever ask Diane, Robert or Keegan for an
 9      opportunity to learn how to assemble and
10      disassemble the grinder?
11  A.  No.
12  Q.  Did you ever ask anyone else about that?
13  A.  Tommy.
14  Q.  Did you ever ask Diane, Robert or Keegan for an
15      opportunity to learn how to assemble and
16      disassemble the stuffer?
17  A.  No.
18  Q.  Did you ever ask Diane, Robert or Keegan for an
19      opportunity to learn how to assemble or
20      disassemble the cuber?
21  A.  No.
22  Q.  Did you ever ask Diane, Robert or Keegan for
23      opportunities to learn how to clean the exterior
```

167

1   Q.   Why do you believe that gender has something to
2        do with the reason you were not given an
3        opportunity to deliver meat to customers?
4   A.   Because no females were ever trained or asked,
5        even when I had brought it to Diane's attention.
6   Q.   Any other reasons that you believe what you
7        believe concerning that opportunity?
8   A.   I believe the guys got trained and treated better
9        than the women there.
10  Q.   Your testimony is that you regularly observed
11       that male employees received more favorable
12       treatment than you with respect to training
13       opportunities?
14  MS. GRECO:   Objection to form.
15  THE WITNESS:   Yes.
16  BY MR. OPPENHEIMER:
17  Q.   Is that your testimony?
18  A.   Yes.
19  Q.   Do you believe that one of the reasons that you
20       were not given an opportunity with respect to the
21       delivery of fliers on company time had something
22       to do with gender?
23  A.   Yes, I do.

184

```
 1        treatment at Black Angus Meats?
 2   A.   No.
 3   Q.   Okay.  What was the treatment at Black Angus
 4        Meats for which you received counseling from the
 5        Dale Association?
 6   A.   Being yelled at in front of customers.
 7   Q.   For what?
 8   A.   Not wrapping something correctly.
 9   Q.   Okay.  What else?
10   A.   My breaks.  I was the one targeted all the time.
11   Q.   Okay.
12   A.   The guys weren't.
13   Q.   Okay.  You think that you were targeted for
14        breaks and the guys weren't had something to do
15        with your gender?
16   A.   Yes.
17   Q.   Why do you think that?
18   A.   Because they got to go out whenever they wanted.
19        Even when I went out with them I got called back
20        in to go on the counter and they didn't.
21   Q.   Okay.  What else were you receiving counseling
22        for regarding the treatment at Black Angus Meats?
23   MS. GRECO:  Objection to form.  You can answer.
```

185

```
 1   THE WITNESS:  How I was ignored by owners.
 2   BY MR. OPPENHEIMER:
 3   Q.  I'm going to try and go at this another way.
 4       Okay?  I think it just seems to me like you're
 5       struggling, and maybe my questions are not clear
 6       and that is very possible.  The reason I'm
 7       raising this is what I'm trying to figure out is
 8       when you think all of this discrimination started
 9       at Black Angus Meats.  That's the big topic that
10       I want to address.  When do you think it started?
11       And the reason I read this sentence is that it
12       says during the last four years I worked I
13       received counseling because of my treatment at
14       Black Angus Meats.  You told me that the
15       treatment that you're referring to here started
16       sometime in 2006, right?
17   A.  The end.
18   MS. GRECO:  Objection to form.
19   BY MR. OPPENHEIMER:
20   Q.  The end of 2006, right?
21   A.  Yes.
22   Q.  Okay.  Is it the treatment that you're referring
23       to that started sometime in 2006, did that have
```

189

1    Q.   Okay.  On the top of the page it indicates it was

2         received by the EEOC on January 3rd of 2011.

3         Does that help you refresh your recollection?

4    A.   It must have been.

5    Q.   Okay.  So you think you signed it on December 16

6         of 2010 and that the EEOC time stamped it in on

7         January 3rd of 2011, that's what that appears to

8         show us, right?

9    A.   Yes.

10   Q.   Okay.  Under earliest there's a block, it says

11        date discrimination took place.  It's down here.

12        Do you see it?

13   A.   Yes.

14   Q.   It says the earliest, and then it's got a date of

15        5/16/2004.  Do you see that?

16   A.   Yes.

17   Q.   Now, is that a typo?  Would that be --

18   A.   Yes.

19   Q.   2005?

20   A.   Yes.

21   Q.   Okay.  Because you didn't start your employment

22        in 2004, you started it in May of 2005, right?

23   A.   Yes.

195

1      you're claiming in this case that you claim had

2      something to do with gender or race.

3   A.  Yes.

4   Q.  When?

5   A.  When I started performing more duties at work.

6   Q.  Okay.  Was that sometime in 2005?

7   A.  When I started in 2006, the beginning.

8   Q.  Okay.  The beginning of 2006?

9   A.  Yes.

10  Q.  Okay.  So you think sometime in the beginning of

11      2006 the discrimination started?

12  A.  Yeah.

13  MS. GRECO:  Objection to form.

14  BY MR. OPPENHEIMER:

15  Q.  I'm just trying to figure out what you're saying.

16      Prior to reading this --

17  A.  As my duties I learned more there, I wanted to

18      learn more so that I could get better pay raises

19      like the guys did.  That's what their -- they

20      were doing so I thought I could do that too to

21      better myself because I was helping the company

22      better.

23  MS. GRECO:  He's asking about all your

198

```
 1        for purposes of whether he was being paid more

 2        for doing similar work?

 3   A.   We were doing the same work.

 4   Q.   I'm asking you if you compare yourself to Sean

 5        Round.

 6   A.   Yes.

 7   Q.   Okay.  Do you compare yourself to Jamie Lapress?

 8   A.   Yes.

 9   Q.   For your pay claims?

10   A.   I could be.

11   Q.   Okay.  You could be or you are comparing yourself

12        to Jamie Lapress for your pay claims?

13   A.   Yes.

14   Q.   Are you comparing yourself to Mark Leible for

15        your pay claims?

16   A.   Yes.

17   Q.   Okay.  The paragraph after Sean Round refers to

18        Patrick Howells in October to March each year

19        during the time I was employed.  So again, that

20        is what I was focused on, trying to figure out if

21        your pay claims began when your employment began.

22        Right?

23   A.   Yes.
```

217

1       you were working in the pack room, is it
2       something that you regularly observed?
3   A.  Yes.
4   Q.  Paragraph -- read paragraph twenty-five to
5       yourself, just like we did with paragraph
6       twenty-four.
7   A.  Okay.
8   Q.  All right.  When did you first observe the facts
9       on which the -- which are addressed in paragraph
10      twenty-five?
11  A.  Towards the end of 2007.
12  Q.  And after you observed those facts, was that
13      something that you regularly observed for the
14      rest of your employment?
15  A.  I don't understand the question.
16  Q.  Okay.  You became aware that your time was being
17      closely scrutinized whereas another male's was
18      not, and you say that happened toward the end of
19      2007, right?
20  A.  Yes.
21  Q.  What I'm asking you is, how long did that
22      continue, that your time was scrutinized and the
23      males' were not?

218

```
 1   A.   Until the end of my employment.

 2   Q.   Okay.  Look at paragraph twenty-six.

 3   A.   Okay.

 4   Q.   When did you first observe the situation which is

 5        described in paragraph twenty-six?

 6   A.   Which situation?

 7   Q.   Oh, the fact that he was twenty minutes -- Jamie

 8        was twenty minutes or an hour and a half late and

 9        wasn't reprimanded?

10   A.   The end of 2007.

11   Q.   When did you first observe the situation

12        involving him going behind the dumpster and

13        smoking marijuana?

14   A.   I can't recall.

15   Q.   Are you able to say what year it was?

16   A.   No.

17   Q.   The next sentence, you say management was aware

18        of this.  Are you referring to the -- that Jamie

19        was behind the dumpster smoking marijuana?

20   A.   Yes.

21   Q.   Who in management was aware of it?

22   A.   Keegan Roberts.

23   Q.   Okay.  And you say someone was joking with Mr.
```

219

```
 1      Lapress and making these comments that quoted,
 2      who was it that you say was joking with Mr.
 3      Lapress and making the comments?
 4  MS. GRECO:  Objection.
 5  THE WITNESS:  Keegan Roberts and Thomas Howells.
 6  MS. GRECO:  Okay.
 7  BY MR. OPPENHEIMER:
 8  Q.  Okay.  Two different people were making those
 9      comments?
10  A.  Yes.
11  Q.  Who said oh, are you stoned today?
12  A.  Thomas Howells.
13  Q.  And who said did you have your daily appointment
14      with the dumpster?
15  A.  I believe both Keegan and Tommy said it.
16  Q.  Okay.  Now, you indicate no action was taken
17      against Jamie.  Is that in reference to him being
18      late but that no action was taken against him?
19  MS. GRECO:  Objection to form.  You can answer.
20  BY MR. OPPENHEIMER:
21  Q.  You refer to several things in the paragraph.  I
22      want to make sure I understand what you're
23      referring to or what your counsel referred to, if
```

220

1      you're able to say when your counsel wrote that

2      no action was taken against him.  So I'm asking

3      first, did the fact that no action was taken

4      against him relate to the fact that he was late

5      and no action was taken against him?

6  A.  Yes.

7  Q.  Did it also relate to the fact that he would

8      leave work during the day and go behind the

9      dumpster, smoke marijuana and no action was taken

10     against him?

11 A.  Yes.

12 Q.  And were -- was that something, the fact that no

13     action was taken against him for engaging in

14     those activities, something that was different

15     than the terms and conditions of your employment?

16 MS. GRECO:  Objection to form.

17 THE WITNESS:  I don't understand.

18 BY MR. OPPENHEIMER:

19 Q.  Were you treated differently than Jamie with

20     respect to when you were late, if you ever were

21     late?

22 A.  I was not late.

23 Q.  Okay.  So there wasn't ever a situation where you

221

```
 1        can say that you were reprimanded for being late
 2        whereas Jamie was not reprimanded for being late?
 3   A.   Can you repeat the question?
 4   Q.   I'm trying to figure out if your claim in the
 5        case is that you were reprimanded for doing
 6        something and Jamie wasn't reprimanded for doing
 7        that thing or something worse.  So if you were
 8        never late you were never reprimanded, right?
 9   A.   Correct.
10   Q.   And you're saying Jamie was late and he was not
11        reprimanded.  I'm trying to figure out if you're
12        saying that you were treated differently than him
13        because he wasn't reprimanded for being late.
14   A.   Well, I can't compare it because I was never
15        late.
16   Q.   Okay.
17   MS. GRECO:  Objection to form.
18   BY MR. OPPENHEIMER:
19   Q.   Okay.  So is there something about your terms and
20        conditions of employment that you think is
21        different than Jamie's because of the fact that
22        he would leave and go behind the dumpster and
23        smoke marijuana?
```

222

1   A.  You don't do that in the workplace.

2   Q.  Okay.  Are you saying that he got -- like he just

3       would take a break during the middle of the day,

4       that didn't count against him and you couldn't do

5       that?

6   A.  Yes.

7   Q.  All right.  And that occurred in around the end

8       of 2007 is when it started?

9   A.  Yes.

10  Q.  And that continued throughout the period of your

11      employment through the end of your employment?

12  A.  Yes.

13  MS. GRECO:  Objection to form to those questions.

14  BY MR. OPPENHEIMER:

15  Q.  In paragraph twenty-five, just going back one

16      page, when you say -- when your counsel said your

17      time was closely scrutinized, do you see that in

18      the first line of paragraph twenty-five?

19  A.  Yes.

20  MS. GRECO:  Objection to form.

21  BY MR. OPPENHEIMER:

22  Q.  Is that language you would use, that your time

23      was closely scrutinized to describe.  What

223

1      happened to you?

2    MS. GRECO:  Objection to form.

3    THE WITNESS:  It could be.

4    BY MR. OPPENHEIMER:

5    Q.  Tell me what happened that you think means that

6        your time was closely scrutinized what happened

7        that you're referring to as being a close

8        scrutiny of your time?

9    A.  They kept tabs on all my breaks so I felt

10       compelled to mark my timecards with every time I

11       walked out the door to every time I walked in.

12   Q.  Okay.  And that began in I think you said

13       sometime in 2007.

14   A.  Yes, the end.

15   Q.  Okay.  And this portion of paragraph twenty-nine

16       where you're indicating that Keegan --

17   MS. GRECO:  Wait.  Wait.  We're not --

18   BY MR. OPPENHEIMER:

19   Q.  Twenty-five where Keegan would come out and he

20       would look at his arm as if he were looking at

21       his watch, did that also happen in 2007?

22   A.  I don't recall.  It happened, but I'm not sure of

23       the time frame.

224

1    Q.   Okay.  Is this something that you regularly

2         observed after you first became aware of it in

3         2007, that your time was closely scrutinized?

4    A.   Yes, when I began to work in the pack room.

5    Q.   Okay.  Is the -- is it also true for paragraph

6         twenty-six that once you became aware of Jamie

7         being treated more favorably, that is something

8         you regularly observed through the end of your

9         employment?

10   A.   Yes.

11   Q.   When did you first become aware of the situation

12        involving Sean Round that is described in

13        paragraph twenty-seven?

14   A.   When I started working in the pack room.

15   Q.   2007?

16   A.   Yes.

17   MS. GRECO:  Did you read the whole thing?  He's going

18        to ask you questions about it.

19   THE WITNESS:  I did.

20   BY MR. OPPENHEIMER:

21   Q.   Okay.  So it was -- Sean Round was treated

22        differently in terms of getting Saturdays off,

23        that's part of what you're alleging -- your

225

```
 1        counsel alleged in paragraph twenty-seven?
 2   A.   Yes.
 3   Q.   And that is something you became aware of in
 4        2007?
 5   A.   Yes.
 6   Q.   And that continued for the balance of the period
 7        of time that Sean was employed there while you
 8        were employed?
 9   A.   Yes.
10   Q.   Okay.  Then you mentioned that he would come in
11        anywhere from a half hour to an hour and a half
12        late and would mark his timecard as if he arrived
13        at the scheduled time.  When did you become aware
14        of that?  I'm asking when you became aware of the
15        timecard business that you have in paragraph
16        twenty-seven.
17   MS. GRECO:  I was just directing her to where it is
18        so she knows where to read.
19   THE WITNESS:  I don't recall when Tommy brought it to
20        my attention.
21   BY MR. OPPENHEIMER:
22   Q.   Is the basis for your knowledge about the
23        timecard business involving Sean Round, that is
```

226

```
 1        referenced in this paragraph from Tommy Howells?
 2   A.   Yes.
 3   Q.   Did you ever observe Sean Round do something with
 4        his timecard that indicated that he filled it out
 5        in a different time than he actually arrived?
 6   A.   After Tommy said something to him he started --
 7   Q.   I'm sorry.  After Tommy said something to him he
 8        started --
 9   A.   Carrying his timecard in his pocket.
10   Q.   Okay.  And and do you have some belief as to why
11        he started carrying it in his pocket?
12   A.   Yeah, because Tommy caught him marking his time
13        wrong.
14   Q.   Do you know whether that continued after Tommy
15        caught him?
16   MS. GRECO:  Objection to form.
17   THE WITNESS:  I don't know.
18   BY MR. OPPENHEIMER:
19   Q.   You mentioned -- your counsel mentioned something
20        in paragraph twenty-seven about Sean Round's
21        girlfriend coming to the store and him being able
22        to leave with management being aware of it, but
23        not taking any action against him.  Do you see
```

227

1      that?

2  A.   Yes.

3  Q.   All right.  So you became aware of that sometime

4       in the summer of 2009?

5  A.   Yes.

6  Q.   Okay.  Had it happened prior to the summer of

7       2009?

8  A.   Not aware of it.

9  Q.   Look at paragraph twenty-eight.

10 A.   Okay.

11 Q.   Okay.  When did you become aware of the

12      circumstances addressed in paragraph twenty-eight

13      with respect to Mark Leible being late?

14 A.   When he was my partner in the pack room.

15 Q.   And that was in 2007, right?

16 A.   I can't recall.

17 Q.   You indicate that he was also allowed to take

18      smoke breaks throughout the day.  When did you

19      become aware of that?

20 A.   When him and Matt Marshall would sneak out the

21      back door by the garage door.

22 Q.   Are you able to put a date on that?

23 A.   No.

228

1   Q.   You address that subject matter in paragraph
2        twenty-nine where Matt Marshall was taking
3        smoking breaks throughout the day?
4   A.   Yes.
5   Q.   All right.  Is it your claim that you were not
6        allowed to take smoking breaks throughout the day
7        on the same basis that employees like Mark Leible
8        and Matt Marshall were permitted to do so?
9   A.   Yes.
10  Q.   And is it your contention that is because of your
11       gender?
12  A.   Yes.
13  Q.   And why do you believe it's because of your
14       gender?
15  A.   Because the guys got to do whatever they wanted.
16  Q.   All right.  Go to paragraph thirty-one, please.
17  MS. GRECO:   Thirty-one?
18  MR. OPPENHEIMER:  Yes.
19  MS. GRECO:  Okay.
20  THE WITNESS:  Okay.
21  BY MR. OPPENHEIMER:
22  Q.   When did you first become aware of the situation
23       which is described in paragraph thirty-one?

229

1   A.   In early parts of 2007.

2   Q.   Once you observed that male employees were given

3        a preference for taking off of Saturdays in 2007,

4        did you regularly observe that to continue

5        throughout the balance of your employment?

6   A.   Yes.

7   Q.   Do you know if other females other than yourself

8        were denied requests to take off on Saturday?

9   A.   Yes.

10  Q.   Who was that?

11  A.   Debbie Negrych.

12  Q.   This paragraph of the Complaint refers to one

13       situation in April of 2010 when you requested to

14       take a Saturday off four weeks in advance and

15       that was denied.  Were there other situations

16       where you requested to be scheduled off on a

17       Saturday and those requests were denied?

18  A.   Yes.

19  Q.   Are you able to tell us when those requests were

20       made, what years?

21  A.   I don't recall at this time.

22  Q.   Was it -- did it begin sometime in, let's say,

23       2005, '6, '7, able to pin it down in a year?

230

1   A.  No.

2   Q.  Paragraph thirty-two, could you read that to

3       yourself, please.

4   A.  Okay.

5   Q.  When did the situation that's referred to in

6       paragraph thirty-two first come to your

7       attention?

8   A.  When I began working in the pack room.

9   Q.  Again, that's 2007?

10  MS. GRECO:  He asked the question.

11  THE WITNESS:  Yes.

12  BY MR. OPPENHEIMER:

13  Q.  Is it your contention that the reason Robert

14      Seibert and Keegan Roberts greeted the male

15      employees but would walk away from you and refuse

16      to acknowledge you had something to do with your

17      gender?

18  A.  Yes.

19  Q.  Okay.  Why do you believe that?

20  A.  Because I was the only female back there.

21  Q.  Once you observed that occurring in 2007, did

22      that regularly continue for the balance of your

23      employment?

231

1   A.   Yes.

2   Q.   Paragraph thirty-three, please read that to

3        yourself.

4   A.   Okay.

5   Q.   Which employee -- which male employee said,

6        quote, she's got a nice ass?

7   A.   Sean Round.

8   Q.   When did he say that?

9   A.   While in the pack room.

10  Q.   When did he first say it?

11  A.   I can't recall.

12  Q.   How many times did he say it?

13  A.   Several.

14  Q.   How many is several to you?

15  A.   I can't recall.

16  Q.   When is the first time he said it?

17  A.   I can't recall.

18  Q.   When is the last time he said it?

19  A.   Shortly before I left.

20  Q.   Sometime in 2010?

21  A.   Yes.

22  Q.   Do you know to whom he was referring when he said

23       she's got a nice ass?

232

1   A.  Raelean Rush.

2   Q.  Did you ever tell Raelean Rush that he said that?

3   A.  He said it to her face.

4   Q.  Was she in the pack room when he said that?

5   A.  Yes.

6   Q.  Was the statement she's got a nice ass made by

7       Sean Round on those several occasions always in

8       the pack room?

9   A.  Yes.

10  Q.  Did Raelean Rush ever say something to you about

11      her reaction to his statement that she's got a

12      nice ass?

13  A.  I witnessed it.  She didn't have to say it.

14  Q.  What did you witness?

15  A.  Her yelling at him.

16  Q.  What did she say?

17  A.  I don't recall word for word.

18  Q.  Well, in substance?

19  MS. GRECO:  Object to form.  Generally he's asking

20      you.  Do you remember?

21  BY MR. OPPENHEIMER:

22  Q.  Yes, generally.  Did she tell him to bug off,

23      shut up?

233

1   A.   Something like that, yeah.

2   Q.   She indicated in no uncertain terms she didn't

3        like hearing the words, is that fair?

4   MS. GRECO:   Object to form.

5   THE WITNESS:   Yes.

6   BY MR. OPPENHEIMER:

7   Q.   Okay.  Did he say that only when Raelean was in

8        the pack room?

9   A.   No.

10  Q.   He would say it to you when Raelean was not

11       there?

12  A.   Not to me.

13  Q.   Who would he say it to?

14  A.   Keegan.

15  Q.   Okay.  And would he say it to Keegan when Raelean

16       was not there?

17  A.   Yes.

18  Q.   Okay.  And on how many times did that -- or was

19       that part of the several that you referred to

20       earlier that the total number of times you heard

21       Sean Round say she's got a nice ass was several?

22  MS. GRECO:   Objection to form.

23  THE WITNESS:   Yes.

234

1    BY MR. OPPENHEIMER:

2    Q.   Okay.  Who said your headlights are on?

3    A.   Sean Round.

4    Q.   And when did he say that?

5    A.   About a customer that was coming in.

6    Q.   When?

7    A.   While I was employed at Black Angus.

8    Q.   What year?

9    A.   I don't recall.

10   Q.   How many times did he say that?

11   A.   I heard that once.

12   Q.   Who said oh, look at that cleavage?

13   A.   Sean Round.

14   Q.   When did he say it?

15   A.   While I was employed at Black Angus.

16   Q.   What year?

17   A.   I don't recall.

18   Q.   To whom did he say it?

19   A.   To Keegan, Jamie Lapress and Turtle, which is

20        William Fries.

21   Q.   Where was Sean Round standing when he said it?

22   A.   He walked in from putting a pack on the cart in

23        the room outside the pack room, back to the pack

235

1        room on the other side opposite from me.

2    Q.  How many times did you hear Sean Round say oh,

3        look at that cleavage?

4    A.  One time that I can recall.

5    Q.  Okay.  Who said does the carpet match the drapes?

6    A.  Thomas Howells.

7    Q.  When did he say that?

8    A.  While I was employed at Black Angus.

9    Q.  What year?

10   A.  I don't recall.

11   Q.  How many times did he say it?

12   A.  Two that I know of.

13   Q.  To whom did he say it?

14   A.  Debbie Negrych and myself.

15   Q.  Did you say anything in response?

16   A.  Yeah, what does that mean.

17   Q.  What did he say?

18   A.  He explained it to me.

19   Q.  Did Debbie Negrych say anything in response to

20       what he said?

21   A.  She laughed.

22   Q.  After he explained it to you, did you say

23       anything to him?

236

1   A.  I don't recall.

2   Q.  What is the -- strike that.  During your -- the

3       period of your employment at Black Angus, did you

4       hear other male employees make comments of a

5       sexual nature other than those that are listed or

6       quoted in paragraph thirty-three?

7   A.  Can you repeat the question?

8   Q.  Yes.  During the period of your employment at

9       Black Angus, did you hear male employees make

10      comments of a sexual nature other than the ones

11      that are quoted in paragraph thirty-three?

12  A.  Not that I can recall.

13  Q.  Did you ever make comments of a sexual nature

14      while you were employed?

15  MS. GRECO:  Objection to the form.

16  THE WITNESS:  What?

17  BY MR. OPPENHEIMER:

18  Q.  Did you ever make comments of a sexual nature

19      while you were employed at Black Angus?

20  A.  No, I did not.

21  Q.  Did you ever say in describing your husband that

22      he's a two pump chump?

23  A.  No, I did not.

239

1    Q.   Why didn't you make a complaint too, or did you

2         make a complaint to anyone at any time about the

3         male employees making comments of a sexual nature

4         to female employees?

5    A.   Keegan was in the pack room and he was the

6         manager at the time.

7    Q.   My question was, did you make a complaint to

8         anyone at any time about male employees making

9         comments of a sexual nature to female employees?

10   MS. GRECO:  Asked and answered.  Tell him again.

11   THE WITNESS:  Keegan was in the pack room at the

12        time.

13   BY MR. OPPENHEIMER:

14   Q.   Okay.  So why did the fact that Keegan was in the

15        pack room at the time affect your decision not to

16        go to Diane Seibert and make a complaint?

17   A.   He was the manager.

18   Q.   And because he was in the room you decided not to

19        go to one of the other owners?

20   A.   Yes.

21   Q.   Okay.  Why didn't you go to Robert Seibert and

22        say to Robert, you know, these comments are being

23        made of a sexual nature in the pack room, Keegan

240

1      is in there and I want someone in ownership to

2      stop it?

3  MS. GRECO:  Objection to form.  You can answer.

4  THE WITNESS:  I don't recall.

5  BY MR. OPPENHEIMER:

6  Q.  I mean, you thought about it, but you don't have

7      a memory as to why you didn't do it?

8  MS. GRECO:  Objection to form.

9  THE WITNESS:  I don't recall.

10  BY MR. OPPENHEIMER:

11  Q.  I heard -- when you said I don't recall, I'm

12      trying to figure out whether when you're saying I

13      don't recall it means that you thought about it.

14  MS. GRECO:  Then ask a question.  Objection to form.

15  THE WITNESS:  I answered your question.

16  MR. OPPENHEIMER:  You made an affirmative decision

17      not -- counsel?

18  MS. GRECO:  I understand, but you keep restating.

19      Just ask the question as a question.

20  BY MR. OPPENHEIMER:

21  Q.  You made an affirmative decision not to go to two

22      of the three owners to make a complaint about

23      sexual comments that were being made to female

241

```
 1      employees because Keegan was in the pack room for
 2      one of the comments?
 3   MS. GRECO:  Objection to form.
 4   BY MR. OPPENHEIMER:
 5   Q.  Is that your testimony?
 6   MS. GRECO:  Objection to form.
 7   THE WITNESS:  Yes.
 8   BY MR. OPPENHEIMER:
 9   Q.  Keegan wasn't there for the comment she's got a
10      nice ass, right?
11   A.  Yes.
12   Q.  He wasn't there, correct?
13   MS. GRECO:  Objection to form.
14   THE WITNESS:  I already answered that question.
15   MS. GRECO:  No, was he there.
16   BY MR. OPPENHEIMER:
17   Q.  Was he there?
18   MS. GRECO:  Ask it that way.  Can you answer it?
19   THE WITNESS:  Yes.
20   BY MR. OPPENHEIMER:
21   Q.  You're saying Keegan was there when Sean Round
22      made the comment she's got a nice ass?
23   A.  Yes, when Raelean wasn't in the pack room.
```

242

1   Q.   And --

2   MS. GRECO:   She said that.

3   BY MR. OPPENHEIMER:

4   Q.   And Sean was -- and Keegan was there when someone

5        said your headlights are on?

6   MS. GRECO:   Objection to form, but you can answer.

7   THE WITNESS:   I don't recall.

8   BY MR. OPPENHEIMER:

9   Q.   Was Keegan there when someone said oh, look at

10       that cleavage?

11  A.   Yes.

12  Q.   Okay.  And was Keegan there when Howells said

13       does the carpet match the drapes?

14  A.   No.

15  Q.   Why didn't you go to Robert Seibert or Diane and

16       make a complaint about the comment made by Tom

17       Howells concerning does the carpet match the

18       drapes?

19  A.   I don't recall.  I don't know.

20  MS. GRECO:   Just wait for a question.  He asks a

21       question, you answer.

22  BY MR. OPPENHEIMER:

23  Q.   Just so I'm clear, none of the comments that were

243

1       made that are quoted in paragraph thirty-three

2       were directed to you, is that right?

3    MS. GRECO:   Object to the form.

4    BY MR. OPPENHEIMER:

5    Q.   Is that right?

6    A.   One of them were.

7    Q.   Okay.   So when Sean said she's got a nice ass,

8        that wasn't directed to your ass, was it?

9    A.   No.

10   Q.   Okay.   When Sean said your headlights are on,

11       that wasn't directed to you, was it?

12   A.   No.

13   Q.   And when Sean said oh, look at that cleavage,

14       that wasn't directed to you, was it?

15   A.   No.

16   Q.   And when Howells said does the carpet match the

17       drapes, that wasn't directed to you, was it?

18   A.   Yes.

19   Q.   That was directed to you?

20   A.   Yes.

21   MS. GRECO:   That's what she said.

22   BY MR. OPPENHEIMER:

23   Q.   So Howells said directly to you does the carpet

244

1     match the drapes?

2  A.  Yes.

3  Q.  And you decided not to make a complaint about the

4     fact that he said that, right?

5  A.  Being a manager, I walked into the cooler.

6  Q.  You decided that you weren't going to make a

7     complaint because he was a manager, is that what

8     you're saying?

9  A.  I walked into the cooler after Debbie.

10  Q.  All right.  After Debbie for what?

11  A.  To tell her.

12  Q.  Okay.  And did you tell Debbie?

13  A.  Yes, I did.

14  Q.  Okay.  And that's when you said she laughed?

15  A.  She laughed when he said it to her prior to that.

16  Q.  Okay.  What did you say to Debbie?

17  MS. GRECO:  I'm just confused.  Are you talking about

18     the incident when he said it to her?

19  BY MR. OPPENHEIMER:

20  Q.  What did you say to Debbie when you walked into

21     the cooler?

22  A.  I told her that he said it to me.

23  Q.  Okay.  Didn't she hear it when he said it to you?

245

1    A.   She was in the cooler.

2    Q.   So what happened after you said that to Debbie?

3    A.   Debbie told me that he said it to her.

4    Q.   At some other time?

5    A.   Yes.

6    Q.   And what did you say to Debbie in response to

7         that?

8    A.   I don't recall.

9    Q.   Did you ever say I want to make a complaint about

10        this?

11   MS. GRECO:  Objection to form.

12   THE WITNESS:  I don't know.

13   BY MR. OPPENHEIMER:

14   Q.   Did you ever hear or see Sean Round ask a female

15        employee out on a date?

16   A.   Yes.

17   Q.   Who was that?

18   A.   Raelean Rush.

19   Q.   When was it?

20   A.   While I was employed at Black Angus Meat.

21   Q.   What year?

22   A.   I don't know.

23   MS. GRECO:  Objection to the form of the questions,

256

1   A.   No.

2   Q.   All of your pay was through the paychecks -- the

3        payroll system?

4   A.   Yes.

5   Q.   Okay.  Turn to page P321 in Exhibit D-11.  What

6        is this page of Exhibit D-11?

7   A.   A resume I had help with.

8   Q.   Okay.  Is it something that you prepared?

9   MS. GRECO:  Objection to form.

10  THE WITNESS:  I had help with it from One Stop.

11  BY MR. OPPENHEIMER:

12  Q.   Okay.  And is the substance of the information

13       contained in this document something you provided

14       so that it could be completed?

15  MS. GRECO:  Objection.

16  THE WITNESS:  I actually provided more, but he picked

17       out stuff for me to put that was pertaining to

18       the job I was applying for.

19  BY MR. OPPENHEIMER:

20  Q.   With respect to the entry for a period of 4/04 to

21       5/10, it says that there was -- you were customer

22       service, cashier at Black Angus Meat Market.  Do

23       you see that?

257

1    A.   Yes.

2    Q.   Did you write that or did the One Stop person

3         write that?

4    A.   The One Stop clicked on the stuff that he wanted

5         entered.

6    Q.   Okay.

7    A.   Pertaining to this job.

8    Q.   Did you agree with this?

9    MS. GRECO:   Objection to form.

10   BY MR. OPPENHEIMER:

11   Q.   Did you agree with what he put in here?

12   A.   Yes.

13   Q.   Did you use this resume for any purpose?

14   A.   For this job at the top.

15   Q.   Okay.   What job was that?

16   A.   Adult care aid slash service provider.

17   Q.   What company was that for?

18   A.   The one that they had posted in the Unemployment

19        office.

20   Q.   Do you have a name for what company it was?

21   A.   No, I don't.   I don't recall at this time.

22   Q.   The next page, P322, line eight, the pay you

23        received at your last job, is that eleven dollars

263

1  A.  Caucasian and African-American.

2  Q.  Okay.  So how do you refer to the fact that they

3      have both a Caucasian biological parent and an

4      African-American biological parent in terms of

5      describing their race?

6  MS. GRECO:  Objection to form.

7  THE WITNESS:  Biracial.

8  BY MR. OPPENHEIMER:

9  Q.  Okay.  I just want to use the term that you're

10     comfortable with.  Some people say mixed race and

11     I don't want to use that if that's offensive.

12     Biracial is how you refer to them?

13 MS. GRECO:  Objection to form.

14 MR. OPPENHEIMER:  I'm asking her how she refers to

15     her children and that results in a form

16     objection?  That is great.

17 BY MR. OPPENHEIMER:

18 Q.  So biracial is how you refer to them, you don't

19     refer to them as black?

20 A.  No.

21 Q.  They are biracial.  Okay.  Did you ever tell

22     anyone at Black Angus Meats that you refer to

23     your children as biracial and not black?

264

```
1    A.   I don't recall.
2    Q.   Now, is it the fact that your children are
3         biracial that you believe has something to do
4         with some -- something about your work
5         environment?
6    A.   I don't understand.
7    Q.   Okay.  You're making a race discrimination claim
8         in this case, right?
9    A.   Yes.
10   Q.   And you're a white woman, right?
11   A.   Yes.
12   Q.   So your race discrimination complaint isn't
13        because you're white, correct?
14   A.   Correct.
15   Q.   It has to do with something else, and I'm tying
16        to figure out what the something else is.  What
17        is it?
18   A.   My children.
19   Q.   Okay.  So the biracial nature of your children is
20        what you base your race claim on in this case?
21   A.   Yes.
22   MS. GRECO:  Objection.
23   BY MR. OPPENHEIMER:
```

265

1   Q.  Okay.  During the period that you were working

2       for Black Angus, are you aware of any black

3       employees who were employed by Black Angus?

4   A.  No.

5   Q.  Are you aware whether any mixed race people were

6       employed by Black Angus during the period of your

7       employment?

8   A.  No.

9   Q.  Are you aware of whether any ethnic minorities

10      were employed at Black Angus during the period of

11      your employment?

12 MS. GRECO:  Objection to form.

13 THE WITNESS:  No.

14 BY MR. OPPENHEIMER:

15   Q.  Do you know whether any minorities were -- were

16      employed by Black Angus while you were employed

17      there?

18   A.  No.

19   Q.  How many people who were forty years of age or

20      older were employed by Black Angus while you were

21      there?

22   A.  Including owners?

23   Q.  Just don't include the owners.

266

1   A.   Four.

2   Q.   Okay.  How old were you when you started your

3        employment there?

4   A.   Thirty-four.

5   Q.   And did your children ever come to Black Angus?

6   A.   Yes.

7   Q.   When was the first time your children were at the

8        Black Angus store on the Boulevard?

9   A.   I believe it was the first deer season.

10  Q.   Okay.  Did you have an opportunity to introduce

11       them to any of the other people who work at Black

12       Angus?

13  A.   Yes.

14  Q.   Who did you introduce them to that first time

15       they were there?

16  A.   The first person was Bob.

17  Q.   Bob Seibert?

18  A.   Yes.

19  Q.   Okay.  Who else?

20  A.   Diane.

21  Q.   Okay.  Anybody else?

22  A.   I believe Debbie was there.

23  Q.   Okay.  And --

271

1   Q.   Did you ever hear the word rag head or towel head
2        used at Black Angus?
3   A.   No.
4   Q.   Did you ever hear the word dego used at Black
5        Angus?
6   A.   No.
7   Q.   Did you ever here the word grease ball or guinea
8        or wop used at Black Angus?
9   A.   No.
10  Q.   Did you ever hear anyone make jokes about
11       individuals who were Chinese?  I'm talking about
12       hear anyone at Black Angus make any jokes about
13       individuals who were Chinese?
14  A.   Not that I can recall.
15  Q.   Did you ever hear anyone at Black Angus make any
16       jokes about individuals who were Middle Eastern?
17  A.   Not that I can recall.
18  Q.   Did you ever hear anyone at Black Angus make any
19       jokes about individuals who were Italian?
20  A.   No.
21  Q.   Did you ever hear anyone at Black Angus make a
22       joke about the Pope?
23  A.   No.

272

1    Q.   You allege in your Complaint that racial comments
2         were made by the owner and other employees about
3         Black individuals.  That's in paragraph
4         thirty-four of the Complaint, if it's still
5         around somewhere.
6    MS. GRECO:  Are you done with this one?
7    BY MR. OPPENHEIMER:
8    Q.   Yes.  You said that in paragraph thirty-four
9         racial comments were made by the owners and other
10        employees about black individuals.  Do you see
11        that?
12   A.   Yes.
13   Q.   With respect to Keegan Roberts, what racial
14        comments were made by him about Black
15        individuals?
16   A.   It was a phrase.
17   Q.   What was the phrase?
18   A.   He had it delivered to Bob's niggs.
19   Q.   You heard Keegan use the phrase Bob's niggs?
20   A.   In the pack room.
21   Q.   You heard Keegan use the phrase Bob's niggs in
22        the pack room?
23   A.   Yes.

273

1   Q.   Okay.  When did you hear that?

2   A.   While I was employed at Black Angus.

3   Q.   How many times did you hear it?

4   A.   I don't recall.

5   Q.   Are you able to give me an estimate?

6   A.   I know it definitely was once.

7   Q.   One time.  Could have been more than one?

8   A.   Could have been.

9   Q.   You don't recall now if it was more than one?

10  A.   I don't recall.

11  Q.   When did that happen, use by Keegan of the words

12       Bob's niggs in the pack room?

13  A.   I can't recall.

14  Q.   What year?

15  A.   I don't know.

16  Q.   Were you offended by the comment?

17  A.   Yes, I was.

18  Q.   What did you do about it?

19  A.   Nothing.

20  Q.   Why?

21  A.   I didn't need to make any more hardness for

22       myself.

23  Q.   What was going on that was hardness for yourself

274

1      at that time?

2   A.   People ignored me as it was.

3   Q.   Are you able -- thinking about the people

4        ignoring you to say when this comment was made,

5        what year?

6   A.   Can you rephrase that?

7   Q.   Yes.  You said that people were ignoring you at

8        the time.  And I'm wondering if thinking back to

9        whatever period of time it was that people were

10       ignoring you, you're able to put the making of

11       this comment in that time frame.

12  A.   While I was in the pack room.

13  Q.   Okay.  So sometime after 2007?

14  A.   Yes.

15  Q.   Are you able to say whether it was in 2007?

16  A.   I don't recall.

17  Q.   How late would be the latest that you think it

18       was made?

19  A.   I don't know.

20  MS. GRECO:  Object to form, but you can answer.

21  BY MR. OPPENHEIMER:

22  Q.   Okay.  Did you hear Keegan make any other

23       comments of a racial nature?

275

1   A.   Not that I can recall at this time.

2   Q.   Okay.  Did you hear Diane make any comments of a

3        racial nature?

4   A.   No.

5   Q.   Did you hear Robert Seibert make any comments of

6        a racial nature about black individuals?

7   A.   I don't recall at this time.

8   Q.   Of the employees who you allege made racial

9        comments, can you identify the employees who made

10       them?

11  A.   Jamie Lapress.

12  Q.   Who else of the employees do you say made racial

13       comments?

14  MS. GRECO:  Objection, form.

15  BY MR. OPPENHEIMER:

16  Q.   You say in your Complaint racial comments were

17       made by the owners and other employees about

18       black individuals.  Right?  That's what it says?

19  A.   Yes.  I'm thinking.

20  Q.   Okay.  So you identified Jamie Lapress as one of

21       the employees who made racial comments about

22       black individuals?

23  A.   Yes.

276

1   Q.   What other employees made racial comments about

2        black individuals?

3   A.   Robert Seibert.

4   Q.   Anybody else?

5   A.   I can't recall at this time.

6   Q.   What did Jamie Lapress say that you regarded as a

7        racial comment about black individuals?

8   A.   Well, for one, he called my kids niggers.

9   Q.   Okay.  Anything else?

10  A.   Yes.  He received a phone call in the pack room.

11       When he hung up he said that was Bob and I gotta

12       go -- Bob's niggs are dirtying up the parking

13       lot, he has to go clean up their mess.

14  Q.   Any other comments by Jamie about racial nature,

15       about black individuals?

16  A.   He never understood how they could have nice cars

17       and get food stamps.

18  Q.   He said something about that?

19  A.   Yes.

20  Q.   Do you recall what he said?

21  A.   I just said it.

22  Q.   Okay.  Anything else?

23  A.   What was that?

277

1   Q.   Any other comments that you can recall that Jamie

2        made that were racial in nature about black

3        individuals?

4   A.   How could they have nice cars and get food

5        stamps.

6   Q.   All right.  So any others?

7   A.   Oh, and the gold around their neck.

8   Q.   What did he say about gold around their neck?

9   A.   And get food stamps.

10  Q.   When did he make the -- when did he get that in

11       the pack room where you said --

12  A.   The what?

13  Q.   When did he get the call?  When did Jamie get the

14       call in the pack room and say something about

15       Bob's niggs dirtying up the parking lot?

16  MS. GRECO:  Object to the form.

17  THE WITNESS:  While I was working in the pack room.

18  BY MR. OPPENHEIMER:

19  Q.   Are you able to tell me when in terms of a date?

20  A.   I don't recall.

21  Q.   What year?

22  A.   I don't recall that either.

23  Q.   How many times did he say something about Bob's

279

```
1        about nice cars and food stamps with respect to a

2        black individual?

3   A.   Once or twice.

4   Q.   How many times did you hear him say anything

5        about gold around their necks and food stamps?

6   A.   Once.

7   Q.   When was that?

8   A.   While I was in the pack room with him.

9   Q.   You're unable to pinpoint a year or date?

10  A.   While I was working there.

11  Q.   So you're unable to say when during this period

12       of years from 2007 through 2010 it happened?

13  A.   Yeah.  I mean, I can't pinpoint down a date.

14  Q.   Okay.  Did you make a complaint to anyone in

15       response to the comments that you just testified

16       about that Jamie made with respect to the parking

17       lot?

18  A.   No.  Keegan Roberts was right in there.

19  Q.   You heard -- Keegan Roberts was present when

20       Jamie said that about Bob's niggs dirtying up the

21       parking lot?

22  A.   Yeah.  So was Sean Round.

23  Q.   Okay.  And so why didn't you go to Diane Seibert
```

280

```
 1      to make a complaint about that?
 2  A.  Because Keegan was right there.  He heard it.
 3  Q.  Okay.  What about the comment about nice cars and
 4      food stamps, did you make a complaint about that?
 5  A.  No, I did not.
 6  Q.  Why not?
 7  A.  I don't really recall.
 8  Q.  Did you make a complaint about Jamie's comment
 9      concerning gold around their next and the food
10      stamps?
11  A.  No.
12  Q.  Why not?
13  A.  I think that was when I was afraid that everybody
14      was going to ignore me more than they already
15      did.
16  Q.  Are you able to say whether racial comments were
17      made by employees concerning black individuals in
18      2005?
19  A.  No, I'm not.
20  Q.  Are you able to say whether racial comments were
21      made by employees about black individuals in
22      2006?
23  MS. GRECO:  Objection to the form.  She already said
```

281

1      they were made during that period of time.  Are

2      you asking to pinpoint?

3  MR. OPPENHEIMER:  I think she said that she was in

4      the pack room when these comments were made.

5  MS. GRECO:  Right.

6  MR. OPPENHEIMER:  And that was 2007.

7  MS. GRECO:  Oh, okay.

8  MR. OPPENHEIMER:  So that's why I'm going through

9      this.

10  MS. GRECO:  I missed that.

11  THE WITNESS:  I don't recall.

12  BY MR. OPPENHEIMER:

13  Q.  Okay.  Is it fair to say that the racial comments

14      that you've testified about so far occurred

15      somewhere in the time frame from 2007 to 2010?

16  A.  Yes.

17  MR. OPPENHEIMER:  Okay.  All right.  I'd like to just

18      take if we can a ten-minute break.  Maybe you can

19      stretch.  It would be good for you.  I want to

20      sort through what I've got here and just focus on

21      the last half hour or so.

22          (Whereupon, a short recess was then taken.)

23  BY MR. OPPENHEIMER:

282

1    Q.   All right.  Five-twenty-five so a half hour left.

2         All right.

3              In your Complaint in paragraph thirty-six,

4         you don't need to look at it.  You allege that

5         help wanted signs were placed in the door of

6         Black Angus and black individuals who applied

7         were not given interviews.  Do you recall saying

8         that or at least claiming that in this case?

9    A.   Yes.

10   Q.   Okay.  What is the basis of your claim that black

11        individuals who applied were not given

12        interviews?

13   A.   That they weren't given interviews.

14   Q.   When did you see a black person apply to Black

15        Angus who was not given an interview?

16   A.   Several times throughout my employment at Black

17        Angus Meats.

18   Q.   Okay.  What is several times?

19   A.   I would say between my whole five-year employment

20        there, probably fifty applicants were

21        African-American.

22   Q.   Fifty applicants were African-Americans.  Okay.

23   A.   Yes.

283

```
1    Q.   How many were given applications to fill out?

2    A.   I believe every one.

3    Q.   Was there a help wanted sign in the window of

4         that door every time an applicant applied, a

5         black applicant applied?

6    A.   I believe so.  That's why they would stop in.

7    Q.   And when -- what happened, if you became aware of

8         it, to the applications that they filled out?

9    A.   We were instructed to take them into the office.

10   Q.   And to your knowledge, were all the applications

11        that were filled out by Black applicants taken

12        into the office?

13   A.   Yes.

14   Q.   Are you aware of whether any of the Black

15        applicants that you've testified about whether

16        they were given interviews?

17   A.   No.

18   Q.   You have no awareness?

19   A.   No awareness.

20   Q.   So they may have been interviewed and you have no

21        awareness whether they were or not?

22   A.   If they were -- I worked every day of the week

23        that they were open, unless they came while I
```

287

1    is Robert, Diane or Keegan, whether an applicant

2    was black or white?

3  A.  They had asked.

4  Q.  Who asked?

5  A.  Diane.

6  Q.  Diane would ask what?

7  A.  If they were African-American or Caucasian, and

8    if they were clean cut or not.

9  Q.  Okay.  Did she ask anything else about them?

10  A.  No.

11  Q.  She didn't ask whether they were a woman or not?

12  A.  No.

13  Q.  She didn't ask what age they were?

14  A.  No.

15  Q.  She didn't --

16  A.  I wouldn't know that.

17  Q.  Well, she didn't ask you whether it was an older

18    person or younger person?

19  A.  No.

20  Q.  She didn't ask whether or not they looked ethnic

21    in some way?

22  A.  No.

23  Q.  Were you ever told to tell an applicant who was

288

1      black that Black Angus Meats was just collecting

2      applications and that the applicant would receive

3      a phone call?

4   A.  Yes.

5   Q.  When were you told that?

6   A.  When Diane instructed me to.

7   Q.  What year was that?

8   A.  It happened more than once.

9   Q.  Are you able to say whether it happened right

10      after you started working in 2005?

11  A.  I can't recall at this time.

12  Q.  Is that something that you regularly said to

13      black applicants, that the company was just

14      selecting applications and that they would

15      receive a phone call?

16  A.  Yes.

17  Q.  How many times do you think you said that over

18      the course of your employment?

19  A.  Twenty-plus times.

20  Q.  Okay.  Since you began working in the pack room

21      sometime in 2007, do you believe that any of

22      those twenty-plus times occurred prior to 2007?

23  A.  Yes.

289

1    Q.   Are you able to say how many?

2    A.   I don't recall at this time.

3    Q.   You allege in your Complaint that you knew of a

4         clean cut well-spoken black male who was looking

5         for employment and Diane threw out his

6         application.

7    MS. GRECO:  Objection to form.  You can answer.

8    BY MR. OPPENHEIMER:

9    Q.   That's alleged in your Complaint?

10   MS. GRECO:  Well, you've paraphrased, but go ahead.

11   BY MR. OPPENHEIMER:

12   Q.   Right.  I paraphrased.  Quote, you knew a clean

13        cut well-spoken black male who was looking for

14        employment, close quote, and that Mrs. Seibert,

15        quote, threw out his application, close quote.

16   A.   I didn't find out until the end of the day.

17   Q.   When did you find that out?

18   A.   When I was asked to collect the garbage.

19   Q.   What year?

20   A.   I don't recall at this time.

21   Q.   Was it prior to when you went into the pack room,

22        sometime prior to?

23   A.   Yes.

290

1   Q.  So it was prior to 2007?

2   A.  Yes.

3   Q.  Regina Rush and Raelean Rush were according to

4       one of the EEOC filings that you made employed

5       between 2004 and 2008, does that -- are you aware

6       of that?

7   MS. GRECO:  Objection to form.

8   BY MR. OPPENHEIMER:

9   Q.  Do you need to look at the EEOC filing you made

10      to refresh yourself on what you said?

11  A.  Yes.

12  MR. OPPENHEIMER:  Okay.  What exhibit is that?

13  MS. BAHAS:  It was one of their pre-marked exhibits.

14      It's on the front of there, the yellow tab.

15  BY MR. OPPENHEIMER:

16  Q.  It's page DEF0144.  Second paragraph, Raelean

17      Rush, it starts.  Second paragraph.  Go up one

18      more, up.  There you go.

19  A.  Yes.

20  Q.  Okay.  Does this a refresh your recollection as

21      to whether Raelean and Regina worked between 2004

22      and 2008?

23  A.  It was the wrong date.  Was from 2005 to 2008.

291

1   Q.  Okay.  So it was 2005 to 2008?

2   A.  Yes.

3   Q.  As far as you were concerned, that's what you --

4   MS. GRECO:  Objection to form.

5   BY MR. OPPENHEIMER:

6   Q.  Well, you started working in 2005?

7   A.  Yes.

8   Q.  So you would know from 2005 forward rather than

9       2004 forward, is that what you're saying?

10  A.  Yes.

11  Q.  Okay.  So they worked during the period that you

12      worked, they worked between 2005 and 2008?

13  MS. GRECO:  Objection to form.

14  BY MR. OPPENHEIMER:

15  Q.  Is that right?  You saw them working in the store

16      between 2005 and 2008?

17  A.  Yes.

18  MS. GRECO:  Objection to form.

19  BY MR. OPPENHEIMER:

20  Q.  Okay.  During that time period what did you hear

21      about them having black boyfriends from other

22      employees at Black Angus Meats?

23  A.  That they should be with one of their own kind,

292

```
 1      what's wrong with white guys.
 2   Q.  Who said they should be with one of their own
 3      kind?
 4   A.  Sean Round.
 5   Q.  When?
 6   MS. GRECO:  Is she done -- or, I mean, you went on,
 7      but is there more?
 8   MR. OPPENHEIMER:  Well, there may be more.  I'll get
 9      to it.
10   MS. GRECO:  Okay.
11   BY MR. OPPENHEIMER:
12   Q.  Who said that they should be with one of their
13      own kind?  You said Sean Round.  I asked when did
14      that happen?
15   A.  When I was employed at Black Angus.
16   Q.  Before you were in the pack room or after?
17   A.  After.
18   Q.  Are you able to say what year?  Let me remind
19      you, you said that Raelean and Regina worked --
20   A.  I know.  I can't remember if it was 2007 or 2008.
21   MS. GRECO:  The records speak for themselves when you
22      worked there, but the best recollection you have
23      now.
```

293

1    BY MR. OPPENHEIMER:

2    Q.   The comment was made by Sean Round in 2007, 2008?

3    MS. GRECO:   Objection to form.

4    BY MR. OPPENHEIMER:

5    Q.   Is that what you're saying is best recollection?

6    A.   Best recollection.

7    Q.   What about what is wrong with white guys, who

8         said that?

9    A.   Sean Round.

10   Q.   When did he say that?

11   MS. GRECO:   Objection to form.

12   THE WITNESS:   I can't recall at this time.

13   BY MR. OPPENHEIMER:

14   Q.   To whom did he say it?

15   A.   To Raelean.

16   Q.   Were you present when that was said?

17   A.   Yes.   We were at the deer wrapping station that's

18        offset from the pack room.

19   Q.   Are you able to say what year that was?

20   A.   I believe that one was in 2007.

21   Q.   Okay.   What other comments did you hear Sean

22        Round make about Raelean or Regina's dating black

23        guys?

 1   MS. GRECO:  Objection.  Because you said -- do you

 2       mean if there is more of these comments or

 3       different comments?

 4   BY MR. OPPENHEIMER:

 5   Q.  Did you hear more comments from Sean Round about

 6       their boyfriends?

 7   MS. GRECO:  Which means if he said it more than once

 8       he wants to know that too.

 9   THE WITNESS:  Yes.

10   BY MR. OPPENHEIMER:

11   Q.  What else did you hear him say?

12   A.  That he found out that Raelean went to put a

13       permit -- a plowing permit in her name in North

14       Tonawanda and he said why would you want to put

15       your name in for him when he can ruin your name.

16   Q.  When did that happen?

17   A.  I don't recall.

18   MS. GRECO:  He's asking can you tell during the

19       period of time that you worked together, even if

20       you don't recall the exact dates, during the

21       period you worked together did it occur during

22       that period or --

23   THE WITNESS:  Yes.

1   BY MR. OPPENHEIMER:

2   Q.   How many times did you hear him say that?

3   A.   That I heard him say once.

4   Q.   When?

5   A.   While I was employed at Black Angus.

6   Q.   Tell me about the incident involving Jamie and

7        the paper towel holder.

8   A.   Okay.

9   Q.   What happened?

10  A.   Jamie called my kids niggers.

11  Q.   From the beginning of the incident, tell me what

12       unfolded.

13  MS. GRECO:   Objection to form.   You can answer.

14  BY MR. OPPENHEIMER:

15  Q.   Something happened that ended up somewhere with

16       Jamie saying the word niggers, right?

17  A.   Yes.

18  Q.   Tell me what happened with respect to the paper

19       towel dispenser that resulted in that.

20  A.   I guess Jamie lost the key to the paper towel

21       machine and I was by the front wrapping table,

22       and he came up alongside on the other side of the

23       wrapping table by me and asked me if I could

296

```
 1        break into it.  And I says no, why would you ask
 2        me that and he says well, you have two black kids
 3        and that's what black people do.  And I says my
 4        kids don't break into stuff, so why would he call
 5        -- why would he say that about my kids.  He goes
 6        well, they're niggers.  And I says that I can't
 7        believe you said that, and I got very upset and
 8        Tommy was right at the butcher block right by the
 9        other wrapping table and that's where Debbie was
10        too.  And Tommy and Debbie both told Jamie that
11        his actions were inappropriate.
12   Q.   You heard both of them say that?
13   A.   Yes.
14   Q.   Okay.  Did Jamie say anything in response?
15   A.   I don't know what he mumbled on the way to the
16        washroom.
17   Q.   Okay.  Did anything happen after that involving
18        Keegan and that incident?
19   A.   I was called into the office by Bob and Keegan
20        and I believe the 25th of May and they wanted to
21        know what happened.  I told them.  They called
22        Jamie in, asked him what happened and he told
23        them that he wasn't talking to me and it was
```

297

1       nice.

2   Q.  What happened next with respect to this incident?

3   A.  Jamie -- he says okay, Jamie, you're done.

4       Keegan walked out the office door closest to the

5       employee entrance and I talked with Bob then, and

6       Bob told me that I would have to get used to

7       things like that, people are mean and cruel, and

8       I said so it's okay for one of my co-workers to

9       call my kids niggers and he says it happens in

10      politics and it happens in sports so I'm going

11      have to get used to the idea.

12  Q.  What was the date of this conversation?

13  A.  I believe it was May 25th, and I told Bob then I

14      was uncomfortable with the situation and he said

15      -- no.  I was uncomfortable with working with

16      Jamie and he said he was uncomfortable with the

17      situation also and I could leave now.  I was

18      punched in for work at about -- for about two and

19      a half hours.

20  Q.  At some point, you had written a letter about the

21      incident to Robert and Diane?

22  A.  Yes.

23  Q.  I'm putting in front of you 195.  On the very

298

```
 1      last page is that a letter that you wrote to
 2      Robert and Diane?
 3  A.  Yes, it is.
 4  Q.  And when did you write that?
 5  A.  On the 19th of May.
 6  Q.  And when did you -- what did you do with it after
 7      you wrote it?
 8  A.  I left it on Diane's desk.  Excuse me.
 9  Q.  What day of the week was that, if you remember?
10  A.  I believe it was a Wednesday.
11  Q.  Okay.  Did you put it on the desk the same day
12      you wrote it?
13  A.  Yes, I did.
14  Q.  Okay.  So how is it that your employment ended at
15      Black Angus?
16  A.  Robert Seibert told me that he was uncomfortable
17      with the situation and having me there so I can
18      gather my things and leave and I did so, and I
19      left crying and Debbie Negrych and Tom -- Thomas
20      Howells were shocked when I went out and told
21      them that I had to leave.
22  MR. OPPENHEIMER:  Okay.
23
```

299

```
 1          (Whereupon, a Bankruptcy Court Document was
 2      then received and marked as Exhibit D-13, for
 3      identification.)

 4

 5  BY MR. OPPENHEIMER:
 6  Q.   This is D-13.  You filed a petition for a
 7      voluntary bankruptcy on March 3rd, 2009, right?
 8      Do you recall filing for bankruptcy in March of
 9      2009.
10  A.   Yes.
11  Q.   Okay.  And --
12  MS. GRECO:  Is there a signature on this somewhere or
13      is this -- oh, there.  It's at the bottom.  I see
14      the bottom.  I did not see that before.
15  MR. OPPENHEIMER:  Okay.
16  MS. GRECO:  For the record, the bottom shows a filing
17      with a case number.  Go ahead.
18  BY MR. OPPENHEIMER:
19  Q.   Who was your -- did you retain counsel to file a
20      bankruptcy for you?
21  A.   Yes, I did.
22  Q.   And that was David Butterini?
23  A.   Yup.
```

300

1   Q.   Okay.  And were you honest and truthful when you

2        spoke to Mr. Butterini about your assets and

3        liabilities?

4   A.   Yes.

5   Q.   Okay.  Did you ever disclose to Mr. Butterini --

6   MS. GRECO:  Any conversation you had with your

7        attorney is attorney/client privilege.

8   BY MR. OPPENHEIMER:

9   Q.   Did you ever ask -- well, tell me --

10  MS. GRECO:  No conversation with her attorney will

11       she be permitted to answer.

12  MR. OPPENHEIMER:  That's fine.

13  MS. GRECO:  If you have something other than a

14       conversation with your attorney you can.

15  BY MR. OPPENHEIMER:

16  Q.   Where in your petition did you disclose that you

17       had a claim against Black Angus or Keegan Roberts

18       or the Seiberts?

19  MS. GRECO:  She has to read the whole thing.

20  BY MR. OPPENHEIMER:

21  Q.   Did you disclose that to the trustee in your

22       bankruptcy?

23  MS. GRECO:  Do you know what a trustee is?  Strike

301

1      that.  Objection to the form of the question.

2  BY MR. OPPENHEIMER:

3  Q.  Do you recall --

4  MS. GRECO:  You have a question pending and she's

5      looking.

6  MR. OPPENHEIMER:  I can do what I want with my

7      question.

8  MS. GRECO:  Are you withdrawing your question?

9  MR. OPPENHEIMER:  I'll let you know if I do.

10  MS. GRECO:  Do you want her to keep looking or stop?

11  MR. OPPENHEIMER:  I want her to keep looking.

12  MS. GRECO:  Keep reading.

13  BY MR. OPPENHEIMER:

14  Q.  Turn to page --

15  MS. GRECO:  She has a right to read a legal document.

16      You asked her specifically if there is something

17      in here.

18  MR. OPPENHEIMER:  I'm directing her attention to a

19      particular page to help the witness -- I'm

20      withdrawing the question then, counsel.  I'll

21      play a trick out of your playbook.

22  MS. GRECO:  That's fine.  It's not a trick.  You have

23      a right to withdraw a question if you want to.

302

```
 1   BY MR. OPPENHEIMER:
 2   Q.  Okay.  Page ten of forty-one, are you there?  On
 3       the bottom there's a number twenty-one.  It talks
 4       about contingent unliquidated claims of every
 5       nature.
 6   MS. GRECO:  Forty-one?  Objection.
 7   MR. OPPENHEIMER:  Twenty-one, I said.
 8   MS. GRECO:  Read it.  He's asking you to read that
 9       language.
10   MR. OPPENHEIMER:  Right.
11   MS. GRECO:  I don't even know what that is.
12   THE WITNESS:  I read it.
13   BY MR. OPPENHEIMER:
14   Q.  Did you ever disclose to the Court at any filing
15       that you had a claim against Black Angus or the
16       Seiberts or Keegan Roberts?
17   MS. GRECO:  Objection to the form of the question.
18       If you understand it.
19   THE WITNESS:  I don't understand what you mean.
20   BY MR. OPPENHEIMER:
21   Q.  Okay.  You filed this in 2009, right?
22   A.  Yes.
23   Q.  And you've been testifying all day about, you
```

1      know, the things that were happening at Black

2      Angus between 2005 and 2009.  Right?

3  A.  Yes.

4  Q.  And your counsel wouldn't let you talk about your

5      conversations with your bankruptcy lawyer about

6      whether you even disclosed that to him so I'm

7      asking you whether you disclosed any of the

8      claims that you think you have against Black

9      Angus or Keegan Roberts or the Seiberts to the

10     bankruptcy court?

11 MS. GRECO:  Objection to form of the question.  The

12     word claim has a legal definition.  This is March

13     3rd of 2009.  There was no legal claim filed.

14     Counsel knows it and so do I, so --

15 MR. OPPENHEIMER:  We've been talking about her claims

16     all day.

17 MS. GRECO:  Claim.  She's a layperson.  If you want

18     to define or that she filed something that --

19 MR. OPPENHEIMER:  I don't have to define it.

20 MS. GRECO:  I know you don't.  Objection to the form

21     of the question.

22 BY MR. OPPENHEIMER:

23 Q.  Did you bring to the attention of the bankruptcy

304

1       court the fact that you thought that you were the

2       victim of discrimination at Black Angus Meats?

3    MS. GRECO:  Objection to the form of the question.

4    BY MR. OPPENHEIMER:

5    Q.  Did you do that?  Did you bring it to the

6       attention of the bankruptcy court?

7    MS. GRECO:  Objection to the form of the question.

8       It's a legal question.  Does she even know what

9       attention to the court -- of the bankruptcy court

10      is?

11   MR. OPPENHEIMER:  I didn't ask her what it is.  I

12      asked if she did something.  Counsel, you made

13      your objection.  Let your witness answer.

14   MS. GRECO:  You're done with your time.  Last

15      question.

16   MR. OPPENHEIMER:  No, I'm not done with my time.

17      You've been objecting just because you want to

18      prevent this witness from answering.

19   MS. GRECO:  No.  This is a document.  You're asking

20      her a legal question.

21   MR. OPPENHEIMER:  No, I asked her --

22   MS. GRECO:  You wouldn't define it.  We're done when

23      we're done.  When the time is done, we're done.

305

1      Which means we have -- I have one minute.  What
2      do you have?
3   MR. OPPENHEIMER:  Did you ever bring to the
4      bankruptcy court -- go ahead, counsel, and we'll
5      be back here, because of your conduct and
6      delaying this witness from answering these
7      questions.
8   MS. GRECO:  Please.  I have an objection and I will
9      put my objections on the record.
10  MR. OPPENHEIMER:  Can I get an answer to my question?
11  MS. GRECO:  She doesn't -- look.
12  THE WITNESS:  I don't understand.
13  BY MR. OPPENHEIMER:
14  Q.  Did you ever bring to the attention of the
15      bankruptcy court the fact that you believed you
16      had been a victim of discrimination at Black
17      Angus Meats?
18  MS. GRECO:  Objection to the form of the question.
19      She already told you she doesn't understand it.
20  MR. OPPENHEIMER:  You're answering, counsel.  I'd
21      like you to shut your mouth.
22  MS. GRECO:  You keep saying the same thing over --
23      she said she didn't understand it.  Why don't you

306

1      rephrase it?

2   BY MR. OPPENHEIMER:

3   Q.  Did you ever bring to the bankruptcy court's

4       attention any of your allegations in this case

5       about pay inequity?

6   A.  No.

7   Q.  Did you ever bring --

8   MS. GRECO:  No.  We're done.

9   MR. OPPENHEIMER:  No, you're not going to do that.

10  MS. GRECO:  That's the time.  We're done.

11  MR. OPPENHEIMER:  Did you --

12  MS. GRECO:  We're done.  Time is up.  We're done.

13  MR. OPPENHEIMER:  If you want -- you continue taking

14      down my questions so when the Order comes from

15      the Court she will answer these questions.

16  MS. GRECO:  You have had your client Robert

17      Seibert --

18  MR. OPPENHEIMER:  If you want to walk out --

19  MS. GRECO:  This is the end of the time.

20  MR. OPPENHEIMER:  No.

21  MS. GRECO:  Well, tell me on the record how many

22      minutes you think you have left, because you

23      timed it.

307

```
 1    MR. OPPENHEIMER:  Based on all of your objections and

 2         conduct now another five minutes.

 3    MS. GRECO:  We're done.  Let's go.

 4    MR. OPPENHEIMER:  Well, you can leave but the

 5         deposition's not over.

 6    MS. GRECO:  You think you have five more minutes and

 7         I'm telling you it's done.  You can't go on.  If

 8         you pose the question --

 9    MR. OPPENHEIMER:  If you want to leave go.

10    BY MR. OPPENHEIMER:

11    Q.  The next question, did you ever disclose to the

12         bankruptcy court any of the facts on which you

13         rely in this case --

14    MS. GRECO:  We're done.

15    BY MR. OPPENHEIMER:

16    Q.  -- with respect to race discrimination?

17    MS. GRECO:  We'd like to put on the record we are

18         leaving.  It's a seven-hour deposition.  It has

19         been timed like all our other depositions have

20         been timed, and we made proper objections.  He

21         rephrased it, she answered.

22    BY MR. OPPENHEIMER:

23    Q.  Did you ever bring to the bankruptcy court's
```

308

```
 1      attention any of the facts that you rely on in

 2      this case with respect to your claims of hostile

 3      work environment?  Did you ever bring to the

 4      bankruptcy court's attention any of the facts on

 5      which you rely in this case for your claims

 6      concerning gender discrimination?

 7  MR. OPPENHEIMER:  Please let the record reflect the

 8      witness has been escorted out of the room by her

 9      counsel.

10  MS. GRECO:  The witness has left.

11  MR. OPPENHEIMER:  You just pushed her out the door,

12      counsel.  Off the record.

13

14                      *    *    *    *    *

15

16

17

18

19

20

21

22

23
```