**EX. 3**

VOLUME II                                              DARCY BLACK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---------------------------------------------------

DARCY M. BLACK,

                          Plaintiff,

     -vs-

BUFFALO MEAT SERVICE, INC., doing business
as BOULEVARD BLACK ANGUS, also known as
BLACK ANGUS MEATS, also known as
BLACK ANGUS MEATS & SEAFOOD,
ROBERT SEIBERT,
DIANE SEIBERT,
KEEGAN ROBERTS,

                          Defendants.
---------------------------------------------------

                          Continued Examination Before

Trial of DARCY BLACK, Plaintiff, taken pursuant to the

Federal Rules of Civil Procedure, in the law offices of

BARCLAY DAMON LLP, The Avant Building, Suite 1200, 200

Delaware Avenue, Buffalo, New York, taken on October 10,

2018, commencing at 9:57 A.M., before MARY ANN MORETTA,

Notary Public.

322

1    A.   Kim Putnam.

2    Q.   One of your claims in this action is that

3         females' breaks were more closely scrutinized

4         than male breaks, correct?

5    A.   Yes.

6    Q.   Was that what your complaint had to do with?

7    MS. GRECO:   Objection to form.

8    THE WITNESS:   Partial.

9    BY MS. BAHAS:

10   Q.   The complaint that you made to Keegan Roberts,

11        part of that had to do with the fact that females

12        were scrutinized more strictly regarding their

13        break times, correct?

14   A.   That was part of it.

15   Q.   When was this complaint made to Keegan Roberts?

16   A.   While I was employed at Black Angus.

17   Q.   Do you have any more specificity in terms of the

18        year?

19   A.   No, I do not.

20   Q.   Now, while you were employed at Black Angus,

21        during that time period there were some issues

22        that you were dealing with your children, is that

23        correct?

336

1  Q.  When did you first consider quitting your job at
2      the butcher shop?
3  A.  Not until after Jamie called my children niggers.
4  Q.  The thought never crossed your mind before that
5      point in time?
6  A.  No.
7  Q.  When did, according to you, Jamie allegedly call
8      your children the N word?
9  A.  Referring to the paper towel machine, when he
10     couldn't find the key, when he asked me if I
11     could break it open.
12 Q.  What date was that?
13 A.  I don't recall.
14 Q.  If I told you that your Federal Court Complaint
15     said it happened on May 15th of 2010, would that
16     refresh your recollection as to when Jamie
17     Lapress allegedly called your children the N
18     word?
19 A.  It could be.
20 Q.  So it's your testimony that the thought of
21     quitting the butcher shop never crossed your mind
22     prior to that date?
23 A.  No.  I needed a job to support my children.

339

1      for the recording of time.

2  MS. GRECO:  For the record, every time she marks an

3      exhibit, she is taking the time off.

4  MR. OPPENHEIMER:  Of course.  The witness isn't

5      testifying.

6  MS. GRECO:  This is, for the record -- and you can

7      correct me if you think I'm wrong.  This has not

8      been the way the depositions have been conducted

9      on both sides up until this deposition.

10

11      (Whereupon, a Psychiatrist Progress Note

12      dated 8/12/09 was then received and marked as

13      Exhibit 14, for identification.)

14

15  THE COURT REPORTER:  10:30 to 10:30 a.m.

16  MS. BAHAS:  Here's a copy for you, Miss Greco.

17  BY MS. BAHAS:

18  Q.  Miss Black, I'm showing you a document we

19      received in response to a request for records

20      from the Dale Association -- a request for your

21      records from the Dale Association.  Do you see

22      the top, it's titled Psychiatrist Progress Note?

23  A.  Yes.

1    Q.   Do you see the next line down, name of patient,

2         Darcy Black?

3    A.   Yes.

4    Q.   Do you see that it's dated August 12th of 2009?

5    A.   Yes.

6    Q.   Now, I would like to direct your attention

7         specifically to the third paragraph from the top.

8         It starts with the words, she talked quite a bit

9         about her work situation.  Do you see where I'm

10        referring to?

11   A.   Yes.

12   Q.   It states, she talked quite a bit about her work

13        situation, how the men, they are not treating her

14        very well and complaining that she takes breaks,

15        which she's allowed to do.  Although she has been

16        there several years, she is looking around to

17        find a new job and there might be a good prospect

18        through a friend.  Did I read that correctly?

19   A.   Yes.

20   Q.   Does that refresh your recollection as to whether

21        or not you ever told a health care provider that

22        you were considering quitting your job in 2009?

23   A.   No.

341

1   Q.   It doesn't?

2   A.   No.  It's with my part-time job.

3   Q.   Your part-time job?  You were -- it's your claim

4        that men at your part-time job were treating you

5        unfairly?

6   MS. GRECO:  Objection to form.

7   THE WITNESS:  No.  I was talking about I was excited

8        about getting a part-time job.

9   BY MS. BAHAS:

10  Q.   To find a new job?

11  A.   That's a new job, at night.

12  Q.   Okay.  So you were complaining to the

13       psychiatrist about how bad the men were treating

14       you at Black Angus?

15  A.   Yes.

16  Q.   It's your position, as you sit here today, that

17       you were referring to a part-time job?

18  A.   Yes.

19  Q.   In connection with looking for a new job, you

20       weren't referring to quitting your job at Black

21       Angus.  That's your testimony?

22  MS. GRECO:  Objection to form.

23  THE WITNESS:  Yes.

342

1   BY MS. BAHAS:

2   Q.   Okay.  Now, Miss Black, you filed for bankruptcy

3        in March of 2009, correct?

4   A.   Yes.

5   Q.   March 3rd of 2009?

6   A.   Yes.

7   Q.   Why did you file for bankruptcy on that

8        particular date?

9   A.   I don't know.

10  Q.   There was nothing in particular that prompted you

11       to file on March 3rd of 2009 as opposed to any

12       other time?

13  A.   No.

14  Q.   When did you marry your current husband again?

15  A.   March 21st, 2009.

16  Q.   Was there a particular reason or reasons you

17       filed bankruptcy approximately eighteen days

18       before your wedding?

19  A.   No.

20  Q.   Did you ever consider filing for bankruptcy in

21       2008?

22  A.   That's when I started the procedure.

23  Q.   You started the procedure in 2008?

349

1            (Whereupon, a short recess was then taken.)

2    THE COURT REPORTER:  Eleven o'clock.

3    BY MS. BAHAS:

4    Q.   Miss Black you mentioned that you filled out a

5         pamphlet of papers for Mr. Butterini, is that

6         correct?

7    A.   Yes.

8    Q.   How many pages was that pamphlet?

9    A.   I don't know.  I can't recall.

10   Q.   You filled it out at home?

11   A.   Yes.

12   Q.   When did you fill that out?

13   A.   I'm not sure.

14   Q.   You had three meetings with him, correct?

15   A.   Yes.

16   Q.   Was it after the first meeting?

17   A.   Yes.

18   Q.   Before the second meeting?

19   A.   Yes.

20   Q.   Did you bring it to him for the second meeting?

21   A.   I brought it to his secretary.

22   Q.   Did you speak with his secretary about it?

23   A.   Just when I handed it in and she said that he'll

351

1   Q.   Did you understand everything in the pamphlet

2        when you were filling it out?

3   A.   I believe so.

4   Q.   You didn't have any questions about it?

5   A.   If I did, which I don't recall, I would have

6        asked him in our meeting.

7   Q.   You would have asked him questions in your

8        meeting or you did ask him questions in your

9        meeting?

10  MS. GRECO:   I direct you not to answer.

11       Attorney-client privilege, any discussion with

12       him.  But the question was, if you had questions,

13       would you ask him?  You can answer.

14  THE WITNESS:   Okay.  Yes, I would ask him.

15  BY MS. BAHAS:

16  Q.   Did you fill out the pamphlet accurately?

17  A.   Yes.

18  Q.   Completely?  Filled it out completely?

19  A.   I believe so.

20  Q.   Do you have a copy of that pamphlet?

21  A.   No, I don't.

22  Q.   Aside from the pamphlet that you just testified

23       about, was there anything else in terms of

361

1    THE WITNESS:  He knows why I'm here today.

2    BY MS. BAHAS:

3    Q.  But you never had a conversation with him about

4        the fact that you resigned?

5    A.  I might have said that I wrote a letter saying

6        that I gave my two weeks' notice.  I'm not sure

7        when or where I was.

8    Q.  You testified earlier that you would come home in

9        tears after work occasionally, is that correct?

10   A.  Yes.

11   Q.  How often would that happen?

12   MS. GRECO:  Object to the form.

13   THE WITNESS:  Probably four days out of five.

14   BY MS. BAHAS:

15   Q.  Four days out of five that you were working?

16   A.  Yeah.

17   Q.  For the entire period of your employment?

18   MS. GRECO:  Object to form.

19   THE WITNESS:  I don't know that.  I can't remember

20       when it started.

21   BY MS. BAHAS:

22   Q.  Well, you began receiving mental health

23       counseling regarding their treatment at Black

362

1      Angus in 2006, correct?

2   A.   Yeah.

3   Q.   So was it before 2006 or after 2006 or during

4        2006?

5   MS. GRECO:   Object to form.

6   THE WITNESS:   I don't recall.

7   BY MS. BAHAS:

8   Q.   Would you say that it was for -- strike that.   On

9        the days that you came home -- I'm sorry.   Strike

10       that.   Okay.

11          So we talked about, earlier, some of the

12       things that you would post on your Facebook,

13       correct?

14  A.   Yes.

15  Q.   You posted about your surgeries, posted about

16       issues related to your mother.   Did you ever post

17       about your sister-in-law?

18  A.   I don't know.

19  Q.   Did you ever post about your mother-in-law?

20  A.   I can't recall.

21  Q.   Did you post about how they made you feel

22       special, meaning your mother-in-law and

23       sister-in-law?