**EX. 4**

DIANE SEIBERT

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

-------------------------------------------------

DARCY M. BLACK,

                         Plaintiff,

      -vs-


BUFFALO MEAT SERVICE, INC., doing business
as BOULEVARD BLACK ANGUS, also known as
BLACK ANGUS MEATS, also known as
BLACK ANGUS MEATS & SEAFOOD,
ROBERT SEIBERT,
DIANE SEIBERT,
KEEGAN ROBERTS,

                         Defendants.
-------------------------------------------------
                         Examination Before Trial of

DIANE SEIBERT, taken pursuant to the Federal Rules of Civil

Procedure, in the law offices of GRECO TRAPP, PLLC, 1700

Rand Building, 14 Lafayette Square, Buffalo, New York,

taken on January 4, 2018, commencing at 9:55 A.M., before

MARY ANN MORETTA, Notary Public.

71

1    A.    Yes.

2    Q.    How long did you work there?

3    A.    Until, I believe, 1984.

4    Q.    Why did you leave?

5    A.    Bob bought the business and I had two children.

6    Q.    What was the last position you held at Buffalo

7          General?

8    A.    I was a lab tech.

9    Q.    When you said Bob bought the business, and who do

10         you mean by Bob?

11   A.    My husband.

12   Q.    His full name is?

13   A.    Robert Seibert.

14   Q.    And when did he purchase the business?

15   A.    October 1984.

16   Q.    Okay.  And were you an owner of the business at

17         that time?

18   A.    I guess I owned half if he owned -- you know, we

19         were married, so yes, I would guess I was.

20   Q.    Did you start working in the business immediately

21         when it opened?

22   MR. OPPENHEIMER:  Form.

23   THE WITNESS:  It opened in 1975, so no.

87

1   BY MS. GRECO:

2   Q.   Have you or anyone else given any employees of

3        Black Angus Meat training relative to

4        discrimination, harassment, hostile environment

5        or retaliation?

6   MR. OPPENHEIMER:   Form.

7   THE WITNESS:   I've done no training.

8   BY MS. GRECO:

9   Q.   Is there any policy, written or otherwise, at

10       Black Angus Meat regarding being to work on time?

11  A.   There's no written policy.  However, above the

12       work schedule it says you get your checks on

13       time, I expect you to be on time for work.

14  Q.   Was that statement written above the work

15       schedule when Miss Black worked there?

16  A.   I don't know.

17  Q.   Do you have any idea approximately when you put

18       it there?

19  A.   No.

20  Q.   If an individual violated -- strike that.  If an

21       individual employee -- well, strike that.  If an

22       employee was going to be late, was there an

23       expectation they would have to call in?

1        his ownership interest in the business?

2   A.   I don't recall.

3   Q.   How did employees become aware, if at all, that

4        Keegan Roberts was an owner of the business?

5   A.   They were not made aware.

6   Q.   During the time Darcy Black was employed at Black

7        Angus Meat, what were the job duties of Keegan

8        Roberts?

9   A.   I don't recall when Keegan became the store

10       manager.  I have no records in front of me.  He

11       filled orders --

12  Q.   Before we go there.

13  MR. OPPENHEIMER:  Let the witness finish her answer,

14       please.

15  BY MS. GRECO:

16  Q.   Okay.

17  A.   He would have filled orders.

18  Q.   Is that before he became store manager or after,

19       I'm trying to find out?

20  A.   Both.

21  Q.   Okay.  Go ahead.

22  A.   He fills orders.  He did some of the ordering,

23       did deliveries.  He did some meat cutting, took

1    most of the orders for deer processing,

2    maintained equipment.

3  Q.  And what position did he hold prior to being a

4    store manager?

5  A.  Just an employee.  He wrapped, filled orders, did

6    deliveries and the other responsibilities that I

7    just mentioned.

8  Q.  Okay.  So what -- when he became a store manager,

9    did his responsibilities change in any way?

10 A.  Took over more of the responsibilities of

11   ordering product, maintaining inventory, more

12   aware of pricing structures, advertising.

13 Q.  Did he have any responsibility with regard to

14   other employees once he became a store manager?

15 A.  Yes.

16 Q.  What was that?

17 A.  Overseeing, supervisory position.

18 Q.  At the time that Keegan Roberts was a -- during

19   the time that Darcy Black was employed at Black

20   Angus Meat, was Keegan Roberts ever her

21   supervisors, meaning did he ever oversee her

22   work?

23 A.  Yes.

1    A.  Mark can cut, Keegan can cut, Bob can cut, Jamie

2        can cut.

3    Q.  So did they have certain hours they were assigned

4        to be a butcher?

5    A.  Assigned, no.

6    Q.  That's what I'm trying to find out.  Was there

7        any other person that was assigned the job of a

8        butcher, meaning the butcher job?

9    A.  Tommy is our main cutter.

10   Q.  Is there special skills in being the main cutter?

11   A.  He was in charge of the product in the building,

12       what was put in the counter for the day.  He was

13       in charge of the cooler.

14   Q.  And approximately how many hours a week did Mr.

15       Howells work, Thomas Howells?

16   A.  Beginning of the month, he's probably, you know,

17       thirty, around the thirty mark.  The end of the

18       month, he's probably in the twenties.

19   Q.  It's fair to say that when Darcy Black was

20       working, she would be able to see him during the

21       time that he was there?

22   MR. OPPENHEIMER:  Form.

23   BY MS. GRECO:

127

1    Q.  -- strike that.  Let me finish the question.
2        It's okay if you say no or yes, whatever the
3        answer is, but I have to finish the question.
4            During the time that Darcy Black was
5        employed at Black Angus Meat, what percent of
6        your customers were inner-city customers?
7    MR. OPPENHEIMER:  Form.
8    THE WITNESS:  I don't know.
9    BY MS. GRECO:
10   Q.  Would there be any way to determine what percent
11       were inner-city customers?
12   A.  No.
13   Q.  Would you agree that Robert Seibert, Diane
14       Seibert and Keegan Roberts have the primary
15       authority to hire, fire and make salary and
16       benefit determinations?
17   MR. OPPENHEIMER:  Form.
18   THE WITNESS:  Yes.
19   BY MS. GRECO:
20   Q.  During the time Darcy Black was employed at Black
21       Angus Meat, were there any job titles?
22   A.  Store manager.
23   Q.  Was there any policy, written or otherwise, at

132

1   A.   Yes.

2   Q.   Would you agree with me that's racially

3        offensive?

4   A.   Yes.

5   Q.   If an employee was dating or married to a black

6        male, female, and another employee said to her

7        that she needs to be with one of her own kind,

8        would you agree with me that's offensive?

9   A.   Yes.

10  Q.   Would you agree with me that that's

11       discriminatory?

12  A.   Yes.

13  Q.   If a female employee was dating a black male and

14       an employee asked her what's wrong with white

15       guys, would you agree with me that's offensive?

16  A.   Yes.

17  Q.   Would you agree with me that's discriminatory?

18  A.   Yes.

19  Q.   If an employee was dating a black male and

20       another employee told her that her boyfriend was

21       using her for her good credit score, would you

22       agree with me that's offensive?

23  A.   Yes.

1   Q.   Would you agree with me that's discriminatory?

2   A.   No.

3   Q.   Why not?

4   A.   Credit score doesn't have to do with

5        discrimination.

6   Q.   Does it imply to you -- when you hear that, what

7        I just said to you, does it imply to you because

8        her boyfriend was black, he would need her credit

9        score because he couldn't get one of his own?

10  A.   No.

11  Q.   Would you agree with me that if a female employee

12       -- all these instances we're talking about a

13       white female employee was dating a black male,

14       and an employee said to her that that male was

15       using her for her name because black men always

16       cheat and he probably has a lot of girlfriends,

17       would you agree with me -- would you -- do you

18       believe that that is offensive?

19  A.   Yes.

20  Q.   Do you believe that's discriminatory?

21  A.   Using her for her name?  No.

22  Q.   Because black men always cheat and he probably

23       has a lot of girlfriends?

1   MR. OPPENHEIMER:  Form.

2   THE WITNESS:  One more time.

3   BY MS. GRECO:

4   Q.  Would you agree with me that when someone is

5       accused of something, in order to protect their

6       job, they might lie?

7   MR. OPPENHEIMER:  Form.

8   THE WITNESS:  I don't know.

9   BY MS. GRECO:

10  Q.  Is it possible --

11  MR. OPPENHEIMER:  Form.

12  MS. GRECO:  I didn't finish.

13  BY MS. GRECO:

14  Q.  In your experience as a business owner for many

15      years and in your own experience in working as an

16      employee of a large employer, Buffalo General

17      Hospital, were you ever aware of any employee at

18      any time lying?

19  MR. OPPENHEIMER:  Form.

20  THE WITNESS:  Am I aware of an employee lying?  No.

21  BY MS. GRECO:

22  Q.  Do you believe it's possible that an employee

23      could lie?

145

1   MR. OPPENHEIMER:   Form.

2   BY MS. GRECO:

3   Q.   Even someone who might be a nice person?

4   A.   Yes.

5   Q.   Did you ever consider the possibility that Darcy

6        Black was telling the truth and Jamie Lapress

7        could have lied?

8   A.   No.

9   Q.   Why not?

10  A.   Because we don't talk like that there.  Those

11       words never left his lips and I believe him.

12  Q.   Why don't you believe Darcy Black?

13  MR. OPPENHEIMER:   Form.   Asked and answered.

14  BY MS. GRECO:

15  Q.   You can answer.

16  A.   I don't believe it happened.

17  Q.   Why don't you believe Darcy Black?

18  A.   It's not the type of environment that we harbor

19       there.   You don't understand.   We are a small

20       company.   The employees actually like each other.

21       Okay.   They don't -- they are not trying to

22       belittle each other.   It's not the way it

23       operates there at all.   Not even close.

151

1       about the use of marijuana during their break

2       time at your company?

3   A.  No.

4   Q.  Did anyone ever indicate to you that comments

5       were made --

6   MR. OPPENHEIMER:  How are you doing?

7   THE WITNESS:  All right.

8   MR. OPPENHEIMER:  Do you need a break?

9   THE WITNESS:  No, I'm okay.

10  MR. OPPENHEIMER:  Let us know if you need a break.

11      It's around noon.  Off the record.

12          (Discussion off the record.)

13  BY MS. GRECO:

14  Q.  Would it ever be appropriate in the workplace for

15      an employee in reference to an African-American

16      customer say how can they have nice cars and get

17      food stamps?

18  A.  No.

19  Q.  Could that -- would you determine that was

20      discriminatory?

21  A.  Yes.

22  Q.  Would it ever be appropriate for an employee to

23      say regarding African-American customers that

157

1     at Black Angus Meat?

2   A.   No.

3   Q.   Would you agree with me that if a female employee

4        was told that she's got a nice ass by a male

5        employee or owner, that that would be offensive?

6   A.   What was the last word?

7   MS. GRECO:   Can you read it.

8            (Whereupon, the above-requested question was

9        then read back by the reporter.)

10  THE WITNESS:   Or owner?

11  BY MS. GRECO:

12  Q.   Yes.

13  A.   It's offensive.

14  Q.   Would you agree with me that could be

15       discriminatory -- that it's discriminatory?

16  A.   Yes.

17  Q.   Would you agree with me that if a female employee

18       was told by a male employee or owner that her

19       headlights are on, that that's offensive?

20  A.   Yes.

21  Q.   And what do you take the headlights are on to

22       mean?

23  A.   Breasts.

158

1   Q.  And would you agree with me that that is

2       discriminatory?

3   A.  Yes.

4   Q.  Would you agree with me that if a male employee

5       or owner said to a female employee oh, look at

6       that cleavage, is that discriminatory?

7   A.  Yes.

8   Q.  Would you agree with me that's offensive?

9   A.  Yes.

10  Q.  Would you agree with me if a male employee or

11      owner said to a female employee does the carpet

12      match the drapes, that that's offensive?

13  A.  Yes.

14  Q.  And what does it mean to you, does the carpet

15      match the drapes?

16  A.  Hair, pubic hair.

17  Q.  Does it match your regular hair on your head?

18  A.  Yes.

19  Q.  Would you agree with me that that's

20      discriminatory?

21  A.  Yes.

22  Q.  And that could create a hostile environment?

23  MR. OPPENHEIMER:  Form.  You are asking for a legal

159

1       conclusion.

2   BY MS. GRECO:

3   Q.   Do you know what the term hostile environment

4        means?

5   MR. OPPENHEIMER:   Form.

6   BY MS. GRECO:

7   Q.   Do you know what the term hostile environment

8        means in your capacity as a business owner?

9   MR. OPPENHEIMER:   At it's defined in a statute?

10  MS. GRECO:   As she understands it.

11  MR. OPPENHEIMER:   In general conversation?

12  MS. GRECO:   She is an owner.

13  MR. OPPENHEIMER:   Are you asking her for a legal

14       conclusion or what the words hostile environment

15       mean in conversation?

16  BY MS. GRECO:

17  Q.   Do you understand in terms of being an employer,

18       what a hostile environment means?  If you don't,

19       say you don't.

20  A.   No.

21  Q.   All right.  Even today after the lawsuit that is

22       pending against you, is it fair to say you have

23       no understanding what a hostile environment is?

168

 1      as niggers, that stuff like this happens all the

 2      time?

 3   A.   I don't think that's what happened.

 4   MS. GRECO:  Could you read the question.

 5          (Whereupon, the above-requested question was

 6      then read back by the reporter.)

 7   MR. OPPENHEIMER:  Okay.  One more time.  I'm really

 8      confused by which way we are --

 9   BY MS. GRECO:

10   Q.   Would it ever be appropriate for Robert Seibert,

11      or any other employer, meaning you or Robert --

12      or, Keegan Roberts to tell Darcy Black, who has

13      biracial children, that another employee

14      referring to her children as niggers, that stuff

15      like this happens all the time?

16   MR. OPPENHEIMER:  Form.

17   THE WITNESS:  No.

18   BY MS. GRECO:

19   Q.   Would it ever be appropriate for Robert Seibert

20      or any other owner or manager of Black Angus

21      Meat, meaning either you or Keegan Roberts, to

22      say to Darcy Black that reference to her children

23      as niggers, well, it's something that happens in

179

1  Q.  Not the applicant, the application.

2  A.  The application, sometimes.  If they were busy up

3      front, they would just leave it up front.

4  Q.  If they weren't busy, what would they do?

5  A.  They may bring it to me.

6  Q.  Would you ever look out the window to see the

7      person?

8  A.  Maybe.  There's no general rule.

9  Q.  Did you ever ask anyone if the applicant was

10     black or white?

11 A.  No.

12 Q.  Do you recall during the time Darcy Black was an

13     employee at Black Angus Meat, did you interview

14     -- strike that.  How did you decide who to

15     interview?

16 A.  Previous experience, number one.  I like college

17     kids.  Somebody with some experience.  Somebody

18     who could work the hours I was looking for.

19 Q.  You said the number one was working the hours --

20 A.  Hours I was looking for.

21 Q.  Do you recall any African-American employee that

22     you interviewed from the time Darcy Black was

23     employed with the company?

199

```
 1    MR. OPPENHEIMER:  Form.

 2    BY MS. GRECO:

 3    Q.  You can answer.

 4    A.  Did I create the job titles?

 5    Q.  Yes.

 6    A.  I probably would have indicated where they

 7        worked, if they worked on the counter, if they

 8        work in the pack room, if they did cleanup, if

 9        they -- you know, I'm not sure I did all of

10        these.

11    Q.  Let's look at Darcy Black.

12    A.  Okay.

13    Q.  You state her job title was front counter.

14    MR. OPPENHEIMER:  Form.

15    THE WITNESS:  That's what she was hired for.

16    BY MS. GRECO:

17    Q.  What was her job title?

18    A.  We don't go by job titles there.  That's why the

19        whole thing is very difficult because we don't

20        use job titles.  We hire employees to do work, to

21        do labor.  We are not specific when they are

22        hired.  If I ask someone to -- if something is on

23        the floor or if the garbage is full, would you
```

200

```
 1      mind taking the garbage out.  It might not be
 2      part of their job description, but I would expect
 3      them to maybe pick up whatever is on the floor or
 4      empty the trash or whatever that might be and it
 5      may not be their job title.
 6   Q. Is front counter different than a packer?
 7   A. The front counter is in the front of the store.
 8      We fill orders in the back of the store.
 9   Q. In preparing or reviewing this document, did
10      anyone ask you to -- strike that.  In reviewing
11      this document, you agree that Darcy's job title
12      was front counter?
13   MR. OPPENHEIMER:  Form.
14   THE WITNESS:  We didn't have job titles.  I tried to
15      establish where they worked the most.  Everybody
16      wants job titles.  You guys want job titles and
17      everything.  We didn't have job titles.  Okay.
18      She was hired to work on the counter.  A counter
19      person might get a customer that needs a pack
20      filled.  They are going to have to go from the
21      front counter to the back to fill a pack, to fill
22      an order.
23   BY MS. GRECO:
```

202

1        she did not just work in the pack room.

2   Q.  So they were interchangeable, basically?

3   MR. OPPENHEIMER:  Form.

4   THE WITNESS:  Yes.

5   BY MS. GRECO:

6   Q.  That was the idea of a small business, to have

7        these positions that interchange?

8   MR. OPPENHEIMER:  Form.

9   BY MS. GRECO:

10  Q.  You hired these people to be interchangeable?

11  A.  For some things.

12  Q.  She could be in the pack room packing for, I

13       think you said -- I don't want to put words in

14       your mouth -- fourteen days or something because

15       that was the busy time of the month?

16  MR. OPPENHEIMER:  Form.

17  BY MS. GRECO:

18  Q.  Is that true?

19  A.  She may be in the pack room most of the day.

20  MR. OPPENHEIMER:  Form.

21  BY MS. GRECO:

22  Q.  So Darcy Black worked in the pack room?

23  A.  As part of her responsibilities, yes.

203

1   Q.   Okay.  And it was a significant part of her

2        responsibilities?

3   A.   Not at the end of the month.

4   Q.   Well --

5   A.   No.

6   Q.   How about --

7   A.   We hired employees not to do a specific job.  I

8        didn't want to hear it's not my job description.

9        Okay.  We don't have job descriptions.  We don't

10       have job titles.  You are an employee.  If this

11       is what I need help with today, if we have fifty

12       deliveries that need to get filled, I need four

13       people in the pack room filling the orders so

14       that they can get delivered.  When the packs are

15       filled, if it's one o'clock, two o'clock and they

16       still are working until three, they would go up

17       to the front, they might wrap, they might wait on

18       customers.  It's whatever needed to be done.

19  Q.   Okay.  Did you ever have any restrictions on

20       applicants relative to position?  For example, if

21       you were looking for someone to organize freezers

22       or put loads away which required heavy lifting,

23       would you discard females, as a rule, or older

248

1  Q.  In the year 2014, did Katie Bidell work for you?

2  A.  I don't recall.

3  Q.  Did Katie Bidell work for you in the year 2015?

4  A.  No.

5  Q.  Did she work for you in the year 2016?

6  A.  No.

7  Q.  Has she worked for you yet this year?

8  A.  No.

9  MR. OPPENHEIMER:  This year now is 2018.  Do you mean

10      2017?

11  BY MS. GRECO:

12  Q.  The end of 2017 and two days of 2018.

13  A.  No.

14  Q.  And did you permit Sean Round to come in late on

15      Saturdays or leave early in the times he played

16      football?

17  A.  There was a few week period that yes, we did.

18  Q.  Was that during the summer and fall of each year,

19      football season?

20  A.  Football season would not be in the wintertime.

21  Q.  Even though it was a busy time for you?

22  A.  He was gone for, yes, two hours, come back.  We

23      did a lot of that.

249

1    Q.   Now, your employees that work hourly --

2    A.   Yes.

3    Q.   -- how many breaks do they get?

4    A.   Everybody is entitled to a fifteen-minute break

5         in the morning, a fifteen-minute break in the

6         afternoon and half hour lunch for which they are

7         paid.

8    Q.   Okay.  And are they required to take their lunch

9         break?

10   A.   No.

11   Q.   And what happens if they work through their lunch

12        break?

13   A.   They are paid.

14   Q.   Are they paid extra at the end of the day or --

15   A.   Someone signs in at seven a.m. in the morning and

16        then signs out at three o'clock in the afternoon,

17        they are paid eight hours whether they took their

18        breaks or not.  They are entitled to a half-hour

19        lunch.

20   Q.   Is it your testimony that each employee is

21        entitled to a one half-hour lunch?

22   A.   They are entitled to a half-hour lunch.

23   Q.   If they have a half-hour lunch, do they have to

264

1  Q.   So just tell me and I'll ask questions.  Go
2       ahead.
3  A.   Workmen's Comp, if someone is injured.  Vacation
4       pay, insurance.
5  Q.   What type of insurance?
6  A.   Medical insurance.
7  Q.   Okay.  Anything else?
8  A.   That's what comes to my mind right now.
9  Q.   So with regard to medical insurance, was that
10      available to all employees?
11 A.   Yes.
12 Q.   Do you recall Darcy Black asking to use medical
13      insurance?
14 A.   No.  It was -- let me clarify one thing.  It was
15      for full-time employees, not part-time employees.
16 Q.   Okay.  Who are full-time employees?
17 A.   I would have to go through the list.
18 Q.   Was Darcy Black a full-time employee?
19 A.   I don't think she was hired as a full-time
20      employee.
21 Q.   Was she ever a full-time employee?
22 A.   She changed that all the time.  She used to come
23      and say my benefits are getting reduced because

274

1      paying their health insurance?

2  A.   It said medical on it.

3  Q.   Every one of these that we were provided that say

4      medical, Black Angus Meat was paying toward the

5      medical insurance?

6  MR. OPPENHEIMER:  Form.

7  BY MS. GRECO:

8  Q.  You can answer.

9  MR. OPPENHEIMER:  What is the these that you are

10      referring to in the question?

11  MS. GRECO:  Documents we were provided.

12  MR. OPPENHEIMER:  Without specificity, you are just

13      referring to these?

14  BY MS. GRECO:

15  Q.  You told me I could look at the records and find

16      them.  What records are you talking about?

17  A.  Payroll records.

18  Q.  And in the payroll records it indicates an amount

19      under deductions, it says MEDIC.  Is that what

20      you mean by medical insurance?

21  A.  Yes.

22  Q.  So would it be fair to say that whoever had the

23      deductions with medical would have been those who

275

1          you were paying medical for?

2     MR. OPPENHEIMER:  Form.

3     BY MS. GRECO:

4     Q.  At least, in part?

5     MR. OPPENHEIMER:  Form.

6     THE WITNESS:  Yes.

7     BY MS. GRECO:

8     Q.  How much did you pay towards benefits?

9     A.  I can't give you an amount.  It changes every

10         year.  The amounts change.  Typically, they pay

11         sixty percent, we pay forty, except Debbie.  Bob

12         and mine are paid for a hundred percent.

13    Q.  So sixty percent and they pay forty?

14    A.  No.  Other way around, they pay sixty, we pay

15         forty.

16    Q.  Except for Debbie?

17    A.  Debbie.

18    Q.  Which you pay a hundred percent?

19    A.  No, we don't pay a hundred percent.

20    Q.  How much do you pay for Debbie?

21    A.  Well, it depends.  When she first had medical

22         insurance, she was on a family coverage.  It was

23         about, at the high, I think it was probably

286

1   MR. OPPENHEIMER:  Form.

2   THE WITNESS:  I'm in the office.  I'm not around

3       other employees.

4   BY MS. GRECO:

5   Q.  Okay.  Were you aware of employees using their

6       cell phone to receive and send texts in the

7       workplace during working hours?

8   A.  No.

9   Q.  Was it a violation of any workplace policy to

10      send text messages or receive text messages

11      during working hours and non-breaks?

12  A.  The only thing that would be frowned upon is

13      excess in anything.  Moderation in anything is

14      okay.  Excess is where things get scrutinized.

15  Q.  Were you aware of Darcy Black or anyone else

16      telling anyone in management that Mr. Leible was

17      late regularly?

18  MR. OPPENHEIMER:  Form.

19  BY MS. GRECO:

20  Q.  From twenty minutes to sometimes up to an hour?

21  MR. OPPENHEIMER:  Form.

22  THE WITNESS:  He was talked to.

23  BY MS. GRECO:

287

1   Q.   Did it continue afterwards?

2   A.   Mark is not a timely person.  Might be five

3        minutes, might be twenty minutes.  It's his

4        nature.

5   Q.   How do you know that he was not there on time?

6   A.   His time card.

7   Q.   Was Mark Leible scheduled off on Saturdays at the

8        end of the month?

9   A.   Usually he's my meat cutter on Saturday.

10  Q.   What specifically are you referring to when you

11       say that Mark Leible has a culinary background?

12  A.   His previous experience.  He worked at a cafe.

13       He worked at Thaxton's, went to school for a

14       short amount of time.

15  Q.   Looking at his resume, do you consider him to

16       have a stellar resume in the food --

17  A.   I wouldn't call it stellar.

18  Q.   -- industry?

19  A.   He's had very good knife skills.  And if you are

20       not aware what knife skills are, there is an art

21       to it.

22  Q.   When did he start making sausage for you?

23  A.   I don't recall.

298

```
 1   BY MS. GRECO:
 2   Q.   Do you know how much Mr. Leible's hourly rate is
 3        at this time?
 4   A.   Seventeen.
 5   Q.   Does Mr. Leible receive health insurance?
 6   A.   Yes.
 7   Q.   Is Mr. Leible guaranteed an average of forty
 8        hours a week?
 9   A.   No.
10   Q.   I would like you to look at Mr. Lapress.  Did Mr.
11        Lapress have any special skills?
12   MR. OPPENHEIMER:   Form.
13   BY MS. GRECO:
14   Q.   You can answer.
15   A.   No.
16   Q.   Okay.  And did he have any difficulty wrapping
17        meat?
18   A.   Yes.
19   Q.   What kind of difficulty did he have?
20   A.   He wasn't good at it.
21   Q.   Was he taken off that job because he wasn't good
22        at it?
23   A.   He wasn't hired for that job.
```

350

1  A.   Yes.

2  Q.   Okay.   Then I would like to refer you to Exhibit

3       130 -- I'm sorry.   I meant Exhibit 129.   This is

4       a payroll pre-check writing report for the period

5       ending 12/26/10.   And you'll see at that point

6       she was working forty hours, making four hundred

7       forty dollars, which is eleven dollars an hour?

8  A.   Uh-huh.

9  Q.   If you look at the third sheet of that document,

10      which is payroll ending 1/2/11, she worked forty

11      hours and made four hundred and twenty dollars,

12      which is ten dollars and fifty cents.   Do you

13      know why her pay was lowered?

14 MR. OPPENHEIMER:   Form.

15 THE WITNESS:   The only thing I can say is this is

16      when we went from me doing the payroll to a

17      payroll company doing the payroll because the

18      sheet is different.   ComputerSearch did this.

19      There might have been an error on her rate.

20 BY MS. GRECO:

21 Q.   Well, if you go to Exhibit 131 for the first

22      page, which is the payroll ending period

23      10/30/2011, she was working forty hours and made

387

1   A.   That would be a question for Keegan.

2   Q.   I'll ask him.  I just want to know what you know.

3   A.   I wasn't there.

4   Q.   Nor did you learn it from anybody, that you can

5        recall?

6   A.   I learned it from Keegan.  He called me.

7   Q.   But you don't recall when that was or how with

8        respect to the timeline?

9   A.   I don't have the date, no.

10  Q.   Do you have any notes that would help refresh

11       your memory?

12  A.   No.

13  Q.   Let's look at -- who would determine whether

14       Darcy Black would get a raise?

15  A.   It would be joint.

16  Q.   Among whom?

17  A.   Probably the three of us, Bob and Keegan and

18       myself.

19  Q.   So for every time Darcy Black got a raise or did

20       not get a raise, that would have been a

21       determination among the three of you, by that I

22       mean, you, Robert Seibert and --

23  A.   I'm not sure we would have called a big meeting,

399

```
 1        Exhibit 160 -- hold on.  I'm sorry.  Looking at
 2        Exhibit 196, payroll from week ending 5/15/05.
 3        And do you see that Darcy Black -- at this point
 4        it was Hoefert worked forty hours and made three
 5        hundred dollars --
 6   A.   Yes.
 7   Q.   -- seven fifty an hour?  Do you recognize that as
 8        seven fifty an hour?
 9   A.   Yes.
10   Q.   Okay.  Going now to Exhibit 198, payroll
11        pre-check writing report period ending 1/1/06,
12        the second one is ending 1/8/06.  Do you see as
13        of 1/8/06 she worked forty hours and made three
14        hundred twenty dollars, which was eight dollars
15        an hour?
16   A.   Yes.
17   Q.   Going to Exhibit 199.  Looking at the -- it has
18        payroll pre-check writing report ending 12/24/06
19        and 12/31/06.  12/31/06 she worked thirty-one
20        hours and made two hundred eighty-nine dollars.
21        Do you recognize that as a fifty-cent increase to
22        eight fifty an hour?
23   A.   Yes.
```

400

1   Q.   Going now to Exhibit 201, the week ending 5 --

2        4/30/07 and 5/6/07.  Do you see 5/6/07 she worked

3        forty hours and made three hundred sixty dollars,

4        which would have been a fifty-cent increase to

5        nine dollars an hour?

6   A.   Yes.

7   Q.   Going to Exhibit 203 for pay period ending

8        7/28/08 and 8/3/08.  Do you see in 8/3/08 she

9        worked forty hours and made three hundred eighty

10       dollars, which would be a fifty-cent increase to

11       nine dollars and fifty cents?

12  A.   Yes.

13  Q.   Going to Exhibit 205 for payroll pre-checking --

14       writing for check date 6/5/09 and check date

15       6/12/09.  Do you see on 6/12/09 she worked forty

16       hours and made four hundred dollars?

17  A.   Which one are we on here?

18  Q.   205.  The last page.  She worked forty hours and

19       made four hundred dollars?

20  A.   Yes.

21  Q.   That would be a fifty-cent increase to ten

22       dollars an hour?

23  A.   Yes.