**EX. 5**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
---------------------------------------------------

DARCY M. BLACK,

                          Plaintiff,

    -vs-


BUFFALO MEAT SERVICE, INC., doing business
as BOULEVARD BLACK ANGUS, also known as
BLACK ANGUS MEATS, also known as
BLACK ANGUS MEATS & SEAFOOD,
ROBERT SEIBERT,
DIANE SEIBERT,
KEEGAN ROBERTS,

                        Defendants.

---------------------------------------------------


                  Examination Before Trial of

ROBERT SEIBERT, Defendant, taken pursuant to the Federal

Rules of Civil Procedure, in the law offices of GRECO

TRAPP, PLLC, 1700 Rand Building, 14 Lafayette Square,

Buffalo, New York, taken on January 10, 2018, commencing at

9:30 A.M., before ERIN L. COPPING, Notary Public.

16

1   A.  Opened Buffalo Meat Service d/b/a Boulevard Black

2       Angus.  That was in the mid '80's.

3   Q.  Was that a -- did you create it from scratch,

4       like it was -- strike that.  Did you purchase an

5       ongoing business?

6   A.  I purchased the equipment out of an ongoing

7       business.

8   Q.  Did you purchase their customers also?

9   A.  No.

10  Q.  And where was the business located that you

11      purchased the equipment from?

12  A.  2519 Niagara Falls Boulevard, Amherst, New York.

13  Q.  What was the name of the business?

14  A.  I think the name actually -- the d/b/a probably

15      on it was Black Angus Meats or House of Black

16      Angus.  It was actually House of Black Angus.

17  Q.  Had you worked there?

18  A.  Yes.

19  Q.  Okay.  So before you purchased the equipment, you

20      actually were an employee there?

21  A.  I opened the business for House of Black Angus

22      for Clark Service Company at that address.

23  Q.  Okay.  That's what I was missing.  So let's

1    backtrack.  You said you worked for Clark Service

2    Company and you were in Allentown, Pennsylvania

3    in the beginning.  Did there come a time when you

4    came to Buffalo?

5  A.  In '75.

6  Q.  Okay.  And tell me how it is you came to Buffalo.

7  A.  Drove.

8  Q.  Was there any business reason for coming to

9    Buffalo?

10  A.  My wife.  No business reason.

11  Q.  Why did you come to Buffalo?

12  A.  My wife finished her last year of school at

13    Buffalo General Hospital.

14  Q.  And what was your purpose for coming to Buffalo?

15  A.  For my wife to finish her last year of school at

16    Buffalo General Hospital.

17  Q.  Oh, she came here to finish her last year of

18    school?

19  A.  Yes.

20  Q.  All right.  So it wasn't like she had finished

21    and you were coming, she came here to finish it.

22    And what were you doing work-wise?  Were you

23    still employed at Clark Service Company?

1   THE WITNESS:  Don't recall their names.

2   BY MS. GRECO:

3   Q.  Was there more than one?

4   A.  I believe there was two people.

5   Q.  Okay.  Do you recall their sex?

6   A.  Males.

7   Q.  All right.  Do you recall what job they

8       performed?

9   A.  Either cut or wrap meat.

10  Q.  Is there anything that would help you recall

11      their names?  Do you know an individual by -- did

12      you ever know an individual by the name of Bobby

13      Rivers?

14  A.  Yes.

15  Q.  Okay.  Did you ever work with him?

16  A.  He worked for me.

17  Q.  Okay.  When?

18  A.  After I opened the business.  I would say it was

19      probably the late '80's -- or, no.  It was

20      actually into the '90's that he worked for me.

21  Q.  Was your wife working with you at that time?

22  MR. OPPENHEIMER:  Form.

23  BY MS. GRECO:

37

1   Q.  If you know?

2   MR. OPPENHEIMER:  Form.

3   THE WITNESS:  No.

4   BY MS. GRECO:

5   Q.  Okay.  How about Eddie Davis, do you know an

6       individual by the name of Eddie Davis?

7   A.  Worked for me.

8   Q.  Do you know when?

9   A.  In the early '90's, mid '90's, maybe into the

10      late '90's.

11  Q.  Do you know how long he worked for you?

12  A.  Long time.

13  Q.  What is a long time to you?  Can you give me your

14      best approximation?  If you can't just say you

15      can't.

16  A.  Years.

17  Q.  More than one year?

18  MR. OPPENHEIMER:  He said years, counsel.

19  BY MS. GRECO:

20  Q.  I understand.  He said mid '90's.

21  A.  Five, six, eight years he worked for me.

22  Q.  Okay.  How about --

23  A.  Maybe ten years.

38

```
 1   Q.  How about Mr. Rivers?

 2   MR. OPPENHEIMER:  What is the how about?

 3   BY MS. GRECO:

 4   Q.  How long did he work for you?

 5   A.  Years.

 6   Q.  You said the late '80's to the mid '90's?

 7   A.  He was a high school kid, and come to work for me

 8       and worked for me for quite some time.  It was

 9       the period I stated.

10   Q.  Okay.  What position did Mr. Rivers hold?

11   A.  Mr. Rivers?

12   Q.  Yes.

13   A.  Pretty much meat wrapper.

14   Q.  How about Mr. Davis, what position did he hold?

15   A.  He took care of all of the cleaning and

16       maintenance of our equipment every evening.

17   Q.  Okay.  And do you know any individuals by the

18       name of the Goodwin brothers?

19   A.  Cut meat for me.

20   Q.  Okay.  And when was that, as best you recall?

21       Was there two -- more than two brothers or just

22       two?

23   A.  Two brothers, both ministers, wonderful
```

39

1      employees.

2   Q.   When approximately did they work for you?

3   A.   Late '80's into the -- I would say maybe the --

4        don't recall exactly, but somewhere in the '90's.

5        They cut meat for me.

6   Q.   Okay.  Is there anyone else that you can recall

7        that was African-American that worked for you?

8        If you can't, you can't.

9   MR. OPPENHEIMER:  Can you give us a date range,

10       counsel?

11  BY MS. GRECO:

12  Q.   During up until the time my client left

13       employment with you, which so you know is

14       approximately May of 2010.

15  MR. OPPENHEIMER:  Starting when, please?

16  BY MS. GRECO:

17  Q.   Starting when you -- started as a manager and the

18       other company owned it, up to then.

19  A.   There was another -- an Eric, I don't know his

20       last name, who worked for me.

21  Q.   Was that Eric Seneca?

22  A.   No.  He actually did a little bit of everything

23       for us, worked for us for probably a year.

42

1    A.   Don't recall.

2    Q.   Did you individually purchase it or the company

3         purchase it?

4    MR. OPPENHEIMER:   Form.

5    THE WITNESS:   Individually.

6    BY MS. GRECO:

7    Q.   Okay.  And you said you formed a new company.

8         You formed a company Buffalo Meat Service d/b/a

9         Black Angus?

10   A.   Boulevard Black Angus.

11   Q.   Boulevard Black Angus.  Okay.  When did that

12        company open?

13   A.   Mid '80's.

14   Q.   And it's still in existence?

15   A.   Yes.

16   Q.   And who were the owners initially?

17   MR. OPPENHEIMER:   Form.

18   THE WITNESS:   Diane Seibert, Robert Seibert.

19   BY MS. GRECO:

20   Q.   Did there ever come a time when there was a

21        change in that ownership?

22   A.   No.  Well, most recently the ownership has

23        changed, 2013.  Shares of the corporation.

43

1    Q.   Shares of the corporation?

2    A.   Were sold.

3    Q.   To who?

4    A.   Keegan Roberts.

5    Q.   And as of that time, what was the ownership

6         interest between the three of you?

7    MR. OPPENHEIMER:   Form.

8    THE WITNESS:   Two thirds, one third.   One third owned

9         by Keegan.

10   BY MS. GRECO:

11   Q.   And do you know when in 2013 that occurred?

12   A.   Late '12, early '13.

13   Q.   And when you first started Boulevard Black Angus,

14        which we'll call it Black Angus Meats for the

15        record for consistency, how many employees did it

16        have?

17   A.   When I started it?

18   Q.   Yes, when you started it as the owner.

19   A.   Four.

20   Q.   Were you one of the four?

21   A.   Was I an employee?

22   Q.   Yes.

23   A.   Yes.

52

1   THE WITNESS:  It's the retail meat market.

2   BY MS. GRECO:

3   Q.  I understand what you're -- what you're saying.

4       What I'm trying to find out is, if someone -- if

5       your employees are cutting meat, where are they

6       doing that, is that building one?

7   A.  Building one.

8   Q.  Okay.

9   A.  Retail meat you're referring to?

10  MR. OPPENHEIMER:  If you don't understand her

11      question, ask that before you answer it.

12  BY MS. GRECO:

13  Q.  Any meat that is cut at your business.  Do you do

14      meat other than retail meat?

15  A.  We process deer.

16  Q.  Okay.  Is that processed at the same place where

17      the retail meat is processed?

18  A.  No.

19  Q.  Okay.  Where is the deer meat processed?

20  A.  Two, three and four.

21  Q.  Is the room that you utilize to package your

22      retail meat also utilized to wrap your deer meat?

23  MR. OPPENHEIMER:  Form.

66

1   A.   Vacation pay, offered an insurance program, free
2        parking.  Could you read back the list?
3             (Whereupon, the above-requested answer was
4        then read back by the reporter.)
5   THE WITNESS:  I'm sure there's others, I just don't
6        recall.
7   BY MS. GRECO:
8   Q.   Okay.  Was there any sick time?
9   A.   No.
10  Q.   Was there any personal time?
11  A.   Don't understand your question.
12  Q.   You said there was vacation pay.  Was there
13       anything separately identified as personal time?
14  A.   No.
15  Q.   Was there a pension or profit sharing plan?
16  A.   No.
17  Q.   Was there health insurance?
18  A.   Offered health coverage.
19  Q.   During the time my client was employed there?
20  A.   Yes.
21  Q.   Can you tell me what was offered relative to
22       health insurance?
23  A.   Wasn't my department, but as I understand we paid

89

1   Q.  Were you involved in the decision to terminate

2      employees -- strike that.  Were you involved in

3      the process relative to the termination of any

4      employees during the time that my client was

5      employed at Black Angus Meat?

6   A.  I don't understand your question.  Process?

7      Process is a pretty open thing.

8   Q.  Did you have any involvement in the decision or

9      decisions relative to terminating any employee

10     during the time my client was employed there?

11  A.  Yes.

12  Q.  Okay.  And what involvement did you have?

13  A.  With the decisions of terminating an employee?

14  Q.  Um-hum.

15  A.  As part owner of the company I had the ability to

16     fire.

17  Q.  Were you the ultimate decision maker?

18  MR. OPPENHEIMER:  Form.

19  BY MS. GRECO:

20  Q.  Do you understand what I mean by that?  Strike

21     that.  Was there an ultimate decision maker who

22     made the final decision?

23  A.  It wasn't any one ultimate decision maker.

90

1  Q.  Okay.  Who would be involved in the decision?

2  A.  Could be either Diane --

3  Q.  This is during the time my client was employed

4      there.

5  A.  Keegan or myself, if any one of us felt that an

6      employee needed to be let go, they could do so.

7  Q.  So you each had the independent ability to be

8      able to terminate an employee?

9  MR. OPPENHEIMER:  Form.

10 BY MS. GRECO:

11 Q.  Is that accurate?

12 MR. OPPENHEIMER:  Form.

13 THE WITNESS:  I would say yes.

14 BY MS. GRECO:

15 Q.  Is there a position of driver -- well, strike

16     that.  Do you have individuals that drive --

17     strike that.  Do you have individuals that make

18     deliveries for your company during the time my

19     client was employed there?

20 A.  Yes.

21 Q.  Okay.  And in order to be an employee who makes

22     deliveries, were there any qualifications that

23     were required during the time my client was

91

```
 1        employed there?
 2   A.   Valid driver's license, good knowledge of Western
 3        New York, the ability to work long hours, be able
 4        to handle fifty to seventy-pound boxes, good
 5        customer skills, able to understand the
 6        collection of EBT forms, credit card forms or
 7        cash, generally to have a key to the building
 8        for -- orders that aren't delivered need to be
 9        put back in the freezer, so huge trust on the
10        part of the owners and management of their
11        driving skills, trust as to handling money,
12        product, trust to have a key of my building, late
13        night hours.  Those are all things that are
14        qualifications to be a driver.  It's not a --
15        it's not a job that we hired anybody for.
16        Employees progressed to that job.
17   Q.   Do you ever recall advertising in any way for a
18        position of driver?
19   A.   No.
20   Q.   Do you recall advertising in the newspaper for
21        any position?
22   A.   During what time frame?
23   Q.   During the time my client was employed there.
```

136

1      employees working at Black Angus Meat during the

2      time Darcy Black was employed there with being

3      timely for their work shift?

4   A.  Schedules were posted, work the schedule that

5      you're posted.  It tells you to show up at nine

6      o'clock in the morning, be at work at nine

7      o'clock in the morning.

8   Q.  Were you aware of any employees who were

9      violating that policy during the time that Darcy

10      Black was employed at Black Angus Meat?

11  MR. OPPENHEIMER:  Form.

12  THE WITNESS:  In the time period that Darcy Black was

13      employed there I would say there's probably been

14      more than one person that showed up late.

15  BY MS. GRECO:

16  Q.  Do you recall any employee who regularly showed

17      up late to work during the time Darcy Black was

18      employed there?

19  MR. OPPENHEIMER:  Form.

20  THE WITNESS:  Explain regularly.

21  BY MS. GRECO:

22  Q.  Okay.  At least weekly.

23  A.  That's regularly?

169

1   Q.  Was Mark Leible such an employee or is he such an

2       employee?

3   MR. OPPENHEIMER:  Form.  Which question are you

4       asking?

5   BY MS. GRECO:

6   Q.  Did Mark Leible have problems with getting to

7       work on time during the time that Darcy Black was

8       an employee at Black Angus Meat?

9   A.  I don't recall.

10  Q.  Okay.  Were you ever aware of Mark Leible coming

11      into work fifteen to twenty minutes late on a

12      regular basis?

13  A.  Has been reported to me that that has happened,

14      and what --

15  Q.  I'm -- go ahead.

16  A.  And what period of time?  Don't know.

17  Q.  Do you know if that day if Mark Leible was

18      approximately twenty minutes late getting to

19      work?

20  MR. OPPENHEIMER:  Form.

21  THE WITNESS:  No.

22  BY MS. GRECO:

23  Q.  If he was late to work that day could that have

172

1        statement on it.

2   Q.   Which is?

3   A.   Which is it wasn't the fact that they were in

4        their cars smoking cigarettes and on their phone

5        at nine-thirty in the morning, it was the pure

6        fact that I got the four letter rant and raving

7        from Taylor Kunzelman that I let him go and it

8        was the situation that was the lack of work that

9        was done.  When management wasn't there work just

10       -- it like stopped.

11  Q.   Do you know if Mark Leible had taken his

12       fifteen-minute break before you arrived that day?

13  A.   No, I don't.

14  Q.   Who else was working in the pack room making

15       packs for you -- strike that.  Was Darcy Black

16       working on packs that you were going to deliver?

17  A.   Yes.

18  Q.   Okay.  Was Mark Leible working on packs that you

19       were going to deliver?

20  A.   Yes.

21  Q.   Was Taylor Kunzelman working on packs that you

22       were going to deliver?

23  A.   Yes.

173

1   Q.  Was anyone else working on packs you were going

2      to deliver?

3   A.  Not that I recall.

4   Q.  And you said Darcy Black said something to you

5      after you fired -- I don't want to put words in

6      your mouth.  I believe you said after you fired

7      Taylor Kunzelman.  Is that true?

8   A.  I did have conversation with her, yes.

9   Q.  Okay.  Can you tell me what was said, to the best

10     of your recollection?

11  MR. OPPENHEIMER:  With respect to Kunzelman or with

12     respect to Darcy?

13  MS. GRECO:  His conversation with Darcy Black.

14  THE WITNESS:  Darcy started to defend Taylor

15     Kunzelman and so on and so forth and letting him

16     go and she had to get her two cents' worth in and

17     I told her at the time that she's following the

18     wrong employee.  It wasn't just based upon the

19     lack of work that was getting done that morning,

20     it was the verbal abuse that I took from him and

21     his previously terrible performance in the

22     workplace.

23  BY MS. GRECO:

177

1      which is probably not more than an hour and a

2      half's work by one employee, and I have three

3      employees there and there only one was order done

4      and a half another one that I believe Mark was

5      working on.

6  Q.  Do you know if any other work was done that

7      morning?

8  A.  No.

9  Q.  What other work normally would have been done in

10     the morning for an employee who started at seven

11     a.m.?

12  MR. OPPENHEIMER:  Form.

13  BY MS. GRECO:

14  Q.  If you know.

15  A.  I don't understand your question.

16  Q.  If an employee started at seven a.m., such as

17     Mark Leible and Darcy Black, when they would

18     arrive to work that day what work would there be

19     for them to do other than making four orders to

20     go?

21  A.  Pretty much fill those four orders, and then go

22     on, start the Buffalo orders.

23  Q.  Okay.  Do you know if any Buffalo orders were

222

1        then read back by the reporter.)

2    THE WITNESS:  Did I, is the question?

3    BY MS. GRECO:

4    Q.   Yes.  Did you?

5    A.   Did I, no.

6    Q.   Okay.  Did you ever tell Darcy Black -- strike

7         that.  Did you ever tell Darcy Black in these or

8         similar words, it means these words or words like

9         this, that she would have to get used to the idea

10        that her children were black, there was no

11        changing that, school kids are cruel and racial

12        remarks from kids is not unusual, that was your

13        opinion?

14   A.   Did I ever?

15   Q.   Yes.

16   A.   I made a comment similar to that six months or a

17        year before she left us.

18   Q.   Can you tell me about that, please?  Where were

19        you when you made the comment?

20   A.   I was in the office and which Darcy was in the

21        office on a phone and some kind of phone call

22        from someplace that -- some kind of problem that

23        she had and went on and on and on and she was in

223

```
 1        her situation that she was emotionally upset.
 2        And I don't know if it was a teacher that called
 3        her or what it was.  It was something regarding
 4        her children and where somebody made a comment to
 5        her children that wasn't nice and regarding she
 6        felt at the time because of her children being
 7        black they were being targeted by other children.
 8        And she sat in there crying and I just told her
 9        that, you know, kids are going to be kids, they
10        are going to be -- you know, make statements like
11        that, you're going to have to learn to deal with
12        it.  I mean, that's what kids do, which was
13        somewheres around six months or could have even
14        been a year before.  It was whatever kind of --
15        like I said, she had multiple situations that
16        she'd be talking in the office with someone about
17        her children.
18  Q.    Do you recall if anyone else was present?
19  A.    I believe my wife was.
20  Q.    And what is your experience with school children
21        making racial remarks?
22  A.    Don't have any experience with it, but I do know
23        that children can be cruel.
```

224

1    Q.   Did your children make racially offensive

2         remarks?

3    A.   No.

4    Q.   Did their friends make racially offensive

5         remarks?

6    A.   Not that I know of.

7    Q.   Did you coach any youth leagues or have any type

8         of position with young people?

9    MR. OPPENHEIMER:   Form.

10   BY MS. GRECO:

11   Q.   Kids school age?

12   MR. OPPENHEIMER:   Form.

13   THE WITNESS:   No.

14   BY MS. GRECO:

15   Q.   Did you ever instruct anyone to retain job

16        applications at Black Angus Meat after you became

17        the owner?

18   MR. OPPENHEIMER:   Form.

19   THE WITNESS:   What's the question?

20            (Whereupon, the above-requested question was

21        then read back by the reporter.)

22   THE WITNESS:   Yes.

23   BY MS. GRECO:

225

```
 1   Q.   Who and when?  I'll start with who.
 2   A.   Whoever the manager probably was, and I had a
 3        few.
 4   Q.   Okay.  And do you know what approximate time
 5        frame?
 6   A.   Approximate time frame?
 7   Q.   When you instructed them to retain the job
 8        applications.
 9   A.   Don't recall.
10   Q.   Was it prior to the time Darcy Black was employed
11        at Black Angus Meat?
12   A.   You asked me if I -- since the time that I owned?
13   Q.   Yes.
14   A.   I have instructed employees to either management
15        or whoever to hang on to job applications.
16   Q.   Okay.  What I'm asking is, were they doing that
17        prior to the time Darcy Black began working there
18        in May of 2005?
19   A.   Yes.
20   Q.   Okay.  Did you ever state to anyone -- well,
21        strike that.  Did you ever state to anyone that
22        it was easy to feel sorry for Darcy Black because
23        she was a single mother with two biracial
```

226

1      children trying to find work and provide for her
2      family?
3   A.  You're asking me if I made that statement?
4   Q.  Yeah.
5   A.  I don't recall ever making that statement.
6   Q.  Okay.  Did you ever speak to Raelean Rush about
7      -- after Darcy stopped employment stop -- that
8      after Darcy stopped employment at Black Angus
9      Meat, did you ever have a conversation with
10     Raelean Rush's mother about Darcy?
11  A.  After she left employment?
12  Q.  Yes.
13  A.  I don't know as though I did.
14  Q.  Did you ever have a conversation with Raelean
15     Rush's mother about Darcy Black at any time?
16  THE WITNESS:  The question again?
17         (Whereupon, the above-requested question was
18     then read back by the reporter.)
19  THE WITNESS:  I think we did discuss Darcy Black.
20  BY MS. GRECO:
21  Q.  Okay.  Do you know on how many occasions you
22     discussed her?
23  A.  No.

245

1          (Whereupon, the above-requested question was

2      then read back by the reporter.)

3   THE WITNESS:  No.

4   BY MS. GRECO:

5   Q.  Were any jokes told at Black Angus Meat that you

6      heard?

7   A.  During the time period that she's employed?

8   Q.  Yes.

9   A.  Or since the business was --

10  Q.  During the time that she was employed.

11  A.  No.

12  Q.  Okay.  And would it ever be appropriate for a

13     male employee to say to a female employee who is

14     dating an African-American male that she'd be

15     better off with a white guy?

16  A.  No.

17  Q.  Were you aware of Sean Round ever telling Raelean

18     Rush or Regina Rush, in these words or similar

19     words, that she'd be better off with a white guy?

20  A.  No.

21  Q.  Would it ever be appropriate for a Caucasian male

22     to tell a Caucasian female who was dating an

23     African-American male that she would be -- she

246

1      needs to be with one of her own kind?

2   A.  Your question again was?

3   Q.  Would it be ever appropriate?

4   A.  No.

5   Q.  Would it ever be appropriate -- were you ever

6       aware of Sean Round telling Raelean Rush and

7       Regina Rush, in these or similar words, that she

8       needs to be with one of her own kind?

9   A.  No.

10  Q.  Would you agree with me that that -- strike that.

11      Do you believe if such a statement was made that

12      it's discriminatory?

13  A.  Yes.

14  Q.  Would it ever be appropriate for a Caucasian male

15      at work to tell a Caucasian female who was dating

16      an African-American male, in these or similar

17      words, what is wrong with white guys?

18  A.  The question again?

19  Q.  Caucasian male telling a Caucasian female dating

20      an African-American male what is wrong with white

21      guys?

22  A.  You asked me if I find that offensive?

23  Q.  I'll ask you that.  Do you find it offensive?

247

1  A.   Yeah.

2  Q.   Would it ever be appropriate to be said in the

3       workplace?

4  A.   No.

5  Q.   Were you ever aware of Sean Round telling Raelean

6       Rush and Regina Rush asking them what's wrong

7       with white guys?

8  A.   No.

9  Q.   Would it ever be appropriate for a Caucasian male

10      to say to a Caucasian female who is dating an

11      African-American male that her boyfriend was

12      using her for her good credit score?

13 A.   The question again?

14 Q.   Would that ever be appropriate to be said in the

15      workplace?

16 A.   No, that wouldn't be appropriate.

17 Q.   Do you find that statement to be an offensive

18      statement?

19 A.   Yes.

20 Q.   Do you find it to be discriminatory?

21 A.   Yes.

22 Q.   Were you ever aware of Sean Round telling Raelean

23      Rush and/or Regina Rush, in these or similar

248

```
 1     words, that her boyfriend was using her for her
 2     good credit score?
 3  A. Start of the question again was?
 4  Q. Were you ever aware of Sean Round telling Raelean
 5     Rush and/or Regina Rush, in these or similar
 6     words, that her boyfriend was using her for her
 7     good credit score?
 8  A. No.
 9  Q. Okay.  Would it ever be appropriate for a
10     Caucasian male to tell a Caucasian female
11     marrying -- I'm sorry.  Dating an
12     African-American male that he was using her for
13     her name because black men always cheat and her
14     -- and he probably has a lot of girlfriends?
15  A. Do I find that offensive?
16  Q. Yes.
17  A. Of course.
18  Q. Would it ever be appropriate to be stated in the
19     workplace?
20  A. In the workplace to ever say that?
21  Q. Yes.
22  A. Of course.
23  Q. It would be appropriate or inappropriate?
```

249

```
 1   A.   Inappropriate.
 2   Q.   Okay.  And would you agree with me that that
 3        statement would be discriminatory?
 4   A.   Yes.
 5   Q.   Okay.  And were you ever aware of Sean Round
 6        telling Raelean Rush and/or Regina Rush that
 7        African-American boyfriend was using her for her
 8        name because Black men always cheat and he
 9        probably has a lot of girlfriends?
10   A.   Was I aware of that?
11   Q.   Yes.
12   A.   No.
13   Q.   Did anyone ever -- did you ever learn that anyone
14        referred to Darcy Black's children as niggers?
15   A.   No.
16   Q.   Did anyone ever complain to you that anyone
17        referred to Darcy Black's children as niggers?
18   A.   To me personally, no.
19   Q.   Yes.  Did Darcy Black ever complain to you that a
20        male employee -- a Caucasian male employee
21        referred to her children as niggers?
22   A.   No.
23   Q.   Would it ever be appropriate to refer to an
```

250

```
 1      African-American as a nigg, N-I-G-G?
 2   A.  No.
 3   Q.  Okay.  Were you ever aware of anyone at Black
 4      Angus Meat referring to African-Americans as
 5      niggs?
 6   A.  No.
 7   Q.  Were you ever aware of anyone at Black Angus Meat
 8      referring to African-American clients as Bob's
 9      niggs?
10   A.  No.
11   Q.  Did you ever ask anyone up to this date if they
12      ever referred to African-American customers as
13      Bob's niggs -- Bob's niggs?
14   A.  Never asked anyone.
15   Q.  Did you ever ask anyone at Black Angus Meat if
16      the term nigger was used at work while Darcy
17      Black was employed there?
18   A.  Ask me the question again.
19   MS. GRECO:  Can you read it.
20        (Whereupon, the above-requested question was
21      then read back by the reporter.)
22   THE WITNESS:  The word was never used there.
23   BY MS. GRECO:
```

254

```
 1      and get food stamps?
 2  A.  Did I ever hear that?
 3  Q.  Did you ever learn that?
 4  A.  No.
 5  Q.  Did you ever learn that Sean Round and/or Jamie
 6      Lapress said relative to African-American
 7      customers how can they have nice clothes and get
 8      food stamps?
 9  A.  No.
10  Q.  Would you -- if that was said would that be
11      inappropriate?
12  A.  Yes.
13  Q.  The statements that I've gone through with you,
14      the ones that you said were offensive or
15      inappropriate at work, would they be grounds for
16      termination at work if they were said in the
17      workplace by an employee?
18  A.  I believe I would, yes.
19  Q.  Okay.  Did you ever tell anyone that -- this is
20      in the workplace, you can talk about the weather
21      and sports, this is no soap opera, leave your
22      personal dramas at home, in those words or
23      similar words?
```

255

1   A.   Yes.

2   Q.   Okay.  And is that something that you've said

3        from the time you began employment -- strike

4        that.  Is that something you've began from the

5        time you began to own the business, continuing to

6        the present?

7   A.   Yes.

8   Q.   And how often would you say that on an annual

9        basis would you say, if you would say it on an

10       annual basis?

11  MR. OPPENHEIMER:  Form.

12  THE WITNESS:  Certainly on all new hires.  And repeat

13       it to employees that maybe got -- didn't get the

14       message when I tried to explain to them that keep

15       their conversation light, sports and weather.

16       I've repeated it, I'm sure told somebody more

17       than once.

18  BY MS. GRECO:

19  Q.   Did you ever say it to groups of people?

20  A.   I don't know.

21  Q.   Okay.  With regard to Thomas Howells -- well,

22       strike that.  During the time that Darcy Black

23       was employed at Black Angus Meat, did Black Angus

324

```
 1    Q.  Did you ever tell Darcy Black that you were
 2        uncomfortable with the situation -- well, did you
 3        -- did this ever occur -- strike that.  Did Darcy
 4        Black say to you that she was uncomfortable
 5        working around Jamie because of his comments?
 6    A.  No.
 7    Q.  Did you say to her that you were uncomfortable
 8        with the situation and she could leave right now?
 9    A.  No.
10    Q.  Would you agree with me if you made that
11        statement that that would be inappropriate as an
12        employer and retaliatory?
13    A.  Yes.
14    MR. OPPENHEIMER:  Form.
15    BY MS. GRECO:
16    Q.  And is it fair to say, sitting here, that what
17        you did or what Keegan Roberts and you did was
18        decide that you liked Jamie Lapress better, is
19        that why?  You said Jamie Lapress was a long-time
20        employee.  Wasn't Darcy Black?
21    A.  I was basing my assumption -- Darcy was a
22        five-year employee we had a lot of time invested
23        in.  She was a valuable employee and made a
```