**EX. 6**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

--------------------------------------------------

DARCY M. BLACK,

                              Plaintiff,

     -vs-


BUFFALO MEAT SERVICE, INC., doing business
as BOULEVARD BLACK ANGUS, also known as
BLACK ANGUS MEATS, also known as
BLACK ANGUS MEATS & SEAFOOD,
ROBERT SEIBERT,
DIANE SEIBERT,
KEEGAN ROBERTS,

                              Defendants.
--------------------------------------------------
                              Examination Before Trial of

KEEGAN ROBERTS, Defendant, taken pursuant to the Federal

Rules of Civil Procedure, in the law offices of GRECO

TRAPP, PLLC, 1700 Rand Building, 14 Lafayette Square,

Buffalo, New York, taken on January 12, 2018, commencing at

9:31 A.M., before MARY ANN MORETTA, Notary Public.

51

1      see that is for period ending 1/9/2005?  Do you

2      see that?

3  A.  Which exhibit are we talking about?

4  Q.  The one in front of you.

5  A.  177?

6  Q.  Yes.  See, on the top it says pay period

7      ending --

8  MR. OPPENHEIMER:  It doesn't say pay period ending.

9  BY MS. GRECO:

10 Q.  The last date of the pay period is 1/9/2005.

11     Okay?

12 A.  Yes.

13 Q.  I'll be using the terms pay period ending to

14     reflect the last day of the pay period.

15 MR. OPPENHEIMER:  What will you be referring to to

16     indicate what the last day of the pay period was?

17 MS. GRECO:  The last day of the pay period.

18 MR. OPPENHEIMER:  On the line that says pay period?

19 MS. GRECO:  Yes.

20 MR. OPPENHEIMER:  Okay.

21 BY MS. GRECO:

22 Q.  So look now at Exhibit 178.  For the record, this

23     is a payroll pre-check writing report for the pay

52

1    period ending -- first page is 5/29/2005 and the
2    second page is for the pay period ending
3    6/12/2005.  Do you see that?
4  A.  Yes.
5  Q.  Okay.  And for the pay period ending 5/29/2005,
6    it indicates you worked eighteen point two five
7    hours and earned one hundred fifty-five dollars
8    and thirteen cents, which is eight dollars and
9    fifty cents an hour, assume.
10 A.  Okay.  Yes.
11 Q.  Okay.  On the next page, which is a pay period
12    ending 6/12/2005, you worked forty hours and made
13    six hundred dollars.
14 A.  Yes.
15 Q.  Do you see that?  And do you recognize that as
16    being an hourly rate of fifteen dollars an hour?
17 A.  Yes.
18 Q.  Okay.  Can you tell me what occurred between the
19    pay period ending 5/29/2005 and the pay period
20    ending 6/12/2005?
21 MR. OPPENHEIMER:  Form.
22 BY MS. GRECO:
23 Q.  Relative to your increase in pay rate?

53

1   A.   I went from hourly to salary.

2   Q.   So in 2005 you were a salaried employee?

3   A.   It appears to be so.

4   Q.   Well, do you recall if in 2005 you were a

5        salaried employee?

6   A.   I don't recall which year I started salary.

7   Q.   Okay.  Let me now help you out here.  So as a

8        salaried employee, would you have received

9        overtime?

10  MR. OPPENHEIMER:  Form.

11  THE WITNESS:  No.

12  BY MS. GRECO:

13  Q.   Okay.  Let me refer you to Exhibit 179, which,

14       for the record, is a W-2 report for the year

15       2005, which for Keegan Roberts indicates he made

16       wages, tips and other compensation of

17       twenty-three thousand one hundred eighty-two

18       dollars and fifty-eight cents.

19  A.   Yes.

20  Q.   Is that accurate?

21  A.   Yes.

22  Q.   Did you earn any compensation that is not

23       reflected in this W-2?

70

1     know, do they have a drive to work, what can they

2     add to our company, do they want to work, can you

3     get to work.

4 Q.  After you had that training, did you start being

5     involved in the hiring process directly?

6 A.  Yes.

7 Q.  And how would individuals know that there was a

8     potential for employment at the Black Angus Meat?

9 A.  We put a sign in the front door or through word

10    of mouth.

11 Q.  Okay.  When there was a sign in the front door,

12    would individuals come in and fill out an

13    application?

14 A.  Yes.

15 Q.  Then what would happen during the time you were

16    involved in the hiring process?

17 A.  Take the applications, read the applications,

18    decide who we wanted to interview, talk to them.

19 Q.  Would you read the application while the

20    individual was at the store?

21 A.  If we were there, if we had time available.  Not

22    necessarily always.

23 Q.  And if you weren't available -- if you were

71

```
 1        available, what would you do?
 2   A.   If we were available and had time, we would take
 3        the application, read the application, probably
 4        give -- bring them into the office to talk to
 5        them if we weren't busy.
 6   Q.   Okay.  And would you bring all applicants in?
 7   A.   No.
 8   Q.   And how would you determine who you were going to
 9        bring in the office for an interview and who you
10        weren't?
11   A.   Read the application, see if they looked on the
12        application like they fit our criteria.
13   Q.   Okay.  Would you look outside the window of the
14        office to see what the person looked like, to see
15        if they were clean cut?
16   A.   I wouldn't.  Most of the time I would be around
17        the store, not in the office.
18   Q.   So is it fair to say you did not do the lion's
19        share of the interview process, hiring process?
20   MR. OPPENHEIMER:  Form.
21   THE WITNESS:  I did some.  I didn't do all.
22   BY MS. GRECO:
23   Q.   Okay.  Who did most of the hiring after you were
```

72

```
1      trained?

2   A.  Me or Diane split it.  I think Diane talked to

3       more people than I did.

4   Q.  So were you over there -- did you ever do

5       interviews with Diane -- strike that.

6   A.  Yes.

7   Q.  If Diane was there and an applicant filled out an

8       application --

9   A.  Uh-huh.

10  Q.  -- would the application then be brought back to

11      Diane?

12  MR. OPPENHEIMER:  Form.

13  BY MS. GRECO:

14  Q.  If she was in her office?

15  A.  If she was in her office?

16  Q.  Yes.

17  A.  Yes.

18  Q.  Okay.  And then would Diane call you or would she

19      do it on her own?

20  MR. OPPENHEIMER:  Form.

21  THE WITNESS:  Could be either.

22  BY MS. GRECO:

23  Q.  Okay.  So she could interview the person herself
```

73

```
 1      then?
 2  A.  She is fully capable, yes.
 3  Q.  No.  Does she have the authority to do it, she
 4      can do it on her own?
 5  A.  Yes.
 6  Q.  It's not a trick question.  You say you both
 7      always do it.  Do you do it separately?  If Diane
 8      wasn't there and you were there and you were in
 9      the office and someone came in, you could take
10      the application?
11  A.  Yes.
12  Q.  All right.  So independently, either one of you
13      could do this?
14  A.  Yes.
15  Q.  It was both your job responsibility and her job
16      responsibility?
17  A.  Yes.
18  Q.  Okay.  Was it Robert Seibert's job
19      responsibility?
20  MR. OPPENHEIMER:  Form.
21  BY MS. GRECO:
22  Q.  After you were trained?
23  MR. OPPENHEIMER:  Form.  What?
```

106

```
 1      find out if Black Angus Meat, if they have a
 2      policy regarding discipline.  You said if there's
 3      a problem, take care of it.
 4   MR. OPPENHEIMER:  The witness asked you to define the
 5      term.  You gave him permission if he didn't
 6      understand the question.  Maybe you can use a
 7      different word or word it differently, counsel.
 8   BY MS. GRECO:
 9   Q.  Okay.  Is there any policy or practices as to
10      what would happen if an employee violates a work
11      rule -- strike that.  Are there any work rules at
12      Black Angus Meat?
13   A.  Yes.
14   Q.  Okay.  What are the work rules at Black Angus
15      Meat?
16   A.  Show up to work, do your job, stay safe, go home
17      at the end of the day.
18   Q.  Okay.  Does show up mean be on time?
19   A.  Employees are expected to be on time.
20   Q.  Okay.  Is there anything over the time clock
21      where the employees complete their time cards
22      relative to an expectation that employees should
23      be on time?
```

111

```
 1   THE WITNESS:  Yes.  We have had employees that are
 2       late.
 3   BY MS. GRECO:
 4   Q.  My question was consistently late, not just late
 5       once or twice, but consistently.
 6   MR. OPPENHEIMER:  Form.
 7   THE WITNESS:  Yes.  We have had employees that have a
 8       hard time getting to work on time.
 9   BY MS. GRECO:
10   Q.  Okay.  And can you give me the names of those
11       employees?
12   A.  Jamie Lapress, Mark Leible.  Those are the two
13       that stick out in my head.
14   Q.  Okay.  And have you spoken to Jamie Lapress about
15       being late for work and failing to call in?
16   A.  Yes.
17   Q.  And on how many occasions have you spoken to him
18       about it?
19   A.  Many.
20   Q.  Mr. Lapress testified already.  Were you aware of
21       that?
22   A.  Yes.
23   Q.  Were you here during his testimony?
```

112

1   A.   No.

2   Q.   Were you aware that he testified that you spoke

3        to him at least seventy times regarding his

4        failure to be to work on time?

5   A.   Could you repeat the question?

6             (Whereupon, the above-requested question was

7        then read back by the reporter.)

8   THE WITNESS:   I am now.

9   BY MS. GRECO:

10  Q.   Did you ever consider firing him for failure to

11       follow your instructions?

12  MR. OPPENHEIMER:   Form.

13  THE WITNESS:   Seventy times over seventeen years, no.

14  BY MS. GRECO:

15  Q.   He didn't testify that's how many times he was

16       late, that's how many you reprimanded him.  How

17       many times --

18  MR. OPPENHEIMER:   Counsel, you are making faces at

19       the witness.   Please stop it.

20  MS. GRECO:   He's not even looking at me.   He's

21       sideways.

22  MR. OPPENHEIMER:   I'm entitled to make my record.

23       Don't make faces.

113

1    MS. GRECO:  I'm entitled to say he's been sideways
2        since he's been here.  If you think I'm making
3        faces -- he's looking the other way.
4    BY MS. GRECO:
5    Q.  Would you agree with me that Mr. Lapress is
6        regularly -- in the course of his employment, has
7        been regularly late for work?
8    MR. OPPENHEIMER:  Form.
9    BY MS. GRECO:
10   Q.  You can answer.
11   A.  Mr. Lapress has been late quite often.
12   Q.  Okay.  And so my question to you, when you
13       assumed a management role -- I'm not talking
14       about when you had no authority.  When you
15       assumed a management role, which assume -- strike
16       that.  Did you ever reprimand him before you had
17       a management role at Black Angus Meat?
18   MR. OPPENHEIMER:  Form.
19   THE WITNESS:  Don't believe so.
20   BY MS. GRECO:
21   Q.  Okay.  So he testified that you spoke to him
22       about it at least seventy times.  So from the
23       time when you were in a management position until

114

1       the present is approximately how many years?

2   A.  Don't know.

3   Q.  Less than seventeen years?

4   A.  Yes.

5   Q.  Less than ten years?

6   A.  Probably right around there.

7   Q.  Okay.  So if you spoke to him about it at least

8       seventy times in seven years, that would be ten

9       times a year, on average --

10  A.  Correct.

11  Q.  -- is that true?

12          So that's when he was spoken to.  Do you

13      consider that a problem?

14  MR. OPPENHEIMER:  Form.

15  THE WITNESS:  Do I consider what a problem?

16  BY MS. GRECO:

17  Q.  That you had to speak to him approximately, in

18      ten years, seventy times relative to his failure

19      to follow the work rule, being to work on time?

20  A.  Yes.

21  Q.  Okay.  And what, if any, action was taken against

22      him?

23  A.  He was verbally reprimanded and told to be on

115

1      time.

2   Q.  Was he ever written up?

3   A.  No.

4   Q.  Was he ever given a warning that he would lose

5      his job if he didn't come to work on time?

6   A.  No.

7   Q.  Did you ever wonder what the reason was why he

8      could not get to work on time?

9   A.  Because he used to work third shift.

10  Q.  What's third shift?

11  A.  Late night.

12  Q.  At your company?

13  A.  Not at my company.  He's used to that lifestyle

14     and staying up.

15  Q.  Where did he work third shift?

16  A.  Don't recall.

17  Q.  Did he work third shift while he was employed at

18     Black Angus Meat?

19  A.  Don't believe so.

20  Q.  And before he began work at Black Angus Meat,

21     where do you believe he worked third shift?

22  A.  Don't know.

23  Q.  Did he ever tell you that's the reason, because

116

1      he worked third shift somewhere at some point

2      during his employment history before Black Angus

3      Meat?

4   A.   I'm sure he did.

5   Q.   Do you think in seventeen years he should have

6      been able to adjust his schedule to get to work

7      on time?

8   MR. OPPENHEIMER:   Form.

9   BY MS. GRECO:

10  Q.   You can answer.

11  A.   I'm not happy when he's late.

12  Q.   Do you have the authority to fire him?

13  MR. OPPENHEIMER:   Form.   When?

14  BY MS. GRECO:

15  Q.   Since you held your management position, have you

16     had the authority to fire him?

17  A.   Yes.

18  Q.   So it's fair to say you chose not to do so,

19     right?

20  A.   Yes.

21  Q.   Have you given him raises despite the fact that

22     he's constantly late to work?

23  MR. OPPENHEIMER:   Form.

117

1   BY MS. GRECO:

2   Q.  You can answer.

3   A.  Yes.

4   Q.  Did you ever consider that perhaps his use of

5       drugs affects his ability to be to work on time?

6   MR. OPPENHEIMER:  Form.

7   BY MS. GRECO:

8   Q.  You can answer.

9   A.  No.

10  Q.  Do you know if he smokes marijuana?

11  A.  No.

12  Q.  Did you ever ask him if he smokes marijuana?

13  A.  No.

14  Q.  Did you ever joke about the fact that he smokes

15      marijuana at work?

16  A.  No.

17  Q.  Did you ever ask him if he smokes marijuana?

18  MR. OPPENHEIMER:  Form.  You just asked him that.

19  THE WITNESS:  You asked that.

20  BY MS. GRECO:

21  Q.  After this lawsuit was initiated and you were an

22      owner of the company and you learned that Miss

23      Black contends he used marijuana while at work,

118

```
 1      did you ever -- since he's a continuing employee,

 2      did you ever ask him about it?

 3  MR. OPPENHEIMER:  Form.

 4  THE WITNESS:  No.

 5  BY MS. GRECO:

 6  Q.  Did it concern you at all in light of the fact

 7      that Miss Black alleged that he used marijuana at

 8      work and his continued inability to arrive to

 9      work on time?

10  A.  No.

11  Q.  Okay.  I asked you which employees were

12      consistently late.  You also said Mark Leible.

13      Can you tell me, have you spoken to him regarding

14      his being consistently late --

15  MR. OPPENHEIMER:  Form.

16  BY MS. GRECO:

17  Q.  -- for work?

18  A.  Yes.

19  Q.  And how often is he late for work?

20  MR. OPPENHEIMER:  Form.

21  THE WITNESS:  Once a month.

22  BY MS. GRECO:

23  Q.  Has that been a consistent problem throughout his
```

119

```
 1      employment?
 2  MR. OPPENHEIMER:  Form.
 3  THE WITNESS:  Yes.
 4  BY MS. GRECO:
 5  Q.  Do you know -- do you recall a time when Darcy
 6      Black was partnered with Mark Leible in the pack
 7      room?
 8  A.  Darcy and Mark worked in the pack room at the
 9      same time, yes.
10  Q.  Okay.  And then they also worked at the same
11      table?
12  A.  At times.
13  Q.  Okay.  And it would be fair to say if she was
14      working with him and he arrived late, that that
15      could impact her ability to -- strike that.  If
16      an individual arrives late and they are packing
17      containers, boxes or whatever to be part of
18      deliveries, could that impact the timeliness of
19      the packages being ready for delivery?
20  A.  Yes.
21  Q.  And when Mark Leible would be late for work,
22      what, if anything, would you do?
23  A.  I would speak to him, talk to him and tell him he
```

120

1       needs to get to work on time.  We can't have

2       this.

3   Q.  Did you ever feel as though he was ignoring you?

4   A.  No.

5   Q.  I'm sorry?

6   A.  No.

7   Q.  So you believe he received the message that he

8       needed to be to work on time?

9   A.  Yes.

10  Q.  And then intentionally did not arrive on time?

11  MR. OPPENHEIMER:  Form.

12  BY MS. GRECO:

13  Q.  You can answer.

14  A.  No.  He would be on time for a while and then he

15      would be late.  Then I would speak to him, then

16      he would be on time again.

17  Q.  And the cycle would continue?

18  MR. OPPENHEIMER:  Form.

19  BY MS. GRECO:

20  Q.  You can answer.

21  A.  Yes.

22  Q.  It continues to date, right?

23  MR. OPPENHEIMER:  Form.  What's the it?

121

 1  BY MS. GRECO:

 2  Q.  His being consistently late for work.

 3  MR. OPPENHEIMER:  Form.

 4  THE WITNESS:  No.  It's gotten better.

 5  BY MS. GRECO:

 6  Q.  But he's still late compared to other employees?

 7  MR. OPPENHEIMER:  Form.

 8  THE WITNESS:  No.  I mean, I have employees that are

 9      late all the time.  I speak to employees all the

10      time and tell them.

11  BY MS. GRECO:

12  Q.  I asked you originally --

13  MR. OPPENHEIMER:  He wasn't finished with his answer.

14  BY MS. GRECO:

15  Q.  I'm sorry.  Go ahead.

16  A.  I've spoken to all employees in a group and told

17      them we need to be on time to make this function

18      efficiently.

19  Q.  When I asked you, do you have employees that are

20      consistently late, you named two names --

21  A.  Uh-huh.

22  Q.  -- Jamie Lapress and Mark Leible.

23  A.  Uh-huh.

122

1   Q.  Now we're talking about Mark Leible.  What I'm

2       asking is, did you have tell Mark Leible that if

3       he did not consistently come to work on time, he

4       would be terminated?

5   A.  No.

6   Q.  Did you consider his failure to be to work on

7       time a violation of a work rule?

8   A.  Yeah.

9   Q.  Do you know if Robert Seibert ever spoke to Mark

10      Leible about him failing to come to work on time?

11  A.  I don't know.

12  Q.  Did you ever speak to Robert Seibert about Mr.

13      Leible's failure to be to work on time?

14  A.  Don't recall.

15  Q.  Would that be something that would be discussed

16      if you were involved in a review of an employee's

17      performance --

18  MR. OPPENHEIMER:  Form.

19  BY MS. GRECO:

20  Q.  -- relative to a potential pay raise?

21  MR. OPPENHEIMER:  Form.

22  THE WITNESS:  Yes.

23  BY MS. GRECO:

125

1      inability to get to work on time was related to

2      his potential use of drugs such as marijuana?

3  A.  No.

4  Q.  At Black Angus Meat, is there a policy relative

5      to raises?

6  MR. OPPENHEIMER:  Form.

7  THE WITNESS:  They were merit based.

8  BY MS. GRECO:

9  Q.  What do you mean by merit based?

10  A.  Learn more, do more, do better, increase your

11      ability to add value to the store.

12  Q.  And would you agree with me that being late for

13      work -- strike that.  Would you agree with me

14      that after being told you are to be on time for

15      work because of your problems with arriving on

16      time to work, that the individual would not be

17      doing better?

18  MR. OPPENHEIMER:  Form.

19  THE WITNESS:  The individual always got their job

20      done.

21  BY MS. GRECO:

22  Q.  Well, if the person is not there to pack and

23      packing has to get done --

175

1    A.   You were asking --

2    MR. OPPENHEIMER:   There's no question.

3    BY MS. GRECO:

4    Q.   If you could be specific because I don't

5         understand what you are saying.   I'm asking

6         you -- let me make a better question.

7             On or about January 2011, did you believe

8         that Darcy Black had unauthorized access to

9         employee files in the Black Angus Meat office?

10   A.   No.

11   Q.   Okay.   When Darcy Black filed her charge of

12        discrimination and it was sent to Black Angus

13        Meat by the EEOC, did you read it?

14   A.   I believe so, yes.

15   Q.   Did you participate in preparing its response?

16   MR. OPPENHEIMER:   Form.

17   THE WITNESS:   I was asked questions.

18   BY MS. GRECO:

19   Q.   Okay.   And did you assist in writing a letter to

20        the EEOC --

21   MR. OPPENHEIMER:   Form.

22   BY MS. GRECO:

23   Q.   -- that was signed by Robert Seibert and Diane

1       Seibert dated on or about January 29th, 2011?

2   A.   I was asked questions.

3   Q.   I'm not interested in now.  I'm interested in

4        back then.  Did you read the letter that was

5        signed by Diane Seibert and Robert Seibert dated

6        approximately -- dated January 29th, 2011 to Miss

7        Sanchez at the EEOC before it was sent?

8   A.   I don't recall.

9   Q.   Would you supply -- strike that.  You said you

10       answered questions to them.

11  A.   Uh-huh.

12  Q.   You have to say yes or no.

13  A.   Yes.

14  Q.   Were you truthful and honest when you answered

15       those questions?

16  A.   Yes.

17  Q.   Have you had an opportunity to read that letter

18       since January 29th, 2011?

19  A.   Yes.

20  MR. OPPENHEIMER:  Form.

21  BY MS. GRECO:

22  Q.   When did you first read it after that date --

23       strike that.  When did you first recall reading

177

```
 1      it?
 2  A.  First recall reading it?
 3  Q.  Yes.
 4  A.  When we met with lawyers from Damon, Morey.
 5  Q.  You don't have to say what happened.  Was that
 6      counsel?
 7  A.  Counsel.
 8  Q.  That was after January 29th, 2011?
 9  A.  Don't recall.
10  Q.  What I'm trying to find out is, do you know if
11      that letter was written before or after counsel
12      was retained, if you know?
13  A.  I don't know.
14  Q.  What I'm trying to find out is, when you and the
15      Seiberts received the charge of discrimination
16      from the EEOC --
17  A.  Uh-huh.
18  Q.  -- did you sit down together and create a
19      response --
20  MR. OPPENHEIMER:  Form.
21  BY MS. GRECO:
22  Q.  -- without the assistance of counsel?
23  A.  Yes.
```

185

1   A.   No.

2   Q.   Did Robert Seibert ever tell you that he was

3        aware that Jamie Lapress would joke about Darcy

4        Black's children not because they were black but

5        because they were always in trouble?

6   A.   No.

7   Q.   Did Diane Seibert ever tell you that she learned

8        or was aware that Jamie Lapress would joke about

9        Darcy Black's kids not because they were black

10       but because they were always in trouble?

11  A.   No.

12  Q.   Would it ever be appropriate for Jamie Lapress to

13       make jokes relative to Darcy Black's children in

14       the workplace?

15  A.   No.

16  Q.   Would you want someone to make jokes about your

17       children?

18  MR. OPPENHEIMER:   Come on, counsel.

19  MS. GRECO:   I have every right to ask this and you

20       know the basis.   Go ahead.

21  THE WITNESS:   No.

22  BY MS. GRECO:

23  Q.   Did Debbie Negrych ever tell you that she learned

200

1    Q.   Well, is it fair to say that Jamie never told you

2         he asked Darcy if she could break into the paper

3         towel dispenser?

4    A.   Jamie asked (sic) me if anyone could break into

5         the paper towel dispenser.

6    Q.   Did he tell you he was standing right next to

7         Darcy?

8    A.   He told me he was near the wrapping table.

9    Q.   I'm asking, did he ever say he was standing right

10        next to Darcy, he directed his question to her?

11   A.   No, he did not tell me that.

12   Q.   Did he ever tell you that he asked Darcy to break

13        into it because -- did Mr. Lapress ever tell you

14        that he asked Darcy Black for assistance because

15        she is larger than he is and he thought she might

16        be able to push on it and get it open or assist

17        him in some manner?

18   A.   He did make a comment like that, yes, he did.

19   Q.   What did he say?

20   A.   He said -- all right.  So what Jamie told me was

21        that he was in the deli, noticed that there was

22        no paper towels.  He went back to find the key,

23        couldn't find the key.  So he came up by the

201

1       wrapping tables and said can anyone break into

2       the paper towel dispenser.  At that point, he

3       said -- told me that Darcy said to him why,

4       because my kids are black.  Which he responded

5       no.  He said I thought you could help me break

6       into them.  That's the story that Jamie told me.

7  Q.   Now, in his testimony Mr. Lapress here -- were

8       you here during his testimony?

9  A.   No.

10 Q.   Mr. Lapress denied that he ever asked for her

11      assistance because she is larger than he is and

12      he thought she might be able to push on it or get

13      it open or assist him in some manner.  Are you

14      sure he told you that?

15 A.   That's what Jamie told me.

16 Q.   Would you be concerned if he said he didn't tell

17      that to you?

18 MR. OPPENHEIMER:  Objection.

19 MS. GRECO:  The testimony is the testimony.  I'm not

20      saying something he didn't testify to.

21 MR. OPPENHEIMER:  You are arguing with the witness.

22 BY MS. GRECO:

23 Q.   Now that he's testifying under oath and you are

213

```
1    MR. OPPENHEIMER:  Form.

2    THE WITNESS:  Yes.

3    BY MS. GRECO:

4    Q.  Okay.  And did you pack next to Mr. Frase?

5    A.  No.

6    Q.  Do you know who Mr. Frase is?

7    A.  Yes.

8    Q.  Is he a personal friend of yours?

9    A.  We work together.

10   Q.  Before he started working at Black Angus Meat,

11       did you ever work with Mr. Frase?

12   A.  Don't recall.

13   Q.  So did you know him before he worked at Black

14       Angus Meat?

15   A.  Don't know.

16   Q.  Did you have any recollection when you first met

17       him?

18   A.  No.

19   Q.  Do you know his mother, Grace Frase?

20   A.  No.

21   Q.  Was he working at Black Angus Meat when she died?

22   A.  Don't know.

23   Q.  Did you go to her wake?
```

232

1      about her boyfriend using her for a good credit

2      score and other things?

3   A.  No.  I was aware there was a fight between Sean

4      Round and Raelean Rush.

5   Q.  Do you believe Sean Round made a comment to

6      Raelean Rush about her boyfriend using her for a

7      good credit score?

8   A.  No.

9   Q.  Why don't you believe it?

10  A.  Because we don't do that.  You know, the best man

11     in his wedding was an African-American.  I'm sure

12     Keshawn has got just a fine credit score.

13  Q.  If -- would there be any reason for Robert

14     Seibert or Diane Seibert to state to the EEOC

15     that they were aware that Sean did make a comment

16     to Raelean about her boyfriend using her for her

17     good credit score and other things --

18  MR. OPPENHEIMER:  Objection.

19  BY MS. GRECO:

20  Q.  -- if it wasn't true?

21          Can you repeat it.

22          (Whereupon, the above-requested question was

23     then read back by the reporter.)

234

1    you and Raelean last night, what happened?  He

2    said it was nothing, it was stupid.  He said I'm

3    -- you know, I'm -- I probably shouldn't have

4    started a fight with her.  I said what happened?

5    He said it was really nothing, it was stupid.  I

6    said so you started a fight with her.  She's

7    telling me it's nothing, I said, but you

8    instigated a problem with another employee.  I

9    said we can't have that, we need to work together

10    here.  I said also you started a fight up front

11    in front of my customers and I have to hear it

12    from another employee about this.  I said it's

13    unacceptable.  I said I want you to apologize to

14    Raelean and I don't want this to ever happen

15    again.  That was the end of it.

16  Q.  Did you ever learn what the conversation was

17    about?

18  A.  Nope.

19  Q.  Did you ever tell anyone that the conversation

20    was inappropriate for the workplace?

21  MR. OPPENHEIMER:  Form.  Asked and answered.

22  BY MS. GRECO:

23  Q.  You can answer.

262

1    MR. OPPENHEIMER:  Form.

2    THE WITNESS:  No.

3    BY MS. GRECO:

4    Q.  So if I told you that Darcy Black's indicated he

5        was there on a regular basis during deer season

6        and in the winter, would you say she is lying?

7    MR. OPPENHEIMER:  Form.

8    THE WITNESS:  Yes.

9    BY MS. GRECO:

10   Q.  Do you know, when you were in the pack room, what

11       individuals would you have worked with between

12       2005 and 2010?

13   A.  Darcy, Sean, Mark, Jamie, Matt.  That's about it.

14   Q.  Did you work with William Frase?

15   A.  He worked in the building.

16   Q.  Would he ever work at the pack table?

17   A.  No.

18   Q.  How about Taylor Kunzelman, did you work with him

19       at the pack table?

20   A.  Yeah.

21   Q.  Would you work with Matt Marshall?

22   A.  Yes.  I already said Matt.

23   Q.  You meant Matt Marshall.  Did you work with Rob

284

1    A.   No.

2    Q.   Jap?

3    A.   No.

4    Q.   Did you ever hear or learn that Sean Round told

5         Raelean Rush and/or Regina Rush that she would be

6         better off with a white guy?

7    A.   In Darcy's complaint.

8    Q.   Okay.  Other than in a legal document in this

9         action, meaning when you got -- if Darcy

10        complained to you or somebody complained to you

11        at work, I want you to tell me about it.  But if

12        you learned about it when you received the charge

13        of discrimination from the EEOC, then I don't

14        want to know.  I want to know if you learned

15        about it in the normal course of your business

16        prior to the time Darcy Black left employment at

17        Black Angus Meat.  Fair enough?

18   A.   Fair enough.

19   Q.   Would it ever be appropriate for a white male

20        employee to tell a white female employee who was

21        dating an African-American male that she would be

22        better off with a white guy?

23   A.   No.

285

1   Q.   Would that be discriminatory?

2   A.   Yeah.

3   Q.   Would that be offensive?

4   A.   Yes.

5   Q.   Would it ever be appropriate for a white male

6        employee to tell a white female employee who was

7        dating an African-American man that she needs to

8        be with one of her own kind?

9   A.   Can you repeat the question?

10  Q.   Would it ever be appropriate for a white female

11       employee -- strike that.  Would it ever be

12       appropriate for a male white employee to tell a

13       female white employee who is dating a

14       African-American male that she needs to be with

15       one of her own kind?

16  A.   No.

17  Q.   Would that be offensive?

18  A.   Absolutely.

19  Q.   Would that be discriminatory?

20  A.   Yes.

21  Q.   Did you ever hear or learn that Sean Round told

22       Raelean Rush and/or Regina Rush that she needs to

23       be with one of her own kind?

286

1   A.   No.

2   Q.   Did you ever become aware that Raelean Rush was

3        dating an African-American male?

4   A.   Yes.

5   Q.   How did you become aware of that?

6   A.   I met him.

7   Q.   When did you first meet him?

8   A.   Don't know.

9   Q.   Was it before May of 2005?

10  A.   Yes.

11  Q.   Okay.  And did you become aware Regina Rush was

12       dating an African-American male?

13  A.   Yes.

14  Q.   How did you become aware of that?

15  A.   Don't know.

16  Q.   Okay.  Did you ever double date with Regina Rush

17       and her boyfriend?

18  A.   No.

19  Q.   Did you ever learn that Sean -- ever hear Sean

20       Round say or learn that he said that Regina --

21       Raelean Rush and/or Regina Rush -- strike that.

22       Did you ever hear Sean Round tell or learn that

23       he told Raelean Rush or Regina Rush, who were

287

```
 1      dating African-American males, what's wrong with
 2      white guys?
 3  A.  No.
 4  Q.  Would that be discriminatory?
 5  A.  Yes.
 6  Q.  Would that be offensive?
 7  A.  Yes.
 8  Q.  Okay.  Did you ever learn or did you ever hear
 9      Sean Round tell Raelean Rush or Regina Rush that
10      her boyfriend was using her for her good credit
11      score?
12  A.  No.
13  Q.  Would that be offensive?
14  A.  Yes.
15  Q.  Would that be discrimination?
16  A.  If you are using somebody for their credit score?
17  Q.  Well, it would be a white male telling a white
18      female who is dating an African-American male
19      that her boyfriend was using her for her good
20      credit score.
21  A.  Yeah.
22  Q.  Would that be offensive?
23  A.  Yes.
```

1    Q.   Would that be discriminatory?

2    A.   Yes.

3    Q.   Did you ever hear or learn that Sean Round told

4         Raelean Rush or Regina Rush that her boyfriend,

5         who was African-American, was using her for her

6         name and black men always cheat and hers probably

7         has a lot of girlfriends?

8    A.   No.

9    Q.   Would that be offensive?

10   A.   Yes.

11   Q.   Would that be derogatory?

12   A.   Yes.

13   Q.   Would a statement by Sean Round to Raelean and/or

14        Regina Rush for any of those we just went over,

15        would those be grounds for termination?

16   A.   Yes.

17   Q.   Did anyone ever say -- strike that.  Did you ever

18        learn or hear Sean Round or Jamie Lapress say,

19        relative to African-Americans, how can they have

20        nice cars and get food stamps?

21   A.   No.

22   Q.   Would that be derogatory?

23   A.   Yes.

289

1   Q.  Would that be discriminatory?

2   A.  Yeah.

3   Q.  Did you ever learn or hear Sean Round and/or

4      Jamie Lapress say, relative to African-American

5      customers, how could they have nice clothes and

6      get food stamps?

7   A.  No.

8   Q.  Did you ever -- would that be offensive?

9   A.  Yes.

10   Q.  Would it be discriminatory?

11   A.  Sure.

12   Q.  Did you ever hear Robert Seibert tell Jamie

13      Lapress to say hi to his -- to say -- did you

14      ever hear Robert Seibert tell Jamie Lapress that

15      his, meaning Robert Seibert's, nigs were dirtying

16      up the parking lot?

17   A.  No.

18   Q.  Would that be offensive?

19   A.  Yes.

20   Q.  Would it be discriminatory?

21   A.  Yes.

22   Q.  Did you ever learn that Robert Seibert called

23      Jamie Lapress and told him that his, meaning

290

```
 1      Robert Seibert's nigs, were dirtying up the

 2      parking lot?

 3  A.  No.

 4  Q.  Would that be offensive?

 5  A.  Yes.

 6  Q.  Would that be discriminatory?

 7  A.  Yes.

 8  Q.  Was Jamie Lapress responsible for maintaining the

 9      parking lot?

10  MR. OPPENHEIMER:   Form.

11  BY MS. GRECO:

12  Q.  During the time Darcy Black was employed there?

13  A.  Yeah.

14  Q.  If Robert Seibert wanted something cleaned off

15      the parking lot, would Jamie Lapress be the

16      appropriate person for him to call?

17  A.  He would usually call me, tell me to send Jamie

18      out to pick up the garbage.

19  Q.  If you weren't there, could he call Jamie Lapress

20      directly?

21  A.  I would be just guessing.

22  Q.  I'm saying, is that something that he would

23      normally do, call someone directly?
```

1   A.   He would call the store.

2   Q.   He could ask to speak to whoever he wanted, true?

3   A.   True.

4   Q.   Did you ever hear Nicole Seibert say with regard

5        to a large black customer or customers who had

6        food stamps and was purchasing filet mignon or

7        strip steak, or something of that nature, that

8        why couldn't the individuals get out and work?

9   A.   No.

10  Q.   Would that be offensive?

11  A.   Yeah.

12  Q.   Would it be derogatory?

13  A.   Yeah.

14  Q.   Would it be discriminatory?

15  A.   Yeah.

16  Q.   Did you ever hear Robert Seibert say you can talk

17       about the weather and sports, this is not a soap

18       opera, leave your personal dramas at home?

19  A.   Yes.

20  Q.   And did you hear him say that when you first

21       started working at Black Angus Meat?

22  A.   He always said that.

23  Q.   That's what I'm trying to figure out.  Did you

295

1        saying -- Bob Seibert telling Darcy Black she
2        would have to get used to the idea her children
3        were black, there was no changing that, school
4        kids are cruel and racial remarks from kids are
5        not unusual?
6   A.   No.
7   Q.   You don't think that's discriminatory?
8   A.   No.
9   Q.   Okay.  Do you work with school kids?  Are you a
10       baseball coach or hockey coach or anything like
11       that?
12  A.   No.
13  Q.   Okay.  Are you familiar with kids making racial
14       remarks?
15  A.   No.
16  Q.   Okay.  Would it ever be appropriate for a male
17       employee at Black Angus Meat to say to a female
18       employee that she has a nice ass?
19  A.   No.
20  Q.   Would that be sexually offensive?
21  A.   Yes.
22  MR. OPPENHEIMER:  Sexually offensive?
23  MS. GRECO:  Yes.

296

```
 1   BY MS. GRECO:
 2   Q.  Would that be an offensive comment to say to a
 3       woman?
 4   A.  Yes.
 5   Q.  Would that be discriminatory?
 6   A.  Yeah.
 7   Q.  Would it ever be appropriate for a male employee
 8       at Black Angus Meat to say to a female employee
 9       your headlights are on?
10   A.  Can you repeat the question?
11   Q.  Would it ever be appropriate for a male employee
12       of Black Angus Meat to say to a female employee
13       of Black Angus Meat that your headlights are on?
14   A.  No.
15   Q.  Would that be offensive?
16   A.  Yes.
17   Q.  Would that be discriminatory?
18   A.  Yes.
19   Q.  Would it ever be appropriate for a male employee
20       at Black Angus Meat to say to a female employee,
21       oh, look at that cleavage?
22   A.  No.
23   Q.  Would that be offensive?
```

297

1    A.   Yes.

2    Q.   Would that be discriminatory?

3    A.   No.

4    Q.   Would it ever be appropriate for a male employee

5         at Black Angus Meat to say to a female employee

6         of Black Angus Meat that -- does the carpet match

7         the drapes?

8    A.   No.

9    Q.   Would that be offensive?

10   A.   Yes.

11   Q.   Would that be discriminatory?

12   A.   Yes.

13   Q.   Have you ever heard any comments of a sexual

14        nature while employed at Black Angus Meat?

15   A.   No.

16   Q.   Can you tell me specifically what you recall

17        Darcy Black told you when she complained --

18        strike that.  When Darcy Black came to you about

19        the incident with -- let's call it the paper

20        towel incident so we all know we're talking about

21        the same thing.  Okay.  When she came to you

22        regarding the paper towel incident -- strike

23        that.  When Darcy Black came to you about the

310

```
 1      was.
 2    THE WITNESS:  It was on her desk on a Friday.
 3    BY MS. GRECO:
 4    Q.  Okay.  So this was on her desk on a Friday?
 5    A.  Uh-huh.
 6    Q.  You had this conversation with Darcy that Friday?
 7    A.  Yes.
 8    Q.  And the incident -- that's when she talked to you
 9        about Jamie Lapress --
10    A.  She talked to me --
11    Q.  -- that he hadn't apologized?
12    A.  -- that he hadn't apologized, yes.
13    Q.  Okay.  How many days before that conversation
14        about Jamie Lapress' failure to apologize did the
15        incident occur?
16    A.  The incident occurred on Saturday.  I was
17        informed about it on Tuesday.  I talked to Darcy.
18        I talked to Bob on Tuesday.  I began -- he told
19        me to get on this, this is important.  On
20        Wednesday when I came in, I talked to Debbie and
21        Tommy.  I did not see Jamie on Wednesday.  I
22        talked to Jamie on Thursday.  Okay.  Then on
23        Friday I saw Darcy, talked to her about this and
```

311

```
 1        she dropped the resignation letter.
 2   Q.   When you talk to Darcy Black on that Friday, the
 3        day you saw the letter -- what you call the
 4        resignation letter, did you tell her that you
 5        didn't believe what she said?
 6   A.   I told her we all needed to get down and get
 7        together and hash -- we all needed to get
 8        together.  And at that point in time, she said I
 9        don't want anything to do with him, is what I was
10        told.
11   Q.   What did you say?
12   A.   I said okay.  Like okay.  And then I still -- you
13        know, we planned on getting us together,
14        straightening this out.
15   Q.   But had you made a determination as to whether or
16        not the comment was made to Darcy Black
17        referencing her children as niggers at that time,
18        at the time you talked to her on Thursday?
19   MR. OPPENHEIMER:  Thursday?
20   BY MS. GRECO:
21   Q.   The Thursday he's telling us about -- sorry.  I
22        misspoke.  Friday.  The same day that you
23        subsequently saw what you called her letter of
```

312

```
 1      resignation?
 2  A.  Yes.
 3  Q.  What determination did you tell her you had
 4      reached?
 5  A.  What determination did I tell her?
 6  Q.  Yes, if you did.
 7  MR. OPPENHEIMER:  That's a different question.
 8  BY MS. GRECO:
 9  Q.  In your conversation with her on that Friday, did
10      you say to her I've looked into this and I've
11      come to a conclusion, or something like that?
12  A.  I did not tell her that.  I wanted everybody to
13      sit down together so we could talk about this.
14      Okay.  I wanted to bring all the parties in
15      involved.
16  Q.  Okay.  So then that Friday evening -- I don't
17      want to put words in your mouth -- I believe you
18      said you came back and that's when you saw this
19      letter?
20  A.  Yes.
21  Q.  In reference to this letter I'm talking about,
22      Bates DEF0048, which is a part of Exhibit 195.
23      And for the record, it is a handwritten letter
```

330

```
1    THE WITNESS:  When you asked Darcy to work, she would
2        work.
3    BY MS. GRECO:
4    Q.  When you read this letter from Darcy, she states,
5        I can deal with issues that have to do with me.
6        Do you know what that meant?
7    A.  No.
8    Q.  Did you discuss with Robert Seibert that you did
9        not know what that meant?
10   A.  No.
11   Q.  Did it concern you that perhaps those issues
12       could have been inappropriate in the workplace?
13   MR. OPPENHEIMER:  Form.
14   THE WITNESS:  No.
15   BY MS. GRECO:
16   Q.  Is it fair to say that you let Darcy Black know
17       that you did not believe that Jamie Lapress
18       called her children niggers?
19   MR. OPPENHEIMER:  Form.
20   THE WITNESS:  I don't -- I don't think so, no.  I
21       don't recall.
22   BY MS. GRECO:
23   Q.  After you had your conversation with Darcy Black
```