**EX. 9**

SEAN ROUND

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
--------------------------------------------------

DARCY M. BLACK,

                              Plaintiff,

      -vs-


BUFFALO MEAT SERVICE, INC., doing business
as BOULEVARD BLACK ANGUS, also known as
BLACK ANGUS MEATS, also known as
BLACK ANGUS MEATS & SEAFOOD,
ROBERT SEIBERT,
DIANE SEIBERT,
KEEGAN ROBERTS,

                              Defendants.

--------------------------------------------------

                         Examination Before Trial of

SEAN ROUND, taken pursuant to the Federal Rules of Civil

Procedure, in the law offices of GRECO TRAPP, PLLC, 1700

Rand Building, 14 Lafayette Square, Buffalo, New York,

taken on November 20, 2017, commencing at 9:07 A.M., before

MARY ANN MORETTA, Notary Public.

15

1   A.   Community and personal health, workplace safety

2        standards, things like that.

3   Q.   Is that the normal four-year program?

4   A.   Uh-huh.  Yes.

5   Q.   Where did you go to high school?

6   A.   Sweet Home.

7   Q.   When did you graduate?

8   A.   1995.

9   Q.   So let's go back to 1995.  When you were in high

10       school, did you work?

11  A.   Yes, I did.

12  Q.   Where did you work?

13  A.   A bunch of places.  Pizzerias, Buffalo Athletic

14       Center, Alladin's Carpet Cleaning, Tops.

15  Q.   Okay.  We'll start with your high school -- after

16       high school where did you work?  Did you have a

17       full-time job when you graduated?

18  A.   No.  I just worked some part-time jobs.

19       Full-time hours, part-time jobs.  I moved to

20       Florida right after I graduated.

21  Q.   Part-time jobs, full-time hours?

22  A.   No.  Sorry.  We're talking high school.  We're

23       going back a little ways.

16

1  Q.  You graduated high school.  Did you go directly

2      to college?

3  A.  Yes, I did.

4  Q.  Where?

5  A.  N Triple C for one year.

6  Q.  What did you major in?

7  A.  At N Triple C?  General studies.

8  Q.  Did you complete it?

9  A.  I transferred after one year.  Technically, I did

10     not complete the two-year program.

11 Q.  What was the two-year -- or, just general

12     studies, right.  Where did you transfer to?

13 A.  Buffalo State.

14 Q.  So you would have been at Buffalo State College

15     in 1997?

16 A.  Uh-huh.

17 Q.  You have to answer.

18 A.  Yes.

19 Q.  How long were you there then?

20 A.  Two years.  Transferred to Brockport for a year

21     and a half.

22 Q.  Two years.  That was from '97 until when?

23 A.  '97-'99.

53

1       pre-check writing report, pay period 2/19/07 to

2       -- strike that.  2/19/07 to 2/19/07.  Do you see,

3       Mr. Round, it's Bates 1307, where it says that

4       you made three hundred forty-six dollars and

5       seventy-five cents and worked thirty-six and a

6       half hours?

7   A.  Yes, I do.  Sorry.

8   Q.  Okay.  And --

9   A.  Doesn't quite add up to ten dollars hour.

10  Q.  Do you recognize that as being nine dollars and

11      fifty cents an hour?

12  MR. OPPENHEIMER:  Objection.

13  THE WITNESS:  I don't recognize that as a rate of

14      pay.  I know ten times thirty-six point five

15      isn't three forty-six point seven.  I know that.

16  BY MS. GRECO:

17  Q.  But does it refresh your recollection that you

18      earned nine dollars and fifty cents an hour?

19  A.  It refreshes my recollection that I did not get

20      paid ten dollars an hour.

21  Q.  Fair enough.  Now, when you started at Black

22      Angus Meats, did they have any written policies

23      or procedures that you were given?

54

```
 1   A.   Not that I recall.
 2   Q.   Was there any employment handbook that you
 3        received?
 4   A.   No.
 5   Q.   At any time that you were employed there, did you
 6        receive an employment handbook?
 7   A.   Not that I recall.
 8   Q.   At any time that you were employed there, did you
 9        receive any policies or procedures?
10   A.   Not that I recall.
11   MR. OPPENHEIMER:   Form.
12   BY MS. GRECO:
13   Q.   Okay.  At any time that you were employed there,
14        did you receive any training regarding
15        discrimination, harassment, hostile environment
16        or retaliation?
17   A.   Uh-uh.  No.
18   Q.   At any time you were employed there, did you
19        receive job training?
20   A.   As in training to do what they were asking me to
21        do?
22   Q.   Yes.
23   A.   Yes.
```

55

1  Q.  Okay.  Now, let's talk about when you first

2      started.  What were you trained in?

3  A.  First thing, I was on the wrapping table.

4  Q.  What does that entail?

5  A.  Wrapping cuts of meat and chicken, fish for

6      customers or for the freezer.

7  Q.  Is there a certain way to wrap those items?

8  A.  Yes, there is.

9  Q.  Who trained you to do that, if you recall?

10 A.  Everybody who was around.  I don't recall who

11     initially took me on the first day and showed me

12     the wrapping table, but everybody kind of pitches

13     out and helps out with new people so --

14 Q.  Do you recall what your hours of work were there?

15 A.  They weren't set and -- not initially, no.  I

16     don't recall.  I believe it was like ten to six

17     kind of thing or something like that.

18 Q.  Were you given a schedule?

19 A.  Weekly a schedule came out that was posted.

20 Q.  Was it your understanding that whatever hours

21     were posted for you, that was the time you were

22     supposed to be there by?

23 A.  Yes.

56

1   Q.  And you were supposed to stay and then leave at

2       the time --

3   A.  That's correct.

4   Q.  -- you were scheduled?

5           When you were employed there, if you needed

6       time off, what was the procedure that you would

7       have to go through --

8   MR. OPPENHEIMER:  Form.

9   BY MS. GRECO:

10  Q.  -- to request -- strike that.  If you desired

11      time off, what, if anything, would you have to

12      do?

13  A.  Communication and some notice.

14  Q.  And who did you have to communicate it to?

15  A.  Diane, because she wrote the schedule.

16  Q.  Okay.  Was it your experience that if you asked

17      for time off, you received it?

18  A.  Yes.  With notice.

19  Q.  And during the time you were at Black Angus

20      Meats, were you always paid for all of your work

21      by check?

22  A.  Yes.

23  Q.  Were you ever paid in cash?

57

1   A.   No.  Can I just say about the time off?  That's
2        more for recreational.  If you had an appointment
3        or something, even though you didn't provide a
4        lot of notice, they honored those type of things,
5        doctors' appointments.  That was for more if you
6        needed a day off, that's what I referred to, a
7        day off.  If something came up, they were always
8        very flexible for that type of thing.  I just
9        wanted to be clear.
10  Q.   Is it fair to say you never really had a problem
11       getting time off, whether it was medical
12       necessity or something else?
13  A.   Correct.
14  Q.   Did you play in a football league or something of
15       that nature?
16  A.   Yes, I did.
17  Q.   Can you tell me about that.
18  A.   Saturday mornings.
19  Q.   Do you recall what time it was?
20  A.   Games ranged anywhere from nine to one maybe.
21       Games are an hour long.
22  Q.   So they would have different start times?
23  A.   Yes.  You would have a schedule for the season.

58

1    Q.   Okay.  And how long is that season, generally?

2    A.   Ten weeks, I believe.

3    Q.   And were you able to -- strike that.  How were

4         you able to accommodate that schedule at work?

5    A.   I had some Saturdays off.  Sometimes I missed

6         games, and then other times I would play and come

7         to work right after.

8    Q.   And would you have to request the ability to do

9         that from anyone?

10   A.   If it was during work, then yes.

11   Q.   Who would you make that request to?

12   A.   Diane.

13   Q.   Did you have any problem being accommodated for

14        that?

15   A.   No.

16   Q.   Did you receive any employment benefits while you

17        were employed at Black Angus Meats?

18   A.   I did.

19   Q.   What employment benefits did you receive?

20   A.   A supplemental insurance.  They wanted to try to

21        provide something for insurance.  As a small

22        business, it's expensive to do, but they wanted

23        to try to give me something.  So they were able

64

1  Q.  What does promoted mean to you?

2  A.  To me, it means job title, responsibilities.

3  Q.  Okay.  Did your job title ever change?

4  A.  No.

5  Q.  Okay.  While you were employed at Black Angus

6      Meats, did you ever become aware of any

7      complaints by anyone of discrimination,

8      harassment, hostile environment or retaliation?

9  A.  No.

10  Q.  While you were employed at Black Angus Meats, at

11      any time do you recall anyone ever doing an

12      investigation?

13  A.  No.

14  MR. OPPENHEIMER:  Form.

15  THE WITNESS:  Not to my knowledge.

16  BY MS. GRECO:

17  Q.  Only asking for your knowledge.

18  A.  Okay.

19  Q.  Have you ever had any problem with your

20      license -- driving license?

21  MR. OPPENHEIMER:  Form.

22  THE WITNESS:  No.

23  BY MS. GRECO:

65

1   Q.  Anything to do with hazards?

2   MR. OPPENHEIMER:  Form.

3   THE WITNESS:  Anything to do with hazards, meaning?

4   BY MS. GRECO:

5   Q.  Car hazards.

6   A.  I don't understand, but no.

7   Q.  You said you started working at Black Angus

8       Meats.  We looked at your first paycheck --

9       strike that.  We looked at the detail regarding

10      your first paycheck, which is Exhibit 2.  Black

11      Angus Meats calls them pre-check writing reports.

12      Do you recall how long after that you received an

13      increase in your hourly rate?

14  A.  I do not.

15  Q.  Let me show you what's been marked as Exhibit 3,

16      which is Sean Round's payroll pre-check writing

17      report for pay periods 3/5/2007 and 3/12/2007.

18      If you look, it's Bates DEF1331 and DEF1339.

19      They are intentionally not consecutive.  They

20      represent two separate things.  Do you see the

21      first one, pay period 3/5/07 to 3/12/07?  It

22      indicates you made three hundred eighty dollars

23      and you worked forty hours.

67

1    A.   From what I recall, it was just after the month I

2         had been there, I had shown, you know, the

3         ability and the want to pick up more

4         responsibilities and work more and help out in

5         other areas where needed.  And with that, that

6         was worth the fifty cents to them to honor my

7         original request for a young man that was single

8         and had bills, ten bucks was the minimum.  I'm

9         assuming I had to prove it.  They didn't tell me

10        that, but I'm assuming after a month they gave me

11        the fifty cents.  They felt I earned it.

12   Q.   Okay.  Do you recall when you received your next

13        increase?

14   A.   I do not.

15   Q.   Showing you Exhibit 4 for the record.  It's Sean

16        Round's payroll pre-check writing report for pay

17        period ending -- well, for pay period 5/27/07 to

18        6/3/2007 and 6/4/2007 through 6/10/2007.  Looking

19        at the first page, Bates DEF1418, do you see

20        where it has four hundred dollars and forty hours

21        for you?

22   A.   Uh-huh.  Yes.

23   Q.   At the time you recognize you were making ten

68

```
 1      dollars an hour?

 2  A.  Yes.

 3  Q.  I would like to show you the next Bates page,

 4      DEF1425, where it indicates you were making four

 5      hundred forty dollars at -- for forty hours of

 6      work.

 7  A.  Yes.

 8  Q.  Do you recognize that -- well, how much was your

 9      hourly rate at that time?

10  A.  Well, that would be more than ten dollars an

11      hour.

12  Q.  Do you recognize it as eleven dollars an hour?

13  A.  Yes.

14  Q.  Okay.  And do you recall how you became aware

15      that you were getting this pay raise?

16  A.  I believe at that point is when I started

17      delivering.  Somewhere around there.

18  Q.  When you say you believe, do you know?

19  A.  I don't.

20  Q.  So there came a time when you began delivering?

21  A.  Yes.

22  Q.  What, in your mind, marks that differential?

23  MR. OPPENHEIMER:  Form.
```

74

1   A.   I do not.

2   Q.   I'm going to show you what's been marked as

3        Exhibit 5, which, for the record, is Sean Round's

4        payroll pre-check writing report for pay periods

5        9/3/2007 to 9/9/2007 and 9/10/2007 to 9/17/2007.

6        I would like to show you the first page of this

7        two-page document.  It says DEF1523 on the

8        bottom.

9   A.   Uh-huh.

10  Q.   Do you see for your name it says you were making

11       four hundred forty dollars for forty hours of

12       work?

13  A.   Yes.

14  Q.   Do you recognize that as eleven dollars an hour?

15  A.   Yes.

16  Q.   Now, looking at the next one, which was the pay

17       period 9/10/'7-9/17/'7.  Do you see where it has

18       your name and address, four hundred eighty

19       dollars for forty hours of work?

20  A.   Yes.

21  Q.   And how much was your hourly rate at that time?

22  A.   It adds up, to me, to be twelve dollars an hour.

23  Q.   Do you recall now receiving twelve dollars an

75

```
 1        hour at that time?
 2   A.   I recall receiving it.  At the time, I do not
 3        recall.  But since it's stated there, I guess it
 4        was then.  I can't say I remember September of
 5        '07 I received the increase.
 6   Q.   You recall there was an increase at some point
 7        from eleven dollars an hour to twelve dollars an
 8        hour?
 9   A.   Yes.
10   Q.   My question is, what, if any, job duties of yours
11        changed at that time?
12   A.   At that point, I received a store key to lock up
13        at the end of the night and set the alarm.  I was
14        -- with that, you pull the cash register at the
15        end of the night, drop money in the safe.
16   Q.   Was that one of your regular duties?
17   A.   It was not.  It became as I closed the store.
18   Q.   That's my question.  When you went to twelve
19        dollars an hour --
20   A.   Yes.  Yes.
21   Q.   -- did that become one of your job duties?
22   A.   And my delivery routes increased.
23   Q.   And how did you get the opportunity to do this?
```

79

1   Q.   Showing you what's been marked as Exhibit 8.  For

2        the record, this is Sean Round's W-2 report 2009.

3        I ask you to look at DEF2750 and ask if you

4        recall that your earnings for 2009 at Black Angus

5        Meats were thirty-three thousand eighteen dollars

6        and thirty cents?

7   A.   Yes.

8   Q.   I'm going to show you what's been marked as

9        Exhibit 9, which, for the record, is Sean Round's

10       payroll pre-check writing report for pay periods

11       1/18/2010 to 1/24/2010 and 1/25/2010 to

12       1/31/2010.  And I would like you first to look at

13       the first page, DEF2355.  And note for the record

14       the second page is DEF2361.

15           Do you see DEF2355 indicates the pay period

16       of 1/18/2010 to 1/24/2010?  And under your name

17       it indicates you made three hundred fifty-four

18       dollars for twenty-nine point five hours of work.

19       Do you have any reason to believe that is not

20       accurate?

21   A.   No.

22   Q.   Okay.  Now, going to -- do you know what that is

23       per hour?

80

1   A.  I do not.

2   Q.  Now, going to the next page of that document,

3       DEF2361, where it says you were making five

4       hundred three dollars and seventy-five cents for

5       thirty-eight point seven five hours.  Do you

6       recognize that as you making thirteen dollars an

7       hour?

8   A.  Without a calculator, no.  But it sounds about

9       right.

10  Q.  Do you recall there came a time where you were

11      raised to thirteen dollars an hour?

12  A.  Yes.

13  Q.  Let me show you what's been marked as Exhibit 10.

14      It's Sean Round's W-2 report 2010.  I'll have you

15      look at this document which is DEF2763 (sic) and

16      show you where it says that your wages, tips and

17      other compensation for the year 2010 were

18      thirty-five thousand three hundred forty-five

19      dollars and twenty-one cents.  Do you recognize

20      that being accurate that you would have received

21      for a W-2?

22  A.  Yes.

23  Q.  Do you recall receiving any other compensation

102

1     out whenever they needed any help.

2  Q.  So you would go in and you could pack meat or

3     whatever?

4  MR. OPPENHEIMER:  Form.

5  THE WITNESS:  Yes.

6  BY MS. GRECO:

7  Q.  My question is, have you worked there after

8     January 11th, 2015?

9  A.  Yes.

10 Q.  Do you continue to work there?

11 A.  I wouldn't use the word continue.  I continue to

12    be available when they need me.

13 Q.  When is the last time you worked there?

14 A.  August of this year.

15 Q.  Of this year.

16 A.  For one day, one night.  Covering some vacations

17    on a Friday night.  They had some people out.

18 Q.  How about before that?

19 A.  I don't recall.  Probably the fall prior, deer

20    season.

21 Q.  Fall of 2015?

22 A.  I guess.

23 Q.  You said -- I'm sorry.  August of '17 --

103

1   A.   Yes.

2   Q.   -- you worked there one night.  You said prior to

3        that would have been deer season, which would

4        have been when?

5   A.   Fall of '16.  I may have covered something

6        between August and last deer season.  I don't

7        recall.  It's very sporadic at this point.

8   Q.   All these times that you are working, you are

9        getting fourteen fifty an hour or had you

10       received a raise?

11  MR. OPPENHEIMER:  Form.

12  THE WITNESS:  I have not received a raise.  I have

13       not confirmed the fourteen fifty, but I am

14       assuming.  It was nothing I ever discussed with

15       them.  It was more about helping them than it is

16       about the money at this point.  Not something I

17       paid attention to.

18  BY MS. GRECO:

19  Q.   So do you consider yourself still an employee of

20       theirs?

21  MR. OPPENHEIMER:  Form.

22  THE WITNESS:  No.  Somebody who is capable of

23       performing the duties and then if they need some

104

1      help, someone who can help.

2  BY MS. GRECO:

3  Q.  Did you get a W-2 from Black Angus Meats for the

4      year 2016?

5  A.  I think so.  Maybe.  I don't recall.  I would

6      have to look, check my records.

7  Q.  Well, you recall working deer season in 2016?

8  A.  It might have only been a handful of days doing

9      some helping, which I wouldn't even allow them to

10     pay me for three hours of my work.  They have

11     been very good to me over the years and fair.

12     And a lot of times I will offer my help and if

13     it's a couple hours, I won't punch in for that.

14 Q.  If you work at deer season, that would be a

15     couple hours, would it?

16 MR. OPPENHEIMER:  Form.

17 THE WITNESS:  It all depends.  Like I said, I'm not a

18     full-time employee anymore.  They have a full

19     crew running deer season.  They need some help

20     for a few hours, whether it's loading barrels of

21     bones in the back of a truck or wait on the front

22     counter.

23 BY MS. GRECO:

105

1   Q.   That's what I'm trying to find out.  In August of

2        2017, you said you were there for a night.  What

3        did you do?

4   A.   I worked in the front of the store, waited on

5        customers and closed the shop up.

6   Q.   Were you paid for that?

7   A.   Yes, I was.

8   Q.   That was by a paycheck?

9   A.   Yes, I believe so.

10  Q.   Okay.  And deer season, fall of 2016, did it go

11       into 2017?

12  A.   No.

13  Q.   Approximately how many hours do you think you

14       helped out?

15  A.   I can't recall.

16  Q.   Because I note in one season you made eight

17       thousand three hundred thirteen dollars for deer

18       season.

19  A.   That's not necessarily just deer season.

20  MR. OPPENHEIMER:  Form.

21  THE WITNESS:  I said I can't recall in what capacity

22       I worked through the year.  Deer season is a big

23       draw for help.  Vacation, short-staffness.

106

1  BY MS. GRECO:

2  Q.  All right.  For the year 2014 which is -- for the

3       year 2014 you testified that you earned eight

4       thousand three hundred thirteen dollars and

5       ninety-seven cents from Black Angus Meats.

6  A.  That's what my W-2 says.

7  Q.  That's after you had transitioned from there in

8       2013?

9  MR. OPPENHEIMER:  Form.

10  BY MS. GRECO:

11  Q.  You said early 2013 you transitioned from there?

12  MR. OPPENHEIMER:  Form.

13  THE WITNESS:  It was a slow transition.

14  BY MS. GRECO:

15  Q.  So my question is, could that amount of money

16       represent your work during deer season and

17       helping out whenever they needed you in addition

18       to your full-time job?

19  MR. OPPENHEIMER:  You are asking him to guess.

20  THE WITNESS:  Yes.

21  MS. GRECO:  I'm asking if he knows.

22  MR. OPPENHEIMER:  You said could it.

23  BY MS. GRECO:

114

1    A.   Yes.

2    Q.   Do you recall her packing meat?

3    A.   Yes.

4    Q.   And were people buddied up?  Do you know what I

5         mean by that?  Strike that.  Were employees

6         partnered with each other relative to wrapping

7         and packing?

8    A.   Not scheduled.  We would work in teams, but there

9         was no appointed teams.

10   Q.   Okay.  So with regard to teams, who was on

11        Darcy's team?

12   A.   For a while there, Mark.  I mean, we all rotated.

13        I worked with Darcy.  Everyone did.  As far as I

14        can remember, the way the pack room evolved over

15        time, as we got busier, the setup was a little

16        different.  The flow was a little different.  For

17        a while there, I know Mark was on that side of

18        the room with Darcy for the most part.

19   Q.   And you were there.  And anyone else that you can

20        recall?

21   A.   Keegan, Jamie LaPress filled packs.  Debbie

22        filled packs.  I mean, a lot of people

23        intermittently.  Everybody would fill packs to

125

1   BY MS. GRECO:

2   Q.  Strike that.  Black Angus Meats, from the time

3       you were employed there -- let's start when you

4       first started.  Did they have a butcher?

5   MR. OPPENHEIMER:  Form.

6   THE WITNESS:  A meat cutter, yes.

7   BY MS. GRECO:

8   Q.  A meat cutter.  How many meat cutters did they

9       have when you started in 2007?

10  A.  They had a handful of people that were capable of

11      cutting meats.  Tommy was the primary cutter.  He

12      was not the only one that was able to trim a loin

13      and cut a loin, though.

14  Q.  Are you saying there were more than --

15  A.  I knew how to trim a tenderloin.  If I needed to

16      do that and Tommy wasn't there, well, then I

17      did.  That doesn't make me a butcher.

18  Q.  That's why I asked you about a butcher.  How many

19      butchers were at Black Angus Meats?

20  A.  Then zero.  I mean, there were people who would

21      just cut meat there.  I don't know if Tommy's a

22      certified butcher.

23  MR. OPPENHEIMER:  Off the record.

130

1   A.   Yes.

2   Q.   Did you ever work with her?

3   A.   Yes.

4   Q.   And what job did she perform?

5   A.   Same.  Work in the front, wrap meat, fill meat

6        packs.

7   Q.   I don't know if I asked.  Did I ask what job

8        duties Mark Leible had?  Do you recall what his

9        job duties were?

10  A.   Same.

11  Q.   Did you work with Nicole Seibert?

12  A.   Yes.

13  Q.   What were her job duties, as you recall?

14  A.   Same.

15  Q.   I didn't ask you.  Over the lunch break, you

16       didn't discuss the case with anyone, did you?

17  A.   No.  My wife.

18  Q.   When you are under oath, you can't speak about it

19       until you are done.  When you are not under oath

20       anymore, you can do what you want, but not until

21       it's done.

22  A.   Okay.

23  Q.   Do you recall Roseanna Barnes being Darcy

138

1      anything in the cooler that needed to be wrapped

2      that can't sit overnight, that kind of thing.

3      Breaking down equipment, cleaning it, putting it

4      back together.

5   Q. What job duties did -- strike that.  Did you ever

6      work with Nicole Seibert?

7   A. Yes.

8   Q. Can you tell me what -- does she work regularly?

9   A. Yes.

10  MR. OPPENHEIMER:  Form.

11  BY MS. GRECO:

12  Q. Okay.  How many hours did she work a week based

13     on your observation?

14  A. I don't know.

15  Q. What job did she work?

16  A. Same as everyone.

17  Q. Did she open or close the store, to your

18     knowledge?

19  A. Yes.  Both.

20  Q. Do you ever recall anyone saying to Mr. LaPress

21     in these or similar words, oh, are you stoned

22     today?

23  A. No.

172

1    A.   Yes.   The front door is about fifteen feet from

2         the street.

3    Q.   That street, is that Niagara Falls Boulevard?

4    A.   Yes.

5    Q.   So it's a very busy street?

6    A.   Very busy.

7    Q.   And were you ever aware of anyone coming into

8         Black Angus Meats, during the time that you were

9         employed there, seeking to respond to that help

10        wanted sign?

11   A.   Yes.

12   Q.   Were you trained on what to do if someone came in

13        that way?

14   A.   Yes.

15   Q.   What were you supposed to do?

16   A.   Receive the application --

17   Q.   Do you give --

18   A.   -- bring it to Diane.  If Diane had a minute, she

19        would usually talk to the person right there,

20        kind of ask them some questions, to which I did

21        not stay and listen.  If she was very busy, she

22        would tell them she'd give them a call.

23             Occasionally, we would have applicants that

173

```
 1        would come without the sign up, in which they
 2        were told we are not hiring at the moment and we
 3        will hold your application.
 4   Q.   Approximately how many people do you think have
 5        given you applications during the time you were
 6        employed there?
 7   A.   I couldn't tell you.  I really couldn't give you
 8        a number that would be close to accurate.  I
 9        really couldn't.  Not something I even thought
10        about keeping track of.
11   Q.   Did you ever have African-American people give
12        you applications?
13   A.   Maybe.  I don't recall.
14   Q.   So you have no recollection?
15   A.   Right.  It was usually you are working, here, let
16        me take that from you and back to work.
17   Q.   Okay.  So is it fair to say if you don't have a
18        recollection of any one person who was
19        African-American, you don't know what happened
20        afterwards?
21   A.   Correct.
22   Q.   Do you know any African-American person who
23        applied for employment at Black Angus Meats?
```