**EX. 13**

RAELEAN McGEE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---------------------------------------------------

DARCY M. BLACK,

                            Plaintiff,

    -vs-


BUFFALO MEAT SERVICE, INC., doing business
as BOULEVARD BLACK ANGUS, also known as
BLACK ANGUS MEATS, also known as
BLACK ANGUS MEATS & SEAFOOD,
ROBERT SEIBERT,
DIANE SEIBERT,
KEEGAN ROBERTS,

                          Defendants.

---------------------------------------------------

                    Examination Before Trial of

RAELEAN McGEE, taken pursuant to the Federal Rules of Civil

Procedure, in the law offices of GRECO TRAPP, PLLC, 1700

Rand Building, 14 Lafayette Square, Buffalo, New York,

taken on May 20, 2019, commencing at 9:28 A.M., before

MARY ANN MORETTA, Notary Public.

37

1   Q.   What size -- besides trucks, does he own anything

2        else?

3   A.   Yes.  He owns a Bobcat.

4   Q.   Is that in his name?

5   A.   Yes.

6   Q.   Anything else?

7   A.   I mean, equipment like snowplows and lawn mowers?

8   Q.   Yes.

9   A.   Yes.  He owns three lawn mowers and seven

10       snowplows.

11  Q.   Is that all in his name?

12  A.   Yes.

13  Q.   Do you believe the business to be successful?

14  A.   Yes.

15  Q.   Would you say that he worked hard for that?

16  A.   Yes.  Very hard.

17  Q.   Okay.  Did there come a time when you were

18       employed at Black Angus Meat?

19  A.   Yes.

20  Q.   I forgot to tell you also.  The court reporter

21       can't take down nods or -- it has to be a verbal

22       response.

23  A.   Okay.

52

1   Q.   Let me show you what's been marked as Exhibit

2        111.  Looking at the first sheet, it's a Black

3        Angus Meat's payroll pre-check writing report for

4        the period December 18, '06 to December 24, '06,

5        indicating that you worked three hundred forty --

6        forty hours at three hundred twenty dollars per

7        hour (sic).  Do you see that?  Which is eight

8        dollars an hour -- strike that.

9             You worked forty hours and earned three

10       hundred twenty dollars, which would be eight

11       dollars an hour?

12  A.   Correct.

13  Q.   Is that consistent with your recollection?

14  A.   Yes.

15  Q.   Okay.  Now, going to the next page, it is the

16       payroll pre-check writing report from December

17       25th to December 31, 2006.  And it indicates that

18       you worked thirty-four point two five hours and

19       earned two hundred ninety-one dollars and

20       thirteen cents, which is eight dollars and fifty

21       cents an hour.  Do you recall receiving a raise

22       at that time?

23  A.   I don't remember the time.

53

1    Q.   Do you recall at one point you made eight dollars

2         and then received a raise to eight dollars and

3         fifty cents?

4    A.   No.  I don't remember.

5    Q.   Okay.  You told me about the first time you

6         received a raise, there was a sticky?

7    A.   Right.

8    Q.   Do you recall ever getting another raise?

9    A.   I do remember receiving a couple raises.  I do.

10   Q.   Do you recall the circumstance of this raise

11        after your first one with the sticky?

12   A.   Not specifically, no.

13   Q.   Any general recollection?

14   A.   No.

15   Q.   Okay.  Do you have any reason to believe you

16        didn't get a fifty-cent raise?

17   A.   No.

18   Q.   And if you did receive that raise, would you

19        believe it was based on your performance?

20   A.   Yes.

21   Q.   Did they ever indicate anything to you regarding

22        your performance?

23   A.   Yes.  About like the speed of wrapping the meat

59

1    A.   I remember wrapping meat and waiting on

2         customers.

3    Q.   And where would you be wrapping the meat?

4    A.   In the front of the store where the customers

5         are.

6    Q.   Did you ever have to go in the -- well, strike

7         that.

8              Let's talk about the store and its layout --

9    A.   Okay.

10   Q.   -- when you worked at Black Angus Meat.

11   MS. O'BRIEN:  Can we take a quick break?

12   MS. GRECO:  Sure.  No problem.

13         (Whereupon, a short recess was then taken.)

14   BY MS. GRECO:

15   Q.   Let me show you what's been marked as Exhibit

16        235.  Now, do you recognize that as Black Angus

17        Meat?

18   A.   Yes.

19   Q.   All right.  And when you say you wrapped up

20        front, in that top picture, is that the area you

21        are talking about?

22   A.   Yes.

23   Q.   Okay.  In addition to wrapping meat and waiting

67

1   Q.   Okay.  And can you -- you said that you worked at

2        the counter?

3   A.   Yes.

4   Q.   Where would that be?

5   A.   So that would be the counter of these meat

6        refrigerators, coolers.

7   Q.   And it makes what looks like an L or a V?

8   A.   Yes.

9   Q.   Okay.  And you can see the meat in the window.

10       You would be behind it on the other side, where

11       the worker is on either side?

12  A.   Yes.

13  Q.   You also said you wrapped meat.  Where would that

14       be?

15  A.   It would be on this table here, number one.  And

16       there's another table closer to the office,

17       number two.

18  Q.   Okay.  So there's -- where this says number two,

19       wrapping table --

20  A.   Uh-huh.

21  Q.   -- is that where you believe it to be?

22  A.   Yes.

23  Q.   Okay.  And where was the butcher area located,

68

```
 1        where the butcher was?
 2    A.  Behind table number two.
 3    Q.  Do you see where it says area of saw and butcher
 4        block with an arrow?
 5    A.  Yes.
 6    Q.  Is that what that is back there?
 7    A.  That is where the butcher was, yes.
 8    Q.  Who was the butcher during the time you were
 9        employed there?
10    A.  Tommy.  I remember Tommy.
11    Q.  Tommy who?
12    A.  I don't know his last name.
13    Q.  And what were your hours of work?
14    A.  They varied.  I tried to stay as full-time as
15        possible, but --
16    Q.  I'm just looking, like, what time during the day,
17        generally?
18    A.  I would work -- sometimes I work seven to three.
19        That would be my main schedule, as long as I
20        can --
21    Q.  Did you ever start at ten in the morning?
22    A.  Yes, I did start at ten.  Because when I would
23        start early, at seven, is when I would put
```

69

1        together meat packages.  So if it was a day I was

2        doing that, I would get in at seven for delivery.

3    Q.  Where would you put the meat packages together?

4    A.  That would be at the back of the store.  And then

5        I'm pretty sure, most days, if I started at ten,

6        it was to come in -- it was straight in to

7        customer service and wrapping.

8    Q.  Okay.  So before we talked about what duties you

9        performed.  You said seven to three, you would

10       come in and go to the back of the store?

11   A.  Correct.

12   Q.  And what would you do there?

13   A.  I put together meat packages for delivery.

14   Q.  What does that entail?

15   A.  It entails putting together a box, marking down

16       on a list the things the customer wanted, and

17       then wrapping up the box and labeling it.

18   Q.  Where in the back of the store would you do that?

19       Was there a certain station?

20   A.  There was a room.  When you came into the back of

21       the store to the right, there was a room set up

22       with a couple tables that each person could work

23       on their own package.

73

```
 1      exhibited in Exhibit 237?
 2   A. Uh-huh.
 3   Q. And the back of the store, where you indicated
 4      you would do the wrapping of the meat and the
 5      venison?
 6   A. Correct.
 7   Q. Okay.  And do you know what number two is --
 8   A. No.
 9   Q. -- whether that was there when you were there?
10   A. No.  That is not familiar to me.
11   Q. So you only ever worked in the main building --
12   A. That's correct.
13   Q. -- number one, as exhibited on Exhibit 241?
14   A. Correct.
15   Q. Okay.  Did you ever take money when people came
16      to pay for venison?
17   A. Yes, I did.
18   Q. Was there a separate cash register for venison?
19   A. I think so, yes.  Yes.
20   Q. And would venison only be checked out on the cash
21      register separate -- strike that.
22          Can you describe how many cash registers
23      there were in the main room?
```

74

1  A.  I remember one cash register when you come in,

2      where that V was, for the storefront.  And I

3      don't remember the venison register, but -- where

4      it was, but I know it was a separate one.  I

5      think it may have been at the -- kind of where

6      this phone is.  I don't remember exactly.  But

7      there was a separate register for venison.

8  Q.  What were your instructions with regard to using

9      the separate register?

10 A.  Anybody who came for venison pickup, to cash out

11     using that register.

12 Q.  Did it have receipts that would be given to the

13     customer?

14 A.  Yes.

15 Q.  And you would just use that register for venison?

16 A.  Correct.

17 Q.  Okay.  And was venison ever paid for by check or

18     was it cash only?

19 A.  I don't remember.

20 Q.  Do you recall any advertising or indication that

21     venison could be paid for by cash only?

22 A.  No.  No.

23 Q.  Were you ever paid separately for wrapping

89

1    Q.   Have you ever indicated that to anyone?

2    A.   No.

3    Q.   Do you have any -- do you know any reason why he

4         would believe such a thing?

5    A.   I do not know.  I don't know.

6    Q.   Do you find it offensive that he would think that

7         of your boyfriend?

8    A.   Absolutely.

9    Q.   Going on, page one sixty-one.  Question -- this,

10        again, is Sean Round's deposition.

11            And how did you know whether or not the

12        person she was with.  Answer, because she would

13        tell us.  Question, what would she tell you.

14        Answer, specifically, I can't say.  In a general

15        sense, that he wasn't working.  Question, did you

16        ever meet him.  Answer, not officially, no.

17        Question, okay.  What do you mean by not

18        officially.  Answer, he would come into the

19        store.  Question, were you aware that Raelean,

20        dash, dash, Regina Rush was dating a black man.

21        Answer, she dated quite a few in my tenure there.

22        Question, okay.  Answer, so yes, I was aware.

23        Question, okay.  And how did you become aware

90

1    that she was dating black men.  Answer, she would

2    talk about it.  Question, okay.  And did any

3    individuals that she dated that were black come

4    into the store.  Answer, I think so.  Question,

5    and did you ever discuss with her dating a black

6    man.  Answer, no.

7         Did you ever discuss your choice of a

8    partner with Sean Round?

9  A.  No.  Not that I remember.

10 Q.  Is that something you would normally do?

11 A.  No.

12 Q.  Did your boyfriend ever come to the store?

13 A.  Yes.  I think he had come to the store a couple

14   of times.

15 Q.  And did he ever talk to any of the employees in

16   the store?

17 A.  I don't remember.

18 Q.  Okay.  Do you ever recall Darcy -- did you ever

19   tell your mother -- strike that.

20        Do you ever recall telling anyone that Darcy

21   told you that Sean Round or anyone was making

22   offensive comments regarding your boyfriend?

23 A.  No.

91

1   Q.   Do you ever recall Keegan Roberts asking you if
2        Sean -- strike that.  Do you ever recall Keegan
3        Roberts asking you if you had any type of
4        disagreement with Sean Round?
5   A.   No.
6   Q.   Okay.  Let me read you from Keegan Roberts'
7        testimony taken on January 12, 2018 under oath.
8   A.   Okay.
9   Q.   Question, did you ever learn -- strike that.  At
10       any time, did you ever become aware of Sean Round
11       making a comment to Raelean Rush that her
12       boyfriend, who is an African-American, was using
13       her for her good credit score and other things.
14       Answer, when I got the complaint filed with the
15       EEOC.  Question, in the normal -- other than the
16       complaint at the EEOC, did you ever learn in your
17       role as an employee or a manager or owner of the
18       business that Sean Round made a comment to
19       Raelean Rush about her boyfriend using her for a
20       good credit score and other things.  Answer, no.
21       I was aware there was a fight between Sean Round
22       and Raelean Rush.  Question, do you believe Sean
23       Round made a comment to Raelean Rush about her

95

1   A.   No, I don't remember.

2   Q.   Did you ever hear anyone at Black Angus Meat

3        refer to anyone as nigs?

4   A.   No.

5   Q.   Bob's nigs.  Would you agree with me that if an

6        employee referred to Black Angus Meat

7        African-American customers as Bob's nigs, that

8        that would be offensive?

9   A.   That would be offensive, yes.

10  Q.   And if you heard that, what, if anything, would

11       you have done?

12  A.   I would have reported it to Diane.

13  Q.   Do you ever recall telling anyone that Sean was

14       Diane and Rob's golden boy?

15  A.   No.

16  Q.   Do you ever recall anyone, in reference to

17       African-American employees, saying they have nice

18       cars and get food stamps?

19  A.   No.

20  Q.   Have you ever heard anyone, relative to

21       African-American employees, saying that they have

22       nice clothes and get food stamps?

23  A.   No.

97

1   A.   No.

2   Q.   Did you ever hear anyone say, does the carpet

3        match the drapes?

4   A.   No.

5   Q.   Do you know what that means?

6   A.   Does the carpet match the drapes?  Is that

7        referring to someone's pubic hair?

8   Q.   Yes.

9   A.   Yes, I've heard of it, but not at Black Angus.

10  Q.   Would you find that statement to be offensive, if

11       someone said that to a woman?

12  A.   Yes.

13  Q.   Would you find that ever to be appropriate in a

14       workplace?

15  A.   No.

16  Q.   If a male employee at Black Angus looked at a

17       woman and said -- customer or otherwise, and said

18       oh, look at that cleavage, would that be

19       appropriate at work?

20  A.   No.

21  Q.   Would you find that offensive, as a woman?

22  A.   Yes.

23  Q.   If an employee at Black Angus Meat said to others

98

1      while working, in reference to a woman's breasts,

2      your headlights are on, would you find that to be

3      offensive?

4  A.  Yes.

5  Q.  If a male at Black Angus Meat referred to any

6      female, she's got a nice ass, would that be

7      offensive?

8  A.  Yes.

9  Q.  Would it ever be appropriate in the workplace?

10 A.  No.

11 Q.  Did you ever hear that -- from Darcy or anyone,

12     that her children were referred to in an

13     offensive term by anybody at Black Angus Meat?

14 A.  No.

15 Q.  Do you recall Darcy Black calling you the day she

16     was fired, the day she left work?

17 A.  I don't remember, no.

18 Q.  Do you recall her contacting you on her way --

19     actually, on her way as she left the building,

20     and telling you that Jamie Lapress had referred

21     to her children as niggers?

22 A.  No, I don't remember that.

23 Q.  Would it ever be appropriate -- well, first, have

102

1   Q.   Were you ever aware of anyone being disciplined

2        for anything at Black Angus Meat?

3   A.   Not that I recall, no.  Uh-uh.

4   Q.   Did you ever tell anyone that you were friends

5        with Darcy Black because -- strike that.  Did you

6        ever believe that Darcy Black was a friend with

7        you because you were dating someone who was

8        African-American?

9   A.   No.

10  Q.   If someone said that, would you find that

11       offensive?

12  A.   Yes, that's offensive.

13  Q.   Were you ever friends with Darcy Black because

14       she had children whose father is

15       African-American?

16  A.   No.

17  Q.   If someone said you were friends with her because

18       you can relate to her because she had children

19       with an African-American male, would you find

20       that offensive?

21  A.   Yes.

22  Q.   Let me show you what's been marked as Exhibit

23       211, which is a statement that was written to the

107

1   A.   No.

2   Q.   Do you think that if he made comments in your

3        presence about the credit rating -- well, strike

4        that.

5             Would you agree with me that someone else

6        could be offended if he made negative comments

7        about your boyfriend relative to his credit

8        rating and you?

9   A.   Yes.

10  Q.   And did you ever think at any time that the

11       comments he made about your boyfriend, in doing

12       so, he was stereotyping?

13  A.   If that was the comment.  I don't know the

14       comment.

15  Q.   But if that was the comment --

16  A.   Yes.

17  Q.   -- would you be concerned he was stereotyping?

18  A.   Yes.

19  Q.   Tell me what you mean by that.

20  A.   By stereotyping -- by saying using good credit,

21       that's stereotypical of black, you know,

22       stereotype that's out there, that they would use

23       girlfriends for their credit score.

108

1   Q.   Would you find that offensive?

2   A.   Yes, that would be offensive.

3   Q.   But do you recall if that was the comment that

4        Sean made to you?

5   A.   No.

6   Q.   Can you think of anything being more offensive

7        than having a white employee refer to Darcy

8        Black's children as niggers?

9   A.   No.

10  Q.   In your opinion, was that -- the use of that word

11       be -- strike that.  That word, in and of itself,

12       do you find it offensive?

13  A.   Yes.

14  Q.   Tell me why.

15  A.   Because it's racist to the black race.

16  Q.   And if Darcy, who is a white mom, had children

17       with an African-American father, would that also

18       be racist relative to her referring to her

19       children in that way?

20  A.   Yes.

21  Q.   When you were hired, were you ever informed you

22       could not request time off for the first twelve

23       days of the month or on Saturdays?

117

1  A.  No.

2  Q.  Do you recall her indicating to you that she

3      asked him if it was okay for Mr. Lapress to refer

4      to her children as niggers, and him responding it

5      happens in sports and politics and she had to

6      deal with it?

7  A.  No, I didn't know that.

8  Q.  Does that at all refresh your recollection?

9  A.  No.

10 Q.  Did Miss Black ever tell you that she was

11     uncomfortable working around Mr. Lapress because

12     of his comments?

13 A.  No.

14 Q.  Did Miss Black ever tell you that Robert Seibert

15     told her in response, he was uncomfortable with

16     the situation and she could leave right now?

17 A.  No.

18 Q.  Would there be any reason you would believe Jamie

19     Lapress -- strike that.  Having worked with both

20     Jamie Lapress and Darcy Black, would there be any

21     reason you would believe Jamie Lapress and

22     disbelieve Darcy Black?

23 A.  No.

118

1   Q.  Did Darcy ever, in working with you for the
2       number of years she did, indicate to you, in any
3       way, that she was the type of person that would
4       tell a lie?
5   A.  No.
6   Q.  Did you always find her to be straightforward and
7       honest?
8   A.  Yes.
9   Q.  And if she had told you that Jamie Lapress
10      referred to her children as niggers, would you
11      have believed her?
12   A.  Yeah, I would have believed her.
13   Q.  Do you know any reason why Robert Seibert would
14      not believe her?
15   A.  No.
16   Q.  Do you know any reason why Diane Seibert would
17      not believe her?
18   A.  No.
19   Q.  Do you know any reason why Keegan Roberts would
20      not believe her?
21   A.  No.
22   Q.  If I told you that Jamie Lapress testified under
23      oath that he frequently was late to work, would

126

1   Q.  Do you recall Darcy Black wanting to be off one
2       Saturday a month to be with her children?
3   A.  No.
4   Q.  Do you know if she was given Saturdays off --
5   A.  No.
6   Q.  -- upon request?
7   A.  No.
8   Q.  Meaning you don't know?
9   A.  Meaning I don't know.
10  Q.  Okay.  Did you ever hear Jamie Lapress -- strike
11      that.  Did you ever hear anyone say that Bob
12      Seibert said that his nigs were dirtying up the
13      parking lot?
14  A.  No.
15  Q.  Was -- to the best of your knowledge, was Darcy
16      always to work on time?
17  A.  Yes.  I remember that.
18  Q.  To the best of your knowledge, did Darcy treat
19      everyone the same and with respect?
20  A.  Yes.
21  Q.  I don't know if I asked you this.  Did you ever
22      hear of a person referred to as Turtle?
23  A.  No.

127

1   Q.   Do you ever hear of an individual named Matt
2        Marshall?
3   A.   No.
4   Q.   Were you ever aware if Darcy -- strike that.
5        Were you aware of Darcy Black -- strike that.
6            Were you allowed to bring your cell phone to
7        the workplace?
8   A.   No.
9   Q.   Do you know any males who utilized their cell
10       phone during working hours?
11  A.   I don't remember.
12  Q.   Did you ever consider, at any time, that Sean
13       Round was jealous of your boyfriend?
14  A.   Just probably when he made the comment, yes.
15  Q.   Okay.  The comment you are telling us about?
16  A.   Yes.
17  Q.   But other than that, that's the only comment you
18       recall?
19  A.   Right.
20  Q.   If an employee referred to your children as
21       niggers and the employer did not discharge or
22       discipline them, would you stay at that
23       employment?

128

1   A.  No.

2   MS. GRECO:  I have no further questions.

3   MS. O'BRIEN:  I have no questions.

4   BY MS. GRECO:

5   Q.  Just one more.  Sorry.

6       Did you ever speak to anyone from -- any

7   lawyer on behalf of the Defendant, not just

8   counsel that's present, but anybody else?

9   A.  No.

10  MS. GRECO:  Okay.  No further questions.

11

12                  *    *    *    *    *

13

14

15

16

17

18

19

20

21

22

23

129

1        I HEREBY CERTIFY that I have read the

2    foregoing 128 pages and that, except as to those

3    changes set forth in the attached errata form(s),

4    they are a true and accurate transcript of the

5    testimony given by me in the above-entitled

6    action on May 20, 2019.

7

8

9

10                    _____

11                          RAELEAN McGEE

12

13

14    Sworn to before me this

15

16    _____ day of _____ 2019.

17

18

19    _____

20         Notary Public.

21

22

23