UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DARCY M. BLACK

                                        Plaintiff,

        v.

BUFFALO MEAT SERVICE, INC., doing business
as BOULEVARD BLACK ANGUS, also known as
BLACK ANGUS MEATS, also known as
BLACK ANGUS MEATS & SEAFOOD,
ROBERT SEIBERT,
DIANE SEIBERT,
KEEGAN ROBERTS

                                  Defendants.

**DECLARATION**

**15-CV-00049 WMS-HBS**

---

      Josephine A. Greco, Esq., declares under the penalty of perjury under the laws of the United States of America that the following is true and correct:

      1.      I am a member of the law firm of Greco Trapp, PLLC, attorneys for Plaintiff, am duly licensed to practice in the State of New York and before this Court. I am fully familiar with the factual and procedural history of this action and this Declaration is based upon that knowledge.

      2.      I make this Declaration in opposition to Defendant's Motion for Summary Judgment.

      3.      Plaintiff, DARCY M. BLACK, brought this action against Defendant January 15, 2015 alleging violations of Title VII of the Civil Rights Act of 1964, as Amended, 42 U.S.C. Section 2000e *et seq.*, the New York State Human Rights Law, Executive Law Section 290, *et seq.*, the Equal pay Act, 29 U.S.C. § 206 *et seq.*, and 42 U.S.C. § 1981. The gravamen of Black's lawsuit is that Defendants created and permitted a hostile work environment on the basis of race and sex, discriminated against her on the basis of race and sex, discriminated against her with respect to

1

wages on the basis of sex, and constructively discharged her.

4.       During the court of discovery, Plaintiff requested but Defendants did not produce the cost of employee health insurance for years 2009 and 2010 or earnings information from before on or about January 7, 2005.

5.       Black is a Caucasian female, and she has two children with African-American fathers; Defendants were aware of this.  On or about May 16, 2005, Black began working for Buffalo Meat Service, Inc. ("BAM").   At that time, Robert Seibert and Diane Seibert owned 100% of BAM.   Keegan Roberts was Store Manager.   During Black's employment at BAM, Robert Seibert, Diane Seibert, and Keegan Roberts each had independent authority to hire, fire, and otherwise affect Black's terms and conditions of employment.   At some point after Black's May 25, 2010 constructive discharge, Keegan Roberts became a 1/3 owner of BAM, with Robert Seibert and Diane Seibert each also holding 1/3 interests.

6.       Defendants failed to provide BAM's employees with any training with respect to discrimination, harassment, hostile work environment, and retaliation.   Instead, Defendants' only standard of conduct was this phrase, which Robert Seibert had repeated since at least about 1991: "you can talk about the weather and sports, this is no soap opera – leave your personal dramas at home."   Defendants, however, failed to hold male employees to this singular standard of conduct, and Defendants were aware that BAM's male employees made numerous racially and sexually offensive comments.   For example, Defendants admit that they were aware that Sean Round, one of Black's male co-employees, made at least two racially offensive comments to Raelean Rush, a Caucasian co-employee who was dating an African-American male.   With respect to Raelean Rush's association with her African-American boyfriend, Sean Round told Raelean Rush that her boyfriend was "using her for her good credit score and other things" and that she could "do better." Sean Round had no factual basis for these racially offensive comments, as Raelean Rush's African-

American boyfriend was a hard-working business owner who fully contributed to their relationship. Defendants also admit that, about six months prior to Black's May 25, 2010 constructive discharge, Robert Seibert, without any factual basis, said to Black "she would have to get used to the idea that her children were black – there was no changing that.   School kids are cruel and racial remarks from kids is not unusual."   Robert Seibert said this to Black without basis, as Black did not tell Robert Seibert that her children were being bullied because they are African-American.

7.       In correspondence to the EEOC Defendants made a number of additional statements that demonstrate animus toward employees who had associations with African-Americans:

- With respect to Black's friendship with Raelean Rush and Regina Rush"[b]oth dated African Americans and Darcy felt a connection to them because her children were biracial." This is untrue.

- "Darcy was easy to feel sorry for early on in her employment.  A single mother with two biracial children trying to work to provide for her family."   Defendants stating that Black was easy to feel sorry for because of the race of her children is demeaning and offensive.

8.       Defendants were aware that BAM's employees made additional racially and sexually offensive comments.   One of the most significant was the regular use of "Bobs niggs" to refer to Defendants' African-American customers.   When Keegan Roberts and Sean Round made deliveries to predominantly African-American neighborhoods, they said that they had to deliver to "Bob's niggs."   When Robert Seibert asked Jamie LaPress to clean BAM's parking lot, Jamie LaPress said that he had to clean the parking lot because "Bob's niggs are dirtying [it] up."   Defendants were also aware of other racially offensive comments, such as Jamie LaPress saying with respect to African-American customers: "how they could have nice cars and get food stamps" or how can they have "gold around their neck . . . [a]nd get food stamps."   The Seiberts' daughter, Nicole Seibert, and Keegan Roberts laughed at these comments.   Additionally, Nicole Seibert said regarding an African-American customer who made a purchase with food stamps, he was "too fat" or "why can't they get out and work."   Defendants were also aware of sexually offensive

3

comments.   For example, Thomas Howells, BAM's main butcher, asked both Black and Debbie Negrych on separate occasions "does the carpet match the drapes?"   During Raelean Rush's employment, Sean Round commented about her "nice ass" both to her and to male employees. Even after Raelean Rush was no longer employed at BAM, Sean Round continued to comment about her "nice ass" to Keegan Roberts."   With respect to BAM's female customers, Sean Round made sexually offensive comments, such as "her headlights are on" and "oh look at that cleavage."

9.      Defendants also failed to interview or offer employment to at least 50 African-American applicants.   Notably, Defendants sought applications by placing a "help wanted" sign on the store's front door, which many African-Americans saw because 60% of BAM's customers are African-American.   Additionally, despite 60% of BAM's customers being African-American, BAM did not have a single African-American employee from the period between the 1990s and after Black's May 25, 2010 constructive discharge.   When an applicant delivered an application to BAM, Diane Seibert looked out of her office window to determine the applicant's race.   If the applicant was Caucasian, Diane Seibert interviewed the applicant.   If the applicant was African-American, Diane Seibert directed BAM's employees, including Black, to tell the applicant that BAM was only accepting applications.   Black recalled three specific African-American applicants subject to this treatment: Spartacus Towne; Leo Cumberlander, Jr.; and the son of a customer who Black knew as Mr. John.   With respect to Spartacus Towne, Black observed Diane Seibert put his application into the trash.   The EEOC determined that Defendants had committed a records-keeping violation in failing to preserve documents and applications relevant to this issue.

10.      Throughout Black's employment and continuing through her May 25, 2010 constructive discharge, Defendants' male employees enjoyed more favorable terms and conditions of employment than Black and other female employees.   But for management employees, all of Defendants' employees are generally comparable, and Diane Seibert indicated that they were

4

basically interchangeable.   With respect to the employees to whom Black compares herself: Mark

Leible, Sean Round, Patrick Howells, and William Frase, all of these employees were, first and

foremost, packers, i.e., they worked in the pack room preparing orders for deliveries.   However,

Defendants provided male employees with more favorable terms and conditions of employment,

including regarding time and attendance, breaks, work rules, enrollment in health insurance, and

wages.   Black did not learn that Defendants paid her less than her similarly situated male co-

employees until in or about April 2010, when Debbie Negrych told her.

11.     On March 3, 2009, while still employed at BAM, Black filed a Voluntary Petition

for Chapter 7 bankruptcy.   At that time, Black had no intention of making any claim against

Defendants.   As discussed below, not until over 14 months after filing for bankruptcy—and an

incident in which Defendants failed to take action against an employee who told Black that her

children were thieves because they were niggers—did Black consider that she may have a claim

against Defendants.   Black could not afford to leave or jeopardize her job at BAM, as she needed

the income to support her family.   Black, who has only a high school education, was not even

aware that she could bring a claim against BAM while she remained employed there.   Thus, Black

did not and had no reason to indicate before the Bankruptcy Court that she had any claims against

Defendants.   On June 11, 2009, the Bankruptcy Court entered and Order discharging Black's

bankruptcy, disposing of $10,220.23 in unsecured debt.   Black worked for BAM for another 11

months and 14 days after entry of this Order.

12.     It was not until Defendants' conduct that began on May 15, 2010 and concluded on

May 25, 2010, resulting in Black's constructive discharge, that she ever considered brining a claim

against Defendants.   Specifically, on May 15, 2010, Jamie LaPress, one of Black's male co-

employees, had lost the key to a paper towel dispenser and came up alongside Black and asked her

if she could break into the paper towel dispenser.   Black told him that she could not and asked him

why he would ask her that question.   Jamie LaPress said to Black "you have two black kids and

that's what black people do."   Black replied that her children do not break into things, and she

asked him why he would say that. "He goes well, they're niggers."   This comment indicated that

Jamie LaPress believed that all African-Americans are thieves and used the word nigger, which

was, to Black, the most offensive, degrading, and inflammatory racial slur used to show hatred and

bigotry toward African-Americans.   Additionally, Defendants admit that, prior to this incident,

Jamie LaPress had made prior offensive comments about Black's children, which can be inferred

were related to their race in light of his May 15, 2010 comment.   Black, however, did not

immediately resign her employment; she allowed BAM opportunities to take corrective action.   On

May 18, 2019, Black complained to Keegan Roberts, Store Manager, that Jamie LaPress said that

her children steal because they are niggers.   Jamie LaPress denied making this comment.   On May

21, 2010, Keegan Roberts had already decided that he believed Jamie LaPress over Black and told

Black that he would like her to have a further conversation with Jamie LaPress about the incident.

Since Defendants were not going to take any action with respect to her complaint, Black, on May

21, 2010, left a letter of complaint and resignation for Robert Seibert and Diane Seibert.   Black's

letter stated:

> I am writing you this because I have a hard time talking about what
> happened at work.   I can deal with issues that have to do with me.
> I get emotional, then I get over it, but when someone can look and
> me and call my kids "niggers", I can not deal with that.   My kids
> might be a handful but they are mine, and don't deserve to be called
> that by one of my co-workers.   So, I am giving you my 2 week
> notice.   Thank you for all you have done for me.

13.   On May 25, 2010, Robert Seibert called Black into a meeting concerning the May

15, 2010 incident in which Jamie LaPress said that her children steal because they are niggers and

her May 21, 2010 letter of complaint and resignation.   Regarding Black's complaint, Robert

Seibert said to Black that she would have to get used to things like that because people are mean

and cruel.   Black then asked Robert Seibert "So it's okay for one of my co-workers to call my kids

niggers?"   He replied "It happens in politics and it happens in sports so [Black is] going have to

get used to the idea."   When Black told Robert Seibert that, as a result of Jamie LaPress's comment,

she was uncomfortable continuing to work with him, Robert Seibert said that he "was

uncomfortable with the whole situation" and directed Black to leave immediately.   Robert Seibert

admitted that asking Black to leave in this manner would be inappropriate and retaliatory.   Prior to

these events, Black had no intention of resigning her employment at BAM.   Raelean Rush, who is

Caucasian and whose husband is African-American and the father of her two children, testified that

she could think of nothing more offensive than a white employee calling Black's children niggers

and that if an employee referred to her children as niggers and her employer did not discharge or

discipline the employee, she would leave employment.

14.     Following Black's May 25, 2010 constructive discharge, Black completed an EEOC

Intake Questionnaire, dated June 14, 2010, and stamped received by the EEOC on June 18, 2010,

which included allegations against BAM, Robert Seibert, and Keegan Roberts.   ¶ 4.   Black

included a handwritten narrative and authorized the EEOC to move forward with an investigation

and Charge of Discrimination.   Black then submitted a Charge of Discrimination, dated December

16, 2010, and stamped received by the EEOC on January 3, 2011, which named as Respondents:

BAM, Robert Seibert, and Diane Seibert.   The EEOC later issued probable cause determinations

on of some of Black's claims, finding that: "reasonable cause to believe that Charging Party was

subjected to a hostile work environment and constructive discharge based on race discrimination."

15.     Black's Complaint did not make Title VII claims against the individual Defendants,

Robert Seibert, Diane Seibert, and Keegan Roberts.

A.    **EVIDENCE SUPPORTS BLACK'S CLAIMS OF HOSTILE WORK ENVIRONMENT AND CONSTRUCTIVE DISCHARGE.**

15.    Contrary to Defendants' position, all of the conduct that Black identifies in support of her hostile work environment claims occurred within the relevant statutory periods.   With respect to Black's Title VII claims, the statutory period extends to 300 days before the EEOC's June 18, 2010 receipt of Black's Intake Questionnaire, which included a handwritten narrative an authorized the EEOC to move forward with an investigation and Charge of Discrimination.   Thus, the Title VII statutory period extends to August 22, 2009, and not February 13, 2010, as Defendants argue.   Defendants also fail to recognize that the statutory period for Black's claims brought under the NYSHRL is three years, which tolled during the period Black's claims were being investigated before the EEOC.   Thus, the NYSHRL statutory period extends to September 3, 2007.   With this background, the following conduct occurred within the relevant statutory periods:

- On May 15, 2010, Jamie LaPress had lost the key to a paper towel dispenser and came up alongside Black and asked her if she could break into the paper towel dispenser.  Black told him that she could not and asked him why he would ask her that question.  Jamie LaPress said to Black "you have two black kids and that's what black people do."   Black replied that her children do not break into things, and she asked him why he would say that.  "He goes well, they're niggers."   Black could think of nothing more offensive that Jamie LaPress saying that her children are thieves because they are niggers.

- On May 25, 2010, Robert Seibert called Black into a meeting concerning the May 15, 2010 incident in which Jamie LaPress said that her children steal because they are niggers.   Robert Seibert said to Black that she would have to get used to things like that because people are mean and cruel. Black then asked Robert Seibert "So it's okay for one of my co-workers to call my kids niggers?" He replied "It happens in politics and it happens in sports so [Black is] going have to get used to the idea."   Defendants failed to take any action regarding Black's complaint.

- Black complained to Robert Seibert that she was uncomfortable continuing to work with Jamie LaPress, Robert Seibert said that he "was uncomfortable with the whole situation" and directed Black to leave immediately.  Even Robert Seibert admitted that asking Black to leave in this manner would be inappropriate and retaliatory.

- About six months prior to Black's May 25, 2010 constructive discharge, Robert Seibert, without any factual basis, said to Black "she would have to get used to the idea that her children were black – there was no changing that.   School kids are cruel and racial remarks from kids is not unusual."

Robert Seibert had no reason to make this racially offensive comment, as Black had not indicated that her children's race had anything to do with them being bullied.

- When Keegan Roberts and Sean Round made deliveries to predominantly African-American neighborhoods, they said that they had to deliver to "Bob's niggs."   This continued through Black's May 25, 2010 constructive discharge.

- When Robert Seibert asked Jamie LaPress to clean BAM's parking lot, Jamie LaPress said that he had to clean the parking lot because "Bob's niggs are dirtying [it] up."

- Defendants were also aware of Jamie LaPress saying with respect to African-American customers: "how they could have nice cars and get food stamps" or how can they have "gold around their neck . . . [a]nd get food stamps."   Keegan Roberts and Nicole Seibert laughed at these comments.

- Nicole Seibert said regarding an African-American customer who made a purchase with food stamps, he was "to fat" or "why can't they get out and work."

- Sean Round said to Raelean Rush, a Caucasian employee who was dating an African-American male, that her African-American boyfriend was using her for her good credit score and other things. Sean Round had no basis for this comment, as Raelean Rush's boyfriend was a hard-working business owner.   Raelean Rush remained employed by Defendants until on or about April 15, 2009.

- Sean Round said to Raelean Rush, a Caucasian employee who was dating an African-American male, that she could "do better" than her boyfriend.  Sean Round had no basis for this comment, as Raelean Rush's boyfriend was a hard-working business owner.   Raelean Rush remained employed by Defendants until on or about April 15, 2009.

- Defendants demonstrated racially discriminatory animus stating before the EEOC with respect to Black's friendship with Raelean Rush and Regina Rush that "[b]oth dated African Americans and Darcy felt a connection to them because her children were biracial."

- Defendants demonstrated racially discriminatory animus stating before the EEOC that "Darcy was easy to feel sorry for early on in her employment.   A single mother with two biracial children trying to work to provide for her family."

- Throughout Black's employment, Defendants did not employ any African-Americans or racial minorities and had not since the 1990s, despite 60% of BAM's customers being African-American and BAM advertising available jobs only by posting a "help wanted" sign on the front door. Additionally, Defendants failed to interview or offer employment to at least 50 African-American applicants.   With respect to Spartacus Towne; Leo Cumberlander, Jr.; and the son of a customer who Black knew as Mr. John, Black observed Diane Seibert decide not to interview these applicants only after determining that they were African-American.   Black observed Diane Seibert put the application of Spartacus Towne into the trash.   This continued through Black's May 25, 2010 constructive discharge.

<u>Sex</u>

9

- During Raelean Rush's employment, Sean Round commented about her "nice ass" both to her and to male employees. Even after Raelean Rush was no longer employed at BAM, Sean Round continued to comment about her "nice ass" to Keegan Roberts. Black recalled Sean Round making such a comment shortly before her May 25, 2010 constructive discharge.

- Sean Round made sexually offensive comments relative to female customers, such as: "her headlights are on" and "oh look at that cleavage." This continued through Black's May 25, 2010 constructive discharge.

- Thomas Howells asked directly to Black and Debbie Negrych on different occasions: "does the carpet match the drapes?"

- Defendants subjected Black to less favorable terms and conditions of employment that similarly situated male employees with respect to wages, time and attendance, breaks, work rules, and enrollment in health insurance, which altered her working conditions for the worse. This continued through Black's May 25, 2010 constructive discharge. S*ee* discussion *infra* Part B.

- Defendants admitted that when hiring for certain positions, they would discard female applicants "as a rule."

16.       The above-referenced conduct occurring within the statutory periods is, alone,

sufficient to establish Black's hostile work environment claims. It is well-established that hostile

work environment claims present mixed questions of law and fact that are especially well-suited

for jury determination. Courts have noted that the pervasiveness of harassing conduct is the sort

of issue that is often not susceptible of summary resolution. The Second Circuit has often noted

that even a single episode of harassment can establish a hostile work environment if the incident is

sufficiently severe. Defendants have not claimed that there is no bases for imputing the hostile

work environment to the employer and, therefore, have waived the issue.

17.       First, the incidents surrounding Black's May 25, 2010 constructive discharge—

Jamie LaPress telling Black that her children are thieves because they are niggers and Robert Seibert

responding to Black's complaint by telling her that she would have to get used to it because people

are mean and cruel and that it "happens in politics and sports"—alone create a question of fact as

to a racially hostile work environment. The fact that the law requires harassment to be severe or

pervasive before it can be actionable does not mean that employers are free from liability in all but

the most egregious cases.   The Second Circuit has not ruled out the possibility that a one-time use

of a severe racial slur could, by itself, support a hostile work environment claim when evaluated in

the cumulative reality of the work environment.   Black, however identifies far more conduct than

the circumstances surrounding her May 25, 2010 constructive discharge in support of her hostile

work environment claims, and cumulative effect of individual acts further demonstrates hostile

work environment.

18.      In light of the particular severity of the conduct surrounding Black's May 25, 2010

constructive discharge and the cumulative effect of other racially offensive conduct, Defendants'

motion should be denied.   First, unlike the authorities Defendants cite with respect to the severe

and pervasive issue, evidence here shows regular use of the word nigger ("Bob's niggs"); the

statement to Black saying that her children are thieves because they are niggers; and many other

instances of racially offensive conduct.   None of the authorities Defendants cite involve multiple

uses of the word nigger.   Additionally, given Robert Seibert's direct involvement in racially

offensive conduct, summary judgment is especially inappropriate.

19.      Evidence also establishes a sexually hostile work environment.   Contrary to

Defendants' argument, Black does, in fact, identify sexually offensive conduct directed at her, i.e.,

Thomas Howells asking her "does the carpet match the drapes?"   Additionally, the Court must

consider Black's evidence in support of a sexually hostile work environment in light of her

significant evidence of a racially hostile work environment.   Additionally, because Black

identified overtly sexually offensive conduct, facially neutral incidents—including disparate

treatment as compared to similarly situated male employees—will also contribute to a hostile work

environment.

20.      Further, Defendants' "discrimination in the air" arguments (Dkt. 106-26 23-24, 26-

27), are inconsistent with Second Circuit authority and recent decisions of this Court.   Black's

hostile work environment claims can be supported by discriminatory behavior not directed at plaintiff" of which Black was aware, because this behavior "can still contribute to the creation of an overall hostile work environment.   In fact, when a Defendant recently raised an argument that discriminatory acts not directed at the plaintiff should not be considered for the purpose of hostile work environment, this Court rejected the argument.

21.     The evidence that establishes Black's hostile work environment claims raise questions of fact exist as to whether the harassment was of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.   Additionally, a finding that the evidence here creates questions of fact would comport with the well-established principle that that the pervasiveness of harassing conduct is the sort of issue that is often not susceptible of summary resolution.

22.     As noted above, the conduct establishing Black's hostile work environment claims occurred within the relevant statutory periods.   Should the Court, however, determine that any acts occurred outside of those periods, those acts should also be considered, as the continuing violation doctrine is applied to hostile work environment claims as a matter of course.   The authorities that Defendants cite for the proposition that Black's hostile work environment claims are untimely are inapplicable here, as the cases relate to the continuing violation doctrine as applied to discrete, tangible employment actions, rather than hostile work environment claims.

23.     Based on the conduct discussed above, evidence also establishes that Defendants constructively discharged Black.   Here, on May 15, 2010, Jamie LaPress told Black that her children were thieves because they were niggers.   To Black, this is the most offensive, degrading, and inflammatory racial slur used to show hatred and bigotry toward African-American.   Black, however, did not immediately resign her employment; she allowed BAM opportunities to take corrective action.   On that same day, Black made complaints to Debbie Negrych and Thomas

Howells, no action was taken.   On May 18, 2019, Black made a complaint to Keegan Roberts.   On

May 21, 2010, Keegan Roberts had already decided that he believed Jamie LaPress over Black and

told Black that Defendants would not discipline or discharge Jamie LaPress.   After this, Black left

her complaint and resignation letter for Robert Seibert and Diane Seibert.

- On May 25, 2010, Robert Seibert called Black into a meeting concerning the May 15, 2010 incident in which Jamie LaPress said that her children steal because they are niggers.   Robert Seibert said to Black that she would have to get used to things like that because people are mean and cruel. Black then asked Robert Seibert "So it's okay for one of my co-workers to call my kids niggers?" He replied "It happens in politics and it happens in sports so [Black is] going have to get used to the idea."

- Black complained to Robert Seibert that she was uncomfortable continuing to work with Jamie LaPress, Robert Seibert said that he "was uncomfortable with the whole situation" and directed Black to leave immediately.   Even Robert Seibert admitted that asking Black to leave in this matter would be inappropriate and retaliatory.

24.     Raelean Rush, who is Caucasian and has two children with her African-American

husband, testified that she could think of nothing more offensive than a white employee calling

Black's children niggers.   She said if her employer did not discharge or discipline the employee,

she would leave employment.   The EEOC found probable cause that Black was constructively

discharged.   The authorities that Defendants rely on with respect to constructive discharge simply

to not apply here.

**B.     DEFENDANTS HAVE NOT MOVED AGAINST BLACK'S CLAIMS OF GENDER AND RACE DISCRIMINATION.**

25.     Black's Complaint pleaded causes of action sounding in discrimination based on

gender and race, which Defendants acknowledge Defendants' Memorandum of Law does not

address these claims; Defendants have waived the issue, and Black's disparate treatment claims

should survive Defendants' motion.   Regardless, if the Court does address this issue, evidence

supports Black's gender and race discrimination claims.   With respect to race discrimination,

Black presents direct evidence based on Robert Seibert saying to Black that "she would have to get

used to the idea that her children were black – there was no changing that.   School kids are cruel and racial remarks from kids is not unusual" and that she would have to get used to things like that because people are mean and cruel and that "[i]t happens in politics and it happens in sports so [Black is] going have to get used to the idea."   Even were the Court to find that Black did not present direct evidence, evidence establishes a prima facie case of gender and race discrimination because Black: (1) in in protected classes (female whose children are African-American); (2) was qualified for her position; (3) suffered the following adverse employment actions: (a) constructive discharge; (b) denial of a raise in March 2010; (c) denial of enrollment in Defendants' health insurance plan; and (d) the cumulative "atmosphere" of adverse employment action arising from Defendants' conduct, such as scrutinizing Black's time, interfering with her breaks, and denying her Saturdays off; and (4) evidence demonstrates that these adverse employment actions occurred under circumstances giving rise to inferences of gender and race discrimination.   As Black establishes a prima face case, Defendants must articulate some legitimate, nondiscriminatory reason for their actions.   Defendants have not articulated a legitimate business reason; thus, there is no issue before this Court as to whether Black's gender and race discrimination claim are subject to dismissal.

## C.   EVIDENCE SUPPORTS BLACK'S CLAIMS OF PAY DISCRIMINATION UNDER TITLE VII AND THE NYSHRL.

26.      Evidence establishes that Defendants paid female employees, including but not limited to Black, less than similarly situated male employees, and Defendants' motion with respect to Black's Title VII and NYSHRL pay discrimination claims should be denied.   Under Both Title VII and the NYSHRL, Black established a prima facie case with evidence that: (1) that she was a member of a protected class; (2) that she was paid less than similarly situated non-members of her protected class; and (3) evidence of discriminatory animus.   Evidence establishes a prima facie

14

case of wage discrimination based on sex.   Diane Seibert admitted that all of Defendants employees are comparable because they are all expected to do any work as needed and are basically interchangeable, and Black's male coworkers, Mark Leible, Sean Round, Patrick Howells, and William Frase, were each similarly situated to her and were all first and foremost, packers.

27.   Evidence also establishes that Defendants paid Black less than these similarly situated male employees.   Defendants have not submitted any evidence to these employees' rates of pay.   Relevant employees' wage and benefit histories are fully detailed in Plaintiff's Counter-Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment. Defendants paid Mark Leible—who was Black's partner in the pack room—a higher hourly rate than Black and allowed him to enroll in health insurance through BAM.   From at least on or about January 7, 2005, until in or about June 2007, Defendants paid 40% of Mark Leible's health insurance premium. From between in or about March 2009 and Black's May 25, 2010 constructive discharge, Defendants paid 100% of Mark Leible's health insurance premium.   Defendants paid Sean Round—who started at BAM after Black (on or about February 3, 2007) and had no specialized skills or experience—more than Black.   Over the course of the first six months of Sean Round's employment with Defendants, he had received raises of $2.50/hour to $11.50/hour, which is more than Black's hourly rate as a five-year employee of $10/hour at the time of her May 25, 2010 constructive discharge.   Evidence also indicates that Defendants allowed Sean Round to work off-the-books.   Defendants also paid Patrick Howells off-the-books for his seasonal work in the pack room.   Finally, Defendants paid William Frase—who also worked with Black in the pack room—50% more than they paid to Black ($10/hour versus $15/hour).   Additionally, prior to on or about July 31, 2009, Defendants had paid William Frase to work off-the-books since at least in or about May 2005.

28.   Evidence also establishes that this pay discrimination occurred because of

15

Defendants' discriminatory animus.   First, the evidence discussed above (see supra) establishes Defendants' discriminatory animus.    Additionally,  specifically  with  respect  to  wage discrimination, evidence that Defendants paid other female employees less than similarly situated male employees also establishes discriminatory animus.   For example, when Defendants hired Sean Round on or about February 23, 2007, they paid him a higher hourly rate than they paid to Debbie Negrych, BAM's 20+ year employee who Defendants identified as "Deli Manager" and the "Face of the Angus."   Defendants also paid Christopher Howells a higher rate than they paid to Raelean Rush and Regina Rush, despite all three employees being part time and working primarily at the front counter.   Finally, evidence establishes that Defendants allowed male employees to retain more of their earnings by working off-the-books, including but not limited to: Sean Round, William Frase, Patrick Howells, David Monolopolus, and Thomas Howells.   A significant portion of Defendants' business is processing deer during hunting season, which is a "cash only" operation for which Defendants use a separate cash register.   This cash business allowed Defendants to pay these employees' wages off-the-books.

29.     Here, Defendants argue only that the pay disparity is based on a factor other than sex, i.e., job duties.   Defendants' argument is without merit because, as noted above, the employees to whom Black compares herself were all, like Black, primarily packers, and only moved on to additional and equivalent duties once packing was completed.   Thus, Defendants have failed to show a legitimate justification for paying Black less than similarly situated male employees, and Defendants' motion should be denied.

**D.     BLACK HAS CAPACITY TO BRING ALL CLAIMS IN THIS ACTION.**

30.     Black has capacity to bring all claims in this action.   Defendants' argument that Black's claims in this matter transferred to the bankruptcy estate (Dkt. 106-25 at 8-10) is an argument of capacity, not standing, as Defendants' argument is that the Trustee, not Black, is the

16

proper party to bring those claims.  Given that Defendants have not pleaded a lack of capacity defense in their Answer or in their responses to Black's Interrogatories, Defendants have waived the defense and cannot rely on it at summary judgment.

31.    Further, Defendants knew about Black's bankruptcy at least as early as February 17, 2017 but failed to seek to amend their Answer, and Black is significantly prejudiced by Defendants' delay in raising this defense.   Here, Black's counsel completed seven of the nine noticed depositions, including of the named Defendants, without knowledge that Defendants intended to rely on this allegedly dispositive issue, thus depriving her of the ability to develop relevant testimony.   Then, during January 21, 2018 deposition Black's deposition, opposing counsel's questions focused on attempting to have Black testify as to when certain conduct occurred for later use in support of this unpleaded capacity defense.   It was not until the final minutes of Black's deposition that opposing counsel even asked about Black's bankruptcy, amounting to an intentional ambush on this issue.   Only after Black's January 23, 2018 deposition did Defendants, with service of their Response to Plaintiff's Second Set of Interrogatories, dated February 12, 2018, first indicate that they would contend that Black's 2009 bankruptcy called for the dismissal of her claims. Defendants cannot, at this late stage, seek to amend their Answer to include this defense, as Defendants' delay in raising it has resulted in incurable prejudice to Black.

32.    Even were the Court to reach this waived defense, Defendants own authorities demonstrate that the lack of capacity doctrine does not apply to these facts.  Specifically, Black petitioned for Chapter 7 bankruptcy on March 3, 2009.   At that time, she was a BAM employee and remained one through her May 25, 2010 constructive discharge.   When Black filed her Petition, she did not have any claims or lawsuits pending against Defendants, had no intention to bring any claims against Defendants, and had no knowledge that any potential claims existed with respect to Defendants.   When required to list all suits and administrative proceedings to which the

17

debtor is or was a party within one year immediately preceding the filing of his bankruptcy case, Black accurately listed the two collection actions in which she was a defendant.   Black had no other such suits or administrative proceedings to disclose.   Black's bankruptcy was discharged on June 11, 2009.

33.     As demonstrated above, the facts here are distinguishable from Defendants' cited authorities, and application of the lack of capacity doctrine to Black would be unreasonable as requiring Black in March 2009 to disclose employment-related claims that she had no knowledge of and no intention to act on.   Black could not afford to leave or jeopardize her job at BAM, as she needed the income to support her family. Additionally, she was not even aware that she could bring a claim against BAM while she remained employed there. Black continued to work for Defendants for a year and two months after filing for bankruptcy and over 11 months after the discharge of her bankruptcy.   Regardless, even were the Court to consider Black's capacity, it would only affect her ability to recover for wage discrimination prior to June 11, 2009, as all of her other claims accrued after discharge of her bankruptcy.

E.     **BLACK IS NOT JUDICIALLY ESTOPPED FROM BRINGING ANY CLAIMS IN THIS ACTION.**

34.     Defendants' contention that Black is judicially estopped from bringing any claims in this action because she failed to schedule a claim before the Bankruptcy Court is meritless.   The doctrine of judicial estoppel operates similarly to capacity, except judicial estoppel is an equitable doctrine and is not appropriate when a party's inconsistency is the result of a good faith mistake or an inadvertent error.   A court should consider all the attendant circumstances in deciding whether nondisclosure was purposeful or inadvertent.   As an equitable principle, the circumstances under which judicial estoppel may be invoked are probably not reducible to any general formulation of principle,' and as such, the applicability of the doctrine is not bound by 'inflexible prerequisites or

18

an exhaustive formula.

35.     Here, Defendants are incorrect in contending that Black's failure to identify any claims against Defendants in the context of her bankruptcy constitutes an inconsistent position because debtors are not required to list every hypothetical, tenuous, or fanciful claim on an asset disclosure form.   As noted with respect to capacity when Black filed her Petition, she did not have any claims or lawsuits pending against Defendants, had no intention to bring any claims against Defendants, and had no knowledge that any potential claims existed with respect to Defendants. Thus, if any claims did exist, they could be only classified as hypothetical, tenuous, or fanciful.

36.     Even were Black's position before the Bankruptcy Court deemed inconsistent, judicial estoppel would not apply, as there is no evidence that Black was playing fast and loose with the courts in order to gain unfair advantage through the deliberate adoption of inconsistent positions in successive suits. Thus, judicial estopped does not apply because any "non-disclosure was harmless and not malicious. Quite the opposite, evidence shows that Black, at all points while her bankruptcy remained open, lacked knowledge of undisclosed claims.   It was not until over 14 months after filing for bankruptcy—and an incident in where her children were called thieves because they are niggers and Defendants failed to take action—that Black had no choice by to end her employment.   Subsequently, with the loss of her full-time income, Black considered that she may have a claim against Defendants.   Thus, Black did not and had no reason to indicate before the Bankruptcy Court that she had any claims against Defendants.   Additionally, Black had no knowledge of claims and thus no motive to conceal.

37.     Application of judicial estoppel is also not appropriate because any nondisclosure had at most a de minimis effect on a prior bankruptcy proceeding, given that Black remained employed at BAM throughout her bankruptcy, and any possible claim was limited to only pay disparity.   Even then, Black did not learn about wage discrimination until in or about April 2010.

Regardless, even were the Court to apply judicial estoppel, it would only affect Black's ability to recover for wage discrimination prior to June 11, 2009, as all of her other claims accrued after discharge of her bankruptcy.

38.     For all of the reasons set forth in this Declaration and as set forth Plaintiff's Counter-Statement of Material Facts and exhibits referenced therein, Defendants' Motion for Summary Judgment seeking to dismiss the Complaint in its entirety should be denied but for with respect to Black's Ninth Cause of Action (Equal Pay Act), which she withdraws.

WHEREFORE, Plaintiff respectfully requests that this Court grant an Order denying Defendant's Motion for Summary Judgment seeking to dismiss Plaintiff's First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Tenth Causes of Action, together with the costs and disbursement of this motion, and such other and further relief as the Court deems just and proper.

Dated: September 19, 2019
Buffalo, New York                                                    s/Josephine A. Greco
                                                                     Josephine A. Greco, Esq.