**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**DARCY M. BLACK**,

                         **Plaintiff**,

    *v.*

**BUFFALO MEAT SERVICE, INC., doing business**          **15-cv-00049**
**as BOULEVARD BLACK ANGUS, also known as**
**BLACK ANGUS MEATS, also known as BLACK**
**ANGUS MEATS & SEAFOOD,**
**ROBERT SEIBERT,**
**DIANE SEIBERT,**
**KEEGAN ROBERTS**,
**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

                         **Defendants.**
_____


**REPLY AFFIRMATION OF RANDOLPH C. OPPENHEIMER, ESQ.**
**IN FURTHER SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

    RANDOLPH C. OPPENHEIMER, an attorney licensed by the state of New York, a member

of the Barclay Damon LLP law firm partnership, and counsel for the Defendants in this action,

affirms under penalty of perjury that the following is true:

    1.    I make this Reply Affirmation in further support of Defendants' summary

judgment motion, and specifically to reply to opposing matter put before the Court by Plaintiff.

    2.    In the "Statement of Facts" (Pages 2 of 26 through Page 7 of 26) in Plaintiff's

Memorandum of Law (Dkt. # 112-15)("Plaintiff's MOL"), Plaintiff portrays her allegations

concerning racial and other discrimination (a) as admitted facts, when they are not, and (b) takes

testimony out of context to inflame, rather than enlighten.

3.      In each of the following paragraphs I identify in quotations what the Plaintiff misstates to be an admission, and then I provide the deposition testimony or other proof showing why the Plaintiff's assertion is false or misleading.

A.      False "Statement of Fact":

Testimony:   "In correspondence to the EEOC Defendants made a number of additional statements that demonstrate animus toward employees who had associations with African-Americans:

With respect to Black's friendship with Raelean Rush and Regina Rush [b]oth dated African Americans and Darcy felt a connection to them because her children were biracial. ¶ 7.

Darcy was easy to feel sorry for early on in her employment. A single mother with two biracial children trying to work to provide for her family." ¶ 7.

*See* Deposition Testimony of Robert Siebert, at p. 219, lines 3-8 (Dkt. # 69-6).

Q.  Did you ever – did you ever tell anyone or state that Raelean Rush and Regina Rush both dated African-Americans and Darcy Black felt a connection to them because their children were biracial.

A.  No.

*See* Deposition Testimony of Robert Siebert, at p. 225, lines 20-23, continued at p. 226, lines 1-5 (Dkt. # 69-6).

Q.  Okay.  Did you ever state to anyone – well, strike that.  Did you ever state to anyone that it was easy to feel sorry for Darcy Black because she was a single mother with two biracial children trying to find work and provide for her family?

A.  You're asking me if I made that statement?

Q.  Yeah.

A.  I don't recall ever making that statement.

*See* Deposition Testimony of Diane Siebert, at p. 213, lines 7-23, and p. 214, lines 1-5 (Dkt. # 69-3).

Q. Do you believe that Darcy Black was easy to feel sorry for early on in her employment because she was a single mother with two biracial children trying to find work to provide for her family?

A. Yes.

2

Q. And why would you include biracial children in that?

A. Because that's how she referred to her children.

Q. And so whenever she talked about her children, she said my biracial children?

A. Not every time. She told us she had biracial children. Okay. She told us that before I ever saw her children. She told us she had biracial children, so that would be why.

Q. But did it make you feel more sorry for her because she had two biracial children?

A. No. It made me feel sorry for her because she was a single mom with two kids trying to work and take care of them.

Q. Exactly. That's how you would normally see it, a single mom with two kids?

A. A single mom with two kids.

*See* Deposition Testimony of Keegan Roberts, at p. 231, lines 3-12 (Dkt. # 69-7).

Q. Did you ever tell anyone or state that you believed that Darcy felt a connection to Raelean Rush and Regina Rush because both of those women dated African-Americans and because Darcy's children were biracial?

A. Can you repeat the question?

MS. GRECO: Can you read it.

(Whereupon, the above-requested question was then read back by the reporter.)

THE WITNESS: No.

*See* Deposition Testimony of Keegan Roberts, at p. 240, lines 12-3, p. 241, lines 1-4 (Dkt. # 69-7).

Q. Okay. Did you ever feel sorry for Darcy Black because she was a single mother with two biracial children?

A. Not because she was a single mother with two biracial children, but Darcy always wanted somebody to feel sorry for her.

Q. What do you mean by that?

A. It was always something. It was always, you know, one thing or another. I don't have a specific for you.

Q. Can you give me any example?

A. You know, my boyfriend beat my son with the phone and put him in the hospital, you know. And then the next day my boyfriend's at the house and I had to hide him from the cops, you know. It's always a story or something.

3

*See* Deposition Testimony of Deborah Negrych, at p. 209, lines 8-18 (Dkt. # 69-5).

> Q. Do you think they were only friends because they had African-American boyfriends and Darcy had –
>
> MR. OPPENHEIMER: Jesus Christ.
>
> BY MS. GRECO:
>
> Q. -- biracial children?
>
> A. No.
>
> Q. Did you ever tell Diane Seibert or Robert Seibert that Raelean Rush, Regina Rush both dated African-Americans and Darcy felt a connection to them because her children were biracial?
>
> A. No.

*See* Deposition Testimony of Thomas Howells, at p. 267, lines 16-23, continued at p. 268, lines 1-4 (A copy of the Transcript of Thomas Howells Deposition is attached hereto as **Exhibit A**, and referred to herein as "Ex. A").

> Q. And do you believe that because Raelean Rush and Regina Rush dated African American males, that Darcy felt a connection to them because their children were biracial?
> MS. BAHAS: Object to the form.
> THE WITNESS: I don't know. I have no opinion. What someone else does, I don't care.
> BY MS. GRECO:
> Q. Do you think Darcy Black just could have been friends with them because they were nice people?
> MS. BAHAS: Object to the form.
> THE WITNESS: We're all nice people there.

B.   False "Statement of Fact":

Testimony:  "For example, Defendants admit that they were aware that Sean Round, one of Black's male co-employees, made at least two racially offensive comments to Raelean Rush, a Caucasian co-employee who was dating an African-American male."  ¶ 11.

*See* Deposition Testimony of Keegan Roberts, at p. 231, lines 14-23, and p. 232, lines 1-8 (Dkt. # 69-7).

> Q. Did you ever learn -- strike that. At any time did you ever become aware of Sean Round making a comment to Raelean Rush that her boyfriend, who was an African-American, was using her for her good credit score and other things?

4

A. When I got the complaint filed to the EEOC.

Q. In the normal -- other than the complaint at the EEOC, did you ever learn in your role as an employee or a manager or owner of the business that Sean Round made a comment to Raelean Rush about her boyfriend using her for a good credit score?

A. No.

*See* Deposition Testimony of Keegan Roberts, at p. 285, lines 21-23, p. 286, line 1 (Dkt. # 69-7).

Q. Did you ever hear or learn that Sean Round told Raelean Rush and/or Regina Rush that she needs to be with one of her own kind?

A. No.

*See* Deposition Testimony of Keegan Roberts, at p. 286, lines 19-23, p. 287 lines 1-3 (Dkt. # 69-7).

Q. Did you ever learn that Sean -- ever hear Sean Round say or learn that he said that Regina -- Raelean Rush and/or Regina Rush -- strike that.  Did you ever hear Sean Round tell or learn that he told Raelean Rush or Regina Rush, who were dating African-American males, what's wrong with white guys?

A. No.

*See* Deposition Testimony of Keegan Roberts, at p. 287, lines 8-12 (Dkt. # 69-7).

Q. Okay. Did you ever learn or did you ever hear Sean Round tell Raelean Rush or Regina Rush that her boyfriend was using her for her good credit score?

A. No.

*See* Deposition Testimony of Keegan Roberts, at p. 288, lines 3-8 (Dkt. # 69-7).

Q. Did you ever hear or learn that Sean Round told Raelean Rush or Regina Rush that her boyfriend, who was African-American, was using her for her name and black men always cheat and hers probably has a lot of girlfriends?

A. No.

*See* Deposition Testimony of Robert Seibert, at p. 245, lines 17-20 (Dkt. # 69-6).

Q.  Were you aware of Sean Round ever telling Raelean Rush or Regina Rush, in these words or similar words, that she'd be better off with a white guy?

A.  No.

*See* Deposition Testimony of Robert Seibert, at p. 246, lines 5-9 (Dkt. # 69-6).

5

Q.  Would it ever  be appropriate – were you ever  aware of Sean Round telling Raelean Rush and Regina Rush, in these or similar words, that she needs to be with one of her own kind?

A.  No.

*See* Deposition Testimony of Robert Seibert, at p. 247, lines 5-8 (Dkt. # 69-6).

Q.  Were you ever aware of Sean Round telling Raelean Rush and Regina Rush asking them what's wrong with white guys?

A.  No.

*See* Deposition Testimony of Robert Seibert, at p. 247, lines 22-23, and p. 248, lines 1-8 (Dkt. # 69-6).

Q.  Were you ever aware of Sean Round telling Raelean Rush and/or Regina Rush, in these or similar words, that her boyfriend was using her for her good credit score?

A.  Start of the question again was?

Q.  Were you ever aware of Sean Round telling Raelean Rush and/or Regina Rush, in these or similar words, that her boyfriend was using her for her good credit score?

A.  No.

*See* Deposition Testimony of Robert Seibert, at p. 249, lines 5-12 (Dkt. # 69-6).

Q.  Okay.  And were you ever aware of Sean Round telling Raelean Rush and/or Regina Rush that African-American boyfriend was using her for her name because Black men cheat and he probably has a lot of girlfriends.

A.  Was I aware of that?

Q.  Yes.

A.  No.

*See* Deposition Testimony of Thomas Howells, at p. 271, lines 14-18 (Ex. A)

Q. Were you aware of Sean Round making comments to Raelean Rush and/or Regina Rush relative to their African American boyfriend that they would be better off with a white guy?

A. No.

*See* Deposition Testimony of Deborah Negrych, at p. 210, lines 1-22 (Dkt. # 69-5).

Q. Did you ever hear or learn that Sean Round made the following comment to Raelean Rush or Regina Rush -- do you follow me? I'm not trying to trick you.

A. Yes.

6

Q. Okay. That she would be better off with a white guy?

MR. OPPENHEIMER: Form.

THE WITNESS: No.

BY MS. GRECO:

Q. Did you ever hear or learn that Sean Round made the following comment to Raelean Rush or Regina Rush, that she needs to be with one of her own kind?

MR. OPPENHEIMER: Form.

THE WITNESS: No.

BY MS. GRECO:

Q. Did you ever hear or learn that Sean Round made the following comment to Raelean Rush or Regina Rush, what is wrong with white guys?

MR. OPPENHEIMER: Form.

THE WITNESS: No.

*See* Deposition Testimony of Deborah Negrych, at p. 212, lines 9-15 (Dkt. # 69-5).

Q. Did you ever hear or learn that Sean Round told Raelean Rush that her boyfriend, who was an African-American, was using her to get her name because black men always cheat and he probably has a lot of girlfriends?

MR. OPPENHEIMER: Form.

THE WITNESS: No.

C.     False "Statement of Fact":

Testimony:   "With respect to Raelean Rush's association with her African-American boyfriend, Sean Round told Raelean Rush that her boyfriend was "using her for her good credit score and other things" and that she could "do better." ¶ 11."

*See* Deposition Testimony of Sean Round, at p. 159, lines 9-12 (Dkt. # 69-2).

Q. Did you ever say, in these or similar words, that Raelean Rush's boyfriend was using her for her good credit score?
A. No.

*See* Deposition Testimony of Sean Round, at p. 160, lines 21-23, and p. 161, lines 1-12  (Dkt. # 69-2).

7

Q. Did you ever discuss Raelean Rush's boyfriend, who was African-American, with her?
A. Yes.
Q. Can you tell me what you recall you said?
A. I said she deserves better. And none of that was based on race.
Q. Why did you tell her she deserves better?
A. She was working hard and finishing school. He wasn't working. She was -- as far as anyone knew from what Raelean would say, she was taking care of whatever their financial obligations were. It was my opinion that she deserved somebody better that would work and be more of a fifty/fifty partner. Again, none of that was racially driven.

*See* Deposition Testimony of Raelean McGee nee Rush, at p. 85, lines 10-13 (A copy of the Transcript of Raelean McGee nee Rush's Deposition is attached hereto as **Exhibit B**, and referred to herein as "Ex. B").

Q. Did anyone ever tell you, when you worked at Black Angus Meat, that you would be better off with a white guy?
A. No.

*See* Deposition Testimony of Raelean McGee nee Rush, at p. 85, lines 20-23 (Ex. B).

Q. Did anyone at Black Angus Meat ever tell you your boyfriend was using you for your good credit score?
A. No.

*See* Deposition Testimony of Raelean McGee nee Rush, at p. 86, lines 22-23, and p. 87, lines 1-2  (Ex. B).

Q. Did Sean ever indicate to you, or anyone ever indicate to you, that you deserve better than your boyfriend?

A. No.

*See* Deposition Testimony of Raelean McGee nee Rush, at p. 105, lines 9-13  (Ex. B).

Q. Do you think it was any of his business -- well, do you recall the comment being about you using your credit rating to do something for your boyfriend?

A. No. I don't remember that being the comment, no.

D.    False "Statement of Fact":

8

Testimony: "Defendants also admit that, about six months prior to Black's May 25, 2010 constructive discharge, Robert Seibert, without any factual basis, said to Black "she would have to get used to the idea that her children were black — there was no changing that. School kids are cruel and racial remarks from kids is not unusual." ¶ 11.

Testimony: "Robert Seibert said this to Black without basis, as Black did not tell Robert Seibert that her children were being bullied because they are African-American." ¶ 11.

*See* Deposition Testimony of Robert Seibert, at p. 222, lines 6-23, and p. 223, lines 1-17 (Dkt. # 69-6).

> Q. Okay. Did you ever tell Darcy Black – strike that. Did you ever tell Darcy Black in these or similar words, it means these words or words like this. That she would have to get used to the idea that her children were black, there was no changing that, school kids are cruel and racial remarks from kids is not unusual, that was your opinion?
> A. Did I ever?
> Q. Yes.
> A. I made a comment similar to that six months or a year before she left us.
> Q. Can you tell me about that, please? Where were you when you made the comment?
> A. I was in the office and which Darcy was in the office on a phone and some kind of phone call from someplace that – some kind of problem that she had and went on and on and on and she was in her situation that she was emotionally upset. And I don't know if it was a teacher that called her or what it was. It was something regarding her children and where somebody made a comment to her children that wasn't nice and regarding she felt at the time because of her children being black they were being targeted by other children. And she sat in there crying and I just told her that, you know, kids are going to be kids, they are going to be – you know, make statements like that, you're going to have to learn to deal with it. I mean, that what kids do, which was somewhere around six months or could have even been a year before. It was whatever kind of – like I said, she had multiple situations that she'd be talking the office with someone about her children.

*See* Deposition Testimony of Keegan Roberts, at p. 293, lines 7-12, (Dkt. # 69-7).

> Q. Okay. Did you ever hear Robert Seibert tell Darcy Black or anyone that Darcy Black has to get used to the idea that her children were black, there was no changing that, school kids are cruel and racial comments to kids is not unusual?

9

A. No.

*See* Deposition Testimony of Diane Siebert, at p. 153, lines 12-16, (Dkt. # 69-3).

Q. Were you ever aware of Robert Seibert saying to Darcy Black that she would have to get used to the idea her children were black, there was no changing that?

A. No.

E.      False "Statement of Fact":

Testimony:   "Defendants were aware that BAM's employees made additional racially and sexually offensive comments. One of the most significant was the regular use of "Bobs niggs" to refer to Defendants' African-American customers. ¶ 11.

Testimony:   "When Keegan Roberts and Sean Round made deliveries to predominantly African-American neighborhoods, they said that they had to deliver to "Bob's niggs." ¶ 11.

*See* Deposition Testimony of Robert Siebert, at p. 250, lines 3-10, (Dkt. # 69-6).

Q.  Okay.  Were you ever aware of anyone at Black Angus Meat referring to African-Americans as niggs?

A.  No.

Q.  Were you ever aware of anyone at Black Angus Meat referring to African-American clients as Bob's niggs?

A.  No.

*See* Deposition Testimony of Diane Siebert, at p. 128, lines 4-15, (Dkt. # 69-3).

Q. I'm going to ask you some questions about specific words. I'm going to ask if you ever heard them used in the workplace or you, yourself, ever used them. Did you ever hear the word nigger used at Black Angus Meat?

A. Absolutely not.

Q. Did you ever hear the word nigs?

A. No.

Q. And all of these are did you ever hear it used at Black Angus Meat, meaning you or anyone else. Did you ever hear the term Bob's nigs?

A. No.

*See* Deposition Testimony of Keegan Roberts, at p. 281, lines 10-15, (Dkt. # 69-7).

10

19244775.1

Q. I'm going to ask if you've ever heard these derogatory terms used at Black Angus Meat. I'll say the term, you can say yes or no. Fair enough?

A. Yep.

Q. Okay. Bob's nigs?

A. No.

*See* Deposition Testimony of Keegan Roberts, at p. 194, lines 13-15, (Dkt. # 69-7).

Q. Have you ever heard anyone use the term nigs at Black Angus Meat?

A. No.

*See* Deposition Testimony of Raelean McGee nee Rush, at p. 95, lines 2-4 (Ex. B).

Q. Did you ever hear anyone at Black Angus Meat refer to anyone as nigs?

A. No.

*See* Deposition Testimony of Mark Leible, at p. 173, lines 13-22 (Dkt. # 69-8).

Q. Did you ever hear anyone refer to black customers as Bob's nigs?

A. No.

Q. Did you ever hear anyone refer to Black Angus Meat customers as nigs?

A. No.

Q. Did you ever hear Sean Round or anyone say that he has to deliver to Bob's nigs, referring to black customers at Black Angus Meat?

A. No.

*See* Deposition Testimony of Deborah Negrych, at p. 213, lines 16-19 (Dkt. # 69-5).

Q. Did you ever hear or were you aware of Sean Round saying that he delivered to Bob's nigs?

MR. OPPENHEIMER: Form.

THE WITNESS: No.

*See* Deposition Testimony of Jamie LaPress, at p. 38, lines 5-8 (Dkt. # 69-4).

Q. Do you ever use the word niggs?

A. No.

11

Q. Do you ever use the word Bob's niggs?

A. No.

*See* Deposition Testimony of Sean Round, at p. 154, lines 11-14  (Dkt. # __).

Q. Did you ever hear the word nigs used?

A. No.

Q. Did you ever hear Bob's nigs used?

A. No.

*See* Deposition Testimony of Sean Round, at p. 164, lines 9-16 (Dkt. # 69-2).

Q. Did you ever refer to any customer who was African-American of Black Angus Meats as Bob's nig or Bob's nigs?

A. No.

Q. Did you ever hear anyone refer to African-American customers of Black Angus Meats or Robert Seibert as Bob's nigs?

A. No.

*See* Deposition Testimony of Sean Round, at p. 167, lines 17-22 (Dkt. # 69-2).

Q. Do you ever recall Bob Seibert or Diane Seibert or Mr. Keegan, or anyone on behalf of Black Angus Meats, speaking to you or anyone else saying that there has been a complaint of discrimination regarding racially discriminative comments?

A. No.

*See* Deposition Testimony of Patrick Howells, at p. 114, lines 9-12 (A copy of the Transcript of Patrick Howells Deposition is attached hereto as **Exhibit C**, and referred to herein as "Ex. C").

Q. Did you ever hear anyone at Black Angus Meat, while you were there during the times you were there, use the word nigs?

A. No.

*See* Deposition Testimony of Thomas Howells, at p. 279, lines 20-23, p. 281, lines 1-4 (Ex. A).

Q. Were you aware of Jamie Lapress referring -- strike that. Were you ever aware of Jamie Lapress stating that he has to deliver to Bob's nigs?
A. Who has to?
Q. Were you ever aware of Jamie -- of Sean Round saying that he has to deliver to Bob's nigs?
A. No, I never heard that.

F.      False "Statement of Fact":

Testimony: "When Robert Seibert asked Jamie LaPress to clean BAM's parking lot, Jamie LaPress said that he had to clean the parking lot because "Bob's niggs are dirtying [it] up." ¶ 11.

*See* Deposition Testimony of Jamie LaPress, at p. 215, line 23, p. 216 lines 1-4, (Dkt. # 69-4).

> Q. Okay. And did you ever say to anyone that Bob or Mr. Seibert had called you and -- and in these or similar words, and said his niggs are dirtying up the parking lot?
>
> A. Absolutely not.

*See* Deposition Testimony of Robert Seibert, at p. 252, lines 13-18 (Dkt. # 69-6).

> Q. Okay. Did you ever learn from anyone at any time that when you would call and ask for Jamie Lapress that when he would hang up he would say that you had called and said your niggs were dirtying up the parking lot.
> A. No.

*See* Deposition Testimony of Diane Siebert, at p. 152, lines 10-13, (Dkt. # 69-3).

> Q. And did you ever hear anyone say that Robert Seibert would call Jamie Lapress and say his nigs are dirtying up the parking lot?
> A. No.

*See* Deposition Testimony of Keegan Roberts, at p. 289, lines 12-17, (Dkt. # 69-7).

> Q. Did you ever hear Robert Seibert tell Jamie Lapress to say hi to his -- to say -- did you ever hear Robert Seibert tell Jamie Lapress that his, meaning Robert Seibert's, nigs were dirtying up the parking lot?
> A. No.

*See* Deposition Testimony of Keegan Roberts, at p. 289, lines 22-23, p.290 lines 1-3 (Dkt. # 69-7).

> Q. Did you ever learn that Robert Seibert called Jamie Lapress and told him that his, meaning Robert Seibert's nigs, were dirtying up the parking lot?
>
> A. No.

*See* Deposition Testimony of Raelean McGee nee Rush, at p. 126, lines 10-14 (Ex. B).

Q. Okay. Did you ever hear Jamie Lapress – strike that. Did you ever hear anyone say that Bob Seibert said that his nigs were dirtying up the parking lot?
A. No.

*See* Deposition Testimony of Sean Round, at p. 164, lines 17-20 (Dkt. # 69-2).

Q. Did you ever hear Mr. Seibert say, in these or similar words, that his nigs are dirtying up the parking lot?

A. Absolutely not.

*See* Deposition Testimony of Patrick Howells, at p. 115, lines 10-17 (Ex. C).

Q. Would it ever be appropriate for an employee at Black Angus Meat to say relative to customers -- black customers of Black Angus Meat that Bob's nigs are dirtying up the parking lot?

MS. BAHAS: Objection. Form.

BY MS. GRECO:

Q. You can answer.

A. Never heard that.

*See* Deposition Testimony of Deborah Negrych, at p. 214, lines 4-11 (Dkt. # 69-5).

Q. Were you ever aware -- did you ever hear or did you ever learn that Jamie Lapress said that the owner, Robert Seibert, called him on the phone and said his, meaning Robert Seibert's, nigs are dirtying up the parking lot?
MR. OPPENHEIMER: Form.
THE WITNESS: No.

*See* Deposition Testimony of Thomas Howells, at p. 281, lines 5-7 (Ex. A)

Q. Were you ever aware of Jamie Lapress saying that Bob's nigs were dirtying up the parking lot?

A. No.

*See* Deposition Testimony of Thomas Howells, at p. 283, lines 4-8 (Ex. A).

Q. Were you ever aware of Mr. Lapress saying on multiple occasions that Robert Seibert called him on the phone, telephone and told him his nigs are dirtying up the parking lot?

A. No.

G.      False "Statement of Fact":

14

Testimony:  "Defendants were also aware of other racially offensive comments, such as Jamie LaPress saying with respect to African-American customers: "how they could have nice cars and get food stamps" or how can they have "gold around their neck . . . [a]nd get food stamps." ¶ 11.

*See* Deposition Testimony of Jamie LaPress, at p. 209, lines 8-23, p. 210 lines 1-4, (Dkt. # 69-4).

> Q. Would you agree with me that with reference to a black customer someone saying how come they have nice cars and get food stamps that that is offensive?
> MR. OPPENHEIMER: Form. Just in terms of the Witness' last answer when he said offensive, he said I wouldn't say it, so I guess that's the way I would like you to interpret the word offensive, that you wouldn't say it.
> THE WITNESS: All right.
> MR. OPPENHEIMER: Does that help?
> BY MS. GRECO:
> Q. Not really. Would you –
> MR. OPPENHEIMER: That's how he understood the prior question.
> BY MS. GRECO:
> Q. Do you know what offensive means?
> A. He said what he means it means.
> Q. What does it mean to you?
> MR. OPPENHEIMER: That he wouldn't say it, that is what he said.
> BY MS. GRECO:
> Q. Did you ever say the statement I said before or this statement?
> A. The two statements you just said, no.
> Q. And did you ever hear anyone make those statements?
> MR. OPPENHEIMER: At Black Angus?
> THE WITNESS: No.

*See* Deposition Testimony of Robert Seibert, at p. 253, lines 4-13 (Dkt. # 69-6).

> Q. Were you ever aware of Sean Round or Jamie – strike that. Were you ever aware of anyone saying in reference to African-American customers these or similar words, how can they have nice cars and get food stamps?
> A. You're asking me if I've ever heard that?
> Q. Any employee at Black Angus Meat saying relative to an African-American customer how can they have nice cars and get food stamps?
> A. No.

*See* Deposition Testimony of Robert Seibert, at p. 253, lines 21-23, p. 254, lines 1-9 (Dkt. # 69-6).

 Q.  Did you ever learn that Sean Round and/or Jamie Lapress said relative to African-American clients, customers, how could they have nice cars and get food stamps?
 A.  Did I ever hear that?
 Q.  Did you ever learn that?
 A.  No.
 Q.  Did you ever learn that Sean Round and/or Jamie Lapress said relative to African-American customers how can they have nice clothes and get good stamps?
 A.  No.

*See* Deposition Testimony of Keegan Roberts, at p. 288, lines 17-21 (Dkt. # 69-7).

 Q.  Did anyone ever say -- strike that. Did you ever learn or hear Sean Round or Jamie Lapress say, relative to African-Americans, how can they have nice cars and get food stamps?
 A. No.

*See* Deposition Testimony of Keegan Roberts, at p. 289, lines 3-7 (Dkt. # 69-7).

 Q.  Did you ever learn or hear Sean Round and/or Jamie Lapress say, relative to African-American customers, how could they have nice clothes and get food stamps?
 A. No.

*See* Deposition Testimony of Raelean McGee nee Rush, at p. 95, lines 16-93 (Ex. B).

 Q.  Do you ever recall anyone, in reference to African-American employees, saying they have nice cars and get food stamps?
 A. No.
 Q.  Have you ever heard anyone, relative to African-American employees, saying that they have nice clothes and get food stamps?
 A. No.

*See* Deposition Testimony of Sean Round, at p. 163, lines 13-23, and p. 164, lines 1-8  (Dkt. # 69-2).

 Q.  Did you ever hear Sean Round say, in these or similar words, relative to African-American customers, how can they have nice cars and get food stamps?
 MR. OPPENHEIMER: You are asking him if he ever heard himself say that?
 BY MS. GRECO:

16

Q. Sorry. Yes, I did. That's not a good question.  I'll withdraw it. Did you ever say, in these or similar words, relative to customers of -- African-American customers of Black Angus Meats how can they have nice cars and get food stamps?

A. No.

Q. Did you ever say, in these or similar words, relative to African-American customers of Black Angus Meats, how can they have nice clothes and get food stamps?

A. No.

*See* Deposition Testimony of Sean Round, at p. 165, lines 13-22 (Dkt. # 69-2).

Q. Did you ever hear Jamie LaPress say, in these or similar words, relative to African-American customers of Black Angus Meats, how can they have nice cars and get food stamps?

A. No.

Q. Did you ever hear Jamie LaPress say, in these or similar words, relative to African-American customers of Black Angus Meats, how can they have nice clothes and get food stamps?

A. No.

*See* Deposition Testimony of Patrick Howells, at p. 114, lines 13-19 (Ex. C).

Q. Did you ever hear anyone refer to African-American employees by stating – strike that. Did you ever hear anyone at Black Angus Meat, an employee, state relative to black customers, how can they have nice cars and get food stamps?

A. No.

*See* Deposition Testimony of Patrick Howells, at p. 115, lines 4-9 (Dkt. # C).

Q. At any time while you were at Black Angus Meat, did you ever hear an employee of Black Angus Meat say the following regarding a black customer or customers, in these or similar words, how can they have nice cars and get food stamps?

A. Never heard that.

*See* Deposition Testimony of Deborah Negrych, at p. 214, lines 18-23, p. 215, line 1 (Dkt. # 69-5).

Q. Okay. Did you ever hear or learn that Jamie Lapress or Sean Round and/or meaning both one or the other said in these or similar words relative to African-American customers, how can they have nice cars and get food stamps?

MR. OPPENHEIMER: Form.

THE WITNESS: No.

17

19244775.1

*See* Deposition Testimony of Deborah Negrych, at p. 215, lines 6-11 (Dkt. # 69-5).

> Q. Did you ever learn that Jamie Lapress and/or Sean Round said in these or similar words relative to African-American customers, how come they have nice clothes and get food stamps?
> MR. OPPENHEIMER: Form.
> THE WITNESS: No.

*See* Deposition Testimony of Thomas Howells, at p. 282, lines 4-20 (Ex. A).

> Q. Did you ever hear anyone at Black Angus Meats state in reference to African American males -- strike that. Did you ever hear anyone at Black Angus Meats state relative to African American customers in these or similar words, how could they have nice cars and get food stamps?
> A. No.
> Q. Did you ever hear Mr. Lapress, Mr. Round or any employee at Black Angus Meats state in these or similar words regarding African American customer, how could they have nice cars and get food stamps?
> A. No.
> Q. Did you ever hear Mr. Lapress or Mr. Round state relative to African American customers how come they have nice clothes and get food stamps?
> A. No.

H.    False "Statement of Fact":

Testimony:   "Additionally, Nicole Seibert said regarding an African-American customer who made a purchase with food stamps, he was "too fat" or "why can't they get out and work." ¶ 11.

*See* Deposition Testimony of Keegan Roberts, at p. 291, lines 4-9 (Dkt. # 69-7).

> Q. Did you ever hear Nicole Seibert say with regard to a large black customer or customers who had food stamps and was purchasing filet mignon or strip steak, or something of that nature, that why couldn't the individuals get out and work?
> A. No.

*See* Deposition Testimony of Deborah Negrych, at p. 215, lines 16-21 (Dkt. # 69-5).

> Q. Were you ever aware when a large, black customer with food stamps came in the store to purchase steaks, did you ever hear or

learn that Nicole Seibert said in these or similar words, why can't
he get out and work?
A. No.

See Deposition Testimony of Thomas Howells, at p. 282, lines 21-23, p. 283,
lines 1-3 (Ex. A).

Q. Did you ever hear Nicole Seibert or anyone else employed at
Black Angus Meats state when a large African American
individual with food stamps came into the store to purchase fillet
mignon or strip steak why can't they get out and work?
A. No.

I.      False "Statement of Fact":

Testimony:  "Defendants were also aware of sexually offensive comments. For
example, Thomas Howells, BAM's main butcher, asked both Black and Debbie
Negrych on separate occasions 'does the carpet match the drapes?'" ¶ 11.

See Deposition Testimony of Thomas Howells, at p. 306, lines 9-12 (Ex. A).

Q. Did you ever say to anyone, any female employee at Black
Angus Meats does the carpet match the drapes?

A. No.

See Deposition Testimony of Deborah Negrych, at p. 201, lines 7-9 (Dkt. # 69-5).

Q. Were you aware of any male employees making comments of a sexual
nature to female employees?

A. No.

See Deposition Testimony of Deborah Negrych, at p. 202, lines 8-10 (Dkt. # 69-
5).

Q. Did you ever hear a male employee tell a female employee does the
carpet match the drapes?

A. No.

See Deposition Testimony of Keegan Roberts, at p. 297, lines 13-15 (Dkt. # 69-7).

Q. Have you ever heard any comments of a sexual nature while
employed at Black Angus Meat?

A. No.

See Deposition Testimony of Raelean McGee nee Rush, at p. 97, lines 2-9 (Ex.
B).

Q. Did you ever hear anyone say, does the carpet match the drapes?

19

A. No.

Q. Do you know what that means?

A. Does the carpet match the drapes? Is that referring to someone's pubic hair?

Q. Yes.

A. Yes, I've heard of it, but not at Black Angus.

*See* Deposition Testimony of Sean Round, at p. 170, lines 6-10 (Dkt. # 69-2).

Q. Did you ever hear anyone say, in these or similar terms, relative to a woman at Black Angus Meats, does the carpet match your dreams?

MR. OPPENHEIMER: Form.

THE WITNESS: No.

*See* Deposition Testimony of Mark Leible, at p. 164, lines 4-13 (Dkt. # 69-8).

Q. Did you ever hear a male employee at Black Angus Meat say to a female employee does the carpet match the drapes?

A. No.

Q. Do you know what that means?

A. Yes.

Q. What does that mean to you?

A. It means does the upstairs match the downstairs.

Q. On a female?

A. Yes.

J.      False "Statement of Fact":

Testimony:  "During Raelean Rush's employment, Sean Round commented about her 'nice ass' both to her and to male employees." ¶ 11.

Testimony:  "Even after Raelean Rush was no longer employed at BAM, Sean Round continued to comment about her 'nice ass' to Keegan Roberts.'" ¶ 11.

*See* Deposition Testimony of Sean Round, at p. 169, lines 4-14 (Dkt. # 69-2).

Q. Did you ever hear any comments about a female's body –

MR. OPPENHEIMER: Form.

BY MS. GRECO:

Q. -- while at work at Black Angus Meats?

MR. OPPENHEIMER: Form.

20

THE WITNESS: No.

BY MS. GRECO:

Q. Did you ever hear anyone say, in these or similar words, she has a nice ass?

A. No.

*See* Deposition Testimony of Raelean McGee nee Rush, at p. 83, line 3, p. 84, lines 1-13 (Ex. B).

Q. Okay. And did Sean Round ever make any comments to you that you felt were inappropriate?

A. No.

Q. Did he ever ask you out?

A. No.

Q. Did he ever make any comments regarding your body?

A. No.

Q. Did anyone ever tell you he made any comments regarding your body?

A. No, not that I remember.

Q. Did anyone ever tell you he, in reference to you, said nice ass?

A. No. I don't remember that.

*See* Deposition Testimony of Deborah Negrych, at p. 201, lines 7-12 (Dkt. # 69-5).

Q. Were you aware of any male employees making comments of a sexual nature to female employees?

A. No.

Q. Were you aware of any male employee telling any female employee that she's got a nice ass?

A. No.

*See* Deposition Testimony of Thomas Howells, at p. 254, lines 13-19 (Ex. A).

Q. Did you ever hear any male employee say to a female employee at Black Angus Meats that she has a nice ass?

A. No, I haven't.

Q. Were you aware of Raelean Rush being told she has a nice ass by Sean Round?

A. No.

*See* Deposition Testimony of Jamie Lapress, at p. 286, lines 14-16 (Dkt. # 69-4).

21

Q. Did you ever hear anyone at Black Angus Meat say to a female that she's got a nice ass?

A. No.

K.      False "Statement of Fact":

Testimony:   "With respect to BAM's female customers, Sean Round made sexually offensive comments, such as 'her headlights are on' and 'oh look at that cleavage.'" ¶ 11.

*See* Deposition Testimony of Sean Round, at p. 169, lines 1-3 (Dkt. # 69-2).

Q. Were there any jokes of a sexual or racial manner?

A.  No.

*See* Deposition Testimony of Sean Round, at p. 169, lines 15-23, p. 170. Lines 1-4 (Dkt. # 69-2).

Q. I'm interested at Black Angus Meats in the time I told you, when you were employed there and Darcy Black was employed there. Did you ever hear anyone say, in these or similar words, referring to a woman's breasts, your headlights are on?
MR. OPPENHEIMER: Form.
THE WITNESS: No.
BY MS. GRECO:
Q. Did you ever hear anyone say, in these or similar terms, towards a woman, oh, look at that cleavage?
MR. OPPENHEIMER: Form.
THE WITNESS: No.

*See* Deposition Testimony of Thomas Howells, at p. 225, lines 11-18, p. 170. Lines 1-4 (Ex. A)

Q. Did you ever hear any male employee comment regarding a female employee that her headlights were on?

A. Her what?

Q. Headlights were on.

A. I think I know what you mean, no.

Q. In reference to her breasts?

A. Yes.  No.

*See* Deposition Testimony of Deborah Negrych, at p. 201, lines 16-23 (Dkt. # 69-5).

Q. Did you -- were you aware of any male employee telling a female employee or multiple female employees your headlights are on?

MR. OPPENHEIMER: Form.

THE WITNESS: What does that mean?

BY MS. GRECO:

Q. Do you know what that means?

A. No.

[No follow-up question was asked]

*See* Deposition Testimony of Deborah Negrych, at p. 202, lines 1-3 (Dkt. # 69-5).

Q. Did you ever hear any male employee tell a female employee, oh, look at that cleavage?

A. No.

L.      False "Statement of Fact":

Testimony:  "When an applicant delivered an application to BAM, Diane Seibert looked out of her office window to determine the applicant's race. ¶ 11. If the applicant was Caucasian, Diane Seibert interviewed the applicant." ¶ 11.

*See* Deposition Testimony of Diane Siebert, at p. 179, lines 6-11 (Dkt. # 69-3).

Q. Would you ever look out the window to see the person?
A. Maybe. There's no general rule.
Q. Did you ever ask anyone if the applicant was black or white?
A. No.

*See* Deposition Testimony of Thomas Howells, at p. 155, lines 4-10 (Ex. A).

Q. Who were the applications brought to?
A. Either Diane, Bob or Keegan.
Q. And do you know where their office is located?
A. Yes.
Q. And from where their office is located, can they look out the window and see?
A. No.

M.      False "Statement of Fact":

Testimony:   "If the applicant was African-American, Diane Seibert directed BAM's employees, including Black, to tell the applicant that BAM was only accepting applications." ¶ 11.

23

*See* Deposition Testimony of Keegan Roberts, at p. 70, lines 11-23, continued at p. 71, lines 1-11 (Dkt. # 69-7).

> Q. Okay. When there was a sign in the front door, would individuals come in and fill out an application?
> A. Yes.
> Q. Then what would happen during the time you were involved in the hiring process?
> A. Take the applications, read the applications, decide who we wanted to interview, talk to them.
> Q. Would you read the application while the individual was at the store?
> A. If we were there, if we had time available. Not necessarily always.
> Q. And if you weren't available -- if you were available, what would you do?
> A. If we were available and had time, we would take the application, read the application, probably give -- bring them into the office to talk to them if we weren't busy.
> Q. Okay. And would you bring all applicants in?
> A. No.
> Q. And how would you determine who you were going to bring in the office for an interview and who you weren't?
> A. Read the application, see if they looked on the application like they fit our criteria.

*See* Deposition Testimony of Sean Round, at p. 172, lines 7-23, continued at p. 173, lines 1-3 (Dkt. # 69-2).

> Q. And were you ever aware of anyone coming into Black Angus Meats, during the time that you were employed there, seeking to respond to that help wanted sign?
> A. Yes.
> Q. Were you trained on what to do if someone came in that way?
> A. Yes.
> Q. What were you supposed to do?
> A. Receive the application –
> Q. Do you give –
> A. -- bring it to Diane. If Diane had a minute, she would usually talk to the person right there, kind of ask them some questions, to which I did not stay and listen. If she was very busy, she would tell them she'd give them a call.  Occasionally, we would have applicants that would come without the sign up, in which they were told we are not hiring at the moment and we will hold your application.

*See* Deposition Testimony of Thomas Howells, at p. 154, lines 11-20 (Ex. A).

Q. And can you give me an estimate of how many African American individuals requested employment applications in the year 2017?

A. No. The only thing I can tell you is if you come in and ask for an application, you got an application. You filled it out, some people took them home, some people filled them out there. When they had them filled out, we'd take them into the office and the office would go from there. They would look it over.

See Deposition Testimony of Raelean McGee nee Rush, at p. 61, lines 10-23, continued at p. 62, lines 1-10 (Ex. B).

Okay. Now, and during the time you worked at Black Angus Meat, how often would there be a help-wanted sign on the window or wherever it was on the building?

A. I don't remember.

Q. Would it be often?

A. I don't remember.

Q. Did you ever receive applications -- strike that. Did you ever receive requests from anyone seeking to put in an application?

A. Yes.

Q. And how would that work, can you tell me?

A. Someone would come in and ask if we were hiring or can I get an application. I would get an application from the office and I would – from Diane, and then I would give them the application.

Q. Every time someone came in to request an application, that you were aware of, would you give them an application?

A. Yes.

Q. Then what would happen? Did anyone ever return applications to you?

A. I don't remember.

See Deposition Testimony of Deborah Negrych, at p. 100, lines 7-13 (Dkt. # 69-5).

Q. When you were at the front counter, did individuals come to you and request applications?

A. Yes.

Q. Okay. And what -- did you have any training to what you were supposed to do?

A. We took the application and we took it into the office.

See Deposition Testimony of Deborah Negrych, at p. 101, lines 10-23, continued at p. 102 lines 1-23, continued at p. 103, line 1 (Dkt. # 69-5).

Q. Were you able to get the application on your own or did you have to request it from someone?

25

A. Usually on our own.

Q. Okay. And then what would you do?

A. Ask them to fill it out.

Q. Okay. Then what?

A. Depending on the person. Some would say I'm taking it home and I'll fill it out and bring it back. Others would fill it out.

Q. Okay. If a person filled it out, what would happen?

A. We would take it into the office.

Q. When you say take it into the office, what do you mean?

A. Depending on who was there, we would take it into the office and put it on the desk.

Q. So what if Diane Seibert was there, what would you do?

A. I would hand it to her.

Q. What about if Keegan Roberts was there – Diane Seibert was't, but Keegan Roberts was?

A. He usually wasn't there that often.

Q. When you would hand it to Diane Seibert, what would happen?

A. If she was't too busy, she would ask them to come in and she would talk to them.

Q. Did she do that for everyone?

A. Yes, unless she was busy. Then she would ask them to either come back or she would call them to come back.

Q. It's your understanding every single person that applied got an interview?

A. Unless we weren't hiring at the time.

Q. If you were hiring, every single person who put in an application, when there was an open position, would get an interview, that's your understanding?

A.   Yes

*See* Deposition Testimony of Deborah Negrych, at p. 109, lines 14-16 (Dkt. # 69-5).

Q. Did anyone ever ask you what a person looked like?

A. No.

*See* Deposition Testimony of Deborah Negrych, at p. 110, lines 4-9 (Dkt. # 69-5).

Q. Did Diane Seibert ever ask you anything about any applicant?

A. No.

Q. She would just routinely see all applicants?

MR. OPPENHEIMER: Form.

THE WITNESS: If we were hiring at the time, yes.

N.     False "Statement of Fact":

Testimony: "Black recalled three specific African-American applicants subject to this treatment: Spartacus Towne; Leo Cumberlander, Jr.; and the son of a customer who Black knew as Mr. John. With respect to Spartacus Towne, Black observed Diane Seibert put his application into the trash." ¶ 11.

*See* Deposition Testimony of Diane Siebert, at p. 212, lines 9-23, continued at p. 213, lines 1-6 (Dkt. # 69-3).

Q. Okay. Do you recall an individual by the name of Spartus Town?

A. Never heard that name.

Q. Do you recall an individual by the name of Leo Cumberland Junior?

A. No.

Q. Do you know a customer by the name of Mr. John?

A. We probably have more than one Mr. Johns. I don't know who you are referring to.

Q. Do you recall any Mr. -- a Mr. John being a parent of an applicant that applied for a job?

A. No, I don't recall that.

Q. If I told you Spartus Town is black, would that help you remember?

A. No.

Q. If I told you Leo Cumberland Junior was black, would that help you remember?

A. No.

Q. If I told you Mr. John was black and his son was black, would that help you remember?

A. No.

O.    False "Statement of Fact":

Testimony: "Throughout Black's employment and continuing through her May 25, 2010 constructive discharge, Defendants' male employees enjoyed more favorable terms and conditions of employment than Black and other female employees. ¶11-14, 28-33. But for management employees, all of Defendants' employees are generally comparable, and Diane Seibert indicated that they were basically interchangeable. ¶ 11. With respect to the employees to whom Black compares herself: Mark Leible, Sean Round, Patrick Howells, and William Frase, all of these employees were, first and foremost, packers, i.e., they worked in the pack

27

room preparing orders for deliveries. ¶ 11. However, Defendants provided male employees with more favorable terms and conditions of employment, including regarding time and attendance, breaks, work rules, enrollment in health insurance, and wages. ¶ 11. Black did not learn that Defendants paid her less than her similarly situated male co-employees until in or about April 2010, when Debbie Negrych told her." ¶ 11.

*See* Deposition Testimony of Diane Siebert, at p. 202, lines 6-11 (Dkt. # 69-3).

> Q. That was the idea of a small business, to have these positions that interchange?
>
> MR. OPPENHEIMER: Form.
>
> BY MS. GRECO:
>
> Q. You hired these people to be interchangeable?
>
> A. For some things.

*See* Deposition Testimony of Diane Siebert, at p. 249, lines 1-7 (Dkt. # 69-3).

> Q. Now, your employees that work hourly --
>
> A. Yes.
>
> Q. -- how many breaks do they get?
>
> A. Everybody is entitled to a fifteen-minute break in the morning, a fifteen-minute break in the afternoon and half hour lunch for which they are paid.

*See* Deposition Testimony of Diane Siebert, at p. 263, lines 6-23, continued at p. 264, lines 1-15 (Dkt. # 69-3).

> Q. Any employment benefits. That's fine. Disability is an employment benefit. That's why I'm asking you what employment benefits were available during the time Darcy Black was employed at your company?
>
> A. Available?
>
> Q. Yes.
>
> A. Everybody pays into disability.
>
> Q. So just tell me and I'll ask questions. Go ahead.
>
> A. Workmen's Comp, if someone is injured. Vacation pay, insurance.
>
> Q. What type of insurance?
>
> A. Medical insurance.
>
> Q. Okay. Anything else?
>
> A. That's what comes to my mind right now.

Q. So with regard to medical insurance, was that available to all employees?

A. Yes.

Q. Do you recall Darcy Black asking to use medical insurance?

A. No. It was -- let me clarify one thing. It was for full-time employees, not part-time employees.

*See* Deposition Testimony of Sean Round, at p. 73, lines 6-18 (Dkt. # 69-2).

Q. Okay. What duties were you doing? You said you weren't sure if you were driving when you went up to eleven dollars an hour. But what other duties were you doing?

MR. OPPENHEIMER: Form.

THE WITNESS: Cleaning, customer service, wrapping.   All aspects of cutting deli meat, cheese, you know, filling delivery orders, loading delivery orders.

BY MS. GRECO:

Q. Okay.

A. Unloading things off the truck, stocking the coolers, changing the signs in the front windows, inventory once a month.

*See* Deposition Testimony of Deborah Negrych, at p. 140, lines 18-23 (Dkt. # 69-5).

Q. Anyone's pay rate -- strike that. Do you ever recall discussing your pay rate with anyone?

A. No.

Q. Do you ever recall discussing anyone else's pay rate with anyone?

A.  No.

*See* Deposition Testimony of Deborah Negrych, at p. 143, lines 11-22 (Dkt. # 69-5).

Q. Do you know if anyone else was ever disciplined at Black Angus Meat while you were employed there?

A. Yes.

Q. Who?

A. I don't recall who, but the boys for being late.

Q. I'm sorry. Who?

A. The boys. Some of the boys for being late.

Q. Anything else you recall?

A. No.

Q. When you say the boys, who do you mean?

A. Jamie and Mark.

P.     False "Statement of Fact":

Testimony: "Specifically, on May 15, 2010, Jamie LaPress, one of Black's male co-employees, had lost the key to a paper towel dispenser and came up alongside Black and asked her if she could break into the paper towel dispenser. ¶ 11. Black told him that she could not and asked him why he would ask her that question. ¶ 11. Jamie LaPress said to Black 'you have two black kids and that's what black people do.' ¶ 11. Black replied that her children do not break into things, and she asked him why he would say that. ¶ 11. 'He goes well, they're niggers.'" ¶ 11.

*See* Deposition Testimony of Jamie Lapress, at p. 34, lines 7-9 (Dkt. # 69-4).

Q. And what were those things?

A. Going back to that her kids were niggers. I never said anything like that.

*See* Deposition Testimony of Jamie Lapress, at p. 64, lines 16-21 (Dkt. # 69-4).

A. And same thing, she just asked me if I said if I ever used the word nigger, if I said any of the things she said I said and I said no, because I didn't.

Q. And anything she said you said meaning what?

A. That I referred to her kids as niggers. I didn't.

*See* Deposition Testimony of Jamie Lapress, at p. 231, lines 12-23, continued at p. 232, lines 1-23, continued at p. 233, lines 1-6 (Dkt. # 69-4).

Q. Okay. So what did you decide to do next?
A. Well, I tried to figure out if I could open it without a key so I asked if anyone knew how to open the lock without a key.
Q. Did you --
A. Like if anyone --
Q. Go ahead.
A. Like if anyone could pick the lock or open it.
Q. And who was present when you said that?
A. I know Darcy was present. I'm trying to think of who else might have been right in the vicinity.
Who was -- who did you direct that question to?
MR. OPPENHEIMER: Form.
BY MS. GRECO:
If anyone?
A. To no one, just in general. Just like hey, does anyone know how to pick the lock on this.

Q. Who would have been closest to you?

MR. OPPENHEIMER: Form.

BY MS. GRECO:

Q. You can answer, if you know.

MR. OPPENHEIMER: You mean physical proximity?

MS. GRECO: Yes.

THE WITNESS: I believe at the time when I said it, Darcy was probably one of the closer people to me.

BY MS. GRECO:

Q. Who else was there? Who was the next closest person?

A. I think Tommy was out there at the time.

Q. And --

A. But I'm not -- I'm not really sure exactly who was there, but I just know I just said it in general. Like I probably said it in a couple different spots in the building just like hey, does anyone know how to do this.

Q. So you think you walked around the building and asked if anyone knew how to break into -- or how to open the paper towel dispenser without the
key?

A.  Yes.

See Deposition Testimony of Jamie Lapress, at p. 270, lines 7-16 (Dkt. # 69-4).

Q. Now I'm asking you -- without having to say the words over and over, I'm asking you did she say anything else?

A. No. I walked away.

Q. Did Ms. Black at any time ever say to you that her children do not steal?

A. No.

Q. At any time did Ms. Black ever say to you her children don't break into stuff?

A. No.

Q.       False "Statement of Fact":

Testimony:   "Additionally, Defendants admit that, prior to this incident, Jamie LaPress had made prior offensive comments about Black's children, which can be inferred were related to their race in light of his May 15, 2010 comment." ¶ 7.

See Deposition Testimony of Jamie Lapress, at p. 293, lines 18-23 (Dkt. # 69-4).

Q. Did you ever make any jokes relative to her [Ms. Black] children?

A. No.

Q. Did you ever make any comments relative to her children?

A. No.

31

*See* Deposition Testimony of Jamie Lapress, at p. 294, lines 1-9 (Dkt. # 69-4).

> Q. Did you ever tell -- let me see. Did you ever joke about Darcy Black's kids not because they were black but because they were always in trouble?
> A. No.
> Q. Did you ever tell Diane Seibert or Robert Seibert or Keegan Roberts that you would joke about Darcy Black's kids because they were always in trouble?
> A. I don't believe so.

*See* Deposition Testimony of Robert Siebert, at p. 249, lines 13-22 (Dkt. # 69-6).

> Q. Did anyone ever – did you ever learn that anyone referred to Darcy Black's children as niggers?
>
> A. No.
>
> Q.Did anyone ever complain to you that anyone referred to Darcy Black's children as niggers?
>
> A. To me personally, no.
>
> Q. Yes.  Did Darcy Black ever complain to you that a male employee  -- a Caucasian make employee referred to her children as niggers?
>
> A. No.

*See* Deposition Testimony of Robert Siebert, at p. 304, lines 8-11 (Dkt. # 69-6).

> Q. Okay.  And did anyone ever tell you that Jamie Lapress had made jokes relative to Darcy Black's children prior to the paper towel incident?
>
> A. No.

*See* Deposition Testimony of Robert Siebert, at p. 315, lines 6-8 (Dkt. # 69-6).

> Q.  Yes.  Did he [Jamie Lapress] ever make any negative comments
>
> about her [Black's] children?
>
> A.  Not that I know of.

*See* Deposition Testimony of Diane Siebert, at p. 134, lines 9-19 (Dkt. # 69-3).

> Q. Did you ever hear or learn that anyone referred to Darcy's Black's children as niggers?
> A. Absolutely not.
> Q. Did anyone ever report to you that anyone referred to Darcy's Black children's as niggers?
> A. No.

Q. To your knowledge, did anyone ever report to anyone in management that Darcy Black's children were referred to as niggers?
A. The only reference to that is Darcy's note that was left on my desk. No one ever heard it.

*See* Deposition Testimony of Diane Siebert, at p. 146, lines 1-7 (Dkt. # 69-3).

Q. Are you aware of anyone ever speaking to Jamie Lapress about his conduct towards Darcy Black before her complaint that her children were referred to as niggers?
A. Do I --
MR. OPPENHEIMER: Form.
THE WITNESS: Do I ever recall that? No.

*See* Deposition Testimony of Keegan Roberts, at p. 184, lines 12-19 (Dkt. # 69-7).

Q. Let me finish. Were you aware of Jamie Lapress making comments or jokes relative to Darcy Black's children?
A. I'm aware of the allegation by Darcy.
Q. Other than the allegation by Darcy, are you aware of Jamie Lapress making negative comments or jokes about Darcy Black's children?
A. No.

*See* Deposition Testimony of Sean Round, at p. 162, lines 21-23, continued at p. 163, lines 1-6 (Dkt. # 69-2).

Q. Did you ever hear anyone refer to Darcy's children as niggers?
A. No.
Q. Did you ever hear anyone refer to Darcy's children as nigs?
A. No.
Q. Did you ever hear anyone refer to Darcy's children in any derogatory way?
A. No.

*See* Deposition Testimony of Thomas Howells, at p. 260, lines 17-23, continued at p. 216, line 1 (Ex. A).

Q. Did anyone ever tell you that Darcy Black's children were always in trouble?
A. Darcy.
Q. Other than Darcy?
A. No.
Q. Were you ever aware of Jamie Lapress making jokes about Darcy Black's children?
A. No

33

*See* Deposition Testimony of Patrick Howells, at p. 130, lines 22-23, continued at p. 131, line 1 (Ex. C).

> Q. Did you ever hear Jamie Lapress make a joke regarding Darcy Black or her children?
> A.  No

R.     False "Statement of Fact":

Testimony:  "On May 21, 2010, Keegan Roberts had already decided that he believed Jamie LaPress over Black and told Black that he would like her to have a further conversation with Jamie LaPress about the incident." ¶ 11.

*See* Deposition Testimony of Keegan Roberts, at p. 308, lines 3-23, continued at p. 131, lines 1-11 (Dkt. # 69-7).

> THE WITNESS: Okay. After I had done that, Darcy told me her story, she told me she told Debbie, she told me she told it to Tommy. I talked to Jamie. Jamie told me his story. Tommy said it didn't happen. Tommy said he didn't talk to Darcy. Debbie said she didn't talk to Darcy. I had talked to Jamie. I got his story. He had told me he went out there, asked for the paper towels, said a comment about her being able to break into it. I told him that that was absolutely inappropriate. I said the whole situation is bad. I said we are going to need to get together, sit down and figure this out. I said if you see Darcy at some point when I'm not here, before then, I would like you to apologize and at least break the ice so we can have a working environment that's going to continue. Okay. Then I went on my deliveries.  The next day I saw Darcy. She asked me if I had talked to Jamie. I said yes, I have. I said did you see him or did he apologize to you at all? She said no. I said that -- okay. Well, I need to talk to him again, we need to get to a point in time here where we can sit down and get this straightened out. At that point, Darcy said that she didn't want to have anything to do with Jamie. Okay. I said okay. And then I went, I got my orders together. Jamie wasn't there yet because he came in in the afternoon. I went on my deliveries. That night when I came back from my deliveries, this note was sitting on Diane's desk.

*See* Deposition Testimony of Keegan Roberts, at p. 313, lines 9-15 (Dkt. # 69-7).

> Q. In your conversation with her on that Friday, did you say to her I've looked into this and I've come to a conclusion, or something like that?
>
> A. I did not tell her that. I wanted everybody to sit down together so we could talk about this. Okay. I wanted to bring all the parties in involved.

S.      False "Statement of Fact":

Testimony:  "Regarding Black's complaint, Robert Seibert said to Black that she would have to get used to things like that because people are mean and cruel. ¶ 11. Black then asked Robert Seibert 'So it's okay for one of my co-workers to call my kids niggers?' ¶11. He replied 'It happens in politics and it happens in sports so [Black is] going have to get used to the idea.' ¶11. When Black told Robert Seibert that, as a result of Jamie LaPress's comment, she was uncomfortable continuing to work with him, Robert Seibert said that he 'was uncomfortable with the whole situation' and directed Black to leave immediately." ¶11.

*See* Deposition Testimony of Robert Seibert, at p. 319, lines 13-2, continued at p. 320, lines 1-4 (Dkt. # ___).

> Q.  No.  Do you recall that you were physically in your office with Darcy Black, is that true, on that Tuesday, did you physically call Darcy Black into your office?
>
> A.  That's correct.
>
> Q.  Okay.  And in that meeting did she tell you that she could no longer bear the harassment from Jamie and that he had made racial comments calling her children niggers?
>
> A.  No.
>
> Q.  But you knew that based on the letter, did you not?
>
> A.  I read the letter.  We – like I said, it was a forty-five second encounter between Darcy and myself and the conversation I just went over.

*See* Deposition Testimony of Robert Seibert, at p. 323, lines 10-17 (Dkt. # 69-6).

> Q.  In fact, isn't it true that you said to her [Black] stuff like this happens all the time?
>
> A.  Absolutely not.
>
> Q.  Did you say to her in these or similar words with reference to Jamie Lapress referring to her children as niggers, that it happens in sports and politics and she needed to deal with it?
>
> A.  Absolutely not.

*See* Deposition Testimony of Robert Seibert, at p. 324, lines 7-9 (Dkt. # 69-6).

> Q.  Did you say to her [Black] that you were uncomfortable with the situation and she could leave right now?
>
> A.  No.

T.      Misleading "Statement of Fact":

Testimony:  "Defendants also failed to interview or offer employment to at least 50 African-American applicants." ¶ 11.

*See* Deposition Testimony of Raelean McGee nee Rush, at p. 64, lines 15-22 (Ex. B).

> Q. And did you ever give an application to an African-American person
> A. I don't remember.
> Q. Do you recall any person you gave an application to?
> A. I remember giving one -- at least one application out. I don't remember what the person looked like or who it was.

*See* Deposition Testimony of Jamie Lapress, at p. 172, lines 8-18 (Dkt. # 69-4).

> Q. Did you ever see anyone other than yourself come in to Black Angus Meat looking for employment?
> A. Yes.
> Q. Okay.
> A. I don't know, just --
> Q. Was it on how many occasions?
> A. I've -- at least once I saw someone come in and ask for an application and they were given one.
> Q. Okay. Did -- do you remember what the person looked like?
> A. No.

*See* Deposition Testimony of Sean Round, at p. 173, lines 4-23, continued at p. 174, line 1 (Dkt. # 69-2).

> Q. Approximately how many people do you think have given you applications during the time you were employed there?
>
> A. I couldn't tell you. I really couldn't give you a number that would be close to accurate. I really couldn't. Not something I even thought about keeping track of.
> Q. Did you ever have African-American people give you applications?
> A. Maybe. I don't recall.
> Q. So you have no recollection?
> A. Right. It was usually you are working, here, let me take that from you and back to work.
> Q. Okay. So is it fair to say if you don't have a recollection of any one person who was African-American, you don't know what happened afterwards?
> A. Correct.
> Q. Do you know any African-American person who applied for employment at Black Angus Meats?

36

A. Personally, no.

*See* Deposition Testimony of Patrick Howells, at p. 111, lines 16-23, continued at p. 112, line 1 (Ex. C).

> Q. Were you ever present when anyone requested an application for employment at Black Angus Meat?
> A. No.
> Q. Were you present when anyone submitted an application for employment at Black Angus Meat?
> A. No.
> Q. Were you ever present when anyone was interviewed for a position at Black Angus Meat?
> A. No.

*See* Deposition Testimony of Mark Leible, at p. 165, lines 14-23, continued at p. 165, line 1 (Dkt. # 69-8).

> Q. And were you aware of any African-American person, male or female, applying for employment at Black Angus Meat?
> A. No.
> Q. While you were at the counter, did any person come in and want to apply for employment at Black Angus Meat?
> A. No.
> Q. Did you ever see anyone request an application for employment at Black Angus Meat?
> A. Maybe once or twice.

*See* Deposition Testimony of Deborah Negrych, at p. 202, lines 22-23, continued at p. 203, lines 1-6 (Dkt. # 69-5).

> Q. How many people, based on your experience, would apply when a help-wanted sign was out? Just in your experience, if you can give me an estimate.
> MR. OPPENHEIMER: Form.
> THE WITNESS: Not many. A few.
> BY MS. GRECO:
> Q. What would a few be to you?
> A. Two or three.

Dated: October 3, 2019
Buffalo, New York

/s/ Randolph C. Oppenheimer
Randolph C. Oppenheimer, Esq.

19244775.1

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 3, 2019, I electronically filed with the Clerk of the District Court using its CM/ECF system, the foregoing REPLY AFFIRMATION OF RANDOLPH C. OPPENHEIMER, ESQ. dated October 3, 2019,   which would then electronically notify the following CM/ECF participant on this case:

Josephine A. Greco, Esq.

GRECO TRAPP, PLLC

Attorneys for Plaintiff

1700 Rand Building

14 Lafayette Square

Buffalo, New York 14203

Telephone: (716) 856-5800

jgreco@grecolawyers.com

/s/  Randolph C. Oppenheimer
Randolph C. Oppenheimer, Esq.

19244775.1