UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DARCY M. BLACK,

              Plaintiff,

   v.

              **DECISION AND ORDER**

              15-CV-49S

BUFFALO MEAT SERVICE, INC. d/b/a
BOULEVARD BLACK ANGUS a/k/a BLACK
ANGUS MEATS a/k/a BLACK ANGUS MEATS
& SEAFOOD, ROBERT SEIBERT,
DIANE SEIBERT, KEEGAN ROBERTS,

              Defendants.

I.   Introduction ........................................................................................................... 2
II.  Background ........................................................................................................... 3
   A.  Facts and Pleadings ...................................................................................... 3
      1.  Causes of Action in the Complaint (Docket No. 1) ........................................ 5
      2.  Proceedings to Defense Motion for Summary Judgment ............................... 6
   B.  Motion for Summary Judgement (Docket No. 106) .......................................... 7
      1.  Facts Asserted in Motion ............................................................................. 7
         a.  Plaintiff's Bankruptcy ............................................................................. 8
         b.  Allegations of Hostile Work Environment and Constructive Discharge ........ 9
         c.  Plaintiff's Equal Pay Claims .................................................................... 11
         d.  Plaintiff's EEOC Proceedings ................................................................. 11
      2.  Motion for Summary Judgment (Docket No. 106) and Defense Motion to Strike
      (Docket No. 114) ...................................................................................... 13
III.  Discussion ........................................................................................................ 13
   A.  Applicable Standards ................................................................................... 13
      1.  Summary Judgment ................................................................................... 13
      2.  Failure to Identify a Claim in Bankruptcy ................................................... 16
         a.  Potential Claim as Bankruptcy Asset ..................................................... 16
         b.  Standing ............................................................................................... 18
         c.  Judicial Estoppel .................................................................................. 19
      3.  Limitations Period for Claims ..................................................................... 20
         a.  Title VII ................................................................................................ 20
         b.  Equal Pay Act ....................................................................................... 21

4.   Civil Rights Claims .................................................................. 22
   a.   Hostile Work Environment ............................................... 23
   b.   Individual Liability under Title VII ..................................... 25
   c.   Constructive Discharge..................................................... 25
   d.   Section 1981 ..................................................................... 27
   e.   Equal Pay Act ................................................................... 28
   f.   New York State Human Rights Law ................................... 29
B.   Contentions ........................................................................... 29
   1.   Defense (Docket Nos. 106, 117)).......................................... 29
   2.   Plaintiff's Response (Docket Nos. 109-12) ............................ 31
C.   Effect of Claims Not Included in Bankruptcy Estate ............................ 33
   1.   Standing................................................................................ 34
   a.   Failure to Disclose and Standing ..................................... 34
   b.   Capacity to Sue and Standing .......................................... 34
   2.   Judicial Estoppel ................................................................. 37
   3.   Pre-Petition and Post-Petition Claims ................................... 44
D.   Statutes of Limitations for Title VII and Equal Pay Claims.................... 48
   1.   Title VII Timeliness............................................................... 48
   2.   Equal Pay Act Timeliness .................................................... 51
E.   Title VII ................................................................................... 53
   1.   Individual Defendants ........................................................... 53
   2.   Hostile Work Environment at the Butcher Shop ........................... 53
   a.   Offensive Comments and Conduct.................................... 54
   b.   Constructive Discharge Claims ......................................... 56
F.   Section 1981 Claim, Tenth Cause of Action ......................................... 59
   1.   Plaintiff as Member of Protected Class .................................. 59
   2.   Plaintiff and a Prima Facie Case of Discrimination ........................ 61
G.   State Human Rights Law Claims ................................................... 65
IV.   Conclusion................................................................................ 66
V.   Orders...................................................................................... 67

## I.    Introduction

This is an employment discrimination action based upon sex and race by a former employee against an Amherst, New York, butcher shop and its principals.  Plaintiff (or "Black"), a Caucasian female with mixed children, worked there from 2004-10, until she was constructively discharged due to the hostile work environment caused or allowed by Defendants.

Before this Court is Defendants' (Buffalo Meat Service, Inc. doing business as Boulevard Black Angus also known as Black Angus Meats & Seafood, referenced by defense counsel as "the Butcher Shop"; its owners Robert and Diane Seibert and Keegan Roberts (see Docket No. 1, Compl. ¶¶ 2, 5-6)) Motion for Summary Judgment (Docket No. 106).  For the reasons stated herein, Defendants' Motion for Summary Judgment (id.) is granted.

## II.    Background

### A.  Facts and Pleadings

Plaintiff Darcy Black alleges sex and race discrimination from a hostile work environment.  She claims she was discriminated against by Defendants under several federal and New York State civil rights and employment discrimination laws (Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17; the Equal Pay Act, 29 U.S.C. §§ 206, et seq.; 42 U.S.C. § 1981; and the New York State Human Rights Law, N.Y. Exec. L. art. 15, §§ 290-301, 296), contending that her employer, Defendant Black Angus Meats & Seafood, created a hostile work environment and had constructively discharged her (Docket No. 1, Compl.).

As Plaintiff later summarized in one of her motions to compel, "the gravamen of Ms. Black's lawsuit is that Defendants created and permitted a hostile work environment on the basis of race and sex, discriminated against her with respect to wages on the basis of sex, and constructively discharged her" (Docket No. 69, Pl. Atty Decl. ¶ 3), Black v. Buffalo Meat Serv., No. 15CV49, 2021 WL 763723, at *1 (W.D.N.Y. Feb. 26, 2021) (Skretny, J.).  She claims that male coworkers were paid more than she was and were afforded liberties from management that Plaintiff was not.  She also alleges that her

coworkers made sexist and racist comments; that the shop rejected African American job applicants; and a coworker allegedly made comments regarding her biracial children, all creating a hostile work environment (see Docket No. 1, Compl.; see also Black v. Buffalo Meat Serv., No. 15CV49, 2016 WL 6962444, at *1 (W.D.N.Y. Nov. 29, 2016) (Scott, Mag. J.) (Docket No. 32)).

Plaintiff was employed by Defendant Black Angus Meats & Seafood on May 16, 2004 (Docket No. 1, Compl. ¶ 11, 2, Ex. C, EEOC Right to Sue Letter, Oct. 20, 2014, at 1), until May 25, 2010 (Docket No. 1, Compl. ¶ 13).   Plaintiff worked as a "Wrapper-Packer-Cleaner," earning $10 per hour (id. ¶ 12).   Defendants argue that the Butcher Shop does not have formal job titles and Plaintiff's designation of "Wrapper-Packer-Cleaner" was of her own invention for this case (Docket No. 106, Defs. Statement ¶ 28; Docket No. 106, Defs. Memo. at 22); Plaintiff concedes this was defense testimony (Docket No. 109, Pl. Counterstatement ¶ 28 (at page 52)).

Plaintiff claims she was constructively discharged by May 25, 2010, after an incident with Jamie LaPress, who called her children "niggers" (Docket No. 1, Compl. ¶¶ 45, 49 (hereinafter "n___")).   After management mildly reprimanded LaPress, he intentionally avoided Plaintiff or assisting  her (id. ¶ 46).   Unable to bear what she considered a hostile work environment, on May 22, 2010, Plaintiff tendered her letter of resignation, which Defendants accepted on May 25 (id. ¶¶ 47, 48).  On May 25, Defendant Robert Seibert initially accepted Plaintiff's two-week notice and stated that "stuff like that happens all the time" and, when Plaintiff said that working with LaPress made her uncomfortable, Seibert replied that calling her children "n___" "happen[ed] in sports and

politics" and she just had to deal with it (id. ¶ 48).  Seibert then said he was uncomfortable with the situation and Plaintiff could leave right then (id.).

### 1.  Causes of Action in the Complaint (Docket No. 1)

The First Cause of Action alleges a hostile work environment in violation of Title VII based upon race (Docket No. 1, Compl. ¶¶ 61-71), including her constructive discharge (id. ¶¶ 63, 64), while the Second Cause of Action alleges a hostile work environment in violation of New York State Human Rights Law based upon race (id. ¶¶ 73-79).  These first two causes of action allege Plaintiff was subject to different terms and conditions of employment than similarly situated Caucasian employees (id. ¶¶ 61, 75).

The Third and Fourth Causes of Action also allege hostile work environment based upon race, either under Title VII (Third) or the New York State Human Rights Law (Fourth, for unwelcome comments, insults, and offensive conduct), from the creation of a hostile work environment based upon race not addressed by Defendants' supervisors (id. ¶¶ 81-89, 91-96).

The Fifth and Sixth Causes of Action allege hostile work environment and different terms and conditions of employment, but based upon sex, again in violation of Title VII (Fifth) and New York State Human Rights Law (Sixth) (id. ¶¶ 98-108, 110-16).

The Seventh and Eighth Causes of Action allege a gender-based hostile work environment from supervisor inaction, again in violation of Title VII (Seventh) and New York State Human Rights Law (Eighth, again for unwelcome comments and conduct) (id. ¶¶ 118-26, 128-33).

The Ninth Cause of Action alleges an Equal Pay Act violation because Plaintiff performed the same or substantially the same job position as male employees (including

LaPress, Mark Leible, Sean Round, and Patrick Howells) but was paid less than these male employees (id. ¶¶ 15, 56, 135-43).  Plaintiff denies that the pay differential was due to a seniority system, merit system, or based upon the quality or quantity of production or any other factor except for sex (id. ¶ 57).  She listed comparable white male employees and their salaries (between $12.50 to $13.00 per hour) (id. ¶¶ 14, 16-19), while alleging that she was paid only $10 per hour (id. ¶ 12) and other female employees were paid $10.50 or slightly more per hour (id. ¶¶ 20-21).  Plaintiff also claims she requested a raise in March 2010 that was denied (id. ¶ 22).

Finally, the Tenth Cause of Action alleges violation of 42 U.S.C. § 1981 because of Defendants' conduct related to her biracial children (id. ¶¶ 145-52).  She seeks lost back wages, reinstatement to employment or recovery for lost future wages, other employment benefits, as well as recovery for her mental anguish, emotional distress, and embarrassment (id. ¶ 149).

Plaintiff seeks compensatory damages ($2 million for each Cause of Action for loss of revenue, back wages, reinstatement of her employment, and lost future wages, mental anguish, embarrassment, and emotional distress) as well as punitive damages (id. at 29-32, Wherefore Clause).

### 2.  Proceedings to Defense Motion for Summary Judgment

Defendants answered (Docket No. 8), asserting 28 affirmative defenses, about half of them declaring that each of Plaintiff's ten causes of action failed to state a claim (id. ¶¶ 154-82; see also id. at pages 17-18 ("Reservation of Rights" clause)).

This case was referred to the late Magistrate Judge Hugh Scott (Docket No. 9; see also Docket No. 122, Order reassigning referral to Magistrate Judge H. Kenneth

Schroeder).  Magistrate Judge Scott entered the initial Scheduling Order (Docket No. 13) and later amended and extended that schedule (Docket Nos. 22, 27, 33, 40, 47, 66, 85, 89, 105).   After extensive and sometimes contentious discovery and related motion practice (see Docket Nos. 23, 27, 28, 32, 34, 36, 40, 47 (Defendants' motion to reconsider), 48, 55, 61, 62, 67, 69, 84, 87, 93, 96; see also Docket Nos. 50, 54 (Plaintiff's motion for attorney's fees)), Defendants moved for summary judgment (Docket No. 106[1]).

### B.  Motion for Summary Judgement (Docket No. 106)

#### 1.  Facts Asserted in Motion

Plaintiff submitted a copious Counterstatement of Material Facts (Docket No. 109), wherein she admits facts stated in Defendants' Statement (Docket No. 106) but with extensive caveats and explanations (see Docket No. 109; see also Docket No. 114, Pl. Atty. Decl.).  In response to Defendants summarizing the allegation of different terms and conditions of employment Plaintiff received as opposed to male colleagues in the Complaint (Docket No. 106, Defs. Statement ¶ 11), Plaintiff filed a 22-page responding Counterstatement (Docket No. 109, Pl. Counterstatement ¶ 11).

Defense counsel replies that Plaintiff summarized these facts in her Memorandum of Law (Docket No. 112, Pl. Memo. at 2-7), claiming that Defendants admitted to the facts she now asserts.   Defense counsel counters that Plaintiff misidentified Defendants' statements as admissions (Docket No. 117, Defs. Atty Reply Affirm. ¶ 3, at pages 2-37).

---

[1]In support of their motion, Defendants submit their Statement of Material Facts not in Genuine Dispute, exhibits, Memorandum of Law, Docket No. 106; their attorney's Reply Affirmation, Docket No. 117.

In opposition, Plaintiff submits her Counterstatement of Material Facts, Docket No. 109; exhibits, Docket Nos. 109-12, including Plaintiff's Declaration, Docket No. 109; Plaintiff's Memorandum, Docket No. 112; Plaintiff's Attorney Declaration, Docket No. 112.

This Court will cite Defendants' stated facts where not contested by Plaintiff and note (where material) any discrepancies between the parties' versions of the facts.

a.  Plaintiff's Bankruptcy

Defendants argue here that Plaintiff is estopped in this case because she failed to raise her present claims in her 2009 bankruptcy (Docket No. 106, Defs. Memo. at 3-11; see id. at 1-2 (standing to raise claims after failing to list them in bankruptcy)).

During her employment, Plaintiff filed a Chapter 7 Petition for personal bankruptcy on March 3, 2009 (Docket No. 106, Defs. Statement ¶¶ 27, 38; Docket No. 106, Defs. Atty. Affirm. Exs. A, B (bankruptcy court docket); see Docket No. 109, Pl. Counterstatement ¶ 38), In re Hoefert, No. 1-09-10778-MJK (Bankr. W.D.N.Y.).  In her schedule of assets, Plaintiff did not disclose any claims against Defendants (Docket No. 106, Defs. Statement ¶ 40).  Plaintiff denies that she failed to disclose; when she filed for bankruptcy she was still employed by Defendants and did not raise any claims she may have had to avoid losing her job (Docket No. 109, Pl. Counterstatement ¶ 40).  Prior to Jamie LaPress's statement about her children in May 2010, Plaintiff stated she had no intention of resigning from her job (id.).

In her bankruptcy Schedule B of her personal property Plaintiff declared that she had no contingent or unliquidated claims (Docket No. 106, Defs. Statement ¶ 40; Docket No. 106, Defs. Atty. Affirm. ¶ 3, Ex. A, at page 11 of 42, Schedule B).  Plaintiff points out in her Statement of Financial Affairs in her petition (Docket No. 106, Defs. Atty. Affirm. Ex. A, at page 28 of 42) that she had no suits and administrative proceedings to which she was a party within one year of her petition and then identified two collection actions where she was a defendant (Docket No. 109, Pl. Decl. ¶ 15).

Plaintiff later stated that

> "when I filed my Bankruptcy Petition, I did not believe that I had any claims against Defendants, and I had not considered bringing a legal claim, as I needed to continue to work at [the Butcher Shop] while I continued to work for [the Butcher Shop] because my conditions at work would have worsened"

(id.), only considering suit after she was constructively discharged (id.).  On June 11, 2009, the Bankruptcy Court granted Plaintiff a full discharge and, on August 25, 2009, closed her case (Docket No. 106, Defs. Statement ¶ 42; id., Defs. Atty. Affirm. Ex. C).

        b. Allegations of Hostile Work Environment and Constructive Discharge

Plaintiff alleges that LaPress made a derogatory statement about Plaintiff's biracial children in May 2010 (Docket No. 1, Compl. ¶ 45).  Plaintiff alleges that LaPress called her children "n___" (Docket No. 106, Defs. Statement ¶ 24).  In their Statement of Material Facts, Defendants state that LaPress vehemently denied making that comment (id.; Ex. O, Jamie LaPress EBT Tr. at 34, 38, 39, 64, 68).  She tendered her letter of resignation of May 19, 2010 (Docket No. 106, Defs. Statement ¶ 37; id., Ex. S).

While conceding LaPress's denial, Plaintiff replies that LaPress admits to the incident that led to the alleged derogatory statement (Docket No. 109, Pl. Counterstatement ¶ 24 (at pages 45-46).  Plaintiff concluded that this incident and Defendants' handling of it led to her constructive discharge on May 25, 2010 (id. (at pages 46-48)).

Here is how LaPress made his statement to Plaintiff.  On May 15, 2010, LaPress lost the key to a paper towel dispenser and asked if Plaintiff could break into the dispenser.  Plaintiff said she could not and asked why he thought she could.  (Id. (at page

46).)  LaPress said "you have two black kids and that's what black people do" and "well, they're n___" (id.; Docket No. 109, Pl. Ex. 2, Pl. EBT Tr., at 295-96).

Plaintiff testified that butcher Thomas Howells and manager Debbie Negrych heard that remark and said it was inappropriate (Docket No. 109, Pl, Ex. 2, Pl. EBT Tr. at 296; Docket No. 109, Pl. Counterstatement ¶ 11 (at pages 19, 25, 34); cf. Docket No. 106, Defs. Statement ¶ 14 (Thomas Howells as meat cutter)).  Defendants, however, produced the testimony of Negrych in which she denied hearing LaPress's statement or Plaintiff telling her about it (Docket No. 106, Defs. Statement ¶ 25; Docket No. 106, Defs. Ex. N[2], Debbie Negrych EBT Tr. at 161-62, 250; cf. Docket No. 109, Pl. Counterstatement ¶ 25 (at page 48); Docket No. 109, Pl. Ex. 7, Negrych EBT Tr.).  Defendants also note that other employees or managers at the Butcher Shop denied hearing LaPress's slur (Docket No. 106, Defs. Statement ¶ 26); Plaintiff responds that Defendants did not offer any admissible evidence to support this contention, thus statement was a "nullity" (Docket No. 109, Pl. Counterstatement ¶ 25 (at page 49)).

On May 18, 2010, Plaintiff claims to have complained about LaPress to store manager Keegan Roberts (id., ¶ 24 (at page 46)).  Roberts testified that he spoke with LaPress, Negrych, and Howells, and La Press denied saying that to Plaintiff (id. (at pages 46-47)).  On May 21, Plaintiff believed that Roberts had already determined that Plaintiff was not to be believed and said he wanted further conversation with LaPress (id. (at page 47)).  As a result, later that day, Plaintiff left her letter of resignation (id.), even though the letter was dated May 19 (Docket No. 111, Pl. Ex. 41, at DEF0048).

---

[2]Defendants also cite to page 244 of Ms. Negrych's deposition, Docket No. 106, Defs. Statement ¶ 25, but neither party produced that page.  Defendants produced page 224 in that exhibit, but it does not relate to this point.

On May 25, after Robert Seibert returned to work, Plaintiff met with him about her accusation against LaPress from the May 10 incident (Docket No. 109, Pl. Counterstatement ¶ 24 (at page 47)).  Seibert and Roberts called LaPress in and LaPress said he was no longer talking to Plaintiff (and "it was nice") (id.).  After LaPress and Roberts left Seibert's office, Seibert told Plaintiff to get used to things like slurs about her children (id. (at pages 47-48)), rationalizing that use of that slur occurs in politics and sports (id. (at page 48)).  Plaintiff contends that other witnesses testified that Seibert's statement was racially offensive and discriminatory (id.).  Stating his discomfort with the situation, Seibert then directed Plaintiff to leave (id.).

Again, prior to May 15, 2010, Plaintiff disclaimed any intention to leave the Butcher Shop (id.).

### c.  Plaintiff's Equal Pay Claims

Defendants distinguish the male employees Plaintiff alleges were comparable to her and were paid more than her.  They contend the male employees performed different duties than those Plaintiff performed (Docket No. 106, Defs. Statement ¶¶ 30-32).  Plaintiff disputed these facts (Docket No. 109, Pl. Counterstatement ¶¶ 30-32).  Defendants report that Plaintiff was hired at a starting pay rate of $7.50 per hour that increased with annual raises to $10.00 per hour when she resigned (Docket No. 106, Defs. Statement ¶ 34).

### d.  Plaintiff's EEOC Proceedings

Plaintiff's EEOC Intake Questionnaire was first filed on June 18, 2010 (Docket No. 1, Compl. ¶ 59(a); Docket No. 106, Defs. Statement ¶ 4, Ex. A; cf. Docket No. 109, Pl. Counterstatement ¶ 4) and Plaintiff filed an identical charge with the New York State Division of Human Rights (Docket No. 1, Compl. ¶ 59(b)).  On or about October 18, 2010,

the EEOC sent a dismissal and right-to-sue letter to Plaintiff (id. ¶ 59(c), Ex. A).   On January 13, 2011, the EEOC sent Plaintiff a Notice of Intent to Reconsider which vacated the dismissal and right-to-sue letter (id. ¶ 59(d), Ex. B).

On December 16, 2010, Plaintiff filed a second EEOC Charge (id. ¶ 59(e), (f); Docket No. 106, Defs. Ex. C).   Plaintiff renewed her charges from her initial charge (compare Docket No. 106, Defs. Ex. A with id. Defs. Ex. C).  Then, on October 20, 2014, the EEOC issued a Determination finding reasonable cause to believe Defendants engaged in unlawful discriminatory practices and issued Plaintiff a right to sue letter (Docket No. 1, Compl. ¶ 59(g), Ex. C).  On November 25, 2014, the EEOC sent a second right to sue letter to Plaintiff (id. ¶ 59(h), Ex. D).

Before the EEOC, Plaintiff charged that she was paid at a lower hourly rate and subjected to different terms and conditions of employment because of her gender.  She alleged that she was subjected to a racially offensive and hostile work environment when a co-worker referred to her biracial children as "n____." (Docket No.1, Compl., Ex. C, at 1).  Despite her complaints to management, no action was taken (id.).  Plaintiff then charged that she was constructively discharged because she could no longer tolerate the hostile work environment (id.).  Finally, she alleged that African American job applicants were denied employment (id.).  Defendants denied the charges before the EEOC (id.).

The EEOC found that female employees were paid higher salaries than male employees or pay rates were based upon seniority, concluding that there was no substantiation that females were paid less than male employees (Docket No. 1, Compl., Ex. C at 2).  The EEOC concluded that there was no evidence to substantiate Title VII

and Equal Pay Act claims regarding wage disparity (id.).  The agency did find that Plaintiff

"was subjected to a racially offensive and hostile work environment" (id.).

>    2.   Motion for Summary Judgment (Docket No. 106) and Defense
>         Motion to Strike (Docket No. 114)

Defendants filed the pending Motion for Summary Judgment (Docket No. 106).

Responses to this motion were due on September 19, 2019, and replies by October 3,

2019 (Docket No. 107).

Plaintiff submitted her opposition papers (Docket Nos. 109-12) including her

attorney's Declaration (Docket No. 112) which repeated Plaintiff's factual allegations

stated in the Counterstatement (Docket No. 109).   Defendants moved to strike that

Declaration (Docket No. 114).   This Court denied the motion, Black, supra, 2021 WL

763723, at *4 (Docket No. 121), but declined to consider legal arguments repeated in that

Declaration, id.

After timely responses and reply (see note 1, supra), the motion then was deemed

submitted without oral argument.

### III.   Discussion

A.  Applicable Standards

1.  Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).   A

fact is "material" only if it "might affect the outcome of the suit under governing law,"

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986).   A "genuine" dispute, in turn, exists "if the evidence is such that a reasonable jury

could return a verdict for the non-moving party," id.  In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion," Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (internal quotations and citations omitted).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper," Bryant v. Maffucci, 923 F.32d 979, 982 (2d Cir. 1991) (citation omitted).  Indeed "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper," Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82, 83 (2d Cir. 2004) (citation omitted).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," Anderson, supra, 477 U.S. at 249.

"When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," Cordiano v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009), citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  "Where the moving party demonstrates 'the absence of a genuine issue of material fact,' the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact," Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted) (quoting Celotex, supra, 477 U.S. at 323).  The party against whom summary judgment is sought,

however, "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original removed).

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003); Fed. R. Civ. P. 56(a). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the nonmovant. Ford, supra, 316 F.3d at 354.

The Local Civil Rules of this Court require that movant and opponent each submit "a separate, short, and concise" statement of material facts, and if movant fails to submit such a statement it may be grounds for denying the motion, W.D.N.Y. Loc. Civ. R. 56(a)(1), (2). The movant is to submit facts in which there is no genuine issue, id. R. 56(a)(1), while the opponent submits an opposing statement of material facts as to which it is contended that there exists a genuine issue to be tried, id. R. 56(a)(2). Each numbered paragraph in the movant's statement will be deemed admitted unless specifically controverted by a correspondingly numbered paragraph in the opponent's statement, id. Absent such an opposing statement, the facts alleged by the movant are deemed admitted. Each statement of material fact is to contain citations to admissible

evidence to support the factual statements and all cited authority is to be separately submitted as an appendix to that statement, id. R. 56(a)(3).

### 2.  Failure to Identify a Claim in Bankruptcy

#### a.  Potential Claim as Bankruptcy Asset

Property in a bankruptcy estate comprises "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1) (emphasis added).   These interests include future and potential claims.   The Bankruptcy Code defines a claim as the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," 11 U.S.C. § 101(5)(A) (emphasis added); see 2 Collier on Bankruptcy ¶¶ 101.05[1], [6] (16th ed. 2018) (tort claims for future damages based upon continuing conduct is within the scope of the bankruptcy definition of "claim" in 11 U.S.C. § 101).   These interests include "future, nonpossessory, contingent, speculative, and derivative" causes of action, Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 122 (2d Cir. 2008) (per curiam) (emphasis added) (Docket No. 106, Defs. Memo. at 4, 1; cf. Docket No. 112, Pl. Memo. at 20, 23); see also Reyes v. Sears Holding Corp., No. 2:17-cv-4719(RJD)(RML), 2019 WL 3754197, at *2 (E.D.N.Y. Aug. 7, 2019); Black, supra, 2018 WL 3213288, at *8 (Docket No. 84, Order of June 29, 2018 (Scott, Mag. J.), appeal denied, Docket No. 93, Order of Aug. 24, 2018 (Skretny, J.) (see Docket No. 106, Defs. Memo. at 8), and "potential" or "possible" claims, 11 U.S.C. § 101(5); see Sea Trade Co., Ltd. v. FleetBoston Fin. Corp., No. 03-CV-10254, 2008 WL 4129620, at *11-12 (S.D.N.Y. Sept. 4, 2008) (citations omitted) (Docket No. 106, Defs. Memo. at 4).

A potential claim is an asset in bankruptcy, see Harrah v. DSW Inc., 852 F. Supp. 2d 900, 903 (N.D. Ohio 2012).

The Bankruptcy Code requires a debtor to disclose all of her assets, including contingent and unliquidated claims, 11 U.S.C. § 521(a)(1); see Browning Mfg. v. Mims (In re Coastal Plains, Inc.), 179 F.3d 197, 208 (5th Cir. 1999). If a debtor is aware of the facts that may give rise to a possible claim, the debtor needs to list that potential claim in the bankruptcy, Grammer v. Mercedes Benz of Manhattan/Mercedes Benz USA, LLC, No. 12-CV-6005, 2014 WL 1040991, at *3 (S.D.N.Y. Mar. 13, 2014) (Docket No. 106, Defs. Memo. at 3). Claims include potential claims even if not perfected or pursued in litigation must be listed, id.; Sea Trade, supra, 2008 WL 4129620, at *12; Grainger, supra, 2011 WL 824484, at *5 n.5. The debtor need only disclose enough information about the claim to inform the trustee that, after reasonable investigation, the claim is worth pursuing, Bejarano v. Bravo! Facility Servs., Inc., 251 F. Supp. 3d 27, 32 (D.D.C. 2017) (citing cases, including Eun Joo Lee v. Forster & Garbus LLP, 926 F.Supp.2d 482, 489 (E.D.N.Y. 2013)).

The debtor's interests pass to the estate and the debtor losses the right to pursue them in her own name, Kassner v. 2nd Ave. Delicatessen Inc., No. 04-CV-7274, 2005 WL 1018187 (S.D.N.Y. Apr. 29, 2005), aff'd, 496 F.3d 229 (2d Cir. 2007) (Docket No. 106, Defs. Memo. at 1, 2; cf. Docket No. 112, Pl. Memo. 21). Property that is not abandoned remains property of the estate, 11 U.S.C. § 554(d) (Docket No. 106, Defs. Memo. at 1-2). The ability to sue to protect or redeem such interests belong to the estate and are enforced only by the bankruptcy trustee, see id. § 323 (id. at 1).

A debtor's failure to disclose her claim in bankruptcy has two consequences.  The debtor loses standing to raise the undisclosed claim in another venue and the debtor is judicially estopped from raising that claim.

b.    Standing

Once a bankruptcy petition is filed, the debtor's assets, including causes of action, vest to the estate and the real party of interest for those causes of action is the trustee, Grainger, supra, 2011 WL 824484, at *5.  The only party with standing post-petition to assert the claim is the trustee, id.; see Kohlbrenner v. Victor Belata Belting Co., No. 94CV915, 1998 WL 328639, at *3 (W.D.N.Y. June 8, 1998) (Elfvin, J.) (deny motion to dismiss without prejudice, ordering plaintiff to amend complaint to substitute bankruptcy trustee for plaintiff).

For example, in Kohlbrenner, Linda Kohlbrenner was fired by defendant on January 1994 and she filed charges with EEOC alleging sex discrimination, obtaining a right-to-sue letter in September 16, 1994.  The next day, Kohlbrenner filed for bankruptcy but did not list the EEOC charge.  She filed suit in December 1994 and days later her bankruptcy was closed.  Id. at *1.  Defendant later moved to dismiss because Plaintiff lacked standing because of her bankruptcy, id.  The bankruptcy trustee's motion in Bankruptcy Court to reopen the bankruptcy case was granted and the trustee was reappointed, id.  Judge John Elfvin stated that, because Kohlbrenner filed the bankruptcy petition after accrual of claims against defendant making the claims property of the estate, the bankruptcy trustee should be substituted as real party in interest, id. at *2.  Judge Elfvin denied dismissal of the action (without prejudice) and ordered Kohlbrenner to amend her Complaint to substitute the trustee as plaintiff, id. at *3.

18

One of the constitutional requirements for standing is the plaintiff suffers an injury in fact.  Injury to a third party (such as the bankruptcy trustee for claims in the estate), however, does not provide the debtor-plaintiff standing, LaPointe v. Target Corp., No. 1:16-CV-0216, 2017 WL 1397311, at *4-5 (N.D.N.Y. Feb. 14, 2017); Wight v. BankAm. Corp., 219 F.3d 79, 86 (2d Cir. 2000).  The debtor-plaintiff loses standing to invoke prepetition claims.

c.    Judicial Estoppel

Judicial estoppel is a common law doctrine that a party asserting one position (for example, that she has no claims in Bankruptcy Court) cannot assume an inconsistent position in this Court (invoking the undisclosed claim), In re Coastal Plains, Inc., supra, 179 F.3d at 205.  "Judicial estoppel is an equitable doctrine invoked at the court's discretion.  New Hampshire v. Maine, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).  It is designed to 'prevent "improper use of judicial machinery."' Id. (citation omitted)."  Coppedge v. Suntrust Banks, Inc., No. 3:08-CV-23(HL), 2009 WL 111639, at *2 (M.D. Ga. Jan. 14, 2009).

One District Court observes, "Failure to list an accrued cause of action as an asset during bankruptcy proceedings can trigger judicial estoppel implications.  Upon filing of a bankruptcy petition, all assets of the debtor, including potential causes of action, become an asset of the bankruptcy estate," Harms v. Cigna Ins. Cos., 421 F. Supp. 2d 1225, 1228 (D.S.D. 2006) (see Docket No. 112, Pl. Memo. at 22).

The purposes of this estoppel are to prevent internal inconsistency, to preclude litigants from playing "fast and loose" with the courts, and to avoid deliberate changing positions for exigencies of the moment, In re Coastal Plains, Inc., supra, 179 F.3d at 206;

United States v. McCaskey, 9 F.3d 368, 378 (5th Cir. 1993); Harrah, supra, 852 F. Supp. 2d at 907.  Judicial estoppel is not to protect the litigants or creditors, but it is to protect the integrity of the judicial system, In re Coastal Plains, supra, 179 F.3d at 210; see Harrah, supra, 852 F. Supp. 2d at 907 (party invoking judicial estoppel need not demonstrate privity, reliance, or personal prejudice, citing White v. Wyndham Vacation Ownership, Inc., 617 F.3d 472 (6th Cir. 2010)).

On the other hand, courts have declined to impose this estoppel if there was an inadvertent failure to disclose from lack of knowledge of the facts for the claim or the lack of a motive to conceal the claim, In re Coastal Plains, Inc., supra, 179 F.3d at 210 & n.9 (citing cases).  Courts also recognized an exception to this estoppel due to a good faith mistake or unintentional error for not citing her civil claims in her bankruptcy filings, see Azuike v. BNY Mellon, 962 F. Supp. 2d 591, 599-600 (S.D.N.Y. 2013); Black, supra, 2018 WL 321324, at *8 (Docket No. 84).  Courts in the Second Circuit have ruled that "failure to disclose will only be deemed inadvertent or due to mistake when either the debtor has [1] no knowledge of the claims or [2] no motive to conceal the claims," Ibok v. Siac-Sector Inc., No. 05-CV-6584, 2011 WL 293757, at *7 (S.D.N.Y. Feb. 2, 2011) (quoting Coffaro v. Crespo, 721 F. Supp. 2d 141, 146 (E.D.N.Y. 2010)); Azuike, supra, 962 F. Supp. 2d at 599.

3.  Limitations Period for Claims

a.  Title VII

As this Court recently observed in Banks v. General Motors LLC, No. 14CV970, 2020 WL 6827707, at *9, 11 (W.D.N.Y. Nov. 20, 2020) (Skretny, J.), Plaintiff must file charges with the state equal employment agency within 300 days of the alleged

discriminatory acts, 42 U.S.C. § 2000e-5(e)(1); Flaherty v. Metromail Corp., 235 F.3d 133, 136 n.1 (2d Cir. 2000).

The issue here is what constitutes a charge.  Title VII fails to define what is a "charge" to initiate an EEOC investigation and demarcates the running of the limitations period.  EEOC regulations provide that filing a written form identifying the parties, and "generally" describing the alleged discriminatory acts constitutes a Title VII charge, Jallow v. Office of Court Admin., No. 10 Civ. 8575, 2012 WL 4044894, at *6 (S.D.N.Y. Sept. 4, 2012), adopted, 2012 WL 4793871, at *2 (S.D.N.Y. Oct. 5, 2012).  To be recognized as a "charge" that document "'must manifest the complainant's intention that the EEOC initiate its investigation and conciliation functions,'" Jallow, supra, 2012 WL 4044894, at *6 (quoting International Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 345, 354 (S.D.N.Y. 2007)).

### b.  Equal Pay Act

The Equal Pay Act, 29 U.S.C. §§ 206, et seq., bars discrimination in pay based upon gender for equal work on jobs performing equal skill, effort and responsibility, see Cox v. Quick & Reilly, Inc., 401 F. Supp. 2d 203, 211 (N.D.N.Y. 2005), quoting 29 U.S.C. § 206(d)(1).  The act generally has a two-year statute of limitations, 29 U.S.C. § 255(a), see, e.g., Pollis v. New School for Social Research, 132 F.3d 115, 118 (2d Cir. 1997), unless the employee establishes the employer willful violation, then there is a three-year limitations period, Cox, supra, 401 F. Supp. 2d at 212.  Each violative paycheck states a cause of action, id.   Unlike Title VII, there is no requirement of commencing an administrative proceeding before suing for violation of the Equal Pay Act, Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 640, 127 S.Ct. 2162, 127 L.Ed.2d 982 (2007);

see Washington Cty. v. Gunther, 452 U.S. 161, 175 n.14, 101 S.Ct. 2242, 68 L.Ed.2d 75 (1981), and the limitations periods under the Equal Pay Act are more generous than those for Title VII, id.

### 4.   Civil Rights Claims

Plaintiff establishes discrimination either by direct evidence, Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d. 523 (1985); Teamsters v. United States, 431 U.S. 324, 358 n.44, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), or by the burden shifting analysis from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Banks, supra, 2020 WL 6827707, at *8.  For direct evidence of discrimination, Plaintiff must meet her "initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act," Teamsters, supra, 431 U.S. at 358.

Under McDonnell Douglas, Plaintiff bears the burden of demonstrating that race (or sex, Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)) was a motivating factor in her adverse employment action, McDonnell Douglas, supra, 411 U.S. at 802-04.  She then must prove that an inference of discrimination where direct evidence is lacking leading to an application of the burden of proof shifting standard of McDonnell Douglas.  Under that standard, Plaintiff bears the burden of establishing a prima facie case of discrimination, Burdine, supra, 450 U.S. at 252-54; McDonnell Douglas, supra, 411 U.S. at 802, by a preponderance of the evidence, Burdine, supra, 450 U.S. at 252-53.  "The burden of establishing a prima facie case of disparate treatment is not onerous," id. at 253, basically that Plaintiff applied for a position or is employed in a job she was qualified for but was rejected or otherwise hindered under

circumstances that give rise to an inference of unlawful discrimination, id.  The prima facie case creates a presumption of unlawful discrimination by the Defendant employer, id.

If Plaintiff meets this initial burden, the burden shifts to Defendant to articulate some legitimate, nondiscriminatory reason for its action, id. at 254-56.  If that has been met, the burden shifts back to Plaintiff to show, beyond the prima facie case, that Defendant's determination was the result of discrimination, id. at 256; see McDonnell Douglas, supra, 411 U.S. at 804-05.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff," Burdine, supra, 450 U.S. at 253.  As noted by the Burdine Court, the McDonnell Douglas evidentiary burden shifting "serves to bring the litigants and the court expeditiously and fairly to this ultimate question," id., or as later held in the TWA case, "that the 'plaintiff [has] his [or her] day in court despite the unavailability of direct evidence,'" TWA, supra, 469 U.S. at 121 (quoting Loeb v. Textron, Inc., 600 F.2d 1003, 1014 (1st Cir. 1979)) (alterations added).

### a.    Hostile Work Environment

Hostile work environment claims under Title VII, § 1981, and the New York State Human Rights Law[3] share the same elements.  Plaintiff needs to prove that the "workplace is permeated with 'discriminatory intimidation, ridicule and insult,'" that is so "severe or pervasive" to create an "objectively hostile or abusive work environment," and plaintiff "subjectively perceive[d] the environment to be abusive," Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).  Thus,

---

[3]See Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 310, 786 N.Y.S.2d 382, 394 (2004).

Plaintiff must "not only allege that she found the environment offensive, but that a reasonable person also would have found the environment to be hostile or abusive," Bentivegna v. People's United Bank, No. 2:14-cv-599, 2017 WL 3394601, at *13 (E.D.N.Y. Aug. 7, 2017), citing Harris, supra, 510 U.S. at 21-22.

This proof must be based upon the totality of the circumstances, Bentivegna, supra, 2017 WL 3394601, at *13.  Plaintiff has to show that the misconduct was so severe or pervasive that the complained-of behavior was sufficiently frequent, or severe; was physically threatening or humiliating or not merely an offensive comment; unreasonably interfered with the victim's work; and caused psychological harm, see Harris, supra, 510 U.S. at 23. "[O]ffhand comments, and isolated incidents (unless extremely serious)" will not suffice, Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); see Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004).  The Meritor Savings-Harris standard "takes the middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury," Harris, supra, 510 U.S. at 21.  The mere utterance of an epithet is not sufficient to "affect the conditions of employment to implicate Title VII," id. (quoting Meritor Sav., supra, 477 U.S. at 67).

> "Isolated instances of harassment ordinarily do not rise to this level [for hostile work environment harassment].  See, e.g., Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir.1992).  Rather, the plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment.  Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir.1997) (quoting Carrero v. New York City Housing Auth., 890 F.2d 569, 577 (2d Cir.1989)) (internal quotation marks omitted)."

Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (Sotomayor, J.). Determining whether the harassment was severe or pervasive enough to be actionable depends upon totality of circumstances, id.

The Second Circuit repeatedly observes that, despite the severity and pervasiveness requirements to establish actionable workplace harassment, it "does not mean that employers are free from liability in all but the most egregious cases," Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004) (citing cases); Davis v. New York Dep't of Corrections, 256 F. Supp. 3d 343, 351 (S.D.N.Y. 2017) (granting defendants motion for summary judgment) (Docket No. 112, Pl. Memo. at 10).  The Second Circuit "has not ruled out the possibility that a 'one-time use of a severe racial slur could, by itself, support a hostile work environment claim when evaluated in the cumulative reality of the work environment,'" Davis, supra, 256 F. Supp. 3d at 351 (quoting Daniel v. T&M Protection Res., LLC, 689 F. App'x 1, 2 (2d Cir. 2017) (summary Order) (id. at 11).

b.    Individual Liability under Title VII

Individuals are not liable under Title VII, Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir. 2000) (Docket No. 106, Defs. Memo. at 12-13).

c.    Constructive Discharge

The elements of constructive discharge under Title VII and § 1981 (as interference in performance and termination of employment contract because of race) are the employer's intentionally created atmosphere so intolerable that the employee is compelled to quit, Petrosino, supra, 385 F.3d at 229 (citations omitted; Title VII claim) (Docket No. 106, Defs. Memo. at 20); Burgos v. Works, No. 13CV704, 2017 WL 2403305,

at *11 (W.D.N.Y. June 2, 2017) (Skretny, J.) (Title VII and § 1981 claims) (Docket No. 112, Pl. Memo. at 14).

"An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily," Terry v. Ashcroft, 336 F.3d 128, 151-52 (2d Cir. 2003); Petrosino, supra, 385 F.3d at 229.   Inquiry into the intolerable work atmosphere is "objective:  Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign," Pennsylvania State Police v. Suders, 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004); Petrosino, supra, 385 F.3d at 230.  "This standard is higher than the standard for establishing a hostile work environment," Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010) (because plaintiff did not establish a hostile work environment, "her claim of constructive discharge also fails") (Docket No. 106, Defs. Memo. at 20); Suders, supra, 542 U.S. at 147.

In Suders, the plaintiff alleged sexual harassment and hostile work environment that Justice Ruth Bader Ginsburg found "the constructive discharge here at issue stems from, and can be regarded as an aggravated case of, sexual harassment or hostile work environment," "a 'worse case' harassment scenario, harassment ratcheted up to the breaking point," 542 U.S. at 146, 147-48, causing the plaintiff Suders to resign, id. at 148, 133.   The issue there was "the proof burdens parties bear when a sexual harassment/constructive discharge claim of that character is asserted under Title VII," id. at 133.  The Court held that, beyond the element for harassment, the plaintiff alleging constructive discharge had a further showing "that the abusive working environment

became so intolerable that her resignation qualified as a fitting response," id. at 134.  The Court then recognized that affirmative defenses under Ellerth[4] and Faragher[5] are available for constructive discharge cases unless the plaintiff "quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation," Suders, supra, 542 U.S. at 134, see also id. at 148.  Justice Ginsburg noted that "harassment so intolerable as to cause a resignation may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts," id. at 148. "A constructive discharge involves both an employee's decision to leave and precipitating conduct," id.

In Petrosino, while the Second Circuit found that Petrosino experienced a work experience that employees and supervisors made deliberately hostile to women, she had endured it for eight years before her forced resignation, 385 F.3d at 230.  The court "consider[ed] whether a reasonable jury could find that further deliberate employer action in early 1999 'ratcheted' the harassment up to 'the breaking point' for a reasonable person in Petrosino's situation," and concluded that the evidence (the denial of promotions in her department) did not support such a finding, id.

### d.     Section 1981

Section 1981 of Title 42 of the United States Code provides that

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other,"

---

[4] Burlington Indus., Inc. v. Ellerth, supra, 524 U.S. 742.

[5] Faragher v. City of Boca Raton, supra, 524 U.S. 775.

42 U.S.C. § 1981(a) (emphasis added).  Making and enforcing contracts in this act "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," id., § 1981(b).

"To establish a claim under 42 U.S.C. § 1981, a plaintiff must allege sufficient facts to support the following elements:  (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (in this case, the making and enforcing of contracts). See Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085, 1087 (2d Cir.1993)," Watson v. Dominican College, 75 F. Supp. 2d 222, 224 (S.D.N.Y. 1999) (Parker, J.).

e.    Equal Pay Act

To establish a prima facie case under the Equal Pay Act, Plaintiff has the burden of proving that her work has been performed similar to that performed by employees of the opposite sex involving equal skills, effort, and responsibility, that work was performed under similar working conditions and that the Defendant employer paid different wages to employees of opposite sexes for such work, Corning Glass Works v. Brennan, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); 29 U.S.C. § 206(d)(1) (see Docket No. 106, Defs. Memo. at 21; see also Docket No. 112, Pl. Memo. at 16-17).  Jobs that are merely comparable are insufficient to state an Equal Pay Act claim, Tomka v. Seiler Corp., 66 F.3d 1295, 1310 (2d Cir. 1995), abrogated on other grounds by Ellerth, supra, 524 U.S. 742 (Docket No. 106, Defs. Memo. at 21); Lambert v. Genesee Hosp., 10 F.3d 46, 56 (2d Cir. 1993), cert. denied, 511 U.S. 1052 (1994).

28

Once Plaintiff meets this burden, the burden of proof shifts to Defendants to show that one of four statutory exceptions apply, namely the existence of a seniority system, merit system, a system that measures earnings by quantity or quality of production, or a differential based on any other factor other than sex, 29 U.S.C. § 206(d)(1); E.E.O.C. v. Maricopa County Community College Dist., 736 F.2d 510, 513 (9th Cir. 1984).

> f.    New York State Human Rights Law

New York State Human Rights Law also has the same burden of proof and burden shifting from McDonnell Douglas stated above for Title VII claims, Cruz, supra, 202 F.3d at 565 n.1; Forrest, supra, 3 N.Y.3d at 310, 786 N.Y.S.2d at 394 (hostile work environment under Human Rights Law); see also Banks, supra, 2020 WL 6827707, at *9.

Subject matter jurisdiction may be raised by the parties or by this Court sua sponte, Lyndonville Sav. Bank & Trust v. Lussier, 211 F.3d 697, 700-01 (2d Cir. 2000); LaChapelle v. Torres, 37 F. Supp. 3d 672, 680 (S.D.N.Y. 2014).  Plaintiff's New York State Human Rights Law claims share the same nucleus of operative facts for her Title VII and § 1981 claims that this Court can exercise supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims, see Klein v. London Star Ltd., 26 F. Supp. 2d 689, 692 (S.D.N.Y. 1998).  Where this Court has original jurisdiction on any other claim (such as the federal civil rights statutes), this Court may exercise supplemental jurisdiction over the New York State Human Rights claims.

> B.   Contentions

>> 1.  Defense (Docket Nos. 106, 117))

Defendants first contend that Plaintiff lacks standing to pursue her claims because she filed a Chapter 7 bankruptcy without disclosing the potential claims as assets of the

estate (Docket No. 106, Defs. Memo. at 1-3). Defendants argue that Plaintiff, when asked if she had claims in bankruptcy, denied that she did, thus she also is estopped from raising claim (id. at 3-11).

Title VII does not subject individuals to liability, Defendants conclude that the claims Plaintiff alleges against the individual Defendants fail (Docket No. 106, Defs. Memo. at 12).  Plaintiff also did not assert claims against the individual defendants in her EEOC charge, thus also failing to exhaust her administrative remedies against them (id. at 12-13).

They next argue that the Title VII claims are time barred (id. at 13-15), contending that Plaintiff filed her EEOC charge on December 16, 2010 (Docket No. 106, Defs. Statement ¶ 4, Ex. C), disregarding earlier charges she filed on June 18, 2010 (id., Ex. A; cf. Docket No. 109, Pl. Counterstatement ¶ 4).

Defendants also assert that Plaintiff's Equal Pay Act claim is time barred (Docket No. 106, Defs. Memo. at 11; see also id. at 21).  They alternatively contend that her Equal Pay claim lacks merit because Plaintiff performed duties different from the male employees she compares (id. at 21-24).

Next, Defendants claim Plaintiff, a Caucasian woman alleging Defendants' employees made disparaging statement about her children, African American/mixed children, lacks standing to assert Title VII claims for hostile work environment (Docket No. 106, Defs. Memo. at 16-19).  Defendants argue that Plaintiff failed to show severe or pervasive harassment based upon sex (id. at 19-20).

Defendants argue that Plaintiff has not established that she was constructively discharged (id. at 20-21).  Defendants argue that at the higher standard for constructive

discharge than mere hostile work environment, Plaintiff did not show that Defendants "engaged in deliberate action, rather than mere negligence or ineffectiveness," to meet the constructive discharge standard (id.).

Defendants did not file a Reply Memorandum of Law to further rebut Plaintiff's arguments. Instead, defense counsel submitted his Reply Declaration (Docket No. 117) contending that the facts stated in Plaintiff's Counterstatement as admitted by the defense were not admitted and other statements produced by Plaintiff were taken out of context (Docket No. 117, Defs. Atty. Reply Affirm.). Counsel quotes from various witnesses' deposition testimonies to provide context or contend that facts were not admitted by Defendants (id.).

## 2. Plaintiff's Response (Docket Nos. 109-12)

After disputing much of the facts asserted by the defense (see Docket Nos. 109-11, Docket No. 112, Pl. Memo. at 1-6), Plaintiff responds that the record supports her claims of a hostile work environment based upon race and sex and that she was constructively discharged on May 25, 2010 (Docket No. 112, Pl. Memo. at 7-13, 14-15). She argues that her Title VII claims were timely for events from August 22, 2009, or 300 days prior to the EEOC's June 18, 2010 receipt of her Intake Questionnaire (id. at 7-10). Furthermore, Plaintiff asserts the three-year limitations period for her New York State Human Rights Law claims, with a toll during the EEOC's investigation, to extend the statute of limitations to September 3, 2007 (id. at 7).

She claims the incidents surrounding her constructive discharge of May 15-25, 2010, presents questions of fact (id. at 10). She argues that the cumulative effect of racial and sexual slurs culminating in calling her children "n___," exceeding the instances of the

use of that pernicious slur in cases Defendants rely upon (id. at 11).  Further, she argues that cases support the use of a single offensive comment to create a hostile work environment (id., citing Daniel, supra, 689 F. App'x at 2).  Plaintiff dismisses the defense's "discrimination in the air" argument (Docket No. 106, Defs. Memo. at 16-17) as one inconsistent with recent authority from the Second Circuit and this Court (Docket No. 112, Pl. Memo. at 12, citing Patane v. Clark, 508 F.3d 106, 114 (2d Cir. 2007) (per curiam) (hostile environment includes discriminatory behavior not directed at plaintiff); Cruz, supra, 202 F.3d at 570 (harassment of coworkers can support plaintiff's hostile environment claim); Burgos, supra, 2017 WL 2403305, at *6 (same, quoting Cruz), and distinguishing cases cited by Defendants)).

Next, she argues Defendants have not challenged her claims of gender and race discrimination (id. at 15-16).  She observes that the record here also supports her Equal Pay claim (id. at 16-19).

Viewing Defendants' standing arguments as one challenging her capacity to sue, Plaintiff counters that she is capable of asserting her claims (id. at 19).  Plaintiff notes Defendants were aware of her bankruptcy and yet did not amend their Answer to assert affirmative defenses based upon that proceeding, with Plaintiff claiming significant prejudice from defense delay in asserting this new defense (id. at 19-20).  Assuming this Court were to address the standing defense, Plaintiff now argues that she did not have any pending claims against Defendants that would be subject to the bankruptcy estate and denies any knowledge of potential claims (id. at 20).  She distinguishes cases cited by Defendants on the status of the undisclosed claims for those debtor-plaintiffs (id. at 20-22).  Finally, Plaintiff denies any judicial estoppel from her bankruptcy, denying that

she had any intention to file a claim under the Bankruptcy Code against Defendants when she filed for bankruptcy (id. at 22-24).

C. Effect of Claims Not Included in Bankruptcy Estate

While Plaintiff filed her personal bankruptcy, she allegedly faced employment discrimination.  She did not note these potential claims in her bankruptcy estate.  Plaintiff contends she did not believe she had a claim (hence not listing these potential claims as assets in her bankruptcy).  She feared that, had she sought to invoke these claims, she would lose her job.

Plaintiff is mistaken in not listing her potential claims.  By knowing the facts of her claim (even if not perfected or yet pursued as litigation), Plaintiff had a future, contingent, or speculative claim that needed to be scheduled in her bankruptcy, Grammer, supra, 2014 WL 1040991, at *3; Sea Trade, supra, 2008 WL 4129620, at *12 (citations omitted); Grainger, supra, 2011 WL 824484, at *5 n.5 (see Docket No. 106, Defs. Memo. at 4). Plaintiff needed to report that she faced sex and racial discrimination at work up to filing her bankruptcy petition to give enough information to the bankruptcy trustee to investigate the viability of the potential claims as assets for the ultimate decision whether to pursue or abandon the claims (returning them to Plaintiff as debtor, 11 U.S.C. § 554), see Bejarano, supra, 251 F. Supp. 3d at 32.

By not listing these potential claims, Plaintiff faced loss of standing and judicial estoppel, both preventing her from asserting these claims.

1. Standing

   a. Failure to Disclose and Standing

By not disclosing her potential employment discrimination claims in her bankruptcy, Plaintiff lost standing to raise these claims later, see also Grammer, supra, 2014 WL 1040991, at *3, 1 (debtor-plaintiff conceded he lacked standing and moved to amend Complaint to add bankruptcy trustee as party); Kassner, supra, 2005 WL 1018187, at *2-4. Upon filing for bankruptcy, those claims belong to the estate and not to Plaintiff, Kassner, supra, 2005 WL 1018187, at *2. The real party in interest for these claims becomes the bankruptcy trustee. The bankruptcy, however, was closed in August 2009, so it is too late to amend the Complaint to add the bankruptcy trustee as a party, see 11 U.S.C. § 350(a); Grammer, supra, 2014 WL 1040991, at *1; Kohlbrenner, supra, 1998 WL 328739, at *3; but cf. Kassner, supra, 2005 WL 1018187, at *4 (difference between discharge and closing of bankruptcy; district court ordered debtor to notify the bankruptcy trustee).

   b. Capacity to Sue and Standing

Black, however, now argues that Defendants did not amend their Answer to assert the standing defense, or what she terms a capacity defense (Docket No. 112, Pl. Memo. at 19-20). The Answer (Docket No. 8) does not assert an affirmative defense of lack of standing. Defendants have made no effort to amend their Answer or raise this issue in their earlier discovery although learning of her bankruptcy (id. at 19). Defendants have not responded to this opposing pleading argument.

Plaintiff, however, cites cases dealing with the legal capacity of litigants to sue, Pressman v. Estate of Steinvorth, 860 F. Supp. 1717, 176 (S.D.N.Y. 1994) (capacity of

alleged administrator of estate who lacked letters of administration), or when standing to sue should be asserted by a defendant, Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC, 127 F. Supp. 3d 156, 169 (S.D.N.Y. 2015) (citing 5A Charles A. Wright, Arthur R. Miller, and A. Benjamin Spencer, Federal Practice and Procedure § 1295 (4th ed. 2018) (on waiver of objection to capacity to sue); Allan Appelstein TTEE FBO D.C.A. v. Province of Buenos Aires, 415 F.3d 242, 245 (2d Cir. 2005) ("a party's incapacity to sue 'should fall within class of "threshold defenses"—issues that must be raised and disposed of at the outset of the suit,'" quoting 5A Federal Practice and Procedure, supra, § 1295, at 20)).

Capacity to sue and standing are distinct concepts, see Fund Liquidation Holdings LLC v. Bank of America Corp., 991 F.3d 370, 382 (2d Cir. 2021); Matteson v. Hall, No. 6:18CV6772, 2019 WL 2192502, at *5 (W.D.N.Y. May 21, 2019) (Telesca, J.) (incapacity due to infancy of one plaintiff). Capacity to sue addresses whether the law recognizes a litigant's ability to sue or be sued. Typically, capacity arises in questions of infancy, estate administration, corporate entities. The capacity to sue is an affirmative defense.

Plaintiff referenced Rule 9(a) (Docket No. 112, Pl. Memo. at 19), which provides that "except when required to show that the court has jurisdiction, a pleading need not allege . . . a party's capacity to sue or be sued," Fed. R. Civ. P. 9(a)(1)(A) (emphasis added). To raise the issue of capacity requires "a specific denial, which must state any supporting facts that are peculiarly within the party's knowledge," Fed. R. Civ. P. 9(a)(2).

As commentators noted, "the capacity to sue or be sued refers to the qualification of a party to litigate in court and is determined under Federal Rule of Civil Procedure 17 and under relevant state or federal law," 5A Federal Practice and Procedure, supra,

§ 1292, at 5; see Fed. R. Civ. P. 17(b) (defines the capacity to sue referring to rules of the individual's domicile or recognized representative capacities); see also id. R. 17(c) (minors or incompetent persons).

Standing, however, considers whether the litigant (regardless the capacity to sue) is the proper party to assert a particular claim in a particular forum, see 13A Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure, § 3531, at 2-4 (Jurisd. 2008).  Standing in the bankruptcy context (as here) distinguishes the debtor from the bankruptcy trustee, where the trustee has standing to pursue claims in the estate, but the debtor lacks the authority to purse those claims once she files her bankruptcy petition, id. at 42.

While Defendants would have the affirmative duty to plead a lack of capacity to sue (which they are not asserting here), Plaintiff had the burden of alleging "'facts that affirmatively and plausibly suggest that it has standing,'" Matteson, supra, 2019 WL 2192502, at *5 (quoting Amidax Trading Group v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011)).  Therefore, Plaintiff's pleading objection is rejected, and this Court will consider Defendants' bankruptcy arguments.

Black has not affirmatively pled she had standing to assert these claims because her Complaint makes no mention of her bankruptcy, its closing, and its effects on her claims.  As she notes concerning Defendants' awareness of this bankruptcy, Plaintiff herself obviously knew of her bankruptcy; what Plaintiff might not have considered is the impact of that proceeding on her present claims.  In this motion, Plaintiff denies realizing the connection between her claims and her bankruptcy and she denies intending to sue Defendants on these claims when she filed her bankruptcy.  Until late in discovery of this

action, Plaintiff might not have been aware that these claims are assets of her former bankrupt estate.  This ignorance does not eliminate these claims as potential claims of the estate under the Bankruptcy Code, e.g., Grammer, supra, 2014 WL 1040991, at *3 (debtor conceded that he lacked standing to sue his undisclosed claims).

Plaintiff thus lacks standing to assert her undisclosed claims from 2005-09 now raised in this action.

### 2.   Judicial Estoppel

While one may question whether Defendants preserved their standing argument, Plaintiff's failure to list her present employment claims estops her from raising pre-petition claims in this case.  Although estoppel is an affirmative defense under Rule 8(c)(1), the purpose of judicial estoppel is to the judicial process and not for the fairness of the parties, Thomas v. FTS, USA, LLC, No. 3:13cv825, 2016 WL 3566657, at *14 (E.D. Va. June 24, 2016) (citing Cathcart v. Flagstar Corp., 155 F.3d 558, 1998 WL 390834, at *8 n.2 (4th Cir. 1998) (summary Order)).   Defense discovery questions (including Plaintiff's deposition, see Docket No. 106, Defs. Ex. H, Pl. EBT Tr. at 343-45, 349) about her bankruptcy put Plaintiff on notice of a judicial estoppel defense, id. at *15, citing Cook v. St. John Health, No. 10-10016, 2013 WL 2338376, at *6 (E.D. Mich. May 29, 2013) (holding that the plaintiff was not prejudiced by the defendants' failure to plead judicial estoppel because questions concerning her bankruptcy at her deposition put her on notice of the defense); Thompson v. Davidson Transit Org., 725 F. Supp. 2d 701, 710 (M.D. Tenn. 2010) (same).  Counsel's contention during defense questioning of Plaintiff on this issue (see Docket No. 109, Pl. Ex. 2, Pl. EBT Tr. at 300-06), Plaintiff was on notice of the estoppel effect of Plaintiff failing to list her potential claims.  Defendants thus have

not waived judicial estoppel because Plaintiff was placed on notice from defense questioning about her bankruptcy and whether she mentioned her claims there, see Thomas, supra, 2016 WL 3566657, at *14-15.

By now raising these claims, Plaintiff takes inconsistent positions before the courts. Black did not mention the potential claims in her bankruptcy schedules (with the bankruptcy subsequently closed) but now she asserts these claims in this Court.

Precedent from other Circuits and districts (those cited by both sides and those found by this Court), consistently hold that a debtor-plaintiff that knows the facts of a claim (whether formally pursued when they file for bankruptcy) and fails to disclose it in bankruptcy court, the debtor-plaintiff is estopped from litigating the undisclosed claim, e.g., In re Coastal Plains, Inc., supra, 179 F.3d at 208; Sea Trade, supra, 2008 WL 4129620, at *12.

Analogous to Black's facts are cases in which the debtors endured discrimination and commenced EEOC charges (or were on the threshold of doing so) and then filed for bankruptcy without noting the EEOC charges in the schedules for the estates, Harrah, supra, 852 F. Supp. 2d 900; Coppedge, supra, 2009 WL 111639; Grainger, supra, 2011 WL 824484, at *5 n.5; Grammer, supra, 2014 WL 1040991.  While these cases differ in the timing in which the debtors raised the EEOC charges as compared with when Black acted (as discussed below), these cases found that the debtors each had their bankruptcy proceeding "claim" when the debtor was aware he or she had a claim or discovered that they were wronged, Grammer, supra, 2014 WL 1040991, at *3 (quoting Sea Trade, supra, 2008 WL 4129620, at *12 (citations omitted)); Grainger, supra, 2011 WL 824484, at *5 & n.5.

In _Harrah_, plaintiff Marsha Harrah claimed she was a victim of age discrimination by her employer from 2007 until her termination on February 2010, 852 F. Supp. 2d at 902.   On October 2, 2009, she filed for bankruptcy but did not list her discrimination claims, before she filed EEOC charges, _id._  Harrah filed those charges in March 2010 and received a right-to-sue letter in May 2011 and she sued in this case, _id._  Harrah amended her Complaint alleging age discrimination on September 2011, _id._

From her petition in 2009 until January 2012 (after defendant employer DSW, Inc., moved for judgment on the pleadings) Harrah did not amend her bankruptcy petition to list her discrimination claim, _id._   Defendant moved for judgment asserting that Harrah failed to list her discrimination claims and was thus judicially estopped from raising them, _id._ at 901.

The United States District Court for the Northern District of Ohio held that judicial estoppel barred her claims, _id._ at 902, 903-08, holding that "the duty to disclose a potential claim as an asset in bankruptcy arises when the wrongful conduct giving rise to the claim is suffered, as opposed to when an actual complaint is filed," _id._ at 903 (citing _Wallace v. Johnston Coca-Cola Bottling Group, Inc._, No. 1:06-cv-875, 2007 WL 927929, at *3-4 (S.D. Ohio Mar. 26, 2007) ("A claim accrues for these purposes at the time that the wrongful conduct giving rise to it is suffered, and not when administrative remedies have been exhausted.")).

There, the parties agreed that a cause of action, even a potential claim as initially in that case, was a disclosable asset under 11 U.S.C. § 521(1), _id._ at 903.  Harrah "first believed herself to be the victim of age discrimination in 2007," although she filed for bankruptcy, Harrah "did not schedule her potential age discrimination and retaliation

claims until 2012," id. at 904.  Harrah could not claim she was unaware of the factual basis for her discrimination claims, because the court, citing her own Amended Complaint asserting that claim, was "unequivocal" proof of her knowledge of the factual basis therefor as of April 2008, id. at 905.  The court applied judicial estoppel despite Harrah later amending the schedule to disclose the claim in reaction to defendant's motion seeking judicial estoppel, id. at 906, 902.

The result is the same in Coppedge, supra, 2009 WL 111639.  Here, Amy Coppedge filed for Chapter 13 protection on October 26, 2007.  She was terminated from her job on November 2, 2007, telling her now former employer upon her departure that the termination was illegal, and that she was going to complain to the EEOC and the Department of Labor, id. at *1.  On November 11, 2007, she filed her bankruptcy court schedules but did not mention there her potential employment discrimination claims, id. On February 20, 2008, she filed her EEOC charge and on March 20, 2008, commenced this action, id.  She failed to amend her bankruptcy schedules after she filed her EEOC charge, id. at *3.  When defendant indicated that it would move to dismiss on judicial estoppel grounds, Coppedge amended her bankruptcy schedules to add the employment discrimination claim, id. at *1.

The district court granted defendant's motion, holding that Coppedge was estopped from raising this claim because she was aware of the claim (by announcing to her employer upon her firing that it was illegal and she would seek redress), id. at *3. That awareness required her to disclose her potential claims in her bankruptcy Schedule of Personal Property, id. (citing In re Coastal Plains, Inc., supra, 179 F.3d at 208).

In Grammer, supra, 2014 WL 1040991, Grammer filed an EEOC Intake Questionnaire on April 2011 alleging his termination was in retaliation, id. at *1.  In August 2011, he filed his Chapter 7 Petition.  Grammer, however, did not list the EEOC proceeding in his bankruptcy schedule, believing that he did not have a viable claim that should have been listed because it was just pending before the EEOC, id. at *2.  This bankruptcy discharged his debts.  He filed a second, Chapter 13 Petition but again failed to list the pending EEOC charge, id. at *3.  In June 2012, Grammer received a right-to-sue letter and, in August 2012, commenced the action before the United States District Court for the Southern District of New York, id.  Only after discovery did Grammer amend his bankruptcy schedule to list the discrimination action and seek to amend the Complaint in that case to name the bankruptcy trustee as a party, id. at *1.

The District Court for the Southern District of New York held that "even if Grammer's claims were not perfected until the EEOC filed its right to sue letter, if a debtor is aware of facts that may give rise to 'a possible cause of action, then that is a 'known' cause of action such that it must be disclosed.'  Sea Trade Co. Ltd. v. FleetBoston Financial, Corp., 03 Civ. 10254 (JFK), 2008 WL 4129620, at *12 (S.D.N.Y. Sept. 4, 2008) (citations omitted))," id. at *3.  Because the bankruptcy court adopted Grammer's representation of not having a claim, Grammer was now judicially estopped from raising that claim, id. at *4.

The court in Grainger concluded that the debtor there knew of the facts giving rise to her claims, rejecting her claim of inadvertent failure to disclose, 2011 WL 824484, at *5.  Debtor Reccie Grainger alleged she experienced sex discrimination at work due to her gender and pregnancy in January 2008, id. at *2, 1. On February 2008, Grainger filed

for bankruptcy, id. at *2.  On May 2008, she filed an EEOC charge of discrimination, but she never disclosed this charge in her pending bankruptcy, id. at *2, later blaming this on incompetent representation, id. at *5 & n.6.  She then filed suit in 2009, id. at *1.  The District Court for the Southern District of Mississippi noted "a lack of awareness of the statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment," id. at *5 (emphasis in original, citing Kamont v. West, 83 F. App'x 1, 2 (5th Cir. 2003) (per curiam)). The court then held that the debtor's "duty to disclose, however, hinges on her knowledge of the underlying facts which she knew even before she filed her EEOC Charge," Grainger, supra, 2011 WL 824484, at *5 n.5.  Failing to disclose leads to judicial estoppel, id.  The court concluded, despite her counsel's actions but without evidence of counsel's dereliction of duty, Grainger "does not overcome the fact that Grainger had knowledge of the facts giving rise to her claims," id.  Further,

> "[A] lack of awareness of the statutory duty 'is simply not relevant to the question of judicial estoppel.' Kamont, at *3, citing In re Coastal Plains, Inc., 179 F.3d 197, 212 (5th Cir.1999).  Grainger 'must show that she was unaware of the facts giving rise to her claim, not of her duty to report her claim.' Id. (Emphasis added)."

Grainger, supra, 2011 WL 824484, at *5.

As with Black's case, judicial estoppel applied in Harrah, Coppedge, Grammer, and Grainger to potential employment discrimination claims before the debtor-plaintiffs asserted the claim in an administrative process or in litigation.  The debtors in these cases experienced discrimination, some losing their jobs; they then were compelled to file for bankruptcy before initiating or completing administrative relief and before litigating their discrimination claims.  Each debtor, however, failed to list their discrimination claims

(potential or actively contested) in the bankruptcy.  This Court detailed the chronologies of the claims in these cases relative to the debtor-plaintiffs' bankruptcies, establishing (like Black in the pending case) that these debtors had potential claims that were unmentioned in their bankruptcies, resulting in judicial estoppel in the subsequent litigation.

Applying Harrah, Coppedge, Grammer, Grainger, and the precedent cited therein, Black in the present case knew of the underlying facts of her discrimination claims, the alleged racial and sexual harassment while her bankruptcy was pending.  As the debtor-plaintiffs in the precedents, Black also failed to list her potential claims in bankruptcy to allow the bankruptcy trustee to assess whether to retain the claims in the estate or abandon them.  Her lack of awareness of her legal obligation under the Bankruptcy Code to disclose potential claims "is simply not relevant to the question of judicial estoppel," Kamont, supra, 83 F. App'x at 2; In re Coastal Plains, Inc., supra, 179 F.3d at 212.  Thus, Black's possible claims should have been disclosed and, without that disclosure, she is estopped from asserting the claims.

The parties argue other cases[6] outside of the employment discrimination context that apply judicial estoppel doctrine to other undisclosed claims (Docket No. 106, Defs. Memo. at 3-11).  As noted by Plaintiff, these cases are factually distinguishable from her case (Docket No. 112, Pl. Memo. at 20-22), mostly because these undisclosed claims

---

[6]Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116 (2d Cir. 2008)(per curiam); Dalley v. Mitchell Rubenstein & Assoc., P.C., 172 F. Supp. 3d 6 (D.D.C. 2016); Ibok v. SIAC-Sector Inc., No. 05-CV-06584, 2011 WL 979301 (S.D.N.Y. Mar. 14, 2011), aff'd, 470 F. App'x 27 (2d Cir. 2012); Alli v. Boston Mkt. Co., No. 3:10-cv-4, 2011 WL 3924246 (D. Conn. Sept. 7, 2011); Coffaro v. Crespo, 721 F. Supp.2d 141, 148 (E.D.N.Y. 2010); Svenningsen v. Ultimate Prof'l Grounds Mgmt., No. 14-CV-5161, 2017 WL 3105871, at *2 (S.D.N.Y. July 20, 2017); Amash v. Home Depot U.S.A., Inc., 503 B.R. 232 (N.D.N.Y. 2013); Lapointe v. Target Corp., No. 1:16-CV-0216, 2017 WL 1397311, at *3-4, 7 (N.D.N.Y. Feb. 14, 2017); In re Coastal Plains, Inc., supra, 179 F.3d 197.

were further in the administrative process or in litigation.  Nevertheless, the employment discrimination cases cited above justifies application of judicial estoppel as a debtor (such as Black) endured discrimination.

The fact that any nondisclosure of these claims was _de minimis_ to Plaintiff's (or other debtors') creditors (cf. Docket No. 112, Pl. Memo. at 24) is of no moment; the concern for judicial estoppel is not its effects on litigants (or the debtor's creditors), but the effect of this inconsistency upon the courts, In re Coastal Plains, Inc., supra, 179 F.3d at 210.

While Plaintiff inadvertently failed to mention her ongoing workplace harassment, she was knowledgeable of the experience and endured it to keep the job she believed she needed.  That knowledge is not inadvertent, see Grainger, supra, 2011 WL 824484, at *5.

Plaintiff is estopped from asserting these employment discrimination claims that were not listed in her bankruptcy schedule.  Defendants' Motion for Summary Judgment (Docket No. 106) upon estoppel grounds is granted.  This Court will not discuss Plaintiff's motive for concealing her workplace discrimination claims from her bankruptcy (but cf. Docket No. 106, Defs. Memo. at 10-11) because Plaintiff's knowledge is sufficient grounds for applying judicial estoppel.

The next issue is the temporal extent of this estoppel.

### 3.  Pre-Petition and Post-Petition Claims

The twin barriers of standing and judicial estoppel clearly apply to potential claims as of Plaintiff's March 2009 bankruptcy petition.  Thus, her claims from 2005 to August 2009 (for equal pay, racial and sexual discrimination, Plaintiff's hostile work

environment claims for different treatment she received as opposed to male employees, sexual comments made by Defendants' staff, and LaPress and Rounds' racial comments (see Docket No. 106, Defs. Statement ¶¶ 16, 18, 19)) are barred by either her lack of standing or judicial estoppel.

Plaintiff alleges other conduct (sexual comments made about female employees and customers, racial comments denigrating African American job applicants) during her employment without specifying when they occurred (see id. ¶ 19). So much of Defendants' summary judgment motion (Docket No. 106) seeking dismissal of these undisclosed claims prior to August 2009 is granted.

Some of Black's claims, however, postdate the August 2009 closing of her bankruptcy estate, namely Plaintiff's Equal Pay Act claims for her alleged underpayment since closure, LaPress and Rounds' subsequent racial statements, continuing discriminatory acts, LaPress's May 2010 statement about Plaintiff's children and Plaintiff's constructive discharge therefrom. Property acquired after the close of the bankruptcy (such as a post-closing claim, 11 U.S.C. § 101(5)(A)) is not part of the estate and remain the debtor's, Chartschlaa, supra, 538 F.3d at 122 (Docket No. 112, Pl. Memo. at 22). Any post-bankruptcy activity that is rooted in the pre-bankruptcy past, however, is part of the estate and not actionable by the debtor-plaintiff if not disclosed, see id.; Reyes, supra, 2019 WL 3754197, at *2.

Since each paycheck constitutes a separate Equal Pay Act cause of action for limitations purposes, Cox, supra, 401 F. Supp. 2d at 212, the pre-bankruptcy Equal Pay claims are estopped (or Plaintiff lacks standing to raise these claims), while her post-bankruptcy closing Equal Pay claims are not barred by lack of standing or judicial

estoppel, see Chartschlaa, supra, 538 F.3d at 122; Reyes, supra, 2019 WL 3754197, at *2.

Defendants argue that Plaintiff's constructive discharge claim (her last claim occurring well after the closing of her bankruptcy) also is subject to judicial estoppel (Docket No. 106, Defs. Memo. at 9-10), see Stephens v. Teleperformance USA, No. 1:15-CV-00078, 2015 WL 5943683 at *4 n.2 (D. Utah Oct. 13, 2015) (timing of termination was in debtor's control). Despite being post-closing and the fact that Plaintiff determined when she resigned, cf. id., Defendants contend her constructive discharge incident was related to her pre-bankruptcy claims that she failed to disclose in bankruptcy, hence the constructive discharge also should be estopped (id. at 10). In Stephens, it was not clear that the bankruptcy was closed after that debtor's discharge or her termination, see id. at *2 (plaintiff granted no asset discharge). Plaintiff counters that the debtor in Stephens was constructively discharged twenty-one days after the close of her bankruptcy (Docket No. 112, Pl. Memo. at 24), although that case did not state when (or whether) the bankruptcy was closed, id. at *4 (three weeks after debt discharge); cf. Kassner, supra, 2005 WL 1018187, at *4 (difference between discharge and closing of bankruptcy). She distinguished that case from her constructive discharge that occurred over eleven months after the closing of her bankruptcy (id.).

This Court agrees with Black that post-closing extension of the judicial estoppel should not apply to Plaintiff's constructive discharge. Plaintiff also has standing to assert this claim. Plaintiff intentionally avoided raising any of her employment discrimination or equal pay claims during her bankruptcy or during her tenure. While her discharge allegedly was cumulative of her harassment, the ultimate incident (LaPress's last slur of

Plaintiff's children) occurred well after the closing of her bankruptcy.  There is no evidence that LaPress's last slur was in continuation of racial harassment addressed to those children that occurred during Plaintiff's bankruptcy.   Plaintiff stated in her letter of resignation that, while she could deal with harassment against her personally, she had to leave when her children were involved (Docket No. 111, Pl. Ex. 41, at DEF0048).  Thus, the reason for her resignation was LaPress's latest statement.  Viewing this claim as property acquired after closing of the bankruptcy, Plaintiff's constructive discharge is not part of the (closed) bankruptcy estate, Chartschlaa, supra, 538 F.3d at 122 (Docket No. 112, Pl. Memo. at 22).  Black thus has standing to raise her discharge claim and she is not estopped from doing so.

Plaintiff's alleged other sexual and racial harassment occurred after the closing of her bankruptcy (the harassment she otherwise endured prior to LaPress's last statement), however, is rooted in her pre-bankruptcy past and continuation of harassment that occurred prior to or during her bankruptcy, see Chartschlaa, supra, 538 F.3d at 122; Reyes, supra, 2019 WL 3754197, at *2.  Black alleges that during much of her tenure, inappropriate statements were made about African American customers, job applicants, the boyfriend or husband of Caucasian coworkers.  Although she does not allege the frequency of these comments, she implies that they occurred on a regular basis.  Included with these statements are those made by LaPress calling Plaintiff's children "n____"; again, she does not specify when LaPress made these statements to distinguish whether they were pre- or post-bankruptcy.  Because Black desperately needed her job with Defendants, she did not pursue her potential claims until she was constructively discharged.

As a result, Defendants' Motion for Summary Judgment dismissing the post-closing claims (Docket No. 106) is granted in part (for Plaintiff's sexual and race discrimination claims after August 25, 2009) and denied in part (her constructive discharge) and Equal Pay claims from closing of her bankruptcy case in August 2009 to her May 2010 termination).

This Court next considers the limitations period for these remaining claims.

### D. Statutes of Limitations for Title VII and Equal Pay Claims

#### 1. Title VII Timeliness

The remaining claims here are from August 2009 until her constructive discharge on May 25, 2010. For her Title VII claims, the events 300 days prior to her EEOC Charge are actionable, 42 U.S.C. § 2000e-5(e). First, the issue is what is the charge to establish the applicable start date: Plaintiff's Intake Questionnaire of June 18, 2010 (Docket No. 106, Defs. Ex. A; <u>see</u> Docket No. 1, Compl. ¶ 59a.), as Plaintiff claims (Docket No. 112, Pl. Memo. at 7), or the December 16, 2010, the second EEOC Charge Plaintiff filed (Docket No. 106, Defs. Ex. C; <u>see</u> Docket No. 1, Compl. ¶ 59e.), as Defendants contend (Docket No. 106, Defs. Memo. at 13)?

Defendants argue that Plaintiff's claims are time barred, using the EEOC Charge of December 16, 2010 (Plaintiff's second charge), as the starting point in measuring the 300 days back to when claims would be timely (Docket No. 106, Defs. Memo. at 13; <u>id.</u>, Defs. Statement ¶ 4, Ex. A). Thus, Defendants conclude that claims prior to February 13, 2010, are barred (Docket No. 106, Defs. Memo. at 13). Defendants terms the earlier intake questionnaire "EEOC Intake Questionnaire" (Docket No. 106 Ex. A; Local 56(a)(3)

Appendix) that was subsequently dismissed on October 18, 2010, but the dismissal order later was vacated on January 13, 2011.

Plaintiff responds that her initial Intake Questionnaire of June 18, 2010, is the relevant event to trigger the Title VII limitations period (Docket No. 112, Pl. Memo. at 7). Thus, she contends her claims from August 22, 2009, were timely (id.).

Plaintiff cites Magistrate Judge Frank Maas's decision in Jallow v. Office of Court Administration, supra, 2012 WL 4044894 (S.D.N.Y. Sept. 4, 2012), adopted, 2012 WL 4793871, at *2 (S.D.N.Y. Oct. 5, 2012), where he found that Jallow's Intake Questionnaire to the EEOC was the charge for limitations purposes, id.. at *7-8.  Discussing in turn Federal Express Corp. v. Holowecki, 552 U.S. 389, 402, 128 S.Ct. 1147, 170 L.Ed.2d 10 (2008), Magistrate Judge Maas compared Holowecki's intake questionnaire found sufficient for his Age Discrimination in Employment Act claim with Jallow's EEOC form before him, Jallow, supra, 2012 WL 4044894, at *7.  Since not all intake questionnaires constitute a charge under Holowecki,

> "the Court noted that determining whether a document constitutes a charge requires consideration of the extent to which an objective observer would reasonably understand the document as an attempt by the filer to 'activate [the EEOC's] machinery and remedial processes.' Id. at 402. As the Court explained, for a filing 'to be deemed a charge it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee.' Id. In the Court's view, this 'permissive standard,' under which 'a wide range of documents might be classified as charges,' best comported with the design and purpose of the ADEA, which, 'like Title VII, sets up a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process.'[7] Id. at 402."

Jallow, supra, 2012 WL 404894, at *7 (footnote omitted).  Magistrate Judge Maas then found that

"Jallow further evinced his intent to set in motion the EEOC's administrative process on the final page of the Intake Questionnaire.  On that page, the questionnaire instructed the employee to check a box "to tell [the EEOC] what you would like [the EEOC] to do with the information you are providing with this questionnaire."

Id.  EEOC also treated Jallow's Intake Questionnaire as a Charge by beginning an investigation, id.  In light of Holowecki's mandate for a permissive standard, Magistrate Judge Maas held that that Intake Questionnaire was a charge and Jallow made a timely claim for race, national origin, and color, id. at *8, 9.

Both Age Discrimination in Employment Act and Title VII fail to define what constitutes a "charge."  Holowecki found some intake questionnaires were charges for Age Discrimination claims, 552 U.S. at 402, and Jallow applied that standard to Mamadou Jallow's Title VII claim, 2012 WL 4044894, at *7.

In the case at bar, Black checked the same box described in Jallow, 2012 WL 4044894, at *7, on her EEOC Intake Questionnaire on June 18, 2010 (Docket No. 106, Defs. Ex. A, at page 5 of 8), inviting the EEOC to investigate her claims.  Thus, the EEOC questionnaire of June 18, 2010, was the charge.  From that questionnaire, the EEOC initiated an investigation, leading first to dismissal and issuance of a right-to-sue letter and then to subsequent intent to reconsider and vacatur of the dismissal and right-to-sue letter.  The fact that Plaintiff filed a second charge in the middle of these proceedings on December 16, 2010, is of no moment.  The second charge (Docket No. 106, Defs. Ex. C) renewed the charges stated in her June 2010 questionnaire (cf. id., Defs. Ex. A).  The June 18, 2010, filing is the relevant terminus for Plaintiff's Title VII claims; three hundred days before that June 18, 2010, filling was August 22, 2009 (see Docket No. 112, Pl. Memo. at 7).

50

After judicial estoppel, Plaintiff's remaining timely claims are those from August 25, 2009 (after the closing of her bankruptcy, and after the August 22 300-day mark), to her termination on May 25, 2010.  Plaintiff's only explicitly dated claims during this period are LaPress's May 2010 statement about her mixed children and her constructive discharge on May 25, 2010.

She does allege during the course of her tenure racially and sexually harassing statements made to coworkers or about minority customers and job applicants, but Plaintiff does not allege specific instances during the August 25, 2009, to May 25, 2010, period.  As previously held, Plaintiff is estopped from raising these (otherwise timely) harassing statements because they are related to pre-bankruptcy conduct.

Thus, Defendants' Motion for Summary Judgment (Docket No. 106) dismissing her Title VII claims as untimely is granted in part (for claims arising before August 22, 2009), and denied for subsequent claims.  While some of these claims may have been timely, they remain barred either by bankruptcy standing or judicial estoppel.

### 2.  Equal Pay Act Timeliness

While arguing the timeliness under Title VII, Defendants also contend that Plaintiff's Equal Pay Act claims were time barred, but with little argument (Docket No. 106, Defs. Memo. at 11).

As for her Equal Pay Act claim, she has two years to assert her claim.  Plaintiff is not alleging (and did not establish) willful violation of the Equal Pay Act for the three-year limitations period.  Plaintiff last worked on May 25, 2010, but asserted Equal Pay claims in her EEOC charge in June 2010.

Plaintiff's Equal Pay claims, however, are time barred, Equal Pay Act, 29 U.S.C. § 255(a).   Even treating each paycheck as a separate cause of action with its own limitations period, plaintiff's last paycheck was for May 25, 2010.   Plaintiff filed the Complaint on January 15, 2015 (Docket No. 1).   She did not need to allege Equal Pay Act violation before the EEOC to state a claim in this Court, although she did allege them with her other employment discrimination claims before the EEOC.   "Thus, there is no reason why Plaintiff could not have filed her Equal Pay Act claim prior to the conclusion of the [New York State Division of Human Rights] and EEOC investigations into her Title VII claims," McGullam v. Cedar Graphics, Inc., No. 04-CV-2891, 2007 WL 4326819, at *1 (E.D.N.Y. Dec. 7, 2007).   There is also no equitable tolling by the EEOC charge, id. (citing cases).

When Plaintiff sued on January 15, 2015 (Docket No. 1), her Equal Pay claim for the last check for on or after May 25, 2010, was untimely.   The Equal Pay claim from May 25, 2010 (when she was terminated) ran as of May 25, 2012, two years later[7].   Plaintiff's Equal Pay claim is time barred.   Defendants' Motion for Summary Judgment (Docket No. 106) to dismiss the Ninth Cause of Action on statute of limitations grounds is granted. Given this time bar disposition of the motion, this Court has not considered Defendants' alternative argument that Plaintiff's Equal Pay claims lack merit because she performed duties different from her alleged comparable male employees.

---

[7]Had Plaintiff alleged willful violation of the Equal Pay Act and obtained a three-year limitations period, her last day of work pay claim would have run until around May 25, 2013, and her claim still would be time barred.

E.  Title VII

1.  Individual Defendants

As for claims against individual Defendants, Plaintiff denied that she alleges Title VII claims against the individual Defendants (Docket No. 112, Pl. Memo. at 7 n.2). The Complaint names as defendants Robert and Diane Seibert and Keegan Roberts (Docket No. 1, Compl. ¶ 6), although here she alleges that Buffalo Meat Service, Inc. is her employer (id. ¶ 7).  Her Title VII claims (the First, Third, Fifth, and Seventh Causes of Action) are against Defendant Black Angus Meats (see generally id.), while naming all Defendants in the parallel New York State Human Rights Law claims (see generally id.). Plaintiff alleges Defendants collectively discriminated against her (see generally id.). Therefore, Plaintiff did not allege claims against the individual Defendants under Title VII.

Plaintiff also may have alleged claims against these individual Defendants under § 1981, Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir. 2004); Habben v. City of Fort Dodge, 472 F. Supp. 2d 1142, 1156 (N.D. Iowa 2007).  She alleged claims only against Defendant Black Angus Meats in the Tenth Cause of Action (id. ¶¶ 145-48), although the actions of Defendants collectively led to Plaintiff's § 1981 claim (id. ¶¶ 145-50).

2.  Hostile Work Environment at the Butcher Shop

Plaintiff's remaining Title VII claims are for Defendants creating a hostile work environment from the months between the August 25, 2009, bankruptcy closure and Plaintiff's May 25, 2010, constructive discharge.

a.      Offensive Comments and Conduct

Plaintiff's race-based claims arise from three sources:  comments concerning her biracial children, Plaintiff's observation of Defendants' treatment of African American job applicants, and her observation of treatment of African American customers by Defendants' employees.

Plaintiff testified to racially or sexually offensive comments during her entire tenure with the Butcher Shop.  As noted above with the bankruptcy pre-closing standing and judicial estoppel, her tenure is divided at when her bankruptcy was closed to see which claims remain actionable.  She does not specify, however, when incidents occurred or the number or extent of these incidents.  The only dated incident is LaPress's May 15, 2010, statement about her children.  This is also the only incident that directly impacted Plaintiff.

Plaintiff's other claims here are associational based upon statements made to coworkers, customers, or potential job applicants (Docket No. 106, Defs. Memo. at 16), see Patane, supra, 508 F.3d at 114; Cruz, supra, 202 F.3d at 570.  Plaintiff's sex-based claims also arise from Plaintiff's observations of treatment of other female employees and female customers by Defendants' staff.  The only gender-based claim directed at Plaintiff are undated offending statements allegedly made by Thomas Howells regarding her anatomy and Plaintiff's allegations of her less favorable terms and conditions of work (Docket No. 112, Pl. Memo. at 9).  She alleged her work condition complaints ran during her tenure, both pre- and post-bankruptcy.  As such, these are also judicially estopped, or Plaintiff lacked standing to assert now, because they are continuation of her pre-bankruptcy closing claims.

Looking at the totality of the circumstances of the last weeks of Plaintiff's tenure at the Butcher Shop, these comments and conduct collectively do not sufficiently constitute severe or pervasive intimidation, ridicule, and insult that would state a hostile work environment claim, see Bentivegna, supra, 2017 WL 3394601, at *13; Banks, supra, 2020 WL 6827707, at *8, 16.  As noted by another court in an age discrimination case where coworkers made disparaging statements, "discrimination in the air, so to speak, will not do" to establish a claim, Ko Shen Chuang v. T.W. Wang Inc., 647 F. Supp. 2d 221, 230 (E.D.N.Y. 2009) (Docket No. 106, Defs. Memo. at 16-17).  Even considering incidents involving other employees or customers (or potential employees) of the Butcher Shop (cf. Docket No. 112, Pl. Memo. at 12), Patane, supra, 508 F.3d at 114; see Cruz, supra, 202 F.3d at 570 (remarks need not target the plaintiff, court considers remarks to other minorities "may contribute to the overall hostility of the working environment for a minority employee," citation omitted), Plaintiff generally alleges discrete incidents with her or others, thus failing to allege sufficient claims for hostile work environment for either race or sex.  Banks, supra, 2020 WL 6827707,  at *8.  Plaintiff has not alleged or established the frequency she endured racial or sexual comments.

The single or two offensive statements made by LaPress (which he denied and defense witnesses claim not to have heard) calling Black's children "n___" fail to establish a hostile work environment, Boakye-Yiadom v. Laria, No. 09CV622, 2012 WL 5866186, at *10 n.12 (E.D.N.Y. Nov. 19, 2012) (single use of "n___," citing cases) (Docket No. 106, Defs. Memo. at 18, 16-17; id., Defs. Statement ¶¶ 24-26); see Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial

enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." (internal quotation marks and citations omitted)); Albert-Roberts v. GGG Constr., LLC, No. 10CV6636, 2012 WL 35660814, at *6 (W.D.N.Y. Aug. 16, 2012) (Telesca, J.).  These comments, while unprofessional and inappropriate, do not stray "into the realm of alarming and threatening conduct," Burgos, supra, 2017 WL 2403305, at *9.

The Third and Seventh Causes of Action allege Defendants failed to correct the racial and sexual harassment in the Butcher Shop (Docket No. 1, Compl. ¶¶ 81-89, 118-26).  Plaintiff alleges that Defendants were made aware of the racially or sexually offensive statements made about customers or coworkers (Docket No. 109, Def. Decl. ¶¶ 11, 14).  She also states that Keegan Roberts was present for LaPress's racially offensive comments and Keegan Roberts and Robert Seibert made their own racially offensive statements (id. ¶ 11).  The same temporal problem exists for supervisory awareness of these statements because Plaintiff fails to allege when these statements were made or when Defendants' management learned of these statements.

Defendants' Motion for Summary Judgment (Docket No. 106) dismissing these claims is granted.

### b.    Constructive Discharge Claims

Plaintiff's Fifth Cause of Action alleges her constructive discharge due to sex.  Her contention, however, is she felt compelled to resign due to racist statements about her biracial children without any reference to her gender or the prior sexually harassing statements made to her or to female coworkers.  Repeatedly in her Counterstatement, Plaintiff denied any intention to resign prior to May 15, 2010, and LaPress's statement

56

(Docket No. 109, Pl. Counterstatement ¶¶ 17, 21, 24 (at page 41), 40 (at pages 62, 63, 65)).  She also noted sexual statements made well before May 15, 2010, but Plaintiff had no indication that she would be compelled to resign.  Plaintiff expressly declared in her letter of resignation that the sole reason for her leaving was LaPress's last racially derogatory statement about her children (e.g., id. ¶ 11 (at page 19); Docket No. 111, Pl. Ex. 41, at DEF0048).  She made no mention to the sexual harassment or hostile atmosphere due to her gender.  Thus, Plaintiff fails to state a prima facie case of hostile work environment or constructive discharge due to sex.  Defendants' Motion for Summary Judgment (Docket No. 106) dismissing the Fifth Cause of Action is granted.

Plaintiff's First Cause of Action alleges her constructive discharge due to race in violation of Title VII.  The stated reasons for her resignation was the racist statement made by LaPress about her biracial children and management's reaction (or the dearth thereof) to it.  LaPress has no supervisory role over Plaintiff; she alleged that LaPress and Plaintiff were "Wrapper-Packer-Cleaners" with similar duties (Docket No. 1, Compl. ¶ 17, 12; see Docket No. 106, Defs. Statement ¶ 13; Docket No. 109, Pl. Counterstatement ¶¶ 11 (at page 24), 13), although the Butcher Shop did not have formal job titles (Docket No. 106, Defs. Statement ¶ 28).  Black also asserted for her Equal Pay Act claim that she and LaPress were comparable (Docket No. 1, Compl. ¶¶ 15, 17).  Absent LaPress having a supervisory role over Plaintiff, his statements are distinguishable from cases which sanction management or supervisors from using an "unambiguously racial epithet" in the presence of subordinates, cf. Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F. 3d 11, 23-24 (2d Cir. 2014), to attribute his statements to the Butcher Shop.  Comments of a mere coworker without supervisory

authority cannot be imputed to defendant employer, Boakye-Yiadom, supra, 2012 WL 5866186, at *10; see also Vance v. Ball State Univ., 570 U.S. 421, 133 S.Ct. 2434, 186 L.Ed.2d 565 (2013) (defining who is a supervisor under Title VII for vicarious liability).

In addition to LaPress denying making the statement (Docket No. 106, Defs. Statement ¶ 24; Docket No. 106, Defs. Memo. at 17), Plaintiff has no other witnesses to the remark being made (see Docket No. 106, Defs. Statement ¶¶ 25-26; Docket No. 106, Defs. Memo. at 17).

Plaintiff's objection is how the Butcher Shop management handled her reaction to LaPress's statement.  Plaintiff's letter of resignation focused upon the slur against her children and Defendants' mishandling of the situation (Docket No. 111, Pl. Ex. 41, at DEF0048; Docket No. 109, Pl. Decl. ¶ 16).  During her last meeting on May 25, 2010, Robert Seibert tried to excuse LaPress's offensive statement as something Plaintiff would have to expect and endure (see, e.g., Docket No. 109, Pl. Counterstatement ¶ 11 (at 20)).  Defendants' management did not use the slur but failed to discipline for its use and failed to diminish its offensiveness, merely accelerating Plaintiff's termination date by ordering her immediate departure.

Constructive discharge has a higher standard than establishing a hostile work environment, Suders, supra, 542 U.S. at 147; Fincher, 604 F.3d at 725 (Docket No. 106, Defs. Memo. at 20).  Since Plaintiff has not established a hostile work environment, even with the issues of fact just noted, she also fails to meet the higher standard assert her construction discharge claim.

Thus, Defendants' Motion for Summary Judgment dismissing these Title VII claims is also granted, including dismissal of her constructive discharge claim in her First Cause of Action.

### F.  Section 1981 Claim, Tenth Cause of Action

In her Tenth Cause of Action, Plaintiff alleges a § 1981 claim (Docket No. 1, Compl. ¶¶ 145-52), that Defendants created a hostile work environment based on race of her children (id. ¶¶ 145, 146).

Defendants contend, like the Title VII claims for racial harassment from the alleged hostile work environment, Plaintiff's § 1981 claim also fails because she has not established a workplace so severely permeated with discriminatory intimidation, ridicule, and insult (Docket No. 106, Defs. Memo. at 15, quoting Fenner v. News Corp., No. 09-CV-09832, 2013 WL 6244156 at *12 (S.D.N.Y. Dec. 2, 2013) (citations omitted)). Defendants otherwise do not address this Tenth Cause of Action.

### 1.  Plaintiff as Member of Protected Class

As for Plaintiff's membership of a racial minority or protected class to state a § 1981 claim, courts have held that whites can invoke the protections of 42 U.S.C. § 1981, McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 285-87, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); DeMatteis v. Eastman Kodak Co., 511 F.2d 306, 312 (2d Cir. 1975) (citing Sullivan v. Little Hunting Park, 396 U.S. 229, 237, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969)).

This Court and the Second Circuit have not addressed whether Caucasians can be included in a § 1981 protected class.  This protected class also has included whites who are in interracial relationships, such as parents of biracial or mixed children, Parr v. Woodmen of the World Life Ins. Co., 791 F.2d 888, 890 (11th Cir.1986) (in § 1981 and

Title VII action, interracial marriage); <u>Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, and GMC Trucks, Inc.</u>, 173 F.3d 988, 994 (6th Cir. 1999); <u>DeMatteis</u>, <u>supra</u>, 511 F.2d at 312 (in § 1981 action, forced retirement after while employee sells property to African American).  The Sixth Circuit in <u>Tetro</u>, <u>supra</u>, 173 F.3d at 994, observed in a case of first impression before that court that,

> "Other courts, however, have broadly construed Title VII to protect individuals who are the victims of discriminatory animus towards third persons with whom the individuals associate.  <u>See, e.g.</u>, <u>Parr v. Woodmen of the World Life Ins. Co.</u>, 791 F.2d 888, 890 (11th Cir.1986) (ruling that both Title VII and § 1981 prohibit hiring discrimination based on an individual's association with African–Americans, or based on interracial marriage); <u>Chacon v. Ochs</u>, 780 F. Supp. 680, 680–81 (C.D. Cal.1991) (holding that it is unlawful under Title VII to discriminate against a white woman married to a Hispanic man); <u>Whitney v. Greater N.Y. Corp. of Seventh–Day Adventists</u>, 401 F. Supp. 1363, 1366 (S.D.N.Y.1975) (ruling that Title VII provides a cause of action for a white plaintiff who is discriminated against because of the plaintiff's relationship with African–Americans)."

<u>Tetro</u>, <u>supra</u>, 173 F.3d at 994.  The <u>Tetro</u> court then found "that Tetro has stated a claim upon which relief can be granted under Title VII.  A white employee who is discharged because his child is biracial is discriminated against on the basis of his race, even though the root animus for the discrimination is a prejudice against the biracial child," <u>id.</u> (citing <u>Parr</u>, <u>supra</u>, 791 F.2d at 892); <u>see</u> <u>Habben v. City of Fort Dodge</u>, 472 F. Supp. 2d 1142, 1157 (N.D. Iowa 2007) (acknowledging that a claim of race discrimination based on plaintiff having biracial children is cognizable under § 1981 and Title VII).

The <u>Tetro</u> court argued that

> "This approach is bolstered by the fact that the Equal Employment Opportunity Commission ('EEOC'), 'which Congress charged with interpreting, administering, and enforcing Title VII, has consistently held that an employer who takes adverse action against an employee or a potential employee because of an interracial association violates Title VII.' <u>Id.</u> at 892 (citing multiple EEOC decisions).  'Moreover, the Supreme Court has declared that the EEOC's interpretation of Title VII is entitled to "great

deference." <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424, 434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971),'"

<u>Tetro</u>, <u>supra</u>, 173 F.3d at 994.

This Court concurs with these precedents from other Circuits and recognizes that Darcy Black is a member of a protected class because of the race of her children and the reaction of her employer to that fact despite her own race.  There is no difference in a protected class between a Title VII race discrimination claim and § 1981 action, <u>Parr</u>, <u>supra</u>, 791 F.2d at 890; <u>Habben</u>, <u>supra</u>, 472 F. Supp. 2d at 1157.  Plaintiff thus alleges the first element for her § 1981 claim.

### 2.   Plaintiff and a Prima Facie Case of Discrimination

Black, however, fails to present direct evidence of racial discrimination, <u>see also</u> <u>Habben</u>, <u>supra</u>, 472 F. Supp. 2d at 1159.  Despite as offensive LaPress's statement was, Plaintiff has not established an inference that her resignation was based upon Defendants' discriminatory animus.  First (as stated above for her Title VII claims), Plaintiff has not established LaPress was part of Defendants' management.  Second, statements made by Robert Seibert were made <u>after</u> Plaintiff tendered her resignation.  Since the decision was Plaintiff's to resign, she needed to establish that Defendants' intentionally created an intolerable atmosphere that compelled her to quit.

As for circumstantial evidence under a <u>McDonnell Douglas</u> analysis (and as stated above), Plaintiff has established that she is a member of a protected class, the mother of biracial children.

As for the § 1981 elements of establishing the intent to discriminate on the basis of race and the discrimination be concerning making and enforcing of employment contracts, Plaintiff needs to establish a <u>prima facie</u> case that the employer's reaction to

the biracial relationship led to the adverse employment action.  Monley, supra, 128 F. Supp. 2d 1155, 1159-60 (N.D. Ill. 2001) (alleged discharge for having biracial child), and Handlon v. Rite Aid Services, LLC, 513 F. App'x 523, 527 (6th Cir. 2013) (same), found that the plaintiffs there failed to establish that the knowledge of the biracial relationship led to their respective terminations.  In Habben, supra, 472 F. Supp. 2d at 1157, 1159-60, the court concluded that Habben had not established direct evidence of discrimination or circumstantial evidence that her reduction in force termination was due to being a parent of biracial children, id. at 1161, 1162.  The court found that there was no contention that the reduction in force was a ruse to terminate Habben or that the reduction was discriminatory because it did not remove parents without biracial children, id. at 1162.

Applying the elements of the intention to discriminate and discrimination concerning activities under § 1981 (here, Plaintiff's employment contract), the key incident is LaPress's May 15th statement that led to Black's resignation.  Prior incidents did not lead to her discharge.  Plaintiff disclaimed in her letter of resignation (Docket No. 111, Pl. Ex. 41, at DEF0048; Docket No. 109, Pl. Decl. ¶ 16; Docket No. 106, Def. Ex. S) other racial slights but she was willing to endure other comments and conduct upon her ("I can deal with issues that have to do with me") but slurring her children was off limits.

Black's claimed incidents of discrimination that can be considered here were the derogatory statements made about African Americans from August 25, 2009, forward. She has not specified these incidents save LaPress's May 15, 2010, statement about her children.  Plaintiff generally alleges that LaPress made other derogatory statements about her children prior to May 15 (Docket No. 109, Pl. Counterstatement ¶ 25 (at pages 48-49)), but without dates, or frequency or the contents of LaPress's statements.  Plaintiff

also alleges that LaPress and Sean Round made racially offensive comments about African American customers (the "Bob's niggs" statements) (id. ¶¶ 11 (at page 17), 19 (at page 42), 26 (at pages 50, 51)). Plaintiff also points out statements made by Defendants to Regina Rush (until she left the Butcher Shop on February 26, 2010) about Rush's African American boyfriend (id. ¶ 25 (at pages 48-49)).[8] These statements, however, had no connection to Plaintiff's children. Also, Plaintiff does not allege any complaints she made about these other comments or the responses from the Butcher Shop's management. These statements alone (and absent responses from Defendants to them) do not establish a prima facie case how the Butcher Shop reacted to her biracial children.

Plaintiff then offers the statement of Defendant Robert Seibert, made from six months to one year before May 25, 2010, volunteering to her that she would have to endure the bullying of her biracial children due to their race (id. ¶ 11 (at page 16)). While this is an inappropriate reference to her children in the workplace, it is not actionable. The statement did not lead to her resignation and from the present record seems to be an isolated statement from Seibert.

The key incident was LaPress's derogatory statement about her biracial children in May 2010, which led Plaintiff to quit days later. Plaintiff alleges that this statement was the culmination of other statements LaPress made on this subject (see Docket No. 109, Pl. Counterstatement ¶¶ 11 (at page 20), 25 (at pages 48-49)). After LaPress was mildly rebuked by his supervisors, he pointedly avoided Plaintiff (Docket No. 1, Compl. ¶ 48).

---

[8]Plaintiff alleges similar statements were made to coworker Raeleen Rush, Regina's sister, regarding Raeleen's boyfriend and later husband, Docket No. 109, Pl. Counterstatement ¶ 18 (at page 42), but this is not considered because Raeleen left the Butcher Shop on April 2009. This accusation is within the pre-closure of Plaintiff's bankruptcy.

Plaintiff has not stated whether she needed to interact with LaPress to perform her duties, but given the relative size of a butcher shop, some interaction probably was required.

The last straw of LaPress's oppressive statements was his statement on May 15, 2010, accusing Plaintiff's children with the ability to break into a locked towel dispenser because LaPress claimed African Americans can break into locked items and her children were "n___" (e.g., Docket No. 109, Pl. Counterstatement ¶ 11 (at page 18)).  Plaintiff complained to management (Debbie Negrych, Thomas Howells, and Keegan Roberts) (id. ¶ 11 (at page 19)).  Roberts wanted to meet with LaPress and have a conversation with him about the incident (id. ¶ 11 (at page 19), ¶ 24 (at pages 46-47)).  On May 21, Plaintiff resigned.  On May 25, she met with Robert Seibert to tender her resignation and challenged him if it was ever appropriate for her children to be insulted.  Seibert replied that it happens in politics and it happens in sports and Plaintiff needs to get used to it. (Id. (at pages 19-20).)  Plaintiff, however, decided to resign before meeting with Seibert and hearing his response.  After his statement, Seibert ordered Plaintiff to leave effective immediately (id. ¶ 11 (at page 20)).

Plaintiff complained and Defendants' management did nothing (id. ¶ 15 (at page 38)), which led Plaintiff to conclude that she needed to leave.  Plaintiff thus alleges intentional conduct, the combination of LaPress's statement and management's lack of an effective reaction to the May 15, 2010, statement.  From her consistent testimony that (despite her alleged work conditions prior to the May 15 statement) Plaintiff continued to work for Defendants, Plaintiff establishes that her termination was involuntary.

What remains an open question is whether the combination of the derogatory statement about her children and management's relative inaction constitutes an

intolerable level to make her resignation a constructive discharge.  As stated for a Title VII claim, <u>Suders</u>, <u>supra</u>, 542 U.S. at 147, to allege an intolerable level for constructive discharge has to be higher than stating a hostile work environment claim, <u>Fincher</u>, <u>supra</u>, 604 F.3d at 725, 723.  Since Plaintiff has not established a hostile work environment claim, she cannot establish the higher objective standard that her working conditions were so intolerable as to compel a reasonable employee in her situation to resign, <u>id.</u>

As held above for dismissal of her Title VII claims that post-date closing of the bankruptcy, Plaintiff has not alleged pervasive discrimination that led to interference of her employment contract based upon race.  Therefore, Plaintiff fails to assert a § 1981 claim.  Defendants' Motion for Summary Judgment (Docket No. 106) to dismiss the Tenth Cause of Action is granted.

G.  State Human Rights Law Claims

As held above and given dismissal of the federal causes of action (the First, Third, Fifth, Seventh, and Ninth, and Tenth Causes of Action) that alleged original jurisdiction before this Court, this Court declines to exercise jurisdiction over Plaintiff's state law Second, Fourth, Sixth, and Eighth Causes of Action under the New York State Human Rights Law, 28 U.S.C. § 1367(c)(3), and those claims are dismissed without prejudice, <u>see</u> 13D Charles A. Wright, Arthur R. Miller, Edward H. Cooper, and Richard Freer, <u>Federal Practice and Procedure</u>, § 3567.3, at 410 & n.46 (citing cases); <u>see also</u> 28 U.S.C. § 1367(d) (toll of statute of limitations during pendency of federal action); 13D <u>Federal Practice and Procedure</u>, <u>supra</u>, § 3567.3, at 410-11, § 3567.4, at 458.  If this Court considers these state causes of action, the claims prior to the bankruptcy closing

either belong to the bankruptcy estate (and Plaintiff lacks standing to now raise) or Plaintiff would be judicially estopped from asserting, as decided above for her federal claims.

As a result, Defendant's Motion for Summary Judgment dismissing these state law claims (Docket No. 106) is granted, although dismissal of these claims is without prejudice.  Murray v. Williamsville Cent. Sch. Dist., No. 19CV750, 2021 WL 1610201, at *13 (Docket No. 23, Apr. 26, 2021, at 24) (Skretny, J.).

## IV.    Conclusion

Defendants' Motion for Summary Judgment (Docket No. 106) is granted.

Specifically, Black's pre-bankruptcy petition claims that she knew the facts thereof (even if she had not yet pursued) are assets under the Bankruptcy Code she failed to disclose.  Thus, Plaintiff lacks standing or is estopped from now raising her Title VII claims (First, Third, Fifth, and Seventh Causes of Action), her parallel New York State Human Rights Law claims (Second, Fourth, Sixth, and Eighth Causes of Action), her Equal Pay claims (Ninth Cause of Action), or her § 1981 (Tenth Cause of Action) alleged for incidents prior to August 25, 2009.

The statute of limitations also bars Plaintiff's Title VII claims for incidents prior to August 22, 2009, and all of her Equal Pay claims that were not raised two years from her last day of work in May 2010.  Plaintiff also fails to assert a prima facie case for most of her alleged hostile work environment due to race (and all alleged hostile environment claims due to sex).

As for her post-bankruptcy closing claims, for the various reasons stated above (extension of lack of standing or judicial estoppel, statutes of limitations), Plaintiff fails to state a claim.  As for her constructive discharge claims in her First (Title VII) and Tenth

Causes of Action (§ 1981) due to race, those claims also fail.  Insulting one's children based upon their perceived race is unconscionable, but Plaintiff has not established that she endured a hostile work environment or that a reasonable employee in her situation would find her work conditions on May 15-25, 2010, were so intolerable due to slurs upon those children as to compel a resignation.

Finally, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining parallel state law claims (Second, Fourth, Sixth, and Eighth Causes of Action), but dismiss these Causes of Action without prejudice.

## V.    Orders

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 106) is GRANTED.

FURTHER, the Clerk of Court is DIRECTED to close this case.

SO ORDERED.


Dated:        May 21, 2021
              Buffalo, New York


                                        s/William M. Skretny
                                       WILLIAM M. SKRETNY
                                     United States District Judge